**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

DANIEL CHU and DAVID GOODGAME,

Defendants.

Case No. 25 Cr. 579 (PKC)

**DANIEL CHU'S OMNIBUS MEMORANDUM OF LAW**
**IN SUPPORT OF HIS INITIAL PRETRIAL MOTIONS**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Daniel Chu*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................ 1

RELEVANT BACKGROUND ............................................................................................. 2

    A.    The Government's Investigation ............................................................... 2

    B.    The Indictment.......................................................................................... 5

    C.    The Government's Post-Indictment Asset Restraints.............................. 7

    D.    Less than Five Months Before Trial, Discovery is Far From Complete ............. 8

    E.    The Government's Ongoing Grand Jury Investigation ..................................... 12

ARGUMENT ..................................................................................................................... 13

    I.    MOTION TO DISMISS COUNT ONE OR, ALTERNATIVELY, FOR A BILL OF PARTICULARS AS TO COUNT ONE ................................................................. 13

        A.    Legal Standards ...................................................................................... 14

        B.    The Indictment's Allegations As To Count One Are Insufficient ..................... 17

    II.    MOTION FOR A BILL OF PARTICULARS ON THE REMAINING COUNTS....... 32

        A.    Mr. Chu and Mr. Goodgame are Also Entitled to a Bill of Particulars on Counts Two, Three, and Four............................................................................. 32

        B.    The Government Must Particularize Counts Three and Four. ........................... 34

    III.    MOTION TO SUPPRESS EVIDENCE, OR FOR A *FRANKS* HEARING.................. 35

        A.    Legal Standard Under *Franks* ................................................................... 35

        B.    The Warrant Affidavits Recklessly Omitted Known Material, Exculpatory Information. ............................................................................................. 36

        C.    The Omissions Were Material to Probable Cause.............................................. 43

        D.    The Court Should Order Disclosure of Unredacted FBI 302s and Underlying Notes of the Kollar and Seibold Interviews. ................................... 45

    IV.    MOTION TO UNSEAL AND DISCLOSE GRAND JURY RECORDS OR, ALTERNATIVELY, FOR *IN CAMERA* REVIEW ...................................................... 46

        A.    The Government Is Required to Present Exculpatory Evidence In the Grand Jury If It Undermines Probable Cause............................................................... 46

        B.    There Is a Particularized Need to Disclose the Grand Jury Record. ................. 48

        C.    The Grand Jury Record Is Necessary to Assess the Integrity of the Probable Cause Determination. .......................................................................... 52

i

V.  MOTION TO SUPPRESS EVIDENCE SEIZED BEYOND THE SCOPE OF THE
    PREMISES WARRANT ................................................................................................ 54

**CONCLUSION** ................................................................................................................. **58**

# TABLE OF AUTHORITIES

**Cases**

*Bank of Nova Scotia v. United States*,
  487 U.S. 250 (1988) .................................................................................................... 53

*Caldarola v. Cnty. of Westchester*,
  343 F.3d 570 (2d Cir. 2003) ........................................................................................ 55

*Dennis v. United States*,
  384 U.S. 855 (1966) .................................................................................................... 48

*Doane v. United States*,
  2009 WL 1619642 (S.D.N.Y. June 5, 2009) ............................................................... 55

*Douglas Oil Co. of California v. Petrol Stops Northwest*,
  441 U.S. 211 (1979) .................................................................................................... 48

*Dowling v. United States,*
  473 U.S. 207 (1985) ............................................................................................. 14, 15

*Franks v. Delaware*,
  438 U.S. 154 (1978) ............................................................................................... passim

*Hamling v. United States*,
  418 U.S. 87 (1974) ...................................................................................................... 15

*Illinois v. Gates,*
  462 U.S. 213 (1983) .................................................................................................... 44

*In re Petition of Craig*,
  131 F. 3d 99 (2d Cir. 1997) ......................................................................................... 52

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
  552 F.3d 93 (2d Cir. 2008) .......................................................................................... 16

*Irizarry v. United States*,
  508 F.2d 960 (2d Cir. 1974) ........................................................................................ 20

*Rivera v. United States*,
  728 F. Supp. 250 (S.D.N.Y. 1990) .............................................................................. 36

*Toussie v. United States*,
  397 U.S. 112 (1970) .................................................................................................... 34

*United States v. Abrams,*
  539 F. Supp. 378 (S.D.N.Y.1982) ............................................................................... 19

*United States v. Aleynikov,*
  676 F.3d 71 (2d Cir. 2012) .................................................................................... 14, 15

*United States v. Allocco*,
  801 F. Supp. 1000 (E.D.N.Y. 1992)................................................................................. 23

*United States v. Ashley*,
  905 F. Supp. 1146 (E.D.N.Y. 1995)................................................................................. 15

*United States v. Awadallah,*
  349 F.3d 42 (2d Cir. 2003)............................................................................................... 43

*United States v. Barrett*,
  153 F. Supp. 3d 552 (E.D.N.Y. 2015)......................................................................... 23, 24

*United States v. Basurto*,
  497 F.2d 781 (9th Cir. 1974)............................................................................................ 49

*United States v. Bennett*,
  2006 WL 8435170 (C.D. Cal. May 24, 2006).................................................................. 30

*United States v. Berlin*,
  472 F.2d 1002 (2d Cir. 1973)........................................................................................... 15

*United States v. Bin Laden*,
  92 F. Supp. 2d 225 (S.D.N.Y. 2000)............................................................................. 16, 17

*United States v. Bonventre*,
  720 F.3d 126 (2d Cir. 2013)............................................................................................. 43

*United States v. Bortnovsky*,
  820 F.2d 572 (2d Cir. 1987)......................................................................................... 15, 16

*United States v. Casamento*,
  887 F.2d 1141 (2d Cir. 1989)........................................................................................... 46

*United States v. Castellanos*,
  820 F. Supp. 80 (S.D.N.Y. 1993)..................................................................................... 35

*United States v. Connolly*,
  2017 WL 2537808 (S.D.N.Y. May 24, 2017)............................................................... 27, 28

*United States v. Cosme*,
  796 F.3d 226 (2d Cir. 2015)............................................................................................. 43

*United States v. Crawford*,
  2023 WL 3244599 (S.D.N.Y. May 4, 2023)..................................................................... 14

*United States v. Curtis*,
  506 F.2d 985 (10th Cir. 1974).......................................................................................... 15

*United States v. Davidoff*,
  845 F.2d 1151 (2d Cir. 1988)................................................................................... 15, 16, 21

*United States v. DiMassa*,
  117 F.4th 477 (2d Cir. 2024)....................................................................................... 20, 32

iv

*United States v. Dunn*,
  2005 WL 1705404 (S.D.N.Y. July 19, 2005) ................................................................. 49

*United States v. Estepa*,
  471 F.2d 1132 (1972) ................................................................................................. 47, 50

*United States v. Ferguson*,
  758 F. 2d 843 (2d Cir. 1985) ........................................................................................... 36

*United States v. Gallant*,
  2006 WL 278554 (D. Colo. Feb. 3, 2006) ....................................................................... 31

*United States v. Gallerani*,
  68 F.3d 611 (2d Cir. 1995) .............................................................................................. 20

*United States v. Gaviria*,
  740 F.2d 174 (2d Cir. 1984) ............................................................................................ 32

*United States v. Gibson*,
  175 F. Supp. 2d 532 (S.D.N.Y. 2001) ............................................................................. 48

*United States v. Gonzalez*,
  686 F.3d 122 (2d Cir. 2012) ............................................................................................ 15

*United States v. Graham*,
  477 F. App'x 818 (2d Cir. 2012) ..................................................................................... 20

*United States v. Halloran*,
  664 F. App'x 23 (2d Cir. 2016) ....................................................................................... 14

*United States v. Harris*,
  1993 WL 300052 (S.D.N.Y. July 30, 1993) .................................................................... 31

*United States v. Harris*,
  79 F.3d 223 (2d Cir. 1996) .............................................................................................. 30

*United States v. Harris*,
  805 F. Supp. 166 (S.D.N.Y. 1992) .................................................................................. 30

*United States v. Hennessy*,
  1993 WL 137766 (S.D.N.Y. Apr. 23, 1993) ................................................................... 16

*United States v. Ho*,
  2009 WL 2591345 (D. Haw. Aug. 20, 2009) ................................................................... 53

*United States v. Hoey*,
  2014 WL 2998523 (S.D.N.Y. July 2, 2014) ............................................................... 52, 53

*United States v. Hogan*,
  712 F. 2d (2d Cir. 1983) ............................................................................................. 49, 50

*United States v. Holihan*,
  236 F. Supp. 2d 255 (W.D.N.Y. 2002) ............................................................................ 45

v

*United States v. Hussain*,
   785 F. Supp. 3d 9 (D. Vt. 2025) ...................................................................................... 32

*United States v. Juarbe*,
   2015 WL 3853032 (W.D.N.Y. Apr. 23, 2015) ............................................................. 55

*United States v. Kahale*,
   789 F. Supp. 2d 359 (E.D.N.Y. 2009)........................................................................... 20

*United States v. Lahey*,
   967 F. Supp. 2d 698 (S.D.N.Y. 2013).................................................................... 37, 39

*United States v. Lefkowitz*,
   125 F.3d 608 (8th Cir. 1997)..................................................................................... 25, 30

*United States v. Lino*,
   2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ...................................................................... 35

*United States v. Litvak*,
   2013 WL 5740891 (D. Conn. Oct. 21, 2013)............................................................... 14

*United States v. Lombardozzi*,
   491 F.3d 61 (2d Cir. 2007) ............................................................................................ 46

*United States v. Lopez*,
   2019 WL 4733603 (S.D.N.Y. Sept. 27, 2019) ............................................................ 15

*United States v. Lustyik*,
   57 F. Supp. 3d 213 (S.D.N.Y. 2014)............................................................................ 55

*United States v. Mandell*,
   752. F.3d 544 (2d Cir. 2014)......................................................................................... 35

*United States v. Matias*,
   836 F.2d 744 (2d Cir. 1988).......................................................................................... 55

*United States v. McDermott*,
   245 F.3d 133 (2d Cir. 2001).......................................................................................... 33

*United States v. Mermelstein*,
   487 F. Supp. 2d 242 (E.D.N.Y. 2007).......................................................................... 33

*United States v. Montour*,
   944 F.2d 1019 (2d Cir. 1991)........................................................................................ 20

*United States v. Muyet*,
   945 F. Supp. 586 (S.D.N.Y. 1996)............................................................................... 21

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................................ 22, 23, 24

*United States v. Nejad*,
   436 F. Supp. 3d 707 (S.D.N.Y. 2020)........................................................................... 36

*United States v. Peoni,*
  100 F.2d 401 (2d Cir.1938) ............................................................................................... 33

*United States v. Peralta,*
  763 F. Supp. 14 (S.D.N.Y. 1991) ................................................................................... 49, 53

*United States v. Perez,*
  247 F. Supp. 2d 459 (S.D.N.Y. 2003) ............................................................................ 37, 41

*United States v. Pinto-Thomaz,*
  352 F. Supp. 3d 287 (S.D.N.Y. 2018) ................................................................................. 24

*United States v. Pirro,*
  212 F.3d 86 (2d Cir. 2000) ................................................................................................. 19

*United States v. Pontz,*
  132 F.4th 10 (1st Cir. 2025) ............................................................................................... 34

*United States v. Priolo,*
  812 F. Supp. 3d 250 (E.D.N.Y. 2025) ................................................................................ 34

*United States v. Rajaratnam,*
  2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) ..................................................................... 36

*United States v. Rajaratnam,*
  719 F.3d 139 (2d Cir. 2013) .......................................................................................... 36, 43

*United States v. Raniere,*
  384 F. Supp. 3d 282 (E.D.N.Y. 2019) ................................................................................ 20

*United States v. Reddy,*
  190 F. Supp. 2d 558 (S.D.N.Y. 2002) ............................................................................ 16, 26

*United States v. Roshko,*
  969 F.2d 1 (2d Cir.1992) .................................................................................................... 20

*United States v. Roy,*
  783 F.3d 418 (2d Cir. 2015) ............................................................................................... 20

*United States v. Salameh,*
  152 F.3d 88 (2d Cir. 1998) ................................................................................................. 43

*United States v. Siddiqi,*
  2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ....................................................................... 16

*United States v. Smith,*
  985 F. Supp. 2d 547 (S.D.N.Y. 2014) ................................................................................ 14

*United States v. Svoboda,*
  347 F.3d 471 (2d Cir. 2003) ............................................................................................... 20

*United States v. Teman,*
  465 F. Supp. 3d 277 (S.D.N.Y. 2020) ................................................................................ 34

*United States v. Twersky*,
1994 WL 319367 (S.D.N.Y. June 29, 1994) ............................................................... 53

*United States v. Valentine*,
591 F. Supp. 2d 238 (E.D.N.Y. 2008) ........................................................................ 57

*United States v. Vetere*,
663 F. Supp. 381 (S.D.N.Y. 1987) .................................................... 46, 47, 49, 53

*United States v. Vilar,*
2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ........................................................ 36, 37

*United States v. Villegas*,
899 F.2d 1324 (2d Cir. 1990) ...................................................................................... 55

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999) ........................................................................................... 19

*United States v. Williams*,
504 U.S. 36 (1992) ......................................................................................................... 46

*United States v. Yashar*,
166 F.3d 873 (7th Cir. 1999) ....................................................................................... 34

*United States v. Yefsky*,
994 F.2d 885 (1st Cir. 1993) ........................................................................................ 16

*Wilson v. Russo,*
212 F.3d 781 (3d Cir. 2000) ......................................................................................... 37

**Statutes**

18 U.S.C. § 1343 .......................................................................................................... 5, 27, 29

18 U.S.C. § 1344 .................................................................................................................. 5, 29

18 U.S.C. § 1349 .................................................................................................................. 5, 20

18 U.S.C. § 1519 ......................................................................................................................... 5

18 U.S.C. § 225 ................................................................................................................... passim

18 U.S.C. § 3500 ................................................................................................................... 8, 45

18 U.S.C. § 371 ....................................................................................................................... 20

**Other Authorities**

American Bar Association, Standards for Criminal Justice, Prosecution Function (3d ed. 1993),
Standard 3-3.6(b) ............................................................................................................. 47

U.S. Dep't of Justice, Justice Manual § 9-11.233 ......................................................... 47

**Rules**

Fed. R. Crim. P. 12 ................................................................................................ 14

Fed. R. Crim. P. 16. ................................................................................... 8, 9, 11, 13

Fed. R. Crim. P. 6 .......................................................................................... 46, 48, 52

Fed. R. Crim. P. 7 ...................................................................................... 14, 15, 19, 20

Daniel Chu respectfully submits this memorandum of law in support of his initial pretrial motions. As directed by the Court at the January pretrial conference, these motions are directed to the face of the Indictment as well as to discovery received by the defense on or before February 19, 2026. Subsequent discovery, whenever the government substantially completes producing it, will likely give rise to additional motion practice.

