**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

DANIEL CHU,

Defendant.

S1 25 Cr. 579 (PKC)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION DEFENDANT DANIEL CHU'S PRETRIAL MOTIONS**

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.

Micah F. Fergenson
Shiva H. Logarajah
Justin V. Rodriguez
Assistant United States Attorneys
- *Of Counsel* -

# TABLE OF CONTENTS


BACKGROUND .......... 2

A. Factual Background .......... 2
B. The Charges and Charged Defendants .......... 4

ARGUMENT .......... 6

I. COUNT ONE ADEQUATELY ALLEGES THAT CHU VIOLATED THE CONTINUING FINANCIAL CRIMES ENTERPRISE STATUTE .......... 6

A. Applicable Law .......... 6
1. The Requirements of an Indictment .......... 6
2. The Continuing Financial Crimes Enterprise Statute, 18 U.S.C. § 225 .......... 7
B. Discussion .......... 8
1. Count One Adequately Alleges a "Series of Violations." .......... 9
2. Count One Adequately Alleges "At Least 4 Persons Acting in Concert." .......... 12
3. Count One Adequately Alleges that Chu Organized, Managed, or Supervised the Enterprise. .......... 13
3. Count One Adequately Alleges that Chu Received $5 Million or More in Gross Receipts from the Enterprise During Any 24-Month Period. .......... 13

II. CHU IS NOT ENTITLED TO A BILL OF PARTICULARS. .......... 16

A. Applicable Law .......... 16
B. Discussion .......... 18
1. The Government Need Not Supply More Information about Count One. .......... 18
2. The Government Need Not Supply More Information About the Conspiracy, Bank Fraud, and Wire Fraud Affecting a Financial Institution Counts. .......... 21

III. CHU'S *FRANKS* MOTION IS WITHOUT BASIS IN LAW OR FACT. .......... 23

A. Applicable Law .......... 23
1. The *Franks* Standard .......... 23
2. Intent .......... 24
3. Materiality .......... 26
B. Discussion .......... 26
1. None of the Purported Omissions Were Made Recklessly or Were Necessary to the Issuing Judge's Probable Cause Determination. .......... 26

IV. CHU HAS NOT MET THE HIGH BAR TO BREAK GRAND JURY SECRECY .......... 33

A. Applicable Law .......... 33
B. Discussion .......... 35

V. CHU'S MOTION TO SUPPRESS PHOTOGRAPHS SHOULD BE DENIED AS MOOT .......... 37

CONCLUSION .......... 37

# TABLE OF AUTHORITIES

**Cases**

*Bank of Nova Scotia v. United States*,
487 U.S. 250 (1988) .......... 35
*Costello v. United States*,
350 U.S. 359 (1956) .......... 34
*D.C. v. Wesby*,
138 S. Ct. 577 (2018) .......... 26
*Dennis v. United States*,
384 U.S. 855 (1966) .......... 33
*Florida v. Harris*,
568 U.S. 237 (2013) .......... 26
*Franks v. Delaware*,
438 U.S. 154 (1978) .......... 23, 24
*Illinois v. Gates*,
462 U.S. 213 (1983) .......... 26
*Kaley v. United States*,
571 U.S. 320 (2014) .......... 34, 36
*Panetta v. Crowley*,
460 F.3d 388 (2d Cir. 2006) .......... 25
*Rivera v. United States*,
928 F.2d 592 (2d Cir. 1991) .......... 24
*United States v. Akparanta*,
19 CR. 363 (LGS), 2019 WL 5616875 (S.D.N.Y. Oct. 30, 2019) .......... 30
*United States v. Alfonso*,
143 F.3d 772 (2d Cir. 1998) .......... 13
*United States v. Amendolara*,
01 Cr. 694 (DAB), 2002 WL 31368279 (S.D.N.Y. Oct. 21, 2002) .......... 18-19
*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) .......... 23-24, 25, 26
*United States v. Bellomo*,
263 F. Supp. 2d 561 (E.D.N.Y. 2003) .......... 17
*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) .......... 16, 17
*United States v. Broadnax*,
06 Cr. 317 (SRU), 2007 WL 3355396 (D. Conn. Nov. 9, 2007) .......... 30-31
*United States v. Brown*,
95 CR. (AGS), 1995 WL 387698 (S.D.N.Y. June 30, 1995) .......... 35
*United States v. Butler*,
351 F. Supp. 2d 121 (S.D.N.Y. 2004) .......... 34
*United States v. Calk*,
19 Cr. 366 (LGS), 2020 WL 3577903 (S.D.N.Y. Jul. 1, 2020) .......... 25, 27-28
*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000) .......... *passim*
*United States v. Chastain*,
22 Cr. 305 (JMF), 2022 WL 13833637 (S.D.N.Y. Oct. 21, 2022) .......... 36

*United States v. Connolly*,
16 Cr. 370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017) .......... 20
*United States v. Coppa*,
267 F.3d 132 (2d Cir. 2001) .......... 31
*United States v. Cromitie*,
09 Cr. 558 (CM), 2010 WL 3025670 (S.D.N.Y. July 28, 2010) .......... 25
*United States v. Da Costa*,
23 Cr. 610 (PKC) 2024 WL 3014329 (S.D.N.Y. June 13, 2024) .......... *passim*
*United States v. Daugerdas*,
837 F.3d 212 (2d Cir. 2016) .......... 6, 7
*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021) .......... 7
*United States v. Dunn*,
05 Cr. 127 (KMK), 2005 WL 1705303 (S.D.N.Y. July 19, 2005) .......... 33, 34
*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008) .......... 24, 27, 28
*United States v. Gallant*,
03 Cr. 232 (RPM), 2006 WL 278554 (D. Colo. Feb. 3, 2006) .......... 8
*United States v. Gibson*,
175 F. Supp. 2d 532 (S.D.N.Y. 2001) .......... 17-18, 34
*United States v. Harris*,
79 F.3d 223 (2d Cir. 1996) .......... 8
*United States v. Harris*,
92 Cr. 455 (CSH), 1993 WL 300052 (S.D.N.Y. July 30, 1993) .......... 15
*United States v. Harris*,
805 F. Supp. 166 (S.D.N.Y. 1992) .......... 12
*United States v. Henry*,
861 F. Supp. 1190 (S.D.N.Y. 1994) .......... 17
*United States v. Holihan*,
236 F. Supp. 2d 255, 264 (W.D.N.Y. 2002) .......... 31
*United States v. Howard,*
216 F.3d 1074 (2d Cir. 2000) .......... 35
*United States v. Klump*,
536 F.3d 113 (2d Cir. 2008) .......... 24
*United States v. Lahey*,
967 F. Supp. 2d 698 (S.D.N.Y. 2013) .......... 26, 31
*United States v. Leonelli*,
428 F. Supp. 880 (S.D.N.Y. 1977) .......... 17
*United States v. Levy*,
11 Cr. 61 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) .......... 19
*United States v. Maisonet*,
12 Cr. 829 (AKH), 2013 WL 12204909 (S.D.N.Y. Mar. 22, 2013) .......... 25
*United States v. Mandell*,
710 F. Supp. 2d 368 (S.D.N.Y. 2010) .......... *passim*
*United States v. Mermelstein*,
487 F. Supp. 2d 242 (E.D.N.Y. 2007) .......... 22 n.4

*United States v. Messalas*,
612 F. Supp. 3d 93 (E.D.N.Y. 2020) ........ 30
*United States v. Mitlof*,
165 F. Supp. 2d 558 (S.D.N.Y. 2001) ........ 16, 17
*United States v. Morgan*,
17 CR. 354 (KBF), 2017 WL 4621632 (S.D.N.Y. Oct. 12, 2017) ........ 30
*United States v. Muhammad*,
824 F.2d 214 (2d Cir. 1987) ........ 12
*United States v. Murphy*,
21 Cr. 280 (AKH), 2022 WL 1270958 (S.D.N.Y. Apr. 28, 2022) ........ 18
*United States v. Murphy*,
2024 WL 3264127 (2d Cir. July 2, 2024) ........ 34-35
*United States v. Perez*,
247 F. Supp. 2d 459 (S.D.N.Y. 2003) ........ 25
*United States v. Persico*,
621 F. Supp. 842 (S.D.N.Y. 1985) ........ 19
*United States v. Phibbs*,
999 F.2d 1053 (6th Cir. 1993) ........ 13
*United States v. Phillips*,
22 Cr. 138 (LJL), 2023 WL 6812286 (S.D.N.Y. Oct. 16, 2023) ........ 36
*United States v. Polanco*,
145 F.3d 536 (2d Cir. 1998) ........ 12
*United States v. R. Enterprises, Inc.*,
498 U.S. 292 (1991) ........ 33
*United States v. Rajaratnam*,
719 F.3d 139 (2d Cir. 2013) ........ 25, 26
*United States v. Rankin*,
422 F. Supp. 3d 564 (D. Conn. 2019) ........ 34
*United States v. Regan*,
103 F.3d 1072 (2d Cir. 1997) ........ 36
*United States v. Reilly*,
76 F.3d 1271 (2d Cir. 1996) ........ 25, 30
*United States v. Riaski*,
91 F.4th 933 (8th Cir. 2024) ........ 29
*United States v. Rigas*,
258 F. Supp. 2d 299 (S.D.N.Y. 2003) ........ 17
*United States v. Rittweger*,
259 F. Supp. 2d 275 (S.D.N.Y. 2003) ........ 17, 18
*United States v. Rodrigues*,
22 Cr. 391 (PMH), 2024 WL 113744 (S.D.N.Y. Jan. 10, 2024) ........ 7, 36
*United States v. Rodriguez*,
99 Cr. (DLC), 1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) ........ 19
*United States v. Scali*,
16 Cr. 466 (NSR), 2018 WL 369195, (S.D.N.Y. Jan. 9, 2018) ........ 36
*United States v. Sells Eng'g, Inc.*,
463 U.S. 418 (1983) ........ 33, 34