## PRELIMINARY STATEMENT

Daniel Chu is innocent. Yet he stands charged with a crime that could send him to prison for the rest of his life. The government has reached to charge a statute that has scantly been used in the almost forty years since its passage, and which carries the most severe penalties possible for a financial crime—a mandatory minimum of ten years and a maximum of life in prison—without any credible basis to do so.

That statute, 18 U.S.C. § 225, imposes these draconian penalties on "whoever organizes, manages, or supervises a continuing financial crimes enterprise." But Mr. Chu is no such figure—not in reality, and not in the Indictment's own telling. While Mr. Chu was the founder and CEO of Tricolor Holdings, LLC, and in that sense supervised many of Tricolor's employees in the course of their legitimate jobs, the Indictment does not allege, and has no basis to allege, that Mr. Chu supervised the "enterprise" required for the Section 225 charge to stick. The Indictment does not even allege what the enterprise *is*, and the government has refused to answer that question in correspondence and at meet-and-confer sessions. Nor does it allege that Mr. Chu received $5 million or more in gross receipts "from such enterprise" during any 24-month period—as opposed to Board-approved compensation—which is a separate and independently fatal omission. The Indictment seeks to hold Mr. Chu liable for orchestrating a massive criminal enterprise without

1

telling him what the enterprise was, who was part of it, how he supposedly supervised it, or how he allegedly profited from it. It cannot survive scrutiny on its face.

The investigation behind the Indictment is just as defective. The government's theory rests overwhelmingly on two cooperating witnesses, Jerome Kollar and Ameryn Seibold, both of whom disclosed material exculpatory information about Mr. Chu at the very outset of the investigation, before the government sought a single search warrant. Rather than present that information honestly, the government selectively relied on those interviews to secure extraordinarily broad search warrants for Mr. Chu's residence and person, omitting the exculpatory information entirely. Kollar and Seibold both also pleaded guilty to destruction of records, a fact that materially undermines their credibility. The government then obtained an Indictment long before it had reviewed any of the evidence those warrants produced. It *still* has not remotely completed that review.

This is a prosecution built on a novel and ill-defined legal theory, advanced through defective warrants, supported primarily by compromised witnesses whose exculpatory accounts were concealed from multiple magistrates and, presumably the grand jury—all to expose an innocent man to the prospect of life in prison. The charges should be dismissed. If they are not, the Court should suppress the fruits of the defective warrants, order disclosure of the grand jury record (including transcripts and legal instructions) and the 302s and notes underlying the cooperators' interviews, and at a minimum require the government to provide a robust bill of particulars that gives Mr. Chu fair notice of the case he is actually being asked to answer.

## RELEVANT BACKGROUND

### A.    The Government's Investigation

Daniel Chu is the founder and former chief executive officer of Tricolor, an auto lender and retailer that offered credit-building loans to consumers with limited or no credit history.

2

Tricolor was founded in 2007 and operated continuously until September 2025, when it filed for bankruptcy. The Indictment alleges, however, that from at least 2018 through September 2025, the company operated through a "systematic fraud." The Indictment alleges that the fraud unraveled after a group of lenders confronted Mr. Chu in the summer of 2025 with concerns about Tricolor's collateral. ECF No. 2 ("Indictment") ¶ 2.

These lenders, among the most powerful financial institutions in the world, appear to have raised the same concerns with federal law enforcement, as the government's investigation was underway even before Tricolor filed for bankruptcy on September 10, 2025. The government interviewed former Tricolor employees Ameryn Seibold and Jerome Kollar on September 6 and 16, 2025. Kollar and Seibold were the Chief Financial Officer and Senior Director of Finance, respectively, with chief responsibility for the financial reporting to the lenders at the crux of this case. Kollar and Seibold immediately began cooperating, and those initial interviews appear to have driven the government's investigation, and its focus on Mr. Chu, from the outset.

From the start, however, Kollar and Seibold both shared material exculpatory information concerning Mr. Chu. Kollar, for instance, stated in that September 16, 2025 interview that ███

████████████████████████████████████

████████████████████████████████████

██████████████████████████ Seibold disclosed on September 6, 2025

that ██████████████████████████████████

████████████████████████████████

_____

[1]    This information is drawn from a *Brady* disclosure made by the government in February 2026. *See* Ex. 19 to the Declaration of Matthew L. Schwartz in Support of Mr. Chu's Pretrial Motions, dated May 20, 2026 ("Schwartz Decl.") (the "*Brady* Letter"). The government's disclosure did not include Kollar or Seibold's complete statements at the relevant interviews, let alone their other statements to the government, so the full import of the exculpatory statements is

Relying heavily on information supplied by Kollar and Seibold, the government moved swiftly to obtain extraordinarily broad search authority for Mr. Chu's digital life and home. The government sought and obtained a series of warrants authorizing searches of Mr. Chu's iCloud accounts, his personal and electronic devices, and his Florida residence. *See* Ex. 1 (USAO_01_00000104–28 (the "iCloud Warrant Affidavit")); Ex. 2 (USAO_01_00000129–34 (the "iCloud Warrant")); Ex. 3 (USAO_01_00000196–222 (the "Premises Warrant Affidavit")); Ex. 4 (USAO_01_00000223-27 (the "Premises Warrant")) (collectively, the "Search Warrant Affidavits" and the "Search Warrants").[2]

The iCloud Warrant authorized access to sweeping categories of cloud-stored data including emails, text messages, photographs, and full device backups, over a period exceeding seven years, from January 1, 2018 through the present. Ex. 2 at -131–33. The Premises Warrant likewise authorized broad seizure or copying of electronic devices reasonably believed to belong to Mr. Chu. Ex. 4 at -225. Although the Search Warrant Affidavits expressly relied on the information provided by Kollar and Seibold during their interviews by the government, *see, e.g.*, Ex. 1 ¶¶ 13, 14; Ex. 3 ¶¶ 9, 10, they do not disclose any of the exculpatory information later contained in the government's *Brady* disclosures. Nor do they disclose (1) that Kollar and Seibold had both destroyed evidence that inculpated them—and likely exculpated Mr. Chu—while carrying out the fraud and knowing that their conduct would be investigated, or (2) that Kollar had

---

unclear. For example, if—as seems likely given their working relationship—Seibold had nothing to say purporting to directly implicate Mr. Chu, his admission that ███████████ ███████ would mean that Seibold's only source of information concerning Mr. Chu's role or knowledge would come second-hand, from Kollar.

[2]     All references to "Ex. __" refer to exhibits to the Declaration of Matthew L. Schwartz, dated May 20, 2026.

a history of dishonest behavior, including being accused of perpetrating a financial fraud at a prior employer, leading to its bankruptcy. *See United States v. Kollar*, 25 Cr. 584 (S.D.N.Y.), ECF No. 1 (charging Kollar with Destruction of Records under 18 U.S.C. § 1519); Ex. 29 at 64.

The government then empaneled a grand jury, which began issuing grand jury subpoenas no later than October 2025. *See, e.g.*, Ex. 23 (USAO_REL_01_00847034). ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See*

Ex. 19 (*Brady* Letter). ████████████████████████████████████

████████████████████████ *Id.*

On or about December 16, 2025, Kollar and Seibold pleaded guilty, pursuant to cooperation agreements, to multiple felonies, including bank fraud, wire fraud affecting a financial institution, false statements to a financial institution, conspiracy to commit securities fraud, and destruction of records, among others. *See United States v. Kollar*, No. 25 Cr. 584 (S.D.N.Y.); *United States v. Seibold*, No. 25 Cr. 585 (S.D.N.Y.). Kollar and Seibold are expected to serve as central witnesses at trial.

### B.    The Indictment

The day after Kollar and Seibold pleaded guilty, the government unsealed the four-count indictment charging Mr. Chu and David Goodgame with (1) conspiracy to commit bank fraud and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1349 (Count Two); (2) bank fraud, in violation of 18 U.S.C. § 1344 (Count Three); and (3) wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343 (Count Four). *See* Indictment ¶¶ 29–36. Mr. Chu alone was also charged under 18 U.S.C. § 225 with organizing, managing, or supervising a continuing financial crimes enterprise (Count One). *See id.* ¶¶ 26–28.

5

Although the government chose to seek a lengthy "speaking" indictment purporting to detail a fraud that spanned almost a decade, from 2018 until Tricolor's demise in 2025, the allegations against Mr. Chu are sparse, and focused overwhelmingly on the final days of Tricolor, after the alleged fraud had been discovered.

Paragraphs 1–3 and 9 of the Indictment give the government's overview of the alleged fraud in general terms, while paragraphs 4–8 describe Tricolor's business model and relationship with lenders.  Paragraph 10 then alleges that Tricolor "faced liquidity pressure" in or about 2018, and "[t]o address that problem," Mr. Chu "instructed Kollar to pledge delinquent loans to the Lender-1 Credit Line," and "instructed Kollar to create a fictitious portfolio company in Tricolor's dealer management system . . . transfer the charged-off loans to that new portfolio company in the dealer management system, and arrange for other Tricolor employees to manually enter fake payments on those charged-off loans in the dealer management system."  The Indictment then fast-forwards to 2021; paragraphs 11–14 and 16 allege a smattering of communications between Mr. Chu and Kollar, between 2021 and 2023.

Paragraph 15 describes conduct by Kollar, Goodgame, and Seibold, but does not mention Mr. Chu.  Paragraph 17 describes the purported size of the fraud.  And paragraphs 18–24 allege Mr. Chu's reaction after the fraud was revealed in August 2025 following an audit engaged by one of the lenders.  The Indictment's final substantive allegation, paragraph 25, describes money that Mr. Chu received, all in the form of "compensation from Tricolor, including an annual salary, bonuses, management incentive units, and company-provided cars."  The Indictment does not allege that Mr. Chu received any proceeds of the fraud, or that he took any money from Tricolor outside of his Board-approved "compensation."

6

### C.    The Government's Post-Indictment Asset Restraints

In late January 2026, more than six weeks after the indictment was unsealed, the government froze Mr. Chu's and his wife's primary bank account without a warrant, without notice and without any claim of exigent circumstances.  The account was Mr. Chu's primary personal account that was used for routine living expenses and the payment of counsel of his choice in this case.

Yet the government did not seek judicial authorization before imposing the freeze.  Instead, on or about January 30, 2026, it restrained the account by letter alone.  Schwartz Decl. ¶ 10; *see also* ECF No. 24.  At the time of the freeze, the government had not alleged that Mr. Chu was dissipating assets, attempting to flee, or engaging in suspicious financial activity.  Nor had the government identified the account as traceable to any charged offense or otherwise directly forfeitable in the Indictment.

On February 6, 2026, Mr. Chu raised this with the Court in an emergency letter motion challenging the warrantless restraint as unconstitutional under the Fourth, Fifth and Sixth Amendments.  *See* ECF No. 24.  The letter detailed the severe constitutional and practical consequences of the freeze, including that it deprived Mr. Chu of access to funds necessary to pay for basic living expenses and retained counsel, and explained that the government had waited weeks after Indictment to take any action against the account, undermining any suggestion of urgency.  *Id.* at 2.  The letter further explained that the timing of the freeze appeared tactical, coinciding with critical proceedings in the related Tricolor bankruptcy pending in the Northern District of Texas.  *Id.* at 2–3.

Only after Mr. Chu publicly challenged the freeze did the government seek judicial authorization.  One day after Mr. Chu's emergency filing, the government submitted its first ever application for a seizure warrant covering the already restrained account.  *See* Ex. 17

(USAO_CHU_0000000003–37 (the "Seizure Warrant Affidavit")).    On February 9, 2026, Magistrate Judge Katharine H. Parker signed the seizure warrant. Ex. 18 (USAO_CHU_0000000001–2 (the "Seizure Warrant")); *see also* ECF No. 25.    The Seizure Warrant Affidavit, like the Search Warrant Affidavits, failed to disclose the material exculpatory information the government had learned from Kollar and Seibold.  And while it averred generally to Mr. Chu's objections to the warrantless freeze in a footnote, it did not disclose the serious factual and constitutional concerns raised by Mr. Chu in his letter.  *See* Ex. 17 at n.4.