*United States v. Shaw*,
06 CR 41 (CM), 2007 WL 4208365 (S.D.N.Y. Nov. 20, 2007)........................................ 33, 35
*United States v. Torres*,
20 Cr. 608 (DLC), 2021 WL 1947503 (S.D.N.Y. May 13, 2021)............................................. 6
*United States v. Torres*,
901 F.2d 205 (2d Cir. 1990)..................................................................................................... 16
*United States v. Trippe*,
171 F. Supp. 2d 230 (S.D.N.Y. 2001)..................................................................................... 19
*United States v. Trzaska*,
111 F.3d 1019 (2d Cir. 1997)................................................................................................... 24
*United States v. Velastegui*,
199 F.3d 590 (2d Cir. 1999)....................................................................................................... 7
*United States v. Vilar*,
05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007)...................................... 24, 25
*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999)....................................................................................................... 16
*United States v. Walters*,
910 F.3d 11 (2d Cir. 2018)......................................................................................................... 7
*United States v. Wedd*,
993 F.3d 104 (2d Cir. 2021)....................................................................................................... 6
*United States v. Williams*,
504 U.S. 36 (1992)................................................................................................................... 33
*United States v. Young*,
745 F.2d 733 (2d Cir. 1984)..................................................................................................... 12

**Statutes**

18 U.S.C. § 225........................................................................................................... *passim*
18 U.S.C. § 1343...................................................................................................................... 10
18 U.S.C. § 1344........................................................................................................................ 9
18 U.S.C. § 3293...................................................................................................................... 22
18 U.S.C. § 3500...................................................................................................................... 30
21 U.S.C. § 848.......................................................................................................................... 8

**Rules**

Fed. R. Crim. P. 6(3)(E)(ii).................................................................................................... 33
Fed. R. Crim. P. 7(c)(1) ............................................................................................................. 6

The Government respectfully submits this memorandum of law in opposition to defendant Daniel Chu's pretrial motions. *See* ECF Doc. Nos. 45 (notice of motion) and 46 (memorandum of law).[1] Chu's motions should be denied in their entirety. In short:

(1) Motion to Dismiss Count One: Count One adequately alleges that Chu violated the continuing financial crimes enterprise, or "financial kingpin," statute, codified at 18 U.S.C. § 225. Count One tracks the relevant statutory language, provides the approximate times and places of the alleged offense, and fairly informs Chu of the core of criminality charged. Indeed, Count One includes 29 paragraphs of detailed factual and statutory allegations, going far beyond what Rule 7 requires. Chu's motion for the extraordinary relief of dismissal should be denied. Chu must stand trial on the merits.

(2) Motion for a Bill of Particulars: The detailed speaking Indictment supplies Chu with information sufficient to understand the charges against him, to prepare a defense, and to protect against double jeopardy. In addition to the extensive text-searchable discovery he already has, Chu will also receive trial exhibits, a witness list, and Jencks Act material a month in advance of trial, as the Court has ordered. Contrary to governing law, Chu's request seeks to improperly compel the Government to disclose the manner in which it will attempt to prove the charges, the precise manner in which Chu committed the crimes charged, and a preview of the Government's evidence and legal theories. In other words, Chu's motion improperly seeks a bill of particulars as a discovery tool. Chus's motion for a bill of particulars should be denied.

(3) Motion for a *Franks* Hearing: The Government's warrant affidavits complied with the Fourth Amendment. Chu comes nowhere close to making a substantial preliminary showing that the affidavits recklessly omitted material information. The alleged omissions either provide no exculpatory value, are speculative or immaterial, or—most notably—were already disclosed to the magistrate judges who issued the warrants. Accordingly, no *Franks* hearing is warranted.

(4) Motion to Disclose Grand Jury Materials: Chu's motion has been mooted by the Government's return of a superseding Indictment. Furthermore, Chu bases his argument almost entirely on premises that are plainly not grounds to break grand jury secrecy. And, in any case, his argument rests entirely on speculation and surmise—a far cry from the significant showing required to break grand jury secrecy.

(5) Motion to Suppress Photographs: While Chu's legal arguments are without merit, the Government does not intend to offer in its case-in-chief at trial the photographs that Chu seeks to suppress, so, in the interest of judicial economy, Chu's motion should be denied as moot.

[1] "Br." refers to Chu's memorandum in support of his motion. "ECF Doc." refers to an entry on the docket of this case. "Indictment" refers to the S1 Superseding Indictment. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

## BACKGROUND

### A. Factual Background

Daniel Chu was the founder and chief executive officer ("CEO") of Tricolor Holdings, LLC and its affiliates ("Tricolor"), a subprime auto retailer and financing company. Indictment ¶ 1. From 2018 until the company's collapse in September 2025, Chu operated Tricolor through systematic fraud. *Id.* He did not act alone. Chu deputized subordinates to execute the nuts-and-bolts of his fraud, including (1) Tricolor's chief financial officer, Jerome Kollar, (2), Tricolor's chief operating officer, David Goodgame, and (3) Tricolor's senior director of finance, Ameryn Seibold. Indictment ¶ 9. Kollar, Goodgame, and Seibold have since pleaded guilty to participating in Chu's fraud.

Tricolor funded its operations substantially through cash advances from several lenders with which Tricolor had entered credit agreements. Indictment ¶ 5. Under these agreements, Tricolor pledged certain assets (either used cars in Tricolor's possession or, with respect to car loans that Tricolor had issued to its customers, car loan receivables) to the lenders as collateral and received cash advances secured by that pledged collateral. *Id.* In addition to these asset-backed lines of credit, Tricolor also raised capital by securitizing car loan receivables-that is, organizing groups, or tranches, of the receivables into classes of bonds that were then sold to investors. *Id.* Tricolor's lenders generally set eligibility criteria for the types of collateral that could be pledged in exchange for cash advances, with eligibility turning on, among other things, whether the car loan was current—meaning the customer was making timely payments—or past due, meaning the customer had missed a scheduled payment and the loan was delinquent. Indictment ¶ 7. Tricolor pledged cars and loans and requested advances by sending lenders borrowing base reports, which were typically spreadsheets with rows of the loans pledged to the facility and dozens of data points for each loan. Indictment ¶ 8.

At Chu's direction, Kollar, Seibold, Goodgame, and others at Tricolor engaged in a series of frauds directed at each of Tricolor's lenders. Indictment ¶¶ 1, 9. These schemes operated through two primary mechanisms. First, the same collateral was "double-pledged" to multiple lenders, allowing Tricolor to receive cash advances on the same collateral from multiple lenders. *Id.* Second, loan data was manipulated to make ineligible, delinquent loans appear current and compliant with lender requirements. *Id.*

In the summer of 2025, lenders confronted Chu and others at Tricolor with concerns about Tricolor's collateral. Indictment ¶ 2. The developing crisis prompted a series of calls among Tricolor executives, including, at times, Chu, Kollar, Goodgame, Seibold, and another Tricolor executive. Indictment ¶ 20. During these calls, Chu and his conspirators initially plotted to conceal the fraud and to falsely claim that the collateral issues were due to an administrative error. Indictment ¶ 2. Some of these calls were secretly recorded, seemingly without Chu's knowledge. Indictment ¶ 20. These recorded calls include (1) Chu proposing a plan for defrauding Tricolor's auditors, *id.* at ¶ 21; (2) Chu fabricating a "Trump administration deferment" policy that did not exist to try and cover up the fraud, *id.* at ¶ 22; (3) Chu berating Seibold, not for committing fraud, but for getting caught, *id.* at ¶ 23; (4) Chu recounting how he falsely told a victim lender that his fraud was really a "systems issue," *id.* at ¶ 24; and (5) Chu laughing while comparing his fraud to Enron, one of the most notorious corporate frauds in United States history, *id.* at ¶ 25.

As the kingpin of the operation, Chu was the person who, by far, benefited the most, financially, from the fraudulent enterprise he oversaw. The series of fraudulent schemes that Chu directed allowed Tricolor to obtain hundreds of millions of dollars in cash advances from Tricolor's victim lenders. Indictment ¶ 1. As Chu concedes, these fraudulently obtained advances were a lifeline for Tricolor and Tricolor could not have survived without them. *See Burns v. Chu et al.*, Adversary No. 3:25-ap-03126 (Bankr. N.D. Tex.) (Dkt. 83 at 1); *see also id.* at 4 (Tricolor

"actually benefited from the alleged scheme because the resulting funding from those lenders and investors kept the company liquid"); *id.* at 6 (Tricolor "benefited from the alleged fraud in securing a financial lifeline"). Chu diverted that "financial lifeline" into his own pockets. Throughout the fraud scheme, Chu received tens of millions of dollars in compensation from Tricolor, including an annual salary, bonuses, management incentive units, and company-provided cars. Indictment ¶ 26. For example, in 2025, Chu was paid a $15 million bonus. *Id.* Such an outsized bonus would not have been possible without the "financial lifeline" that Chu's fraud secured.