### D.    Less than Five Months Before Trial, Discovery is Far From Complete

Meanwhile, trial is scheduled to commence in October.  As a result of the government's rush to indict, however, its investigation is very much ongoing and its discovery obligations far from complete.  In fact, despite representing to the Court in March that it was prepared to try this case essentially immediately, the government continues to collect and produce voluminous discovery, including from devices it seized from Mr. Chu back in October.  Just *yesterday*, on the eve of the filing of these motions, the government produced for the first time responsive material from four of those devices.  And by its own account, none of the government's responsive reviews of *any* seized device is complete and neither is any other category of discovery.  *See* Schwartz Decl. ¶ 48.

In short, almost six months after charging the case, the government has come nowhere close to meeting its obligations to produce discovery under Federal Rule of Criminal Procedure 16. On January 12, 2026, the parties jointly submitted, and the Court entered, a stipulated protective order governing discovery materials produced under Rule 16, 18 U.S.C. § 3500, and the government's disclosure obligations under *Brady* and *Giglio*.  ECF No. 22.  Since then, the government has produced over one million documents, as well as the full images of 10 employee laptops from Tricolor and, as to Mr. Chu, full extractions of 10 of Mr. Chu's electronic devices

8

seized by search warrant and the full reports of Mr. Chu's iCloud accounts. In total, these imaged devices and accounts constitute an additional approximately 12.21 terabytes of data—on top of the million-plus documents.

But the quantity of data here belies compliance; the government is far, far from satisfying its Rule 16 obligations.[3] To date, the government continues to produce voluminous discovery. Its most recent production of Rule 16 material was served yesterday, on May 19, 2026, totaling over 168,000 new files. Schwartz Decl. ¶ 37. And less than two weeks ago, on May 8, 2026, the government made a production—which was completely unrelated to Mr. Chu's seized devices— that by itself contained over 107,000 new documents. *Id* ¶ 36. And the government has told the defense that there is no deadline in sight for the completion of discovery from grand jury subpoenas. *See* Ex. 26 (May 13 Letter) at 6 ███████████████████████████ ███████████████████████████████████████████ Despite the return dates on those subpoenas, the government has apparently not taken any steps to enforce the grand jury's deadlines, let alone moved to compel production. It is instead █████████████████ ████████████████████████████ *See id*. The defense has requested that the government follow up with producing parties in order to communicate to the defense the timeframe for additional production, but the government has declined to do even that. *See* Schwartz Decl. ¶ 47.

---

[3]    On May 11, 2026, consistent with the requirements of Local Rule 16.1, Mr. Chu served the government with a letter demanding (1) the prompt completion of Rule 16 discovery, (2) undisclosed *Brady* material to the extent any exists, (3) a bill of particulars with respect to the allegations unsupported by discovery (described further below), and (4) the discharge of the grand jury given the pending Indictment and the government's continued indecision in bringing a superseding indictment. Ex. 25 (the "May 11 Letter"). On May 13, 2026, the government served a responsive letter, Ex. 26 (the "May 13 Letter"), and the parties subsequently conferred by email and videoconference, *see* Ex. 28; Schwartz Decl. ¶ 44.

Worse yet, the government has not completed its responsiveness review of seized devices and accounts as required by the Search Warrants—a failure that is entirely within its own control. The government previously produced only partial responsive sets from the iCloud accounts, and a responsive set from Mr. Chu's MacBook. Schwartz Decl. ¶ 32. Yesterday, the government produced additional responsive sets from four devices, Schwartz Decl. ¶ 37, but even as to those devices, the government has qualified that this review is ongoing, additional responsive sets may be produced, and that there is no estimated date of completion. *Id.* ¶¶ 40, 47, 48. The government has yet to produce any responsive records from at least one of Mr. Chu's devices, and has not even started to review at least one other. *Id.* ¶ 48. This does not include devices the government is currently locked out of but still attempting to access. *Id.* In addition, the government has produced no responsive data from the cellphone seized from Mr. Goodgame, nor has it produced to Mr. Chu the complete image of Mr. Goodgame's device. *See* Ex. 25 (May 11 Letter) at 2. In other words, Mr. Chu has received no discovery from Mr. Goodgame's phone whatsoever. *Id.*

The relative volume of responsive material produced in comparison to the full forensic extractions, moreover, underscores how critical that review is. For instance, the MacBook contains 38.3 GB of data but the government has only identified 131 responsive documents from both the MacBook and dchu@tricolorauto.com iCloud account. Schwartz Decl. ¶ 32. The government's May 19 production is still being processed so Mr. Chu is unable to fully assess how the responsive data from each device compares to the full images already produced. Schwartz Decl. ¶ 37. Nevertheless, it cannot be disputed that the government's delay in competing its responsiveness review and producing that material caused the defense to waste a tremendous amount of time, effort, and resources scouring ultimately irrelevant material with a trial date fast approaching.

10

Beyond these major deficiencies, the defense has also not yet received substantial additional discovery, including documents produced initially to the Securities and Exchange Commission, and which the government has agreed to produce. Ex. 25 (May 11 Letter) at 3. While the parties may disagree on whether this is Rule 16 material, the government volunteered to produce this material, the defense requested it on April 8, and more than a month later it remains outstanding. *Id.* And despite the defense's efforts to keep its requests as narrowly tailored as possible, we still expect the additional discovery to include at least 100,000 additional documents. *See* Ex. 26 at 2.

The government's inability to conclude discovery sufficiently in advance of trial is problematic on at least two fronts. First, the defense cannot possibly adequately prepare for trial on the current schedule where there is no deadline for the production of Rule 16 discovery and no estimated completion date (or willingness by the government to agree to one). As Mr. Chu expects to make clear in a separate filing to the Court, the trial date simply cannot hold under these circumstances without causing him irreparable prejudice of a constitutional magnitude.

Second, and perhaps more disturbing given the charges here, Mr. Chu has yet to receive any document discovery substantiating many of the core allegations contained in the Indictment. For example, the *single* non-conclusory allegation in the Indictment predating 2021 is the reference (in paragraph 10) to a "fictitious portfolio company in Tricolor's dealer management system" allegedly created at Mr. Chu's direction. Yet when, just a week ago, the government finally identified this alleged fictitious company, Ex. 26 (May 13 Letter) at 3, it became clear that there are precisely *zero* references to that entity anywhere in the discovery produced to date, Schwartz Decl. ¶ 42. More fundamentally, and as discussed further below, the document discovery is devoid

11

of any evidence that Mr. Chu had the sort of supervisory role in the alleged fraud that is required to sustain Count One.

Given the disconnect between the Indictment's allegations and the discovery produced to date, Mr. Chu and Mr. Goodgame have met and conferred with the government regarding discovery that has *not* been produced that the defense believes is necessary to defend against the charges filed. This discovery includes, for instance, Kollar's archived emails, as well as discovery from the data system that generated the borrowing base reports that are the center of this case. *See* Schwartz Decl. ¶ 45; *see also* Ex. 25 (May 11 Letter) at 3–4.[4] But even these efforts have fallen short of getting Mr. Chu and Mr. Goodgame the discovery they need now, and the Court's intervention is needed.

### E.    The Government's Ongoing Grand Jury Investigation

Perhaps because the government is aware that its evidence does not support the charges against Mr. Chu, the government is continuing to investigate through grand jury process. Despite previewing as early as January that it anticipated obtaining a superseding indictment, the government has not yet done so. Schwartz Decl. ¶¶ 8, 9. The defense has inquired about, and the government has declined to provide, any further information about such a superseder, including whether additional defendants may be charged or whether additional conduct may be implicated. *See, e.g.*, Ex. 26 (May 13 Letter) at 3, 4. Meanwhile, the government has continued to use grand jury process to attempt to collect evidence relevant to the crimes already charged, including as recently as April 13, 2026. Schwartz Decl. ¶¶ 18, 47; Ex. 22 (Dropbox subpoena).

---

[4]    The government has produced only six documents containing data derived directly from Tricolor's dealer management system. *See* Ex. 25 (May 11 Letter) at 2–3. These documents do not enable Mr. Chu to access the entire data set or discern which Tricolor employees accessed the data therein that was then manipulated and falsified—information fundamental to understanding and meeting the government's allegations.

**ARGUMENT**

Just months before Mr. Chu and Mr. Goodgame are set to go to trial, they are faced with an Indictment that fails to sufficiently put them on notice of the charges against them; the impending prospect of a superseding indictment that may add other unknown charges, conduct, and defendants; and they have been deprived of the timely production of the evidence against them, including evidence that was obtained based upon a misleading presentation to the magistrate, and which has been in the government's possession for many, many months but which remains unreviewed—all while the government continues to investigate to shore up its case.

This is not how federal criminal prosecution is supposed to work, particularly where the government has also invoked a little tested and ill-defined legal theory with potentially devastating consequences for Mr. Chu. The charges should be dismissed. At a minimum, Mr. Chu should be provided with a robust bill of particulars that puts him on fair notice of the charges against him, and the government should be required to complete its production of Rule 16 material by a date certain, well in advance of trial. And evidence and seizures derived from—or seized in contravention of—the incomplete and misleading Search Warrant and Seizure Warrant Affidavits should be suppressed. Likewise, if the charges are not dismissed outright, the Court should order production of the grand jury record so that the defense can determine whether material exculpatory information was similarly withheld from the grand jury, and whether it was properly instructed.

## I.    MOTION TO DISMISS COUNT ONE OR, ALTERNATIVELY, FOR A BILL OF PARTICULARS AS TO COUNT ONE

Count One, the Section 225 charge, should be dismissed. Since its passage following the savings and loan crisis of the 1980s, Section 225 has been charged only a handful of times anywhere. That statute, sometimes referred to as the "financial kingpin" statute, imposes a sentence of no less than ten years' imprisonment, and up to life, for someone who leads a

"continuing financial crimes enterprise." But despite pages of speaking allegations, the Indictment here has numerous facial deficiencies. It does not identify what the relevant enterprise is; who was a part of it; how it operated; how Mr. Chu supposedly directed it; or how he allegedly profited from it—all elements of the offense. The charge should therefore be dismissed. Short of that, Mr. Chu is entitled to a bill of particulars that tells him, at minimum, the nature of the charges against him.

### A.    Legal Standards

#### 1.    Dismissal of the Indictment

Pursuant to Federal Rule of Criminal Procedure 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Cr. P. 7(c)(1). Federal Rule of Criminal Procedure 12(b)(3)(B) requires dismissal of an indictment for "lack of specificity" or "failure to state an offense."

"In determining a motion to dismiss, the Court accepts as true the facts alleged in the indictment." *United States v. Crawford*, 2023 WL 3244599, at *3 (S.D.N.Y. May 4, 2023). "However, a charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged." *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (alteration adopted) (quoting *United States v. Litvak*, 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013)).

"Since federal crimes are 'solely creatures of statute,' a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (quoting *Dowling v. United States, 473 U.S. 207, 213 (1985)). "Due respect for the prerogatives of Congress in defining federal

14

crimes prompts restraint in this area, where we typically find a narrow interpretation appropriate." *Id.* at 76 (quoting *Dowling*, 473 U.S. at 213).

"Although the language of the statute may be used to describe the offense, the description 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" *United States v. Lopez*, 2019 WL 4733603, at *2 (S.D.N.Y. Sept. 27, 2019) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). An indictment must be dismissed where it provides no details on the "facts and circumstances" on the essential elements of the offense such that the defendant's alleged conduct is "left to speculation." *United States v. Ashley*, 905 F. Supp. 1146, 1159 (E.D.N.Y. 1995) (citing *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir. 1974) ("some substantial indication of the nature or character of any scheme or artifice to defraud, or to obtain money or property by means of false pretenses, representations or promises is requisite.")); *see also United States v. Berlin*, 472 F.2d 1002, 1007 (2d Cir. 1973) (failure to allege essential element of offense, such as knowledge of falsity of statement when made, requires dismissal) (cited in *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) ("to be sustainable," essential elements "must *always* be pleaded and proved to a jury or admitted by a defendant") (emphasis in original)).

### 2.    Bill of Particulars

Federal Rule of Criminal Procedure 7(f) provides that a court may direct the government to file a bill of particulars. A bill of particulars is meant to enable the defendant to prepare for trial, prevent surprise, and allow him to interpose a plea of double jeopardy in a subsequent prosecution. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

While "the decision to grant or deny a bill of particulars is within the sound discretion of the district court," *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), a defendant is entitled to a bill of particulars "where the charges of the indictment are so general that they do not

15

advise the defendant of the specific acts of which he is accused." *United States v. Siddiqi*, 2007 WL 549420, at *2 (S.D.N.Y. Feb. 21, 2007) (internal quotation marks omitted). These principles are to be "applied with some care" when the government charges criminal offenses under broad statutes, because where the prosecution has "wide latitude" to "frame a charge," there is "an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope." *Davidoff*, 845 F.2d at 1154 (discussing RICO); *see also United States v. Hennessy*, 1993 WL 137766, at *3 (S.D.N.Y. Apr. 23, 1993) (requiring bill of particulars to identify victims of each allegedly unlawful act taken in furtherance of conspiracy); *see also United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) ("The indictment . . . must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.") (internal quotation marks omitted).