Chu allowed those at the bottom to bear the heaviest burdens of his crimes. As Chu's frauds unraveled and Tricolor approached collapse in the summer of 2025, Chu observed on a recorded phone call that the company was "definitely insolvent." Indictment ¶ 26. That did not stop Chu from directing Kollar to pay him more than $6.5 million from the company's quickly diminishing funds. *Id.* Chu used some of this money to purchase a multi-million-dollar property in Beverly Hills, California on August 27, 2025. *Id.* Meanwhile, on September 5, 2025, with the company plummeting and unable to pay its workers, counsel for Tricolor, at the direction of the company's Board of Directors, demanded Chu immediately repay his $15 million bonus, noting in its demand letter "[a]s you are aware, the Company is suffering a severe liquidity crisis and is unable to pay accrued wages and trust fund tax obligations." ECF Doc. 41-2. Chu refused. The next day, September 6, 2025, Tricolor placed more than 1,000 of its employees on unpaid leaves of absence. Indictment ¶ 26. On September 10, 2025, Tricolor filed for Chapter 7 bankruptcy. *Id.* By that time, the company's largest lenders had advanced and were owed more than $900 million as a result of Chu's schemes. Indictment ¶ 3.

### B. The Charges and Charged Defendants

On December 15, 2025, grand jury sitting in this District returned a four-count indictment charging Chu with a violation of Title 18, United States Code, Section 225 (Continuing Financial

Crimes Enterprise) and Chu and Goodgame with violations of Title 18, United States Code, Sections 1349 (Conspiracy to Commit Bank Fraud and Wire Fraud Affecting a Financial Institution), 1344 (Bank Fraud), and 1343 (Wire Fraud Affecting a Financial Institution).

On December 16, 2025, the United States charged Kollar and Seibold by information in seven counts with violations of Title 18, United States Code, Sections 1349 (Conspiracy to Commit Bank Fraud and Wire Fraud Affecting a Financial Institution), 1344 (Bank Fraud), 1343 (Wire Fraud Affecting a Financial Institution), 1014 (False Statements to a Financial Institution), 371 (Conspiracy to Commit Securities Fraud); Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud); and Title 18, United States Code, Section 1519 (Destruction of Records). Kollar and Seibold pleaded guilty to all seven counts, pursuant to cooperation agreements.

On June 24, 2026, grand jury sitting in this District returned an eight-count Superseding Indictment charging Chu with violations of Title 18, United States Code, Sections 225 (Continuing Financial Crimes Enterprise), 1349 (Conspiracy to Commit Bank Fraud and Wire Fraud Affecting a Financial Institution), 1344 (Bank Fraud), 1343 (Wire Fraud Affecting a Financial Institution), 371 (Conspiracy to Commit Securities Fraud); and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud).

On June 24, 2026, a Superseding Information was filed charging Goodgame in six counts with violations of Title 18, United States Code, Sections 1349 (Conspiracy to Commit Bank Fraud and Wire Fraud Affecting a Financial Institution), 1344 (Bank Fraud), 1343 (Wire Fraud Affecting a Financial Institution), 371 (Conspiracy to Commit Securities Fraud); Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud); and Title 18, United States Code, Section 1001 (False Statements). Goodgame pleaded guilty to all six counts, pursuant to a cooperation agreement.

# ARGUMENT

## I. COUNT ONE ADEQUATELY ALLEGES THAT CHU VIOLATED THE CONTINUING FINANCIAL CRIMES ENTERPRISE STATUTE.

Daniel Chu claims that he "is innocent," Br. at 1, and he asks the Court to spare him from a trial on the merits of Count One of the Indictment. He is not entitled to such extraordinary relief. When a charge contains the essential elements of the offense and gives notice of the core criminality at issue, as Count One does, a trial must follow. Chu's motion to dismiss Count One should be denied.

### A. Applicable Law

#### 1. The Requirements of an Indictment

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1); *United States v. Torres*, 20 Cr. 608 (DLC), 2021 WL 1947503, at *3 (S.D.N.Y. May 13, 2021). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021).

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Wedd*, 993 F.3d at 120. Accordingly, an indictment must only describe the "core of criminality to be proven at trial," or the "essence of a crime, in general terms." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016). It need not describe "the particulars of how a defendant effected the

crime." *Id.*

Dismissal of an indictment is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018). Under this standard, "[d]efendants seeking to dismiss an indictment carry a 'Herculean burden' given the extraordinary nature of the remedy sought." *United States v. Rodrigues*, 22 Cr. 391 (PMH), 2024 WL 113744, at *2 (S.D.N.Y. Jan. 10, 2024).

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). This Court has aptly described the governing law in this regard:

> The Second Circuit has explained that a motion to dismiss is not a vehicle to test the strength of the government's anticipated evidence: at the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something we do after trial. Otherwise, we would effectively be asking district courts to engage in summary judgment proceedings—something that does not exist in federal criminal procedure."

*United States v. Da Costa*, 23 Cr. 610 (PKC) 2024 WL 3014329, at *2 (S.D.N.Y. June 13, 2024); *see also United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021).

### 2. The Continuing Financial Crimes Enterprise Statute, 18 U.S.C. § 225

The centerpiece of Congress's legislative response to the savings-and-loan crisis was enacted in the Bank and Thrift Fraud Prosecution Act of 1990 and codified at Title 18, United States Code, Section 225. That statute provides:

(a) Whoever—

> (1) organizes, manages, or supervises a continuing financial crimes enterprise; and
>
> (2) receives $5,000,000 or more in gross receipts from such enterprise during any 24-month period,

> shall be fined not more than $10,000,000 if an individual, or $20,000,000 if an organization, and imprisoned for a term of not less than 10 years and which may be life.
>
> (b) For purposes of subsection (a), the term "continuing financial crimes enterprise" means a series of violations under section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4 persons acting in concert.

18 U.S.C. § 225.

Congress modeled Section 225 on the Continuing Criminal Enterprise statute, or "drug kingpin" statute, 21 U.S.C. § 848, and precedents construing Section 848 are instructive in interpreting Section 225. *See United States v. Gallant*, 03 Cr. 232 (RPM), 2006 WL 278554, at *3-4 (D. Colo. Feb. 3, 2006). To convict a defendant under Section 225, the Government must prove "(1) [the defendant] committed three or more violations of the bank fraud and/or wire fraud statutes affecting a financial institution; (2) the three or more bank fraud and/or wire fraud violations were part of a series of violations of these laws; (3) [the defendant] undertook to commit this series of violations in concert with three or more other persons; (4) [the defendant] organized, managed or supervised these three or more persons in connection with this series of violations; and (5) [the defendant] received $5 million or more in gross receipts from this series of violations during any 24-month period." *United States v. Harris*, 79 F.3d 223, 229 (2d Cir. 1996).

**B. Discussion**

Count One tracks the relevant statutory language and provides the approximate times and places of the alleged offense. Count One also includes 29 paragraphs of detailed factual and statutory allegations about Chu's continuing financial crimes enterprise. Those allegations encompass the essential elements of the offense as described in the Second Circuit's *Harris* decision. They identify a series of underlying violations: five violations of the bank fraud statute and five violations of wire fraud affecting a financial institution against certain of Tricolor's

lenders. They identify at least three people with whom Chu acted in concert: Kollar, Goodgame, and Seibold. They describe in detail how Chu organized, managed, and supervised the enterprise. And they allege that, over a 24-month period, Chu received tens of millions of dollars, which was only possible because of Chu's criminal enterprise. In doing so, Count One's allegations provide Chu with a "plain, concise, and definite written statement of the essential facts constituting the offense charged," as required by Rule 7, and much more beside.

### 1. Count One Adequately Alleges a "Series of Violations."

Chu argues that Count One does not sufficiently plead an "enterprise," which is defined by statute as "a series of violations," because the Indictment does not "identify . . . the underlying violations . . . that formed part of the series." Br. at 18. This argument fails, as Count One plainly does so.

Here, the Indictment alleges:

> From at least in or about 2018 up to and including in or about September 2025, in the Southern District of New York and elsewhere, DANIEL CHU, the defendant, knowingly organized, managed, and supervised a continuing financial crimes enterprise, in that the defendant committed violations of Title 18, United States Code, Sections 1343 and 1344, including violations one through ten set forth below, which violations were part of a series of violations of those statutes committed by at least four persons acting in concert, and from which the defendant received $5,000,000 and more in gross receipts from such enterprise during a 24-month period.