Discovery, even where voluminous, does not fulfill or replace the requirement of the indictment providing adequate notice. "[T]he Second Circuit has made clear that the Government does 'not fulfill its obligations merely by providing mountains of documents to defense counsel who were left unguided' as to the nature of the charges pending." *United States v. Reddy*, 190 F. Supp. 2d 558, 565 (S.D.N.Y. 2002) (quoting *Bortnovsky*, 820 F.2d at 575). To the contrary, "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008). "[I]f necessary to give the defendant enough information about the charge to prepare his defense, a bill of particulars will be required even if the effect is disclosure of the Government's evidence or theories." *Reddy*, 190 F. Supp. 2d at 565 (citation omitted); *see also Bin Laden*, 92 F. Supp. 2d at

16

237 ("we do not believe that because the Government might be unable to provide a complete response to a Defendant's request for information, it should therefore not provide any information at all.").

### B.      The Indictment's Allegations As To Count One Are Insufficient

The text of Section 225 provides:

(a) Whoever—

> (1) organizes, manages, or supervises a continuing financial crimes enterprise; and
>
> (2) receives $5,000,000 or more in gross receipts from such enterprise during any 24-month period,

shall be fined not more than $10,000,000 if an individual, or $20,000,000 if an organization, and imprisoned for a term of not less than 10 years and which may be life.

(b) For purposes of subsection (a), the term "continuing financial crimes enterprise" means a series of violations under section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4 persons acting in concert.

There is scant caselaw, and no form jury instructions, concerning Section 225. But it is clear from the face of the statute that to be guilty, a defendant must (1) "organize, supervise, or manage" (2) an "enterprise" (3) consisting of four or more persons "acting in concert" (4) who commit a series of violations of specified crimes, and must also (5) receive $5 million or more in gross receipts (6) "from such enterprise" (7) during any 24-month period. It is also clear that the defendant must do so willfully; there is no other way to "organize, supervise, or manage" the kinds of crimes at issue here.

The Indictment here is insufficient on multiple fronts. It does not allege what the "enterprise" is. And while the Indictment does identify four people (Kollar, Seibold, and the two trial defendants), the Indictment does not allege when they joined the "enterprise" or whether they

17

were the only ones.  In fact, the government has taken the position that people could comprise the "enterprise" even if they did not have co-conspirator or aiding-and-abetting liability, and has even left open the possibility that a person who was factually and legally innocent could be someone who "acts in concert" with the defendants to constitute the charged enterprise.  Schwartz Decl. ¶¶ 49, 50.  That leaves Mr. Chu without any meaningful information about who or what he supposedly "organize[d], supervise[d], or manage[d]."  On the government's admitted theory, Mr. Chu should face the prospect of life imprisonment if the government proves that he led an enterprise consisting entirely of unknown people acting at unknown times to commit unspecified predicates—perhaps unwittingly.  That can't be right.

The Indictment is also hopelessly vague as to how Mr. Chu supposedly "organized, supervised, or managed" the enterprise, whatever it was, or how he profited from it to the tune of $5 million or more.  The government, in fact, had told the defense that ███████████████████ ███████████████████████████████████████████ ███████████████  Ex. 26 (May 13 Letter) at 5.  But that is the only thing the Indictment alleges.

### 1.    The Indictment Does Not Adequately Allege An "Enterprise."

The Indictment insufficiently pleads the "enterprise" itself.  Because "the term 'continuing financial crimes enterprise' means a series of violations . . . committed by at least 4 persons acting in concert," 18 U.S.C. § 225(b), the Indictment must identify both the four persons that committed the underlying violation(s), as well as the underlying violations, that formed part of the series in order to state the offense.

The Indictment here does neither.  It broadly alleges that, "[f]or years," unidentified "multiple Tricolor executives," "engaged in a series of frauds."  Indictment ¶¶ 1, 9.  Far from identifying who did what, the Indictment even at times alleges that the company itself engaged in

misconduct. *See, e.g.,* Indictment ¶ 12 ("Tricolor also pledged to other lenders the loan receivables for cars that had been sold and financed, but were still nonetheless pledged to the Lender-2 Inventory Credit Line."). These allegations conflate the company itself with a criminal enterprise and Mr. Chu's leadership position in the business with his alleged role in the criminal enterprise.

When Mr. Chu sought clarification as to the specific scope of the alleged enterprise from the government, it helpfully responded that ███████████████████████████ ████████████████████████████████████████████████████ Ex. 26 (May 13 Letter) at 4. This does nothing to shed light on the charges. It remains unclear, for example, whether the charged "enterprise" is Tricolor itself, the "multiple Tricolor executives" alleged to have engaged in fraud, the four individuals named in the Indictment, or some other group, organization, or assembly of people. *See* Indictment ¶¶ 1, 26. Both the enterprise and its membership must be sufficiently pled to give notice of the conduct alleged to constitute the offense and to ensure proper use of the grand jury. Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged"); *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments."); *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) ("The Indictment Clause of the Fifth Amendment 'requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury.'") (quoting *United States v. Abrams,* 539 F. Supp. 378, 384 (S.D.N.Y.1982)). Because the Indictment does not adequately do so, Count One must be dismissed.

19

In response, the government may attempt to rely on cases concerning conspiracies charged under 18 U.S.C. §§ 371 or 1349 or similar statutes.  But the law there is much different.  General conspiracies require a criminal agreement amongst two or more people, and the offense there is the unlawful agreement itself.  *See United States v. Svoboda*, 347 F.3d 471, 476–77 (2d Cir. 2003); *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024).  A Section 371 conspiracy requires just one overt act—which need not itself be a crime—and a Section 1349 conspiracy doesn't even require that.  *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015); *United States v. Montour*, 944 F.2d 1019, 1026 (2d Cir. 1991).  Still, caselaw requires that a conspiracy indictment identify the object of the conspiracy, at least one co-conspirator (by description if not name), and (where applicable) at least one overt act.  *See, e.g.*, *United States v. Gallerani*, 68 F.3d 611, 617–18 (2d Cir. 1995) ("'Without question, the object of a conspiracy constitutes an essential element of the conspiracy offense' defined by 18 U.S.C. § 371.") (quoting *United States v. Roshko,* 969 F.2d 1, 5 (2d Cir.1992)); *Irizarry v. United States*, 508 F.2d 960, 968 n.5a (2d Cir. 1974) ("the government must allege and prove an overt act under the general conspiracy statute, 18 U.S.C. 371"); *United States v. Kahale*, 789 F. Supp. 2d 359, 373 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012) ("relative complexity of the fraud charges facing defendants" requires identification of co-conspirators).

Section 225 is much more specific.  It requires, by statute, four or more people to act in concert, and to commit a series of actual violations of specified offenses—that is, a series of actual, completed offenses, not just overt acts.  It stands to reason that the Indictment must identify those individuals and those completed offenses.  *See, e.g.*, *United States v. Raniere*, 384 F. Supp. 3d 282, 300 (E.D.N.Y. 2019) ("RICO conspiracy indictments satisfy Rule 7(c) if they identify an enterprise, name the defendant as someone associated with that enterprise, allege that the defendant

20

conspired to violate RICO, specify the time period during which the conspiracy operated, list specific types of predicate crimes allegedly committed, and discuss in detail the means and methods of the conspiracy."); *United States v. Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y. 1996) (RICO indictment must "adequately advise the defendants of the specific acts of which they are accused."); *see also Davidoff*, 845 F.2d 1151, 1154.  The failure of the Indictment to do so here renders it legally insufficient.

### 2.    The Indictment Does Not Allege Who Acted "In Concert" With Mr. Chu to Comprise the Enterprise.

A continuing financial crime enterprise is defined by the series of criminal violations "committed by at least 4 persons acting in concert."  18 U.S.C. § 225(b).  That is, the existence of at least four people "acting in concert" is an element of the offense and defines the "enterprise" that a defendant must be shown to have "organized, managed, or supervised."  The Indictment here identifies only four people total.  If those are the only members of the alleged enterprise, then so be it—although Count One will then fail for other reasons.  But the government has indicated that it believes it can rely on unnamed and unidentified individuals to satisfy this element, meaning that Mr. Chu has absolutely no notice of the contours of the enterprise that he supposedly commanded.  The government should be required to identify all members comprising the "enterprise" on which it may rely to prove the charges at trial.

In both the Indictment and its May 13 Letter, the government refused to name all participants who allegedly acted "in concert" with Mr. Chu and under his direction.  *See, e.g.*, Indictment ¶ 9 ("For years, DANIEL CHU and DAVID GOODGAME, the defendants, Jerome Kollar, Tricolor's chief financial officer, and Ameryn Seibold, Tricolor's senior director of finance, *and others*, engaged in a series of frauds directed at each of Tricolor's lenders.") (emphasis added); *id.* ¶ 13 ("From at least in or about 2022, DANIEL CHU and DAVID GOODGAME, the

21

defendants, Kollar, Seibold, *and others* repeatedly manipulated borrowing base data . . .") (emphasis added); *id.* ¶ 14 ("Kollar, Seibold, *and others* submitted borrowing base reports with false and manipulated data or already-pledged loans") (emphasis added); *id.* ¶ 17 ("The difference—consisting of approximately $800 million in bogus collateral—resulted from the series of schemes and the conspiracy in which DANIEL CHU and DAVID GOODGAME, the defendants, Kollar, Seibold, *and others* participated.") (emphasis added); Ex. 26 at 4 ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

Even in ordinary conspiracy cases—which this is not, since "at least 4 persons acting in concert" is an element of the Section 225 offense—the government is often required to identify unindicted co-conspirators. "In deciding whether a defendant's demand for the names of known unindicted co-conspirators would achieve these ends"—*i.e.*, the purposes of a bill of particulars, including allowing a defendant to prepare for trial and avoid surprise—"courts should consider the following factors: (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation." *United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000). These factors weigh strongly in favor of disclosure, which in this Section 225 case should be required to help define the "enterprise" charged in the Indictment.

*First*, the government has not indicated how many individuals may be included in the category of "others." Therefore, "it is uncertain how many co-conspirators are involved here,"

which weighs in favor of disclosure, as "[t]he potential for unfair surprise looms large here." *United States v. Barrett*, 153 F. Supp. 3d 552, 572–73 (E.D.N.Y. 2015); *see also United States v. Allocco*, 801 F. Supp. 1000, 1003 (E.D.N.Y. 1992), *aff'd*, 29 F.3d 620 (2d Cir. 1994) ("the government must provide defendant with the names of 'the others' referred to in the indictment in order to allow defendant to properly prepare for trial."). That is especially true because the government has taken the position, as noted above, that the members of the enterprise need *not* have co-conspirator liability to be counted as "acting in concert" with Mr. Chu. Schwartz Decl. ¶ 49. The vagueness of who might constitute a member of the enterprise dramatically heightens the uncertainty here.

*Second*, the government alleges an eight-year criminal enterprise potentially spanning the ranks of Tricolor. A significant number of individuals could fall within the definition of "others." *Nachamie*, 91 F. Supp. 2d at 572–73 ("If there are a large number of co-conspirators and a long-running conspiracy, a defendant is more likely to be surprised by the identity of other co-conspirators, whom he may never have met. If the government has failed to provide adequate notice of the particulars, or if the discovery has been voluminous, identification of known unindicted co-conspirators will help a defendant focus his investigation and prepare for trial.").

*Third*, the government has not provided adequate notice by other means. The government ███████████████████████████████████████████████ in its May 13 Letter. Ex. 26 at 4. This leaves Mr. Chu unable to investigate the alleged enterprise, identify potential witnesses, or mount any meaningful defense.

*Fourth*, the government's pretrial disclosures have been voluminous. That fact weighs in defendant's favor. *Barrett*, 153 F. Supp. 3d at 572–73. With no clear indication of the relevant individuals from the government's productions, and no clear guidance for what might make

23

someone a member of the enterprise, "it would meaningfully alter the nature of the charges and, accordingly, [Chu's] preparation for trial if it were revealed that the Government considered him to be conspiring with other individuals" not named in the Indictment. *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 (S.D.N.Y. 2018); *cf. Reddy*, 190 F. Supp. 2d at 570 (bill of particulars not required where "the number of defendants is small, the duration of the alleged acts was not long and the number of unnamed co-conspirators or parties allegedly assisting in the wrongdoing does not appear to be so large such that there is not much likelihood that Defendants would be surprised by the identity of these persons."); *Nachamie*, 91 F. Supp. 2d at 573 ("the Government has produced a substantial number of documents . . . but has failed to give defendants adequate notice of the particular charges against them. Providing the names of known unindicted co-conspirators therefore will allow defendants to prepare for trial."). The voluminous discovery received to date does not reasonably allow Mr. Chu to ascertain who is among the "others" and who is not, particularly in light of the amorphous legal standard articulated by the government for what it means to be "acting in concert."

*Fifth*, Mr. Chu has not been charged with a violent offense, and the alleged crime is not ongoing. No one is in any danger from Mr. Chu.

*Sixth*, the approaching trial date requires disclosure of co-conspirators "in order to prevent unfair surprise and enable defendants to prepare for trial." *Nachamie*, 91 F. Supp. 2d at 573. The government cannot claim an ongoing investigation would be hindered where it has also claimed that it is prepared to try the case. *Barrett*, 153 F. Supp. 3d at 573.