Indictment ¶ 27. With respect to the "series of violations," the Indictment identifies ten such violations against seven of Tricolor's lenders. Count One alleges five violations of the bank fraud statute, 18 U.S.C. § 1344:

> to wit, CHU, while the CEO of Tricolor, engaged in schemes to make a series of false statements to the financial institutions listed below regarding Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor from those financial institutions.

| Violation Number | Financial Institution and Credit Agreement | Approximate Time Period |
|---|---|---|
| 1 | Lender-1<br>Lender-1 Credit Line | 2018 to September 2025 |
| 2 | Lender-2<br>Lender-2 Inventory Credit Line | 2020 to September 2025 |
| 3 | Lender-4 and Lender-5<br>SPV4 Warehouse | 2020 to September 2025 |
| 4 | Lender-5<br>SPV5 Warehouse | 2021 to 2023 |
| 5 | Lender-8<br>SPV6 Warehouse | 2022 to September 2025 |

Indictment ¶ 28. Count One also alleges five violations of wire fraud affecting a financial institution, 18 U.S.C. § 1343:

> to wit, CHU, while the CEO of Tricolor, engaged in schemes to make a series of false statements to lenders listed below, including multiple financial institutions, regarding Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor from those lenders, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

| Violation Number | Financial Institution and Credit Agreement | Approximate Time Period |
|---|---|---|
| 6 | Lender-1<br>Lender-1 Credit Line | 2018 to September 2025 |
| 7 | Lender-2<br>Lender-2 Inventory Credit Line | 2020 to September 2025 |
| 8 | Lender-4, Lender-5, Lender-6, Lender-7<br>SPV4 Warehouse | 2020 to September 2025 |
| 9 | Lender-5<br>SPV5 Warehouse | 2021 to 2023 |
| 10 | Lender-8<br>SPV6 Warehouse | 2022 to September 2025 |

Indictment ¶ 29.[2] These allegations alone are sufficient to warrant a trial on Count One.

[2] The Government has identified the victim lenders to Chu. *See* Ex. 26 (May 13 Letter) at 4-5 to the Declaration of Matthew L. Schwartz.

Nevertheless, in addition to the "to wit" clauses, further factual bases for these ten violations are set forth in detail in Count One's speaking allegations. In short, "DANIEL CHU, the defendant, David Goodgame, the Tricolor's chief operating officer, Jerome Kollar, Tricolor's chief financial officer, and Ameryn Seibold, Tricolor's senior director of finance, and others, engaged in a series of frauds directed at each of Tricolor's lenders." Indictment ¶ 9. The schemes included "'double-pledging' collateral—pledging assets to support one loan and then pledging the same assets to another lender to support another loan and . . . manipulating the descriptions and classification of assets pledged as collateral for loans to make ineligible, near-worthless assets appear to meet lender requirements." Indictment ¶ 1; *see also* Indictment ¶ 9 ("These schemes operated through two primary mechanisms: first, CHU and his conspirators double-pledged the same collateral to multiple lenders, allowing Tricolor to borrow against the same assets, at the same time, repeatedly; second, they manipulated loan data to make ineligible, delinquent loans appear current and compliant with lender requirements."). The Indictment identifies the specific lenders and lending facilities at issue (Indictment ¶¶ 5-8, 28-41) and actions taken by Chu and his conspirators to defraud these lenders (Indictment ¶¶ 9-16, 20-25, 28-41). In short, the Indictment more than adequately alleges a "series of violations" in Count One.

Chu argues that the Government must specify "whether the charged 'enterprise' is Tricolor itself" or "the 'multiple Tricolor executives' alleged to have engaged in fraud." Br. at 19. But there is no requirement that the Indictment define the "enterprise" in such a way. Chu has confused the "enterprise" element of the RICO conspiracy statute with the meaning of "enterprise" in Section 225, which is defined by the statute as a "series of violations." While Chu cites several RICO cases in support of his motion to dismiss, *see* Br. at 20, neither Section 225's legislative history nor the cases interpreting the statute suggest that RICO precedents inform its interpretation. "RICO's component parts are differently worded from the continuing financial crimes enterprise statute,"

*United States v. Harris*, 805 F. Supp. 166, 180 (S.D.N.Y. 1992), and Section 225, like the CCE statute, "does not contain the 'enterprise' or 'pattern' elements of the RICO conspiracy statute," *United States v. Muhammad*, 824 F.2d 214, 218 (2d Cir. 1987). The Indictment is not required to allege an "enterprise" as a particular business or specific association of persons; rather, the Indictment must allege a "series of violations," which it has done.

**2. Count One Adequately Alleges "At Least 4 Persons Acting in Concert."**

Chu also argues that the Count One does not identify "at least 4 persons acting in concert." Br. at 18. It does. Count One expressly alleges that the violations at issue "were part of a series of violations . . . committed by at least four persons acting in concert." Indictment ¶ 27. More specifically, as noted above, Count One identifies Chu, Goodgame, Kollar, and Seibold, Indictment ¶ 9, and describes actions by Chu, Goodgame, Kollar, and Seibold in furtherance of the frauds, Indictment ¶¶ 9-16, 20-25. And, of course, Goodgame, Kollar, and Seibold have all accepted responsibility and pleaded guilty to their roles in the frauds, which leaves only Chu. That's what the trial is for. Accordingly, Count One sufficiently alleges "at least 4 persons acting in concert," namely, at least Chu, Goodgame, Kollar, and Seibold.

Chu seems to suggest that Count One is defective because it alleges different people acting in concert at different times. Br. at 25-27. The Second Circuit has repeatedly rejected these kinds of arguments when interpreting the analogous drug kingpin statute, as has every other court of appeals to consider the issue. *See United States v. Polanco*, 145 F.3d 536, 542 (2d Cir. 1998) ("Polanco first contends that the government must establish that he acted 'in concert' with five other persons at the same time, and that evidence of five persons involved at various times does not support his CCE conviction. The Second Circuit has already rejected this argument."); *United States v. Young*, 745 F.2d 733, 747 (2d Cir. 1984) ("As to the next requirement of the statute, that the continuing series of violations be undertaken by the defendant in concert with five or more

other persons whom the defendant supervises, it is sufficient to note that the government need not establish that the defendant acted in concert with each of the other five persons at the same time."); *see also United States v. Phibbs*, 999 F.2d 1053, 1084–85 (6th Cir. 1993) (noting that "[e]very circuit which has considered this argument has rejected it"). The same holds true here. There is no requirement that Count One allege that Chu acted in concert with three other people at all times or even at any given particular time.[3]

**3. Count One Adequately Alleges that Chu Organized, Managed, or Supervised the Enterprise.**

Next, Chu argues that Count One "falls short" in its allegations that he organized, managed, or supervised the enterprise. Br. at 27-29. Again, Count One's detailed allegations belie Chu's arguments.

To start, Count One alleges that "[f]rom at least in or about 2018 up to and including in or about September 2025, in the Southern District of New York and elsewhere, DANIEL CHU, the defendant, knowingly organized, managed, and supervised a continuing financial crimes enterprise[.]" Indictment ¶ 27. Because "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998), that finding by the grand jury by itself defeats Chu's argument. Nonetheless, Count One provides ample details of Chu's organization, supervision, and management of the enterprise. For example, Count One alleges:

- "At CHU's direction, multiple Tricolor executives repeatedly defrauded lenders using various fraudulent schemes, including 'double-pledging' collateral—pledging assets to support one loan and then pledging the same assets to another lender to support another loan." Indictment ¶ 1.

[3] Chu also argues that the Government is required to identify all the persons acting in concert that Chu supervised. That argument is addressed below in response to Chu's request for a bill of particulars.

- "Other fraudulent schemes directed by CHU involved manipulating the descriptions and classification of assets pledged as collateral for loans to make ineligible, near-worthless assets appear to meet lender requirements." Indictment ¶ 1.

- "For years, DANIEL CHU, the defendant, and David Goodgame, Tricolor's chief operating officer, Jerome Kollar, Tricolor's chief financial officer, and Ameryn Seibold, Tricolor's senior director of finance, and others, engaged in a series of frauds directed at each of Tricolor's lenders. . . . . Under CHU's leadership, this activity became Tricolor's routine manner of business and eventually Tricolor's means of financial survival." Indictment ¶ 9.

- In 2018, to address Tricolor's liquidity problem, "DANIEL CHU, the defendant, instructed Kollar to pledge delinquent loans to the Lender-1 Credit Line." Indictment ¶ 10. "To make these charged-off loans falsely appear to be performing loans that could serve as collateral (which they were not), CHU directed Kollar to create a fictitious portfolio company in Tricolor's dealer management system (which was used to track Tricolor's loans and their associated data), transfer the charged-off loans to that new portfolio company in the dealer management system, and arrange for other Tricolor employees to manually enter fake payments on those charged-off loans in the dealer management system." *Id.*

- "Over time, DANIEL CHU, the defendant, addressed liquidity constraints by repeatedly falsifying information regarding ineligible collateral to make it appear eligible to use as collateral." Indictment ¶ 11.

- "To increase the amount of cash received from Lender-2, DANIEL CHU, the defendant, directed Kollar to keep sold vehicles on the borrowing base for the Lender-2 Inventory Credit Line, even though they were supposed to be removed once sold, a practice that continued through Tricolor's bankruptcy." Indictment ¶ 12.

- "At CHU's direction …, Kollar and Seibold, sometimes with the assistance of others, executed the schemes to defraud Tricolor's lenders by submitting fraudulent borrowing base reports. CHU directed Kollar to fraudulently obtain more liquidity, and Kollar, in turn, directed Seibold to submit fraudulent borrowing base reports. Kollar, Seibold, and others submitted borrowing base reports with false and manipulated data or already-pledged loans to the Lender-1 Credit Line, the Lender-2 Inventory Credit Line, the SPV3 warehouse, the SPV4 warehouse, the SPV5 warehouse, the SPV6 warehouse, and the Lender-9 Credit Line in order to fraudulently obtain cash advances." Indictment ¶ 13.