Simply put, even in an ordinary conspiracy case, it would be appropriate to identify the alleged co-conspirators for this vast, years-long conspiracy where so much is left out of the Indictment. But the fact that this is a Section 225 case—which both has the existence and Mr.

24

Chu's leadership of an "enterprise" constituted of "at least 4 persons acting in concert" as elements of the offense, *and* which exposes Mr. Chu to the most serious penal consequences possible for a financial crime—requires the Indictment to allege the relevant "enterprise."  The failure of the Indictment here renders it insufficiently pled, and at a minimum the government should be required to provide a bill of particulars identifying all known individuals that comprise the charged enterprise.

### 3.    The Alleged Duration of the Enterprise, Eight Years, Compounds The Problem.

Count One is premised on a criminal enterprise that was allegedly active from at least 2018 through 2025.  Indictment ¶ 1.  And, as observed above, that enterprise must have consisted of at least four people acting in concert with one another, or, put differently, "at least three other persons act[ing] in concert with [Mr. Chu] in executing" a series of specified violations.  *United States v. Lefkowitz*, 125 F.3d 608, 618 (8th Cir. 1997).

The Indictment identifies only four people as allegedly part of the enterprise:  Mr. Chu and Mr. Goodgame, who are charged, and the two cooperators, Kollar and Seibold.  According to the Indictment, this "enterprise" dates back to at least 2018, when Mr. Chu allegedly "directed Kollar to create a fictitious portfolio company in Tricolor's dealer management system (which was used to track Tricolor's loans and their associated data), transfer the charged-off loans to that new portfolio company in the dealer management system, and arrange for other Tricolor employees to manually enter fake payments on those charged-off loans in the dealer management system."  Indictment ¶ 10.

There are many problems with this allegation.  To begin with, it involves only two people.  The Indictment does not bring a third or fourth person into the narrative until (in paragraph 13) 2022.  This begs the question:  what was the enterprise prior to 2022?

The Indictment also does not identify what the fictitious company was or how Mr. Chu directed its creation. As noted above, it wasn't until May 13 that the government finally provided Mr. Chu with the name of this alleged fictitious company. Upon receiving it, the defense immediately scoured the discovery produced to date for any references to that company, and found none. Schwartz Decl. ¶ 42. The government, for its part, ███████████████████

███████████████████████████████████████

███████████████████████████████████ Ex. 26 (May 13 Letter) at 3. That is woefully insufficient if this allegation is supposed to be one of the "series of offenses" that comprise the enterprise. *See, e.g., Reddy*, 190 F. Supp. 2d at 569 (ordering bill of particulars where indictment alleged the defendant "directed the creation of fraudulent claims" and "[t]he [i]ndictment provide[d] no further facts with respect to this allegation").

The other allegations predating 2022 fare no better. The Indictment lacks any factual allegations concerning the enterprise in 2019 or 2020. After the single paragraph concerning 2018, the Indictment jumps to 2021, but again describes communications solely between Mr. Chu and Kollar, with no identified third or fourth person "acting in concert" with them. Indictment ¶¶ 11–12. Even assuming for the sake of argument that these allegations were sufficient to make out a conspiracy or a scheme to defraud between the two men, they fall short of pleading the four-person concert required under Section 225. An "enterprise" cannot exist under Section 225 when it consists of only two people—yet that is what the Indictment charges for a substantial portion of the relevant period.

To be clear, it is not necessarily Mr. Chu's contention that each and every act in the "series of violations" constituting the "enterprise" involve four or more persons acting in concert. One could imagine a large-scale financial crime enterprise that involves one person "organizing,

26

managing, or supervising" a battalion of individuals and teams that otherwise acted essentially independently from one another in classic wheel-and-spoke fashion. Think, for example, of a hedge fund manager whose business model was based on insider trading, with each trader or portfolio manager at the fund trading different securities and acting independently of one another, all in violation of 18 U.S.C. § 1343. Even though some of those groups of traders might consist of fewer than three individuals (plus the alleged "kingpin"), it might be appropriate to consider their offenses part of the "series of violations" that constitute the enterprise. But it cannot be the case that an "enterprise" exists for purposes of Section 225 when the *entire enterprise* consists of only two people, which appears to be what the Indictment charges here for a substantial number of years.

Simply put, the Indictment does not give Mr. Chu adequate notice of the "enterprise" he allegedly commanded. Who were its members? When did they participate? What did they do? These are the essential elements of a Section 225 offense, and the Indictment does not answer them. Count One must therefore be dismissed, or at minimum, the government must be required to provide the requisite specificity.

> **4.    The Indictment Also Does Not Adequately Allege That Mr. Chu Organized, Managed, or Supervised the "Enterprise," as Opposed to the Company.**

Section 225 requires that the charged defendant "organizes, manages, or supervises" the charged "enterprise." 18 U.S.C. § 225(a)(1). The Indictment falls short on this point, as well.

Given the expansive scope of fraudulent conduct referenced in the Indictment that Mr. Chu allegedly organized, the government should be required to "particularize the crimes charged by identifying to the defense a finite universe" of conduct, from which it will present a subset to the jury in attempting to prove the charges at trial. *United States v. Connolly*, 2017 WL 2537808, at *6 (S.D.N.Y. May 24, 2017). "Given the magnitude of the Government's data dump and the length

27

of time over which the alleged conspiracy took place"—not to mention the novelty of the Section 225 charge—"the usual rules on bills of particulars need to be stretched." *Id.*

Here, the Indictment contains no specific allegations regarding how Mr. Chu directed the enterprise. The allegations, though occasionally detailed, do not describe Mr. Chu's organization, management, or supervision of the enterprise itself. In some places, Mr. Chu's leadership is asserted entirely generically. *See, e.g.*, Indictment ¶ 13 ("CHU directed Kollar to fraudulently obtain more liquidity"). In others, the Indictment alleges what appears to be direct, personal conduct by Mr. Chu, which says nothing about his alleged leadership. *See, e.g., id.* ¶¶ 9, 11, 13 (alleging, incorrectly, that Mr. Chu *personally* double pledged loans and manipulated data).

Further, the allegations that Mr. Chu directed the fraudulent conduct are belied by both the discovery produced to date and by the allegations that Kollar and Seibold were personally manipulating data in borrowing base reports and directing others to assist in doing so. *Id.* ¶¶ 15, 16. The government has acknowledged that, while co-conspirators only acted under Mr. Chu's "specific direction" "at times," it will nevertheless rely on alleged "overarching directives" to prove Mr. Chu's leadership. *Id.* ¶ 14. That is improper, at least without adequate notice of those directives. But the government cannot proceed on that theory without first identifying what those directives were. Where Mr. Chu's alleged direction of the enterprise is an element of the offense, the government must provide notice of each specific action it intends to rely on as evidence of Mr. Chu's organization, management, or supervision of an underlying violation. *See, e.g., Connolly*, 2017 WL 2537808, at *6 ("it is simply unrealistic to think that giving defendants the underlying data for millions of transactions . . . without identifying a limited subset of transactions on which

28

the Government intends to rely, is 'sufficiently precise' to allow defendants to prepare a defense and to avoid unfair surprise at trial.").[5]

Unable to allege specific instances of directing the fraud as it occurred, the Indictment focuses extensively on Mr. Chu's communications once "The Frauds Unravel." Indictment at 10; *see id.* ¶¶ 18–25. However, Mr. Chu's conduct post-dating the alleged "Frauds" cannot as a matter of law or logic prove that he organized, managed, or supervised them while they were ongoing. The Indictment does not allege any specific offense—much less a "series of violations"—that occurred during that brief period in August and September 2025, and it stands to reason that no such offenses could have been committed in that period, after the alleged fraud was revealed. Further, the government chose to charge a fraud that allegedly persisted during eight calendar years—not for two months—and it should be required to provide notice of how it intends to prove Mr. Chu's direction of the fraud throughout that span; a few weeks doesn't suffice.

Because the Indictment does not sufficiently allege Mr. Chu's leadership of the enterprise, Count One must be dismissed, or the government must at least provide a bill of particulars.

### 5.    The Indictment Fails to Adequately Allege the Gross Receipts Element of Count One.

Finally, the Indictment also fails to allege the gross receipts element of the Section 225 offense in two ways, both of which are fatal to the count. First, the Indictment fails to allege how Mr. Chu "receive[d] $5,000,000 or more in gross receipts from such [continuing financial crimes] enterprise during any 24-month period . . . ." 18 U.S.C. § 225(a)(2). As pled, the Indictment only

---

[5]    To the extent that the government intends to rely only on the alleged violations of 18 U.S.C. §§ 1343 and 1344 identified in the charts in paragraphs 27 and 28, it should specify that. *See* Indictment ¶ 26 ("the defendant committed violations of Title 18, United States Code, Sections 1343 and 1344, including violations one through ten set forth below"). Still, those violations are not much more specific, each one spanning multiple years.

catalogues various forms of compensation that Mr. Chu received at different points of time. Indictment ¶ 25. It does not differentiate "gross receipts" from compensation received by Mr. Chu in the normal course of business, nor does it allege that all of Tricolor's assets constituted gross receipts of the enterprise. At best, the Indictment alleges that, "[o]ver time, this series of fraudulent schemes had a profound effect on Tricolor, which obtained hundreds of millions of dollars in cash advances," while Mr. Chu allegedly "used a portion of the funds to enrich himself." *Id.* ¶ 1. But the $5 million or more in "gross receipts from such enterprise" is an element of the Section 225 offense, and to adequately plead it the Indictment needs to identify which payments the government believes constitute the gross receipts *from* the enterprise. *See United States v. Lefkowitz*, 125 F.3d 608, 618 (8th Cir. 1997) (in a case alleging fraud on the investors, "[t]he jury found that Lefkowitz violated § 225 when CEG raised more than $5,000,000 from FSM–VI and FSM–VIII investors within a two-year period."); *United States v. Bennett*, 2006 WL 8435170, at *3 (C.D. Cal. May 24, 2006) ("the $5 million element of the offense [i]s 'tied to the series of violations,' *i.e.*, the $5 million or more in receipts should come 'from the series of violations during any 24-month period.'") (quoting *United States v. Harris*, 79 F.3d 223, 230 (2d Cir. 1996)). It is not sufficient to allege that "CHU had received tens of millions of dollars in compensation from Tricolor," *id.* ¶ 25, unless it is the government's position that all *compensation* received by Mr. Chu (which was approved by an independent Board of Directors) is in fact gross receipts of the charged enterprise. And if that is the government's position, it should say so.

Second, the Indictment fails to specify the particular 24-month period in which Mr. Chu allegedly received the gross receipts. In order to state this offense, the government must identify the 24-month period in which it alleges that Mr. Chu received more than $5,000,000 in gross receipts. *See United States v. Harris*, 805 F. Supp. 166, 179 (S.D.N.Y. 1992) (indictment was

sufficiently definite in alleging that "the chief executive officer of companies is accused of seven separate executions of a scheme to defraud a financial institution, and 12 violations of the wire fraud statute in furtherance of that scheme, during a specified twenty-four month period."); *United States v. Gallant*, 2006 WL 278554, at *2 (D. Colo. Feb. 3, 2006), *aff'd in part*, 537 F.3d 1202 (10th Cir. 2008) (denying motion for acquittal of § 225 claim where jury was instructed that defendants must have "received more than $5,000,000 in gross receipts, from such enterprise during a 24 month period," and in the indictment, "[t]he 24–month period was identified in Count 74 as beginning on August 1, 1996, and ending on July 23, 1998."). But instead of identifying a particular 24-month period, the Indictment merely cites to various forms of compensation Mr. Chu received from Tricolor at various points during the seven plus years encompassed by Count One. The failure to identify the 24-month period relevant to this element is, alone, enough to dismiss Count One.

Regardless of the Indictment's facial deficiencies in this respect, the defense attempted to confer with the government to obtain greater clarity on the gross receipts element of Count One. In its May 13 Letter, the government specified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Ex. 26 at 5 (alterations adopted) (quoting *United States v. Harris*, 1993 WL 300052, at *8 (S.D.N.Y. July 30, 1993)). However, during the parties' May 15 meet and confer, the government retreated from its position, refusing to identify what "gross receipts" it would rely on at trial. Schwartz Decl. ¶ 51. Having chosen to bring this charge, the government cannot now refuse to identify its own proof as to essential elements. Because the government has failed to properly allege a core element of the offense, Count One must be dismissed. Short of that, it

31

should be required to clarify in a bill of particulars what "gross receipts" Mr. Chu is charged with receiving.

## II.    MOTION FOR A BILL OF PARTICULARS ON THE REMAINING COUNTS[6]

### A.    Mr. Chu and Mr. Goodgame are Also Entitled to a Bill of Particulars on Counts Two, Three, and Four.

These charges—bank fraud, wire fraud affecting a financial institution, and conspiracy to commit the same—while much more common than the Section 225 charge discussed above, are still plagued by many of the same pleading infirmities.  A bill of particulars is necessary to clarify Mr. Chu's alleged role and participation in the Indictment's sweeping conspiracy and years-long fraudulent conduct.  The allegations on these counts fail to provide sufficient notice of the conduct alleged to enable Mr. Chu and Mr. Goodgame to prepare for trial.  The Government Must Particularize Count Two.