- "Kollar, Seibold, and others manually edited collateral data in borrowing base reports provided to lenders so that ineligible loans would falsely appear to lenders to meet eligibility criteria when in fact the loans were significantly past due. They did this with the awareness and, at times, specific direction of DANIEL CHU, the defendant." Indictment ¶ 14.

- "At the direction of DANIEL CHU, the defendant, Kollar and Seibold also double-pledged the same loans as collateral to multiple lenders and securitizations." Indictment ¶ 15.

As reflected above, Count One more than adequately alleges that Chu organized, managed, or supervised the enterprise.

**4. Count One Adequately Alleges that Chu Received $5 Million or More in Gross Receipts from the Enterprise During Any 24-Month Period.**

Finally, Chu claims that Count One fails to allege Section 225's gross receipts requirement. Br. at 29-32. This argument lacks merit.

The grand jury found that Chu "received $5,000,000 and more in gross receipts from [the] enterprise during a 24-month period." Indictment ¶ 27. Specifically, a portion of the funds that were fraudulently obtained from the victim lenders were used to enrich Chu, including in the form of salary and bonus payments. *See* Indictment ¶¶ 1, 26. In that regard, "during the 24-month period from August 2023 through August 2025, Tricolor made more than $19.3 million in salary and bonus net cash payments to CHU's bank accounts." Indictment ¶ 26. These allegations suffice.

The Government expects that the evidence at trial will show that Tricolor's survival during this period and, therefore, the salary and bonus payments to Chu were only possible "as a result of [the defendant's] continuing financial crimes enterprise." *See United States v. Harris*, 92 Cr. 455 (CSH), 1993 WL 300052, at *8 (S.D.N.Y. July 30, 1993). Indeed, Chu has acknowledged in Tricolor's bankruptcy proceeding the "alleged fraud actually benefited the Company by providing it with capital from those lenders and investors that allowed the Company to survive and grow." *See Burns v. Chu et al.*, Adversary No. 3:25-ap-03126 (Bankr. N.D. Tex.) (Dkt. 83 at 1); *id.* at 4 (Tricolor "actually benefited from the alleged scheme because the resulting funding from those lenders and investors kept the company liquid"); *id.* at 6 (Tricolor "benefited from the alleged fraud in securing a financial lifeline"). But "a motion to dismiss is not a vehicle to test the strength of the government's anticipated evidence." *Da Costa*, 2024 WL 3014329, at *2. Chu must await trial to contest the Government's theory.

For all the reasons set forth above, Chu's motion to dismiss Count One should be denied.

## II. CHU IS NOT ENTITLED TO A BILL OF PARTICULARS.

The twenty-four-page speaking Indictment supplies Chu with information sufficient to understand the charges against him, to prepare a defense, and to protect against double jeopardy. The Indictment, therefore, discharges its constitutional obligations without need for further particularization. Even so, the Government has provided extensive text-searchable discovery organized with cover letters and indices. Chu will also receive trial exhibits, a witness list, and Jencks Act material a month in advance of trial, as the Court has ordered. Accordingly, Chu has already obtained more information (and will obtain more in advance of trial) about the nature of the allegations and, indeed, the Government's anticipated trial proof, than the law requires.

### A. Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). "Accordingly, "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999).

"A bill of particulars is not a discovery device," *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010), and "[a]cquisition of evidentiary detail is not the function of the bill of particulars," *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (overruled on other grounds). The "wheres, whens and with whoms" are "beyond the scope of a bill of particulars." *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001). Bills of particulars would undoubtedly be helpful to the defense in any case. But because "the law does not impose upon the

Government an obligation to preview its case or expose its legal theories," *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful," *Mitlof*, 165 F. Supp. at 569.

"The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories." *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003). "Nor, given that a bill of particulars confines the Government's proof to particulars furnished, should a motion for a bill of particulars be granted where the consequence would be to restrict unduly the Government's ability to present its case, or permit the defendant to tailor her testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."). As a general matter, if "the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574

Nor does the law "allow Defendants to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government, when the Indictment, discovery, and other information provided by the government adequately notify Defendants of the charges against them." *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003); *see also Mandell*, 710 F. Supp. 2d at 385 ("the mere existence of 'mountains of documents' does not entitle [defendant] to a bill of particulars"). In short, courts "must examine the totality of the information available to the defendant, including the indictment and general pre-

trial discovery, and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Gibson*, 175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001).

**B. Discussion**

Chu's request for a bill of particulars should be denied because the Indictment, discovery produced to date, and additional information that the Government has provided and will provide on the schedule already set by the Court are far more than sufficient to put Chu on notice of the nature and specifics of the crimes of which he is accused and to permit him to adequately prepare his defense. Courts "routinely" deny motions for bills of particular where, as in this case, the charging document is sufficiently detailed and further notice has been supplied through discovery. *See United States v. Murphy*, 21 Cr. 280 (AKH), 2022 WL 1270958, at *3 (S.D.N.Y. Apr. 28, 2022).

**1. The Government Need Not Supply More Information about Count One.**

With respect to Count One, Chu insists that Government must particularize all the members of the enterprise, every action Chu took to organize, manage, and supervised the enterprise, and Chu's gross receipts from the enterprise. In short, Chu wants a detailed catalogue of the Government's trial evidence to which he is not entitled.

To start, even though Count One identifies Chu, Goodgame, Kollar, and Seibold as members of the enterprise, Chu argues that the Government "should be required to identify all members comprising the 'enterprise[.]'" Br. at 21. Chu's request is akin to the kind of blanket request for the identities of all co-conspirators that courts routinely deny. *See, e.g.*, *Rittweger*, 259 F. Supp. 2d at 292 (concluding, in thirteen-count, multidefendant securities fraud case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States v. Amendolara*, 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6

(S.D.N.Y. Oct. 21, 2002) (denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to Defendant Anello by the Government sufficiently facilitate his ability to avoid surprise and prepare for trial"); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases); *United States v. Rodriguez*, 99 Cr. 367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the Indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial").

Here, as discussed above, the Indictment already identifies "at least 4 persons acting in concert"—Chu, Goodgame, Kollar, and Seibold. The Government has made substantial productions of discovery and will also disclose a witness list, exhibit list, and Jencks Act material one month before trial, as ordered by the Court, which will further inform Chu of the specifics of the Government's proof at trial. *See* ECF Doc. 35. The Government is under no obligation to particularize at this stage, "Who were [all of the enterprise's] members? When did they participate? What did they do?" Br. at 27. These are not "essential elements of a Section 225 offense," as Chu claims. *Id.* They are requests for the "production of evidentiary minutiae that is not appropriate in a bill of particulars." *United States v. Levy*, 11 Cr. 61 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013); *see also United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985) ("Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial").

Furthermore, as exhibited by the nine-bullet point summary set forth above in Section I.B.3, Count One sets forth in detail how Chu organized, supervised, and managed the enterprise.

Such detail is more than sufficient. Still, Chu makes the extraordinary claim that "the government must provide notice of each specific action it intends to rely on as evidence of Mr. Chu's organization, management, or supervision of an underlying violation." Br. at 28. This argument is baseless. His request is nothing short of a demand for the Government's trial proof masquerading as a request for a bill of particulars, and it should be rejected.

Chu cites one case in support of his breathtaking claim and it is inapposite. Judge McMahon's decision in the LIBOR manipulation case, *United States v. Connolly*, 16 Cr. 370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017), did not require the Government to particularize "each specific action it intend[ed] to rely on as evidence of" the defendant's leadership or involvement in a scheme. Far from it. Instead, because there were potentially "millions" of trades that were affected by the charged fraudulent scheme in that case, the court in *Connolly* required the Government to identify "a finite universe of trades" that would be used to explain the scheme to the jury. *Id.* at *6. There is no similar issue here. The Indictment makes clear that the transactions at issue are those involving Lenders 1, 2, 4, 5, 6, 7, and 8. Indictment ¶¶ 28-29. *Connolly* in no way supports the broad relief that Chu seeks here.

Finally, Chu demands to know whether—beyond the more than $19.3 million in salary and bonus net cash payments to his bank accounts during the 24-month period from August 2023 through August 2025 alleged in paragraph 26 of the Indictment—what other additional gross receipts from the enterprise the Government may prove at trial. The Indictment provides sufficient detail on that score. It alleges that the universe of such receipts will be drawn from benefits that Chu received from Tricolor, including Chu's annual salary, bonuses, management incentive units, and company-provided cars. Indictment ¶ 26. Chu may dispute that those benefits were receipts from the enterprise, but he cannot possibly be in the dark about what they were and how to investigate them in advance of trial.

**2. The Government Need Not Supply More Information About the Conspiracy, Bank Fraud, and Wire Fraud Affecting a Financial Institution Counts.**

Chu is not entitled to a bill of particulars with respect to the conspiracy to commit bank fraud and wire fraud affecting a financial institution count, and the substantive bank fraud and wire fraud affecting a financial institution counts.

With respect to Count Two (conspiracy to commit bank fraud and wire fraud affecting a financial institution), the only specific argument that Chu makes is that the Indictment "offers no explanation how Mr. Chu's communications with Kollar were—or reasonably could have been—interpreted as directives to commit fraud." Br. at 33. Chu ignores, however, the allegations in the Indictment that explicitly accuse him of directing Kollar and others to commit fraud and the specific example communications between Chu and Kollar in which he does it. For instance, the Indictment alleges:

- "Over time, DANIEL CHU, the defendant, addressed liquidity constraints by repeatedly falsifying information regarding ineligible collateral to make it appear eligible to use as collateral. In January 2021, for example, CHU asked Kollar whether Tricolor had 'anything we can pledge from [Lender-I] to [Lender-4] or [Lender-3] to get some liquidity,' and Kollar responded, 'I will look. What is 'there' typically is [ineligible] for those'-referring to the charged-off loans manipulated to look like they were performing loans." Indictment ¶ 11.