Count Two alleges conspiracy to commit bank fraud and wire fraud affecting a financial institution.  *See* Indictment ¶¶ 29–32.  A conspiracy charge requires that the defendant "agreed with another" to commit an underlying substantive offense "and knowingly engaged in the conspiracy with the intent to commit that offense."  *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024).  Conspiracy to commit fraud requires specific intent.  *United States v. Hussain*, 785 F. Supp. 3d 9, 13 (D. Vt. 2025) (citing *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984)).

---

[6]    Mr. Chu expressly joins in and incorporates by reference the arguments made by Mr. Goodgame in his motion for a bill of particulars, and any other arguments in Mr. Goodgame's motion relevant to Mr. Chu.

Here, for the reasons described above (*supra* Sec. I.B.4), the Indictment fails to allege how Mr. Chu "engaged in the conspiracy" and its methods of modifying and submitting fraudulent borrowing base reports, or how Mr. Chu intended to commit fraud.

"Additionally, it is a long-standing principle of this Court's law of conspiracy that '[n]obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it.'" *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (quoting *United States v. Peoni,* 100 F.2d 401, 403 (2d Cir.1938)). For example, in *McDermott*, the court reversed a conviction for conspiracy to commit insider trading where the defendant had no knowledge that the information he passed to one person was then passed to several others. *Id.* at 137–38.

Here, the Indictment fails to connect Mr. Chu's alleged requests that his CFO "obtain more liquidity" with Kollar's conduct in which he "directed Seibold to submit fraudulent borrowing base reports." Indictment ¶ 13. The government offers no explanation how Mr. Chu's communications with Kollar were—or reasonably could have been—interpreted as directives to commit fraud.

On this basis alone, the conspiracy charge is insufficiently pled. The government should be required to state in a bill of particulars, as it did in *United States v. Mermelstein*, 487 F. Supp. 2d 242, 250–51 (E.D.N.Y. 2007), (1) the time frame of the scheme, (2) the scheme's victims, (3) the perpetrators of the scheme, (4) the place where the scheme was perpetrated, (5) the purpose of the scheme, and "most significantly" (6) the means by which the scheme was carried out. In addition, to the extent that the conspiracy charged in Count Two is different than the enterprise charged in Count One, the government must be required to explain how.

33

**B.    The Government Must Particularize Counts Three and Four.**

Given the inconsistent ways in which the government alleges Mr. Chu himself participated in the alleged fraud, a bill of particulars is necessary on the substantive fraud counts, as well.  Like the conspiracy charge, the bank fraud and wire fraud charges require specific intent.  *See, e.g.*, *United States v. Priolo*, 812 F. Supp. 3d 250, 264 (E.D.N.Y. 2025).  In addition, where the government charges a continuing offense, as it has in Counts Three and Four (*see United States v. Teman*, 465 F. Supp. 3d 277, 311–15 (S.D.N.Y. 2020), *aff'd*, 2023 WL 3882974 (2d Cir. June 8, 2023)), it must identify each occurrence that constitutes part of the continuing offense and thereby tolled the statute of limitations.  *See United States v. Pontz*, 132 F.4th 10, 25 (1st Cir. 2025) ("an overbroad application of the continuing-offense doctrine would undermine congressional policy to 'protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.'") (quoting *Toussie v. United States*, 397 U.S. 112, 114–15 (1970)); *United States v. Yashar*, 166 F.3d 873, 876 (7th Cir. 1999) ("for a conspiracy offense, the statute of limitations would not run from the time of the first overt acts, but instead would run from the occurrence of the last act in furtherance.").  Here, the Indictment contains no facts at all as to whole years supposedly part of the fraud, and only brief, tenuous allegations relating to others.

In Count Three—bank fraud—the Indictment alleges a wide scope of potentially fraudulent misrepresentations, which may have included "Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral . . . ."  *See* Indictment ¶¶ 34.  Count Four—wire fraud affecting a financial institution—is similarly vague.  The government should be required to state each instance of fraud on a particular lender, the manner in which the fraud was committed, and Mr. Chu's particular connection to the fraud.  Courts "routinely award" bills of particulars identifying each false statement the government may attempt to prove at trial.  *United States v.*

34

*Lino*, 2001 WL 8356, at \*6 (S.D.N.Y. Jan. 2, 2001) (collecting cases).  This Court should order similar relief here.

## III.  MOTION TO SUPPRESS EVIDENCE, OR FOR A *FRANKS* HEARING

Mr. Chu respectfully moves for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether evidence seized pursuant to the warrants issued for his iCloud accounts, personal devices, residence, and bank account should be suppressed.  The Warrant Affidavits—particularly to the extent they purport to inculpate Mr. Chu or provide probable cause to believe that Mr. Chu's devices contain evidence of criminal activity—rely extensively on the government's two cooperating witnesses, Kollar and Seibold.  But the Warrant Affidavits omitted material, exculpatory information that the government possessed at the time, including information from the cooperators' interviews (later revealed through a *Brady* disclosure) as well as information about Kollar's past involvement in fraudulent activity.  Those omissions were not harmless; they were the basis for the government's showing of probable cause.

### A.    Legal Standard Under *Franks*

"[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing."  *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978).  The Fourth Amendment "would be 'reduced to a nullity if a police officer was able to … remain confident that the ploy was worthwhile.'"  *United States v. Castellanos*, 820 F. Supp. 80, 84 (S.D.N.Y. 1993) (quoting *Franks*, 438 U.S. at 168).  As such, the law "permits a defendant to challenge the truthfulness of factual statements made" in an affidavit supporting a search warrant application, "and thereby undermine the validity of the warrant and the resulting search and seizure."  *United States v. Mandell*, 752. F.3d 544, 551–52 (2d Cir. 2014) (citing *Franks*, 438 U.S. at 155–56).  *Franks* likewise permits a defendant to

35

challenge the omission of material information from a warrant affidavit. *See United States v. Rajaratnam,* No. 09-cr-1184 (RJH), 2010 WL 4867402, at *7-8 (S.D.N.Y. Nov. 24, 2010).

A defendant is entitled to a *Franks* hearing upon a "substantial preliminary showing" that (1) the affidavit contained intentional or reckless misrepresentations or omissions—*i.e.*, "deliberate falsehood or reckless disregard for the truth," and (2) the misstatements were material—*i.e.*, "necessary to the judge's probable cause finding." *United States v. Nejad*, 436 F. Supp. 3d 707, 718–19 (S.D.N.Y. 2020) (emphasis omitted) (quoting *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)). "[T]he Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 156. Material omissions "are governed by the same rules." *United States v. Ferguson*, 758 F. 2d 843, 848 (2d Cir. 1985).

### B. The Warrant Affidavits Recklessly Omitted Known Material, Exculpatory Information.

The Search Warrant Affidavits heavily relied on summaries of interviews of two cooperating witnesses—Kollar and Seibold—to establish probable cause that Mr. Chu knowingly participated in and directed the alleged scheme. But the affidavits did not present those interviews fairly; they omitted material qualifications and exculpatory facts that the government possessed *before* the warrant applications were submitted.

To establish both intentional and reckless falsehoods, a defendant must show that "the misstatement or omission [was intended] to mislead the judicial officer into approving the requested warrant." *United States v. Vilar,* 2007 WL 1075041, at *25 (S.D.N.Y. Apr. 4, 2007). When an affiant makes statements that ignore or disregard the facts as he knew them, or which he seriously doubted to be true, the "reckless disregard for the truth" standard is met. *Rivera v. United States,* 728 F. Supp. 250, 258 (S.D.N.Y. 1990) ("If [the affiant] made statements which failed to take account of the facts as he knew them, or which he seriously doubted were true, that would

36

show reckless disregard for the truth."), *aff'd in part, vacated in part,* 928 F.2d 592 (2d Cir. 1991); *Vilar,* 2007 WL 1075041, at \*26 ("[O]ne 'recklessly disregards' the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations.").

Similarly, an omission is made with reckless disregard for the truth when "'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *United States v. Perez,* 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003) (quoting *Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir. 2000)). "[W]here the omitted information was 'clearly critical' to the probable cause determination," recklessness can be inferred. *Id. See, e.g.*, *United States v. Lahey*, 967 F. Supp. 2d 698, 717 (S.D.N.Y. 2013) (granting motion to suppress in part where warrant affidavit "omitted certain . . . information in order to create the impression that" the defendant was tied to the alleged criminal conduct "when, in actuality, [the defendant] had no knowledge" of the criminal activity taking place). Information tending to exculpate the target of a warrant, or that calls into question the veracity of the factual sources of information in a warrant affidavit, is necessarily the sort of thing that "a judge would wish to know." *See Perez*, 247 F. Supp. at 474.

Here, the Search Warrant Affidavits selectively summarized the Kollar and Seibold interviews to create the appearance of direct knowledge and intentional participation by Mr. Chu, while recklessly omitting those witnesses' statements that contradicted that narrative. This information was material to the probable cause determination—indeed, more than a third of the sections of the affidavits detailing probable cause for the subject offenses relied directly on summaries of Kollar and Siebold's interviews. *See* Ex. 1 (iCloud Warrant Affidavit) at 11–16; Ex. 3 (Premises Warrant Affidavit) at 3–7.

### 1.    Reckless Omissions from the Kollar Interview

The Search Warrant Affidavits present Kollar as supplying direct inculpatory evidence that Mr. Chu knew about and directed the alleged conduct. For example:



- ███████████████████████████████████████████████████████ Ex. 1 ¶ 14.a;
Ex. 3 ¶ 10.a.

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 1 ¶ 14.b; Ex. 3 ¶ 10.b.

However, what the Affidavits failed to tell the issuing judges is critical. The Affidavits omit exculpatory statements Kollar made during his September 16, 2025 interview, which the government cannot dispute it possessed before both Search Warrant Affidavits were sworn on September 26 and October 7, 2025. *See* Ex. 19 (*Brady* Letter) at 4. Kollar told the government that ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

*Id.* The *Brady* Letter likewise contains key limitations that materially undercut the Search Warrant Affidavits' narrative of Mr. Chu's knowledge. Kollar stated that ████████████████

████████████████████████████████████████████

████████████████████████████████████████ *Id.* And with respect to

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.*

38

The Search Warrant Affidavits omitted this context entirely, even though it bears directly on Mr. Chu's knowledge.[7]

In short, the Search Warrant Affidavits asked two different magistrate judges to credit Kollar's statements to establish Mr. Chu's knowledge and direction, while omitting information that materially changes that assessment. This information was material to the probable cause determination and supports ordering a *Franks* hearing. *See e.g., Lahey*, 967 F. Supp. 2d at 723–30.

### 2.    Reckless Omissions from the Seibold Interview

The Search Warrant Affidavits similarly relied on Seibold to supply an inculpatory narrative about Mr. Chu's knowledge and intent, while omitting a critical limitation on what Seibold actually knew. For instance, the Search Warrant Affidavits recount that ████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████  Ex. 1 ¶ 13.b; Ex. 3 ¶ 9.b.

The Affidavits also summarized that ██████████████████████████

█████████████████████████████████████████████████

████████████████████████████  Ex. 1 ¶ 11.c; Ex. 3 ¶ 7.c.

---

[7]    The government was likely also already in possession of other exculpatory information, including ████████████████████████████████████
██████████████████████████████████████  Ex. 19 (*Brady* Letter) at 4; *see also* Ex. 20 (audio recording of September 3, 2025 call (USAO_REL_07_00114891)). This contemporaneous admission, even more than Kollar's self-interested proffers, makes clear that Chu was unaware of Kollar's manipulation of the borrowing bases—the central allegation in the Indictment.

But the government's *Brady* disclosures reveal a limitation that fundamentally changes how an issuing judge would evaluate those statements: ███████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████ Ex. 19 (*Brady* Letter) at 5.

That limitation directly bears on the reliability and scope of Seibold's knowledge and information, and suggests that anything Seibold knew about Mr. Chu came from Kollar— effectively double-dipping on Kollar's statements to provide probable cause. For instance, the Search Warrant Affidavits ████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████ The limitation is particularly important given that, like Kollar, Seibold's credibility is plagued by incentives to align his account with the government's theory and shift responsibility upward.

Contemporaneous documentary evidence that was likely available to the government at the time it submitted the Warrant Affidavits would have rendered any reliance on Seibold's statements unreasonable. As demonstrated by his own text messages Seibold produced to the government, Seibold ████████████████████████████████████████████ ████████████████████████ Ex. 24 (Seibold texted █████████████████████ ██████████████████████████████████████████████.") . A magistrate judge deciding whether probable cause exists would plainly want to know that █████████████ ██████████████████████████████████████████████████████████ ████████████████████████████

### 3.     Reckless Omissions Concerning Kollar's History of Fraud

The Search Warrants Affidavits' heavy reliance on Kollar is especially troubling given what else they omit: this is the second time a company where Kollar served as CFO was driven into bankruptcy following revelations of his misconduct.