- "To increase the amount of cash received from Lender-2, DANIEL CHU, the defendant, directed Kollar to keep sold vehicles on the borrowing base for the Lender-2 Inventory Credit Line, even though they were supposed to be removed once sold, a practice that continued through Tricolor's bankruptcy. For instance, on or about April 20, 2021, CHU texted Kollar and others that, '[i]n an ideal scenario, we buy and increase inventory by $10mm and then we can move the sold units off the borrowing base'-meaning Tricolor would increase its inventory by $10 million to give it enough cushion to remove the sold units that were fraudulently included on the Lender-2 Inventory Credit Line borrowing base." Indictment ¶ 12.

- "Kollar, Seibold, and others manually edited collateral data in borrowing base reports provided to lenders so that ineligible loans would falsely appear to lenders to meet eligibility criteria when in fact the loans were significantly past due. They did this with the awareness and, at times, specific direction of DANIEL CHU, the defendant. For instance,

on or about July 25, 2022, CHU texted Kollar, 'Can we work the > 60s"-asking whether Kollar could manipulate data for loans over 60 days past due to make them appear eligible. In response to these requests, and to achieve CHU's overarching directives, Kollar and Seibold would manually change the data fields in borrowing base reports related to whether a loan was performing or past due by, for example, editing loans more than 60 days past due to appear current or paid within the past 60 days." Indictment ¶ 14.

- "To minimize the risks of discovery . . . and with the knowledge of DANIEL CHU, the defendant, and Goodgame, Kollar and Seibold fabricated and falsified backup records when audits of the borrowing bases were conducted, including loan payment ledgers and system records indicating to which lender a loan had been pledged. On July 22, 2021, for example, while an audit firm was conducting an audit of Tricolor's prior year financial statements, Kollar texted CHU, 'We will need to make sure [the auditor] does not try to[ t]ie out [Lender-I],' because a comparison of the manipulated data that was provided to Lender-I to the real data in Tricolor's internal dealer management system would have revealed the fraud. CHU responded: 'I know.' Later, on July 28, 2023, in connection with another audit, CHU texted Kollar: 'Can you reconstruct [Lender- I] BB,' referring to the borrowing base of purported collateral pledged to Lender-1. Kollar responded, in part, 'It includes loans that are not active.' Indictment ¶ 16.

In short, the Indictment explains in detail how Chu engaged in and directed the conspiracy and includes specific communications, which have been produced in discovery, between Chu and Kollar in which Chu directs or otherwise discusses the fraud. Nothing more is required.[4]

With respect to the bank fraud and wire fraud affecting a financial institution counts, Chu's main argument is premised on the mistaken belief that the applicable statute of limitations for these offenses is five years. It's not. It's ten years. *See* 18 U.S.C. § 3293. The bank fraud and wire fraud affecting a financial institution counts in the Indictment start, at the earliest, in 2020. *See* Indictment ¶¶ 34-41. Even if the Court ignored that the Indictment alleges that these offenses continued through 2025, the absolute earliest that the statute of limitations could possibly expire on these counts is in 2030. And yet, for those counts, Chu insists that the Government "must identify each occurrence that constitutes part of the continuing offense and thereby tolled the statute of limitations." Br. at 34. Chu's argument makes no sense. There has not been any "toll[ing]

[4] Chu cites *United States v. Mermelstein*, 487 F. Supp. 2d 242, 2050-51 (E.D.N.Y. 2007), but that decision did not require the Government to provide a bill of particulars.

of the statute of limitations." The alleged conduct on these substantive counts took place between 2020 and 2025—*all of which* is within the 10-year statute of limitations.

Chu's remaining request with respect to these substantive counts continue with his theme of wanting a premature roadmap of exactly how the Government's evidence will be presented at trial. He is not entitled to that. His request for a bill of particulars should be denied.

## III. CHU'S *FRANKS* MOTION IS WITHOUT BASIS IN LAW OR FACT.

Chu's attempt to suppress evidence seized pursuant to several search warrants should be denied because he cannot meet the threshold *Franks* requirement of making a substantial preliminary showing of either reckless omission or materiality. The search warrant affidavits contained detailed summaries of statements from Kollar and Seibold that established Chu's knowledge, direction, and involvement in the double-pledging and loan-manipulation schemes, and nothing in the additional statements Chu identifies undermines or contradicts that evidence. The alleged omissions either provide no exculpatory value, are speculative or immaterial, or—most notably—were already disclosed to the magistrate judges who issued the warrants. Far from demonstrating reckless disregard for the truth, the record shows that the affidavits provided the magistrates with the relevant context needed to assess probable cause, which was more than amply supported even if every purported omissions are added back into the affidavits. Accordingly, Chu's assertions fall well short of the demanding *Franks* standard and cannot justify suppression or even a hearing.

### A. Applicable Law

#### 1. The *Franks* Standard

There is a "presumption of validity with respect" to a search warrant affidavit. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the

validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). These circumstances are quite limited because "[t]he *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

"Every statement in a warrant affidavit does not have to be true" for the warrant to be valid. *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997). And so "[t]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding." *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000). A "substantial preliminary showing" on both elements—intent and materiality—is necessary to warrant even an initial hearing on the defendant's claim. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008); *see also Franks*, 438 U.S. at 170 ("The requirement of a substantial preliminary showing . . . prevent[s] the misuse of a veracity hearing for purposes of discovery or obstruction."). And if a hearing is ordered, the defendant ultimately bears the burden of proving intent and materiality by a preponderance of the evidence. *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008).

**2. Intent**

The *Franks* standard is designed to prevent "lawless or reckless misconduct." 438 U.S. at 169. As a result, "[a]llegations of negligence or innocent mistake are insufficient." *Id.* "[C]ourts have recognized that *Franks* claims based on omissions"—like the claims here—"are less likely to justify suppression than claims of intentionally or recklessly false assertions." *United States v. Vilar*, 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *Vilar*, 2007 WL 1075041 at *27; *see also Awadallah*,

349 F.3d at 67. "[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Mandell*, 710 F. Supp. 2d at 373.

As a result, the law recognizes that while "an officer may not disregard plainly exculpatory evidence," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), an affiant is "not required to include all potentially exculpatory information" in seeking the search warrant, *United States v. Maisonet*, 12 Cr. 829 (AKH), 2013 WL 12204909, at *1 (S.D.N.Y. Mar. 22, 2013); *see also United States v. Calk*, 19 Cr. 366 (LGS), 2020 WL 3577903, at *5 (S.D.N.Y. Jul. 1, 2020). Indeed, "[a] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process and place an extraordinary burden on law enforcement officers, and is not the law." *United States v. Cromitie*, 09 Cr. 558 (CM), 2010 WL 3025670, at *6 (S.D.N.Y. July 28, 2010). Accordingly, "[o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Mandell*, 710 F. Supp. 2d at 374.

To permit the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). The movant must make a substantial preliminary showing that a reasonable person would have known that the magistrate judge would have wanted to know the kind of information that was omitted. *See United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003). "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner." *Canfield*, 212 F.3d at 719.

A search warrant affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be clearly critical." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013). "Rather, the reviewing court must be presented with credible and probative evidence that the omission of information . . . was designed to mislead or was made in reckless disregard of whether [it] would

mislead.'" *Id*. "[T]he mere intent to exclude information is insufficient . . . [since] every decision not to include certain information in the affidavit is intentional insofar as it is made knowingly." *Awadallah*, 349 F.3d at 67-68.

**3. Materiality**

Materiality requires a showing that the "false information was necessary to the issuing judge's probable cause determination." *Canfield*, 212 F.3d at 718. "To determine if misrepresentations . . . are material, a court corrects the errors and then resolves *de novo* whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718.

"Probable cause is not a high bar." *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). In other words, probable cause exists where the "the facts available . . . would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013). In assessing whether this "practical and common-sensical standard" is met, courts "have consistently looked to the totality of the circumstances." *Id.*

**B. Discussion**

**1. None of the Purported Omissions Were Made Recklessly or Were Necessary to the Issuing Judge's Probable Cause Determination.**

Chu argues that statements the Government disclosed in its *Brady* letter attributed to Kollar and Seibold should have been included in affidavits used in support of warrants to search Chu's (1) iCloud accounts (Exhibit 1 to the Schwartz Declaration ("Ex. 1")), and (2) premises and

electronic devices (Exhibit 3 to the Schwartz Declaration ("Ex. 1")) (the "Search Affidavits"). Chu fails to make a "substantial preliminary showing," *Falso*, 544 F.3d at 125, that any of the omissions in the challenged search warrants were made with a "reckless disregard for the truth" or were "necessary to the issuing judge's probable cause determination," *Canfield*, 212 F.3d at 718.