In 2017, Kollar was sued by the court-appointed Chapter 7 trustee of Mach Speed Holdings, LLC and its affiliates—a consumer electronics, audio, and recreational products company over which Kollar was CFO.  The trustee alleged that Kollar and other officers of the debtors orchestrated a multi-step scheme to siphon value from the company, including through improper loan practices and related-party transactions.  The trustee's complaint alleges a variety of claims, including breach of fiduciary duty and engaging in fraudulent transfers, and expressly alleges that Kollar and other defendants engaged in "malicious, willful, and fraudulent conduct and/or gross negligence."  Ex. 29 (*Chow v. Baldwin et al.*, Case No. 3:17-cv-03056-K (N.D. Tex.), ECF No. 1 (Notice of Removal) at 64 (*Chow v. Baldwin, et. al.,* Case No. DC-17-13506 (192nd District Court of Dallas County, Texas) (Complaint)).[8]

The fact that Kollar had a history of engaging in allegedly fraudulent transactions— including fraudulent lending transactions—as CFO of another company, which likewise ended up in bankruptcy, is highly relevant to his credibility as someone upon whom the Warrant Affidavits rely.  Ex. 1 ¶ 14; Ex. 3 ¶ 10.  It is certainly something that a "judge would wish to know," *Perez,* 247 F. Supp. 2d at 474, particularly where the Warrant Affidavits relied so heavily on information from Kollar to attempt to implicate Mr. Chu.

---

[8]     The complaint against Kollar was subsequently removed to federal court in light of the Mach Speed bankruptcy.  *See* Ex. 29 at 3–4.

41

### 4.    Reckless Omissions in the Seizure Warrant Affidavit

This pattern of selective disclosure did not end with the Search Warrants.  It resurfaced in the application for the Seizure Warrant restraining Mr. Chu's bank account.  As set forth above, the government froze Mr. Chu's and his wife's primary bank account without a warrant, notice, or exigency.  *See supra* Relevant Background, Sec. C.  Only after Mr. Chu publicly filed an emergency letter motion laying out the severe constitutional threats and practical consequences of that freeze*, see* ECF No. 24, did the government apply for a warrant to seize the account, *see* Ex. 17 (Seizure Warrant Affidavit); Ex. 18 (Seizure Warrant); *see also* ECF No. 25 (government's response to Mr. Chu's Emergency Letter Motion).

By the time the Seizure Warrant Affidavit was submitted, the government knew that Mr. Chu had publicly challenged the warrantless freeze of his bank account and laid out, in detail, why it violated Mr. Chu's Fourth, Fifth and Sixth Amendment rights.  But rather than fairly presenting that information to the magistrate judge, the Application reduced Mr. Chu's objections to a cryptic footnote, stating only that he had objected to the prior restraint as unconstitutional.  The Application failed to include the important factual information in Mr. Chu's emergency motion regarding the particular account or describe the intervening events in the parallel bankruptcy proceeding that precipitated the government's freezing of the account.  And while the Seizure Warrant Affidavit disclosed that the government had already frozen the account by letter before it sought judicial authorization, it failed to explain why judicial process was not sought in the first instance or provide the court with the full context needed to assess the significance of that sequence.

The omissions were material because they would have directly addressed what the magistrate judge was being asked to approve: a warrant authorizing seizure and continued restraint of funds that were already frozen.  And the omissions were not accidents; they allowed the

42

government to present the seizure as an urgent necessity rather than an attempt to retroactively justify the freeze that it had already imposed without lawful process.  Had the magistrate judge been presented with a complete record on the premature account freeze, there is at least a fair probability that she would have questioned whether seizure was appropriate at all.

Accordingly, the Seizure Warrant Affidavit's omissions provide an additional, independent basis for a *Franks* hearing.[9]

### C.        The Omissions Were Material to Probable Cause.

Having established that the affiants omitted material information in reckless disregard for the truth, the next step in the *Franks* inquiry is to establish that the omissions were material.  *See United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).

In assessing materiality, a court must decide whether "putting aside erroneous information . . . there remains a residue of independent and lawful information sufficient to support probable cause," *United States v. Awadallah,* 349 F.3d 42, 65 (2d Cir. 2003), or, in the case of material omissions, whether inclusion of the omitted truths would support probable cause, *Rajaratnam,* 719 F.3d at 146.  When the remaining allegations are "insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks,* 438 U.S. at 156.  In that regard, probable cause to support a search warrant exists if the totality of circumstances "raise a fair probability that contraband or evidence of a crime will be found." *Illinois v. Gates,* 462 U.S. 213,

---

[9]        As set out in Mr. Chu's emergency letter motion, the government's seizure of his assets also raises potential Fifth and Sixth Amendment rights.  Because Mr. Chu is currently able to afford counsel of choice thanks to insurance coverage, any motion based on those grounds would be premature. *See United States v. Cosme*, 796 F.3d 226, 233 (2d Cir. 2015) (citing *United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013)).  But Mr. Chu reserves the right to raise those issues should it become ripe.

238 (1983).  If, as is often the case, probable cause is putatively established by information obtained from an informant, courts may consider both the reliability of the informant and the reliability of the information provided by the informant.  *See id.* at 230 (holding that while an informant's "veracity" is "highly relevant" to the existence of probable cause, it is only one part of the larger common sense determination).

The Search Warrants depend on the proposition that Mr. Chu knew about and directed the alleged lending misrepresentations.  But the *Brady* Letter materially undercuts that proposition. Kollar's account that ████████████████████████████████████████ ████████████ is incompatible with the narrative of Mr. Chu's longstanding direction.  Ex. 19 (*Brady* Letter) at 4; *see also id.* ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Separately, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████—undermines the Search Warrant Affidavits' ability to treat Seibold as having direct knowledge of Mr. Chu's intent, and instead reveals that he was reciting hearsay from Kollar.  And of course this double reliance on Kollar to try to pin the fraud on Mr. Chu is particularly problematic in light of the Search Warrant Affidavits' omissions about Kollar's history of similar fraudulent conduct.

With those facts restored, the affidavits show—at most—that a single cooperating witness, facing substantial sentencing exposure and with his own history of fraud, offered a qualified account implicating his corporate superior.  That is not enough to establish probable cause for the sweeping searches authorized here.

44

**D.** **The Court Should Order Disclosure of Unredacted FBI 302s and Underlying Notes of the Kollar and Seibold Interviews.**

Given the indisputably critical significance of the anticipated testimony of Kollar and Seibold at trial, and the exculpatory statements attributed to them in the *Brady* Letter, Mr. Chu respectfully requests that the Court order the government to immediately produce the unredacted interview notes and the FBI interview reports (the "FBI FD-302s" or "302s") and the underlying witness notes for the interviews identified in the *Brady* Letter, and any subsequent interviews of Kollar and Seibold. *See* Ex. 19 (*Brady* Letter) at 4–6 (describing meetings with Kollar on September 16 and November 20, 2025, and with Seibold on September 6, 2025). Because *Franks* asks what information the government possessed and knew at the time it sought judicial authorization, the most reliable record of that knowledge includes the contemporaneous 302s and underlying notes. *See, e.g.*, *United States v. Holihan*, 236 F. Supp. 2d 255, 263-64 (W.D.N.Y. 2002) (holding that, even though requested 302s were not presently discoverable under the *Jencks* Act, they contain information that is "material to the preparation of the defense given that it may demonstrate how [bank employees] became aware of the alleged embezzlement" and "may also aid Defendant with her defense that she was set up by co-employees," and ordering transposition of specific facts in the reports).

Mr. Chu should not be forced to litigate reckless omissions and materiality based on the government's paraphrasing and summaries of what occurred in these pivotal interviews. In the alternative, Mr. Chu requests that the Court conduct *in camera* review of the unredacted materials and order production of all portions that bear on the omissions identified in this Motion, on Mr. Chu's alleged knowledge and intent (including his purported supervision of the continuing financial crimes enterprise), and on the credibility and scope of knowledge of Kollar and Seibold.

45

IV.     **MOTION TO UNSEAL AND DISCLOSE GRAND JURY RECORDS OR, ALTERNATIVELY, FOR *IN CAMERA* REVIEW**

For similar reasons, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), Mr. Chu respectfully moves for disclosure of the grand jury record—specifically, (i) the transcripts of all grand jury proceedings, and (ii) all legal instructions provided to the grand jury—or, at minimum, *in camera* review of those materials in the first instance.

A.     **The Government Is Required to Present Exculpatory Evidence In the Grand Jury If It Undermines Probable Cause**

As demonstrated in the *Franks* Motion, the government's theory of Mr. Chu's knowledge and intent depends entirely on two cooperating witnesses: Kollar and Seibold.  But the government's sworn Warrant Affidavits omitted material portions of these witnesses' pre-indictment interviews that undermine and contradict that narrative.  Those omissions—especially when coupled with the Indictment's speaking allegations that plainly come from information provided by Kollar and Seibold, *see, e.g.*, Indictment ¶ 13, 14—raise serious concerns that the grand jury's probable cause determination may likewise have rested on the same selective and incomplete presentation, rather than a fair account of what the government already knew when it sought to indict.

While the Supreme Court has found that prosecutors have no "legal obligation to present exculpatory evidence" to a grand jury, *United States v. Williams*, 504 U.S. 36, 52 (1992), dismissal may still be warranted if "the prosecutor's conduct" before the grand jury "amount[ed] to a knowing or reckless misleading of the grand jury as to an essential fact," *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (quoting *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989)).  A prosecutor who intentionally or recklessly misleads the grand jury "impair[s] . . . the grand jury's independent role." *United States v. Vetere*, 663 F. Supp. 381, 386 (S.D.N.Y. 1987) (quotation omitted).

46

The Department of Justice's own policy reinforces that principle.  When a prosecutor is "personally aware of substantial evidence that directly negates the guilt of a subject of the investigation," the prosecutor "must present or otherwise disclose such evidence to the grand jury before seeking an indictment."  U.S. Dep't of Justice, Justice Manual § 9-11.233 (Presentation of Exculpatory Evidence) ("While a failure to follow the Department's policy should not result in dismissal of an indictment, appellate courts may refer violations of the policy to the Office of Professional Responsibility for review.").  The ABA Standards for Criminal Justice likewise mandate the government's responsibility:  "No prosecutor should knowingly fail to disclose to the grand jury evidence which tends to negate guilt or mitigate the offense."  American Bar Association, Standards for Criminal Justice, Prosecution Function (3d ed. 1993), Standard 3-3.6(b).  Courts have repeatedly recognized that such violations may warrant judicial scrutiny and dismissal, particularly where the failure to disclose exculpatory information may have affected the grand jury's probable cause determinations.  *See, e.g.*, *Vetere*, 663 F. Sup 381; *United States v. Estepa*, 471 F.2d 1132 (1972).

Here, nothing on the face of the Indictment indicates that the grand jury heard the full scope of Kollar's and Seibold's statements, including the exculpatory and qualifying information later disclosed in the *Brady* Letter.  In fact, between the Search Warrants being authorized and the Indictment being returned, the government continued to obtain exculpatory information from Kollar about Mr. Chu's involvement.  For example, as detailed in the *Brady* letter, on November 20, 2025, Kollar was asked about ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████     Ex. 19 (*Brady* Letter) at 4; *see also* Ex. 20 (audio recording of September

47

3, 2025 call (USAO_REL_07_00114891)).  Kollar ███████████████████████████

██████████████████████████████████████████████████████████████ Ex. 19

(*Brady* Letter) at 4.   This additional exculpatory statement, coupled with Kollar's previous exculpatory statements and the underlying recording itself, apparently did not give the government pause.

Further, the Indictment was returned only months after the government obtained the Search Warrants, when it had obtained little third-party document discovery and had not begun to identify, let alone review, the vast majority of data it had seized.  The limited discovery it likely did have, *e.g.*, from the cooperators themselves, also contained material, exculpatory content.  Ex. 24 (Seibold texts).   Even now—less than five months before trial—the government's discovery remains ongoing with no projected end date for production.  That means the government likely went to the grand jury with an incomplete evidentiary record and appears to have rushed to charge the case based on early accounts from Kollar and Seibold.  Stripped of the omissions later disclosed in the Brady Letter, and without meaningful corroboration, the grand jury's probable cause determination was based on an incomplete and misleading presentation.

### B.       There Is a Particularized Need to Disclose the Grand Jury Record.

Rule 6(e)(3)(E)(ii) permits disclosure of matters occurring before a grand jury, "at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." *Dennis v. United States*, 384 U.S. 855, 870 (1966).  Parties seeking such disclosure must show: (i) "that the material they seek is needed to avoid a possible injustice in another proceeding," (ii) "that the need for disclosure is greater than the need for continued secrecy," and (iii) "that their request is structured to cover only material so needed." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979); *see also United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001) (to obtain

disclosure, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity"). This standard applies to both *in camera* review and disclosure to the parties of grand jury minutes. *See United States v. Dunn*, 2005 WL 1705404, at *1 (S.D.N.Y. July 19, 2005). Here, there is a particularized need for the grand jury record, including transcripts and instructions.