**a. The Kollar Statements**

Both Search Affidavits contained summaries of Kollar's statements to the Government which noted that Kollar reported to the Government that Chu knew about double pledging. As an example of that, the Search Affidavits noted that Kollar stated that (a) Chu had directed Kollar to make defaulted or delinquent loans appear current such that they could be pledged, and (b) Kollar had directly reported to Chu and others in 2024 the amount of collateral Tricolor actually had was lower by $300 million than what Tricolor claimed to others it held (the "Kollar Statements"). *See* Ex. 1 ¶¶ 13(a) - (b); Ex. 3 ¶¶ 10(a) – (b). Chu does not dispute the accuracy of these statements in the Search Affidavits. Instead, Chu claims there are two statements from Kollar which were recklessly omitted: (1) a statement Chu made to Kollar—which Kollar relayed to the Government—on an August 2025 call that Chu "seemed to be shocked at the amount" of the double pledging and "the size of what it had grown to be" (the "August 2025 Statement"), and (2) a statement Kollar made in a September 2025 interview with the Government where Kollar explained that a July 2021 text message—which was not quoted or referenced in the Search Affidavits—that Kollar received from Chu referring to double pledging at a lender "may have an innocent explanation" (the "September 2025 Statement").

The August 2025 and September 2025 Statements, on their face, do not give rise to any inference that they were recklessly omitted. To start, the August 2025 and September 2025 Statements say nothing about Chu's knowledge of the double pledging scheme at Tricolor. Nor do they in any way "directly contradict" Kollar's statements included in the Search Affidavits. *Calk*,

19 CR. 366 (LGS), 2020 WL 3577903, at *6. The August 2025 Statement simply refers to Chu's surprise at how large the double pledging scheme had gotten—not the existence of the double pledging scheme—just before the company's bankruptcy. And the September 2025 Statement was Kollar's speculation that a one-off text message which referred to double pledging "may" have been about something else. Both statements do not change, much less "materially change"—as the defendant claims, Br. at 38—the conclusion from the unchallenged Kollar Statements that Chu *knew* about the double pledging scheme.

What was included in the Search Affidavits—but omitted from the Chu's brief—further undercuts any showing of recklessness. Chu's argument is that the August 2025 and September 2025 Statements provide "key limitations that materially undercut the [Search Affidavits'] narrative of Mr. Chu's knowledge." Br. at 38. What Chu fails to disclose in his brief, however, is that the Search Affidavits already included Chu's disclaimer of any knowledge. In a footnote in the Search Affidavits, the reviewing magistrate judges were informed that "[t]o Tricolor's outside counsel, CHU has denied any knowledge of Borrowing Base misrepresentations. Individual counsel for CHU has told an Assistant U.S. Attorney that Chu is committed to being cooperative and is 'the good guy.'" *See* Ex. 1 ¶ 13 n.2 and Ex. 3 ¶ 5 n.2 to the Schwartz Declaration.

In short, the point Chu claims was recklessly omitted from the Search Affidavits was made explicitly to the reviewing magistrates. Thus, he falls well short of even a "preliminary substantial showing" that the August 2025 and September 2025 Statements were recklessly omitted. *Falso*, 544 F.3d at 125.

**b. The Seibold Statements**

Similarly, statements Seibold made to the Government were included in the Search Affidavits. The statements include a direct conversation Seibold overheard between Chu and Kollar which Seibold interpreted as being about fraud and a statement Kollar made to Seibold

indicating that others in management—without naming Chu—knew about misrepresentations made (the "Seibold Statements"). Like with the Kollar Statements, Chu does not dispute the accuracy of the Seibold Statements. But, again—without any real evidence or argument—Chu claims that it was reckless for the Government to omit Seibold's statements to the Government in a September 2025 Interview that he never (a) witnessed Chu and Kollar speaking about loan misrepresentations to each other, and (b) spoke with Chu about Chu's conversations with Kollar (the "Seibold Interview Statements"). Chu also claims that a text message Seibold sent to his mother questioning whether Kollar had conversations with Chu was also recklessly omitted (the "Seibold Text Message").

The omission of the Seibold Interview Statements and the Seibold Text Message come nowhere near evincing a "reckless disregard for the truth." *Canfield*, 212 F.3d at 718. To start, the prosecution team only received the Seibold Text Message on October 16—well after the Search Affidavits were sworn to.[5] This, of course, is no basis for a *Franks* claim because "[a]n [affiant] who does not personally know information cannot intentionally or recklessly omit it." *United States v. Riaski*, 91 F.4th 933, 936 (8th Cir. 2024) (internal quotation marks omitted).[6] The Seibold Interview Statements fare no better for Chu's claim. Chu argues that the Seibold Interview Statements "suggests that anything Seibold knew about Mr. Chu came from Kollar—effectively double-dipping on Kollar's statements to provide probable cause." Br. at 40. But the bases of the Seibold Statements were plainly disclosed to the reviewing magistrates, as described above. Put

[5] The affidavit in support of a warrant to search Chu's iClouds was sworn out on September 25, 2025, and the affidavit in support of a warrant to search Chu's residence and person for electronic devices was sworn out on October 7, 2025.

[6] In a footnote, Chu insinuates the Government had in its possession a recording he made of a call with Kollar on September 3, 2025. Br. at 39 n.7. But it was Chu that produced that recording to the Government on October 28, 2025. Chu cannot manufacture a claim based on a self-serving recording he made and delivered to a Government well after the Search Affidavits were sworn out.

another way: the Seibold Interview Statements add nothing more to the reviewing magistrates probable cause determination given that the Search Affidavits disclose exactly how Seibold learned the information conveyed in the Seibold Statements.

**c. The Kollar Civil Complaint**

Chu also argues that a civil complaint lodged against Kollar by a Chapter 7 Trustee in 2017 was also recklessly omitted from the Search Affidavits. Br. at 41. What Chu, again, omits from his argument is that the case was settled without any admission by Kollar. The parties' Joint Notice of Settlement made clear that the parties settled the claims "without any admission of liability or wrongdoing." *See Chow v. Baldwin et al.*, 17 Civ. 865 (E.D. Tex. Apr. 5, 2018) (ECF No. 77). Chu mentions that nowhere in this brief. In any event, courts in this Circuit have routinely found that the omission of even criminal convictions for informants or witnesses cited in affidavits does not provide "evidence of either a deliberate falsehood or an offer of proof sufficient to warrant a *Franks* hearing." *United States v. Akparanta*, 19 CR. 363 (LGS), 2019 WL 5616875, at *6 (S.D.N.Y. Oct. 30, 2019); *see also United States v. Morgan*, 17 CR. 354 (KBF), 2017 WL 4621632, at *5 (S.D.N.Y. Oct. 12, 2017); *United States v. Messalas,* 612 F. Supp. 3d 93, 103 (E.D.N.Y. 2020). Given this, it strains credulity to argue that the mere filing of a civil complaint that was settled without any admission of wrongdoing is something that is "clearly critical" to the probable cause determination. *Reilly*, 76 F.3d at 1280.

**d. Chu's Demand for Unredacted FBI 302s and Underlying Notes of the Kollar and Seibold Interviews Should Be Summarily Rejected.**

Chu demands production of Seibold's and Kollar's witness statements for no other reason than the fact that Seibold and Kollar are expected to give "critical . . . testimony" at trial. Br. at 45. But "[t]he government's responsibilities with regard to the FBI 302 are governed by the Jencks Act, 18 U.S.C. § 3500." *United States v. Broadnax*, 06 Cr. 317 (SRU), 2007 WL 3355396, at *2

(D. Conn. Nov. 9, 2007). And the Second Circuit has been clear that the "Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements." *United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001).

To be sure, the Government recognizes its obligation under *Brady* which is why it produced a letter summarizing certain statements made by Kollar and Seibold to the defense out of an abundance of caution. There is no basis for any further relief at this juncture.

The only case cited by Chu actually supports the Government's position. In *United States v. Holihan*, the Court ordered a limited set of facts "be transposed from the FBI 302 Reports" given that they may be potentially exculpatory inasmuch as they showed others having financial motive to commit the crime with which the defendant was charged. 236 F. Supp. 2d 255, 264 (W.D.N.Y. 2002). In other words, the Court there ordered production of a letter similar to the one already sent to Chu. Simply put, no further relief is required or justified even under the authority the defendant cites.

**e. Ample Probable Cause Existed Even with the Inclusion of the Purported Omissions.**

In any case, even including the purported omissions Chu points to does not detract from the ample probable cause in the Search Affidavits. *Lahey*, 967 F. Supp. 2d at 711. As set forth in the Search Affidavits:

- Chu was copied on inaccurate borrowing base reports sent to lenders by Tricolor (specifically, by Seibold) several times a week, Ex. 1 ¶ 11(b);

- Seibold admitted that he and Kollar manipulated the borrowing base reports—which Chu was copied on—in several different ways, Ex. 1 ¶ 11(c);

- Seibold overheard a conversation between Kollar and Chu which he understood was about changing VIN numbers to support the fraud scheme, Ex. 1, ¶ 13(b);

- Kollar specifically told law enforcement that the loan misrepresentations at Tricolor "began in or about 2018 at the direction of Chu." Ex. 1 ¶ 14(b);

- Kollar specifically told Chu in 2024 that the difference between the collateral base that Tricolor actually had versus what it had reported out was approximately $300 million. Ex. 1 ¶ 14(b);

- Kollar was instructed by Chu to delete an incriminating WhatsApp Group thread in August 2025—an assertion corroborated by screenshots of conversations between Kollar and Seibold. Ex. 1 ¶ 14(c) & n.4.