*First*, the government already distorted Kollar's and Seibold's witness evidence to secure the Search Warrants. The Indictment was returned only months later, based on the same narrative, even though additional exculpatory information like Kollar's November 20, 2025 statements had emerged. *See, e.g.*, Ex. 19 (*Brady* Letter) at 4. We cannot know for certain whether the grand jury was misled by the same cooperating witnesses, or government agents who selectively summarized the cooperators' statements, without disclosure of the omitted *Brady* information. But if, as it is reasonable to infer, the grand jury heard testimony consistent with the Search Warrant Affidavits before it deliberated as to whether to indict Mr. Chu, then the grand jury proceedings are defective because they were based on misleading testimony. *See United States v. Hogan*, 712 F. 2d 757–62 (2d Cir. 1983) ("Heavy reliance on secondary evidence is disfavored precisely because it is not first-rate proof."); *see also, e.g.*, *United States v. Peralta*, 763 F. Supp. 14, 18–21 (S.D.N.Y. 1991) (dismissing indictment on supervisory grounds and holding that cumulative effect of inaccurate hearsay testimony and erroneous legal instructions warranted this relief even midtrial); *Vetere*, 663 F. Supp. at 383–87 (dismissing indictment even after trial jury returned guilty verdict where the hearsay testimony presented in the grand jury "crossed line" in being presented specifically to "push a wavering grand jury over the edge"); *see also United States v. Basurto*, 497 F.2d 781, 787 (9th Cir. 1974) (reversing conviction where indictment was obtained in part on perjured testimony in front of grand jury).

49

For instance, Mr. Chu must be equipped to assess whether—like the magistrate judges by the Search Warrant Affidavits—the grand jury was misled about the limits of Seibold's claimed knowledge. Although the Indictment alleges that Kollar and Seibold acted at Mr. Chu's direction, *see, e.g.*, Indictment ¶ 14, Seibold stated in his pre-indictment interview that ███████████ ████████████████████████████████████████████████ ████████████████████████████ Ex. 19 (*Brady* Letter) at 6. The grand jury "must not be 'misled into thinking it is getting eye-witness testimony from the agent whereas it is actually being given an account whose hearsay nature is concealed.'" *Estepa*, 471 F.2d at 1136 (dismissing indictment after finding that sole grand jury witness, a police officer with severely limited personal knowledge of a drug transaction, testified "at length and in detail" about events he had not seen or heard without any indication to the grand jury of the limits on his knowledge); *see also Hogan*, 712 F.2d at 757–62 ("[O]ur decision in [*Estepa*] indicates that extensive reliance on hearsay testimony is disfavored" and "the government prosecutor, in presenting hearsay evidence to the grand jury, must not deceive the jurors as to the quality of the testimony they hear").

*Second*, the lack of corroborating documents makes the grand jury record even more critical. Despite producing massive volumes of data, the government has identified only a small subset as responsive from Mr. Chu's sources, and has pointed to no contemporaneous documentary evidence substantiating its central allegation that Mr. Chu participated in the fraud. For example, the Indictment's allegation that Mr. Chu "directed Kollar to fraudulently obtain more liquidity, and Kollar, in turn, directed Seibold to submit fraudulent borrowing base reports," Indictment ¶ 13, is unsupported by any discovery identified to date that shows Mr. Chu directing Kollar to fraudulently obtain more liquidity. Given the lack of documentary or other evidence, there is a substantial risk that the grand jury's decision hinged on the narratives of cooperating witnesses.

50

Further, any documentary evidence that *does* exist was likely only explained to the grand jury by the cooperators themselves (almost certainly indirectly, via a government agent). For instance, the Indictment references a text message from Mr. Chu to Kollar—"Can we work the >60s"—and alleges that this meant Mr. Chu is "asking whether Kollar could manipulate data for loans over 60 days past due to make them appear eligible." Indictment ¶ 14. Without more, whether that message is inculpatory depends almost entirely on cooperating witness Kollar's interpretation and context—precisely the kind of testimony that must be evaluated for completeness and reliability.

*Third*, the cooperators' incentives heighten the danger of a misleading presentation to the grand jury. Kollar and Seibold are not disinterested observers; they were senior insiders who pleaded guilty and agreed to cooperate. Their sentencing exposure provides powerful incentives to minimize their roles and instead blame Mr. Chu, particularly on issues of knowledge and intent. The *Franks* record already shows that when the government sought judicial authorization for sweeping searches, it presented these cooperators' accounts in a manner that emphasized inculpatory interpretations while withholding key limitations and qualifying facts. Their bias underscores the need for heightened scrutiny.

If anything, the likelihood that critical information about Kollar and Seibold's testimony was withheld from the grand jury is even more material than with respect to the Search Warrant Affidavits. While the Search Warrant Affidavits relied on the cooperators to establish probable cause to believe that Mr. Chu's home, devices, and cloud storage accounts might have evidence of crime, the grand jury was asked to rely on those same cooperators to find probable cause to believe (among other things) that Mr. Chu "organized, managed, or supervised" a continuing financial crime enterprise. Any evidence of Mr. Chu's alleged supervisory role, particularly in light of the

51

absence of inculpatory documentary evidence on this point, necessarily came from the other members of the enterprise.  And the only members of the enterprise that the government has identified are the two trial defendants and the two cooperators.  The government's presumed failure to inform the grand jury of the information contained in its *Brady* disclosures, related evidence that corroborates those disclosures—such as the September 3, 2025 recorded call with Mr. Chu and Kollar—and information concerning Kollar's prior fraud, necessarily tainted the Indictment.

### C.     The Grand Jury Record Is Necessary to Assess the Integrity of the Probable Cause Determination.

For the reasons stated above, the unsealing of the grand jury transcripts is necessary to assess the grand jury's determination of probable cause.  Mr. Chu recognizes the Court's responsibility to safeguard grand jury secrecy.  *See* Fed. R. Crim. P. 6(e)(3)(E) (authorizing Court to structure disclosure "at a time, in a manner, and subject to any other conditions that it directs"); *see also In re Petition of Craig*, 131 F. 3d 99, 103 (2d Cir. 1997) (the court has the power to order grand jury disclosures in its "sound discretion under the special circumstances of each case").  However, given the novelty and lack of model jury instructions on the elements of the Section 225 charge, and the disconnect between the allegations in the Indictment and the elements of the offense, there are important questions regarding the grand jury's basis for finding probable cause on that offense, which the government has failed to answer.

The Court may, of course, impose appropriate limitations, authorize targeted redactions or conduct *in camera* review in the first instance.  *See, e.g.*, *United States v. Hoey*, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014).  In the alternative, if the Court determines broader disclosure of the transcripts is unnecessary at this stage (it is not), Mr. Chu respectfully requests the disclosure of materials limited to Kollar and Seibold, and any other subjects bearing on Mr. Chu's alleged knowledge and intent.

The grand jury instructions are independently necessary to assess whether the grand jury applied a correct legal framework to the government's evidence. Erroneous legal instructions can constitute such a ground, provided that there is "grave doubt that the decision to indict was free from such substantial influence" of the defect. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988).

Based on the inherently prejudicial impact of mis-instructing a grand jury, courts have ordered dismissal of an indictment based, at least in part, on erroneous or misleading legal instructions. *See, e.g.*, *Peralta*, 763 F. Supp. at 19–21 (dismissing indictment where there was "grave doubt that the decision to indict was free from the substantial influence" of the prosecutor's "misleading statements of law" regarding constructive possession of a firearm, notwithstanding fact that the prosecutor had also read the statute to the grand jury); *Vetere*, 663 F. Supp. at 386–87 (dismissing indictment, even after a guilty verdict at trial, on grounds that the independent role of the grand jury was impaired based on the prosecutor's misleading "presentation both with respect to the facts and the law"); *United States v. Twersky*, 1994 WL 319367, at *4 (S.D.N.Y. June 29, 1994) (an indictment "will not be permitted to stand" if the prosecutor's instructions are "misleading due to mistakes or omissions" (internal quotation marks and citations omitted)). At a minimum, *in camera* review of the grand jury instructions is warranted. *See United States v. Hoey*, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (ordering *in camera* review of grand jury instructions because a significant "change in the law" made it possible that "the grand jury did not receive the proper instructions"); *United States v. Ho*, 2009 WL 2591345, at *3–5 (D. Haw. Aug. 20, 2009) (inspecting grand jury instructions in camera because the prosecutor had made "on-the-record statements" reflecting a misunderstanding of a necessary element and, as a result, the court could not "rule out that the government did not properly instruct the grand jury").

That is especially so for the rare Section 225 charge, as to which the government has failed to articulate a coherent view of the law. For example, the jury must have been properly instructed that a continuing financial crime enterprise requires at least four persons acting in concert, and what it means to "act in concert." During the parties' May 15 meet and confer, however, the government explained that it believes that a person can "act in concert" without having co-conspirator or even aiding-and-abetting liability. *See* Schwartz Decl. ¶ 49. And when asked whether a factually innocent person can count as one of the four people "acting in concert" as part of the enterprise, the government declined to answer. *See id.* The government likewise declined to answer how, and even *whether*, the grand jury had been instructed on what it means to "act in concert." *See id.*[10]

Ensuring that the grand jury was not erroneously instructed is especially important here, where the government ███████████████████████████████████████ ███████████ Ex. 26 (May 13 Letter) at 6.

## V.    MOTION TO SUPPRESS EVIDENCE SEIZED BEYOND THE SCOPE OF THE PREMISES WARRANT

Finally, Mr. Chu respectfully moves to suppress certain photographs obtained by the government during execution of the Premises Warrant.

On October 7, 2025, the government sought and obtained the Premises Warrant to search Mr. Chu's Florida home. The Premises Warrant identified as the "Items to Be Seized" ███████

███████████████████████████████████████████████████████

---

[10]    The facial infirmities of the Indictment coupled with government's steadfast refusal to articulate its basis for bringing a continuing financial crimes enterprise charge against Mr. Chu raises due process concerns and suggests that the statute is unconstitutionally vague as applied to Mr. Chu through the Indictment. To the extent the Court does not dismiss the Count and the government refuses to cure these deficiencies through a bill of particulars or otherwise, Mr. Chu reserves his rights to make a further application to the Court on this basis.



Ex. 4, Attachment A-1.

On January 14 and February 3, 2026, following the execution of the Premises Warrant, the government produced several hundred photographs taken during the search. However, 38 of the photographs are far beyond the permissible scope of "Items to Be Seized," and should be suppressed.

"Like all activities governed by the Fourth Amendment, the execution of a search warrant must be reasonable. . . . [O]fficers may not seize and retain items outside the scope of a warrant." *United States v. Lustyik*, 57 F. Supp. 3d 213, 230 (S.D.N.Y. 2014). "[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). "[T]he retention of items outside the scope of the warrant can be justified only if the Government meets its burden of demonstrating that those items fall within an exception to the warrant requirement," such as the plain view exception. *Doane v. United States,* 2009 WL 1619642, at *10–11 (S.D.N.Y. June 5, 2009).

Here, Mr. Chu does not object generally to photographs taken during the execution of the search. However, Mr. Chu does object to certain photographs identified below that depict specific items, outside the scope of the warrant, at close range. These photographs constitute seizures. *See, e.g.*, *Caldarola v. Cnty. of Westchester*, 343 F.3d 570, 574 (2d Cir. 2003); *United States v. Villegas*, 899 F.2d 1324, 1334 (2d Cir. 1990); *see also United States v. Juarbe*, 2015 WL 3853032, at *17 (W.D.N.Y. Apr. 23, 2015) ("The taking of photographs of the items to be seized and the interior

55

of the defendant's apartment by the agents also constituted an illegal search and seizure in violation of the defendant's Fourth Amendment rights since such photographs were taken without a search warrant authorizing same.").

The government clearly exceeded the scope of the warrant by photographing dozens of personal items and confidential documents that are irrelevant to Mr. Chu's electronic devices and thus beyond the Premises Warrant's authorized scope of seizure. The photographs Mr. Chu seeks to suppress are:



56

- ██████████████████████████████████████████████████

These photographed items undoubtedly do not relate to any of the "Items to Be Seized" specified in the warrant. They are not electronics, they do not shed any light on the owner of any electronics on the premises, nor would they assist in accessing the electronics. Therefore, the photographs fall outside the scope of the warrant.

Finally, no exception to the warrant requirement applies. The items photographed do not fall within the plain view exception. Many of the items were located in safes and physically held up or rearranged by the government for the specific purpose of capturing the images.[11]

---

[11]    Mr. Chu also reserves the right to bring additional motions relating to this evidence if it comes to light that the government took any investigative steps based on this unlawful seizure. *See United States v. Valentine*, 591 F. Supp. 2d 238, 242 (E.D.N.Y. 2008) ("It is well-settled that evidence obtained pursuant to an unlawful seizure or search must be suppressed as the fruit of the poisonous tree.").

## **CONCLUSION**

For the foregoing reasons, Mr. Chu's motions should be granted in their entirety.

Dated:    May 20, 2026
          New York, New York

                        Respectfully Submitted,

                        /s/ *Matthew L. Schwartz*
                        Matthew L. Schwartz
                        Craig A. Wenner
                        Jacqueline C. Kelly
                        BOIES SCHILLER FLEXNER LLP
                        55 Hudson Yards
                        New York, New York 10001
                        Telephone: (212) 303-3646
                        E-mail: mlschwartz@bsfllp.com
                                cwenner@bsfllp.com
                                jkelly@bsfllp.com

                        Adam Fee
                        WEIL, GOTSHAL & MANGES LLP
                        1999 Avenue of the Stars, Suite 1800
                        Los Angeles, California 90067
                        Telephone: (213) 667-5100
                        E-mail: adam.fee@weil.com

                        *Attorneys for Daniel Chu*

58

## CERTIFICATE OF GOOD FAITH PURSUANT TO L. CRIM. R. 16.1

I hereby certify that on May 15, 2026, I conferred with counsel for the government in an effort in good faith to resolve by agreement the issues raised by this motion without the intervention of the Court and have been unable to reach agreement.

/s/ *Matthew L. Schwartz*
Matthew L. Schwartz