Put simply, the Search Affidavits provide unchallenged evidence of (1) evidence of fraud at Tricolor through loan misrepresentations which was started by Chu—the company's CEO, (2) specific examples of how Chu would have learned of the fraud, including through conversations recounted by two different witnesses, and (3) specific instruction from Chu to delete evidence of the fraud—powerful evidence of Chu's consciousness of guilt—corroborated by contemporaneous screenshots. None of the supposed omissions Chu highlights undermine or otherwise negate those facts.[7]

**f. Chu's Challenge to the Seizure Warrant is Frivolous**

Chu separately claims that omissions in an affidavit for a seizure warrant the Government filed for Chu's bank account were reckless (the "Seizure Affidavit"). *See* Schwartz Decl. Ex. 17. Chu claims that the Government did not sufficiently disclose the bases for his challenge to a freezing letter the Government had previously gotten for the bank account. But he does concede that the Government explicitly laid out that Chu had "objected to the prior restraint as unconstitutional" and that it had "already frozen the account by letter before it sought judicial authorization." Br. at 42. Chu, however, complains that the Seizure Affidavit lacked sufficient detail about his objections and the events in the bankruptcy which purportedly led to the Government filing a freezing letter. Chu's argument is baseless. First, nothing was withheld,

---

[7] Moreover, the Government was not even required to demonstrate probable cause that Chu was *guilty* of the crimes being investigated, only that evidence relevant to those offenses would be found in the places to be searched.

recklessly or otherwise, from the magistrate. While the Seizure Affidavit provided a summary of Chu's motion, it also, notably, provided the specific citation to Chu's motion, as it was publicly available in its entirety on this case's docket—a fact that Chu ignores. Ex. 17 n.4. Second, even assuming *arguendo* there was some kind of omission (and there was not), Chu's quibbling over the extent of the Seizure Affidavit's description of his publicly-available and specifically-cited motion is simply no basis for a *Franks* challenge. *See, e.g.*, *Mandell*, 710 F. Supp. 2d at 374 ("[o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing.").

Accordingly, Chu's *Franks* claims on both the Search Affidavits and the Seizure Affidavit should be summarily denied.

## IV. CHU HAS NOT MET THE HIGH BAR TO BREAK GRAND JURY SECRECY.

Breaking grand jury secrecy constitutes "extraordinary relief." *United States v. Shaw*, 06 CR 41 (CM), 2007 WL 4208365, at *6 (S.D.N.Y. Nov. 20, 2007). As a threshold matter, Chu's basis for relief is moot given that a superseding indictment has been returned. Regardless, Chu's basis for relief rests on pure speculation which comes nowhere near meeting the standard for breaking grand jury secrecy.

### A. Applicable Law

"The grand jury has always occupied a high place as an instrument of justice in our system of criminal law—so much so that it is enshrined in the Constitution." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423 (1983). Indeed, it "is a constitutional fixture in its own right," *United States v. Williams*, 504 U.S. 36, 47 (1992), and "grand jury proceeding[s] [are] accorded a presumption of regularity," *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (internal quotation marks omitted). Given this, there has been a "long-established policy that maintains the secrecy of grand jury proceedings in the federal courts." *Dennis v. United States*, 384 U.S. 855, 869 (1966).

Rule 6(3)(E)(ii) of the Federal Rules of Criminal Procedure permits limited disclosure. It allows for disclosure "at the request of the defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(3)(E)(ii). To invoke disclosure under this Rule, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the Grand Jury's substantial interest in secrecy. *Gibson*, 175 F. Supp. 2d at 534; *see also Sells Eng'g, Inc.*, 463 U.S. 418 at 443. "This standard applies both to *in camera* review and disclosure to the parties of grand jury minutes." *United States v. Dunn*, 05 Cr. 127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005).

Even under this rigorous standard, Rule 6(3)(E)(ii) cannot be invoked to challenge an indictment "on the ground that there was inadequate or incompetent evidence before the grand jury." *Costello v. United States*, 350 U.S. 359, 363 (1956). Indeed, "[t]he grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Kaley v. United States*, 571 U.S. 320, 328 (2014). Stated simply, "it is hornbook law that a federal defendant may not challenge a facially-valid indictment . . . on the ground that it is based on insufficient evidence." *United States v. Butler*, 351 F. Supp. 2d 121, 126 (S.D.N.Y. 2004).

To be sure, "[a] prosecutor may not mislead a grand jury by knowingly presenting false evidence." *United States v. Rankin*, 422 F. Supp. 3d 564, 587 (D. Conn. 2019). But "[d]ismissal of [an] indictment"—and the seeking of grand jury records to do so—"is especially unwarranted when the particular claims of impropriety before the grand jury concern the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence, or error in explaining the law—improprieties that could be cured in the trial before the petit jury." *United States v. Murphy*, 2024 WL 3264127, at *4 (2d Cir. July 2, 2024);

*see also United States v. Howard,* 216 F.3d 1074 (2d Cir. 2000).

If, however, there is a claim based on prosecutorial misconduct before the grand jury, it must be well supported: "[s]peculation and surmise as to what occurred before the grand jury is not a substitute for fact." *Shaw*, 2007 WL 4208365, at *6. "In this Circuit . . . it is well established . . . that a defendant's mere speculation as to what occurred in front of the grand jury does not warrant inspection of the minutes." *United States v. Brown*, 95 CR. 168 (AGS), 1995 WL 387698, at *7 (S.D.N.Y. June 30, 1995). And dismissal is ultimately warranted on a claim of prosecutorial wrongdoing only if "such errors prejudiced the defendant[]." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).

**B. Discussion**

As a threshold matter, the defendant's claim is moot. "Rule 6(e)(3)(E)(ii) . . . provides that a court may authorize disclosure of a grand-jury matter 'at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.'" *Da Costa*, 2024 WL 3014329, at *4. Since the defendant has filed his pretrial motions, the Government obtained a superseding indictment on June 25, 2025, which the grand jury returned and the petit jury will consider. Thus, the defendant bears the burden of demonstrating a ground under Rule 6(e)(3)(E)(ii) to dismiss the newly returned Indictment.

In any case, even if the Court considers Chu's arguments, Chu comes nowhere near meeting the standard set forth by Rule 6(e)(3)(E)(ii). Chu's claims are based on solely on his belief (1) that exculpatory information contained in the Government's *Brady* letter was not presented to the grand jury, (2) a government agent may have blurred a distinction between hearsay and eyewitness testimony, (3) there is a lack of a documentary record supporting his guilt which meant that the grand jury necessarily inappropriately weighed any information presented related to Kollar and Seibold, and (4) that he has a need to review the jury instructions given the purported novelty

of the Section 225 charge.

Most of Chu's claims, even if substantiated, do not present a basis to break grand jury secrecy. To start, it is black letter law, as Chu himself recognizes, that the "the Government ha[s] no obligation to present exculpatory material to the grand jury." *United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997). Thus, "the Government's alleged failure to present exculpatory evidence to the grand jury cannot justify the relief the defendant seeks." *United States v. Scali*, 16 Cr. 466 (NSR), 2018 WL 369195, at *3 (S.D.N.Y. Jan. 9, 2018), *aff'd*, 820 F. App'x 23 (2d Cir. 2020). Chu's complaints about the documentary record are equally unavailing. Putting aside the fact his claim is squarely rebutted by the written messages and recordings quoted in the original and superseding indictments, Chu's claim, again, is squarely foreclosed by black letter law: "[t]he grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Kaley*, 571 U.S. at 328. And, finally, Chu's mere speculation—"given the novelty and lack of model jury instructions on the elements of the Section 225 Charge," Br. at 52—that the grand jury was improperly instructed "is insufficient to establish a particularized need to review the grand jury instructions." *United States v. Phillips*, 22 Cr. 138 (LJL), 2023 WL 6812286, at *3 (S.D.N.Y. Oct. 16, 2023); *United States v. Chastain*, 22 Cr. 305 (JMF), 2022 WL 13833637, at *3 n.5 (S.D.N.Y. Oct. 21, 2022).

In any case, Chu has not substantiated any of his claims. Despite taking over ten pages of his brief, Chu offers no "tangible basis for the Court to conclude that any of the alleged impropriety occurred, and the speculation that the jury may have been incomplete or erroneous information is precisely the type that courts in this district have routinely rejected as basis for vitiating grand jury secrecy." *Rodrigues*, 2024 WL 113744, at *5; *see also Da Costa*, 2024 WL 3014329 at *4 (denying an "application" for grand jury materials because it was "based upon speculation and does not make out a showing that the grand jury acted beyond its authority, nor does it make concrete

allegations of government misconduct”).

Accordingly, Chu’s claims for access to grand jury minutes, or for their *in camera* review, should be denied.

## V. CHU’S MOTION TO SUPPRESS PHOTOGRAPHS SHOULD BE DENIED AS MOOT.

Chu moves to suppress certain photographs taken by agents while executing the search warrant at his residence. Br. 56-57 (specifying Exhibits 5-15 to the Schwartz Declaration). While Chu’s legal arguments are without merit, the Government does not intend to offer these photographs in its case-in-chief at trial, so in the interest of judicial economy Chu’s motion should be denied as moot.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that Chu’s motions should be denied in their entirety.

Dated: New York, New York
June 26, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: Justin Rodriguez
Micah F. Fergenson
Shiva H. Logarajah
Justin V. Rodriguez
Assistant United States Attorneys