**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

DANIEL CHU,

Defendant.

Case No. 25 Cr. 579 (PKC)

**DANIEL CHU'S OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF HIS SECOND PRETRIAL MOTIONS**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Daniel Chu*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ iii

**PRELIMINARY STATEMENT** ........ 1

**RELEVANT BACKGROUND** ........ 3

A. The Government's Investigation ........ 3

B. The Indictment ........ 4

C. Mr. Chu's Initial Pretrial Motions ........ 5

D. The Superseding Indictment ........ 6

E. Current Status of Discovery ........ 9

F. Pre-Motions Meet and Confer, and the Government's Ongoing Use of the Grand Jury ........ 12

**ARGUMENT** ........ 13

I. RENEWED MOTION TO DISMISS COUNT ONE OR, ALTERNATIVELY, FOR A BILL OF PARTICULARS AS TO COUNT ONE ........ 13

A. Legal Standards ........ 13

B. The Indictment's Allegations As To Count One Are Insufficient ........ 16

II. RENEWED MOTION FOR A BILL OF PARTICULARS ON COUNTS TWO TO FOUR ........ 26

III. MOTION FOR A BILL OF PARTICULARS ON COUNTS FIVE AND SIX ........ 28

IV. MOTION FOR A BILL OF PARTICULARS ON COUNTS SEVEN AND EIGHT ........ 28

V. RENEWED MOTION TO UNSEAL AND DISCLOSE GRAND JURY RECORDS OR, ALTERNATIVELY, FOR *IN CAMERA* REVIEW ........ 31

A. The Superseding Indictment Does Not Moot This Motion ........ 32

B. There Is a Particularized Need to Disclose the Grand Jury Record. ........ 33

C. The Grand Jury Record Is Necessary to Assess the Integrity of the Probable Cause Determination ........ 40

VI. MOTION TO PRECLUDE EVIDENCE AND QUASH SUBPOENAS BASED ON ABUSE OF THE GRAND JURY PROCESS ........ 43

A. Legal Standard ........ 45

B. The Government Improperly Used the Grand Jury To Prepare Its Already-Pending Case Against Mr. Chu for Trial ........ 46

C. Remedy ........ 51

**CONCLUSION .......................................................................................................................... 52**

# TABLE OF AUTHORITIES

**Cases**

*Bank of Nova Scotia v. United States*,
487 U.S. 250 (1988) .......... 35, 40

*Democratic Nat'l Comm. v. Russian Fed'n*,
392 F. Supp. 3d 410 (S.D.N.Y. 2019) .......... 30

*Douglas Oil Co. of California v. Petrol Stops Northwest*,
441 U.S. 211 (1979) .......... 33

*Dowling v. United States,*
473 U.S. 207 (1985) .......... 14

*Fulton Cnty. Bd. of Registration & Elections v. United States*,
2026 WL 1959461 (N.D. Ga. July 7, 2026) .......... 49

*Grunewald v. United States*,
353 U.S. 391 (1957) .......... 30

*Hamling v. United States*,
418 U.S. 87 (1974) .......... 14

*In re Grand Jury Proceeding*,
971 F.3d 40 (2d Cir. 2020) .......... 51

*In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*,
767 F.2d 26 (2d Cir. 1985) .......... 45, 51

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
823 F. Supp. 3d 1 (D.D.C. 2026) .......... 48

*In re Grand Jury Subpoenas*,
2026 WL 1783899 (D. Minn. June 22, 2026) .......... 50

*In re Petition of Craig*,
131 F. 3d 99 (2d Cir. 1997) .......... 40

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
552 F.3d 93 (2d Cir. 2008) .......... 16

*United States v. Abrams*,
539 F. Supp. 378 (S.D.N.Y. 1982) .......... 18

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) .......... 14

*United States v. Alfonso*,
143 F.3d 772 (2d Cir. 1998) .......... 24

*United States v. Amendolara*,
2002 WL 31368279 (S.D.N.Y. Oct. 21, 2002) .......... 22

*United States v. Ashley*,
905 F. Supp. 1146 (E.D.N.Y. 1995) ..... 14

*United States v. Barrett*,
153 F. Supp. 3d 552 (E.D.N.Y. 2015) ..... 21

*United States v. Basurto*,
497 F.2d 781 (9th Cir. 1974) ..... 37

*United States v. Bennett*,
2006 WL 8435170 (C.D. Cal. May 24, 2006) ..... 25

*United States v. Berlin*,
472 F.2d 1002 (2d Cir. 1973) ..... 15

*United States v. Bin Laden*,
92 F. Supp. 2d 225 (S.D.N.Y. 2000) ..... 16, 22

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ..... 15, 16, 22, 29

*United States v. Calandra*,
414 U.S. 338 (1974) ..... 49

*United States v. Calk*,
87 F.4th 164 (2d Cir. 2023) ..... passim

*United States v. Crawford*,
2023 WL 3244599 (S.D.N.Y. May 4, 2023) ..... 14

*United States v. Curtis*,
506 F.2d 985 (10th Cir. 1974) ..... 14

*United States v. Da Costa*,
2024 WL 3014329 (S.D.N.Y. June 13, 2024) ..... 43

*United States v. Davidoff*,
845 F.2d 1151 (2d Cir. 1988) ..... 15

*United States v. Davis*,
2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) ..... 18

*United States v. Doss*,
563 F.2d 265 (6th Cir. 1977) ..... 45

*United States v. Dunn*,
2005 WL 1705303 (S.D.N.Y. July 19, 2005) ..... 34

*United States v. Gabriel*,
920 F. Supp. 498 (S.D.N.Y. 1996) ..... 30

*United States v. Gaviria*,
740 F.2d 174 (2d Cir. 1984) ..... 26

*United States v. Halloran*,
664 F. App'x 23 (2d Cir. 2016) ..... 14

*United States v. Harris*,
1993 WL 300052 (S.D.N.Y. July 30, 1993) .......... 25, 26

*United States v. Hennessy*,
1993 WL 137766 (S.D.N.Y. Apr. 23, 1993) .......... 15

*United States v. Hernandez*,
980 F.2d 868 (2d Cir. 1992) .......... 28

*United States v. Ho*,
2009 WL 2591345 (D. Haw. Aug. 20, 2009) .......... 41

*United States v. Hoey*,
2014 WL 2998523 (S.D.N.Y. July 2, 2014) .......... 40, 41, 42

*United States v. Hogan*,
712 F. 2d 757 (2d Cir. 1983) .......... 36

*United States v. Holmes*,
2020 WL 666563 (N.D. Cal. 2020) .......... 29

*United States v. Hussain*,
785 F. Supp. 3d 9 (D. Vt. 2025) .......... 26

*United States v. Johnson*,
225 F. Supp. 2d 982 (N.D. Iowa 2002) .......... 19

*United States v. Kandic*,
134 F.4th 92 (2d Cir. 2025) .......... 28

*United States v. Kollar*,
No. 25 Cr. 584 (S.D.N.Y.) .......... 5, 46

*United States v. Lefkowitz*,
125 F.3d 608 (8th Cir. 1997) .......... 26

*United States v. Levy*,
2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) .......... 20

*United States v. Lino*,
2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) .......... 27

*United States v. Litvak*,
2013 WL 5740891 (D. Conn. Oct. 21, 2013) .......... 14

*United States v. Lopez*,
2019 WL 4733603 (S.D.N.Y. Sept. 27, 2019) .......... 14

*United States v. McDermott*,
245 F.3d 133 (2d Cir. 2001 .......... 26

*United States v. McGuinness*,
764 F. Supp. 888 (S.D.N.Y. 1991) .......... 22

*United States v. Nacchio*,
2006 WL 2475282 (D. Colo. 2006) .......... 29

*United States v. Nachamie,*
91 F. Supp. 2d 565 (S.D.N.Y. 2000) ..... 21

*United States v. Peralta*,
763 F. Supp. 14 (S.D.N.Y. 1991) ..... 36, 41

*United States v. Persico*,
621 F. Supp. 842 (S.D.N.Y. 1985) ..... 20

*United States v. Pinto-Thomaz*,
352 F. Supp. 3d 287 (S.D.N.Y. 2018) ..... 22

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ..... 18

*United States v. Priolo*,
812 F. Supp. 3d 250 (E.D.N.Y. 2025) ..... 26

*United States v. Punn*,
737 F.3d 1 (2d Cir. 2013) ..... 45

*United States v. Reale*,
1997 WL 580778 (S.D.N.Y. Sept. 17, 1997) ..... 27

*United States v. Reddy*,
190 F. Supp. 2d 558 (S.D.N.Y. 2002) ..... 16, 22, 25

*United States v. Rittwege*,
259 F. Supp. 2d 275 (S.D.N.Y. 2003) ..... 22

*United States v. Rodrigues*,
2024 WL 113744 (S.D.N.Y. Jan. 10, 2024) ..... 42

*United States v. Rodriguez*rs,
1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) ..... 22

*United States v. Savin*,
2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ..... 29, 30

*United States v. Seibold*,
No. 25 Cr. 585 (S.D.N.Y.) ..... 5, 46

*United States v. Siddiqi*,
2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ..... 15

*United States v. Smith*,
985 F. Supp. 2d 547 (S.D.N.Y. 2014) ..... 14

*United States v. Trie*,
21 F. Supp. 2d 7 (D.D.C. 1998) ..... 29

*United States v. Trippe*,
171 F. Supp. 2d 230 (S.D.N.Y. 2001) ..... 22

*United States v. Twersky*,
1994 WL 319367 (S.D.N.Y. June 29, 1994) ..... 41

*United States v. Vaid*,
2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017) .......... 29

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999) .......... 18

*United States v. Yefsky*,
994 F.2d 885 (1st Cir. 1993) .......... 15

**Statutes**

15 U.S.C. § 78 .......... 7

17 C.F.R. § 240 .......... 7

18 U.S.C. § 1001 .......... 7

18 U.S.C. § 1343 .......... 5, 6, 7

18 U.S.C. § 1344 .......... 5, 6, 7

18 U.S.C. § 1349 .......... 4, 6, 7

18 U.S.C. § 225 .......... 17

18 U.S.C. § 341 .......... 7

18 U.S.C. § 371 .......... 7

21 U.S.C. § 848 .......... 19

**Other Authorities**

American Bar Association, Standards for Criminal Justice: Prosecution Function Standard 3-3.6(b) (3d ed. 1993) .......... 36

**Rules**

Fed. R. Crim. P. 12 .......... 13

Fed. R. Crim. P. 7 .......... 13, 15, 23

Daniel Chu respectfully submits this memorandum of law in support of his second set of pretrial motions. As directed by the Court at the January and June pretrial conferences, these motions are directed to the face of the Superseding Indictment and to discovery received by the defense between February 20, 2026 and the date of this filing, except for motions relating to the government's productions of responsive material from Mr. Chu's imaged electronic devices and iCloud accounts, for which the Court has set a separate briefing schedule. Subsequent discovery, whenever the government substantially completes producing it, may give rise to additional motion practice.

## PRELIMINARY STATEMENT

Daniel Chu is innocent. The Superseding Indictment does nothing to change that. Because the new indictment suffers from the same infirmities as the first—despite the government having had the opportunity to attempt to cure them—Mr. Chu is substantially renewing three motions previously made on the basis of the original indictment. First, Mr. Chu renews his motion to dismiss or, in the alternative, for a bill of particulars on Count One of the Superseding Indictment. Second, Mr. Chu renews his motion for a bill of particulars on the conspiracy charge as well as the bank and wire fraud charges concerning SPV4, which are alleged in Counts Two through Four. Third, Mr. Chu renews his motion to unseal and disclose grand jury records or, alternatively, for *in camera* review, based on the government's repeated failure to disclose material exculpatory evidence to the grand jury.[1]

[1] Return of the Superseding Indictment does not require Mr. Chu to renew his motions (1) to suppress evidence, or for a *Franks* hearing, based on the government's reckless omissions from its warrant affidavits, *see* ECF No. 46 at 35–45, or (2) to suppress evidence seized beyond the scope of the Premises Warrant, *see id.* at 54–57. Accordingly, and pursuant to the Court's Orders, Mr. Chu will submit his reply in support of these motions tomorrow, July 17, 2026.

The merit of these motions has only grown stronger in light of the Superseding Indictment and the government's continued misconduct. With respect to Count One, for example, rather than adding supporting facts or clarifying its theory, the government tacked on a small handful of additional lines as the premise for new securities fraud allegations. Without even waiting for his guilty plea, the government also dropped as a defendant its new cooperating witness, David Goodgame, in a blatant attempt to manifest a four-person enterprise it would otherwise be unable to prove to satisfy the required elements of Count One. In addition, even after Mr. Chu raised the issue in his initial motions, the Superseding Indictment demonstrates that the government again failed to present the grand jury with exculpatory information received months earlier from cooperating witnesses Kollar and Seibold. Further, to the extent that the government relied on its new cooperator, Goodgame, in obtaining the Superseding Indictment, there is every reason to believe that the government failed to present exculpatory information from him, too.

In addition to these renewed motions, Mr. Chu also submits three new motions based on the face of the Superseding Indictment. First, Mr. Chu moves for a bill of particulars on the bank and wire fraud charges concerning SPV5 alleged in Counts Five and Six. Second, Mr. Chu moves for a bill of particulars on the new securities fraud charges, Counts Seven and Eight.

Finally, Mr. Chu moves to preclude evidence obtained via grand jury subpoena and quash outstanding subpoenas based on the government's abuse of the grand jury process. We do not make that motion lightly, but the government's conduct in this case has been inexplicable. In December when the original indictment was announced, the U.S. Attorney recognized that he had "brought these charges in I would say almost record time for a[n alleged] fraud of this type," but boasted that his office had conducted "a thorough investigation in the three months since Tricolor's

collapse."[2] He was half right. These charges were brought incredibly quickly, but the government's investigation was far from thorough. As the Court is well aware, the government did not even begin to look at the materials it seized from Mr. Chu and others until after it obtained the original indictment. It also continued to rely on grand jury process in the seven months since Mr. Chu was indicted in the name of a continuing investigation—even though the government informed the defense back in January that it would be filing securities fraud charges—improperly holding subpoenas open indefinitely in blatant derogation of proper grand jury practice. The government is supposed to investigate first, and then charge, not the other way around.

## RELEVANT BACKGROUND

### A. The Government's Investigation

In September of 2025, the business that Mr. Chu founded and led for several decades filed for bankruptcy after the years-long fraudulent conduct of its Chief Financial Officer, Jerome Kollar, was discovered. At the same time, the government began investigating what led to the company's downfall. Mr. Kollar—the architect of the fraud—and his direct report, finance executive Ameryn Seibold, were approached by law enforcement and quickly began cooperating. Less than three months later, after a rushed and incomplete investigation, Kollar and Seibold pleaded guilty and the government charged Mr. Chu and Chief Operating Officer David Goodgame. The flaws in the government's investigation, including the material exculpatory information withheld from the Court, are more thoroughly described in Mr. Chu's Omnibus Memorandum of Law in Support of His Initial Pretrial Motions. Ex. 3[3] ("Initial Motions"); *see*

---

[2] https://www.youtube.com/watch?v=0jy9Ffu6BLM (starting at 3:27).

[3] All references to "Ex. __" refer to exhibits to the Declaration of Matthew L. Schwartz in Support of Daniel Chu's Second Pretrial Motions, dated July 16, 2026 ("Schwartz Decl."). All references to "May 20 Schwartz Decl." refer to the Declaration of Matthew L. Schwartz in Support

*also* ECF No. 46 (redacted version on the public docket). The following facts are most relevant for purposes of the present motion and were not disputed in the Government's Memorandum of Law in Opposition to Defendant Daniel Chu's Pretrial Motions, ECF No. 83 ("Initial Opposition").

As disclosed in a *Brady* disclosure made by the government on February 19, 2026, the government obtained material exculpatory information concerning Mr. Chu during interviews of its first two cooperating witnesses, Jerome Kollar and Ameryn Seibold, in September 2025. *See* Initial Motions at 3; Ex. 1 (*Brady* Letter). These interviews took place before the government obtained and executed a search warrant at Mr. Chu's residence, and before the government asked a grand jury to return an indictment against him.

In his September 16, 2025 interview, Kollar stated that Chu seemed to be "shocked" at the size of the fraud once it was revealed to him and that, as far as Kollar remembered, he had not communicated with Mr. Chu about misstatements in the securitization offering memoranda. And in his September 6, 2025 interview, Seibold stated that he never witnessed Chu and Kollar speaking about loan representations to each other, and Seibold never spoke with Chu about Chu's conversations with Kollar, either. *Id.*

**B. The Indictment**

On December 17, 2025, the government unsealed a four-count indictment charging Mr. Chu with continuing financial crimes enterprise ("CFCE") under 18 U.S.C. § 225 (Count One), and both Mr. Chu and then-co-defendant Goodgame with conspiracy to commit bank fraud and wire fraud affecting a financial institution under 18 U.S.C. § 1349 (Count Two), bank fraud under

---

of Daniel Chu's Initial Pretrial Motions, dated May 20, 2026. Schwartz Decl. Ex. 4; *see also* ECF No. 44 (redacted version on the public docket).

18 U.S.C. § 1344 (Count Three), and wire fraud affecting a financial institution under 18 U.S.C. § 1343 (Count Four). *See* ECF Nos. 2 and 3.

The day prior, Kollar and Seibold pleaded guilty pursuant to cooperation agreements to multiple felonies, including bank fraud, wire fraud affecting a financial institution, false statements to a financial institution, conspiracy to commit securities fraud, and destruction of records, among others. *See United States v. Kollar*, No. 25 Cr. 584 (S.D.N.Y.); *United States v. Seibold*, No. 25 Cr. 585 (S.D.N.Y.). Kollar and Seibold are expected to serve as central witnesses at trial.

**C. Mr. Chu's Initial Pretrial Motions**

At Mr. Chu's January 13 arraignment, the Court stated that it intended to schedule a first round of pretrial motions "directed to the face of the indictment or to discovery that's produced by . . . February 19th . . . ." *See* ECF No. 44-16, May 20 Schwartz Decl. Ex. 16 at 9. The Court expressly noted that, because discovery would not be complete by February 19, the defense in its initial motions "cannot address the issue of privilege" and "cannot address the issue of responsiveness [or] relevance responsiveness" because the necessary information was not yet available. *Id.*

On May 20, 2026, Mr. Chu filed his Initial Motions. First, Mr. Chu moved to dismiss Count One or, alternatively, for a bill of particulars as to Count One, the CFCE charge. Ex. 3 at 13–32. Second, Mr. Chu moved for a bill of particulars on the remaining counts: Count Two, conspiracy to commit bank fraud and wire fraud affecting a financial institution; Count Three, bank fraud; and Count Four, wire fraud affecting a financial institution. *Id.* at 32–35. Third, Mr. Chu moved to suppress evidence, or for a *Franks* hearing, based on the government's reckless omissions from its warrant affidavits. *Id.* at 35–45. Fourth, Mr. Chu moved to unseal and disclose grand jury records or, alternatively, for *in camera* review, based on the government's repeated failure to disclose material exculpatory evidence to the grand jury. *Id.* at 46–54. Fifth, Mr. Chu

moved to suppress evidence seized beyond the scope of the warrant authorizing a search of Mr. Chu's premises. *Id.* at 54–57. Goodgame joined in the motions for a bill of particulars on Counts Two through Four, as well as the motion to suppress evidence, or for a *Franks* hearing, and the motion to unseal and disclose grand jury records or, alternatively, for *in camera* review. *See* ECF No. 48.

On June 26, 2026, the government filed its Initial Opposition, ECF No. 83.

### D. The Superseding Indictment

On June 24, 2026, the government unsealed an eight-count Superseding Indictment. ECF No. 77 ("Superseding Indictment"). The Superseding Indictment dropped all charges against Goodgame and doubled the number of charges against Mr. Chu.

Other than removing Goodgame as a defendant, the 26 paragraphs of speaking allegations preceding Count One are almost entirely unchanged. The government's lone addition is paragraph 17, which alleges in general terms that Mr. Chu "also defrauded investors in Tricolor's bonds backed by securitized auto loans through several fraudulent practices." *Id.* ¶ 17.

As in the original indictment, Count One's statutory allegations charge continuing financial crimes enterprise, in violation of 18 U.S.C. § 225. *Id.* ¶¶ 1–29.

Count Two is unchanged, alleging conspiracy to commit bank fraud and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1349. *Id.* ¶¶ 30–33.

Counts Three and Four are also unchanged, alleging bank fraud and wire fraud affecting a financial institution in connection with what the indictment refers to as SPV4, in violation of 18 U.S.C. §§ 1344 and 1343, respectively. *Id.* ¶¶ 34–37

Counts Five and Six allege new charges for bank fraud and wire fraud affecting a financial institution in connection with SPV5, in violation of 18 U.S.C. §§ 1344 and 1343, respectively. *Id.* ¶¶ 38–41.

Counts Seven and Eight allege new charges for conspiracy to commit securities fraud and securities fraud, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5. *Id.* ¶¶ 42–47.

Counts Seven and Eight allege conduct spanning "[f]rom at least in or about 2018 up to and including at least in or about 2025 . . . ." *Id.* ¶¶ 43, 47. However, Count Eight does little more than recite the statutory elements, while Count Seven alleges just two overt acts in furtherance of the conspiracy to commit securities fraud: "a. On or about March 1, 2025, DANIEL CHU, the defendant, executed a sale and servicing agreement with respect to a Tricolor asset-backed securitization," and "b. On or about August 17, 2025, CHU told Jerry Kollar and Executive-1 that if Tricolor's loan performance had recently improved, the conspirators could try to transfer the fraudulent collateral from the SPV4 warehouse to future bondholders, stating that if the potential improvement in loan performance was 'right, then you can in theory put more shit in that securitization and it'll kind of wash out.'" *Id.* ¶ 45.

As noted, Goodgame was not charged in the Superseding Indictment. But the same day it was unsealed, Goodgame pled guilty pursuant to a cooperation agreement to a superseding felony information charging him with six counts: conspiracy to commit bank fraud and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1349 (Count One), bank fraud, in violation of 18 U.S.C. § 1344 (Count Two), wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343 (Count Three), conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count Four), securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Count Five), and false statements, in violation of 18 U.S.C. § 1001 (Count Six). The superseding information alleges that Goodgame, while serving as COO of Tricolor, agreed to make and cause to be made a series of false statements to multiple financial institutions regarding

Tricolor's financial condition and the existence, nature and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor. Goodgame's guilty plea was entered just over a month after he filed coordinated, joint motions with Mr. Chu, suggesting that any pre-plea cooperation was limited, as such cooperation often takes many months.

During his plea allocution, Goodgame admitted that he "kn[e]w th[at] Jerry Kollar, Am[eryn] Seibold, and others were manipulating the data related to these loans, and in doing so, this was defrauding the banks. I also know I talked to Daniel Chu and raised concerns about all of these things." Ex. 5 at 22:14–17. Goodgame further admitted that he "was aware that there were things going on in the finance department." *Id.* at 21:2–3. Although Goodgame's allocution is inconsistent with the notion that Mr. Chu "organized, supervised, or managed" a continuing financial crimes enterprise, it is consistent with his prior statements about Mr. Chu. On February 19, 2026, the government produced a FD-302 report of an October 2025 interview of Goodgame. In that interview, Goodgame told the government that he and Mr. Chu [redacted] Ex. 2 at 2. Goodgame also explained that [redacted]

[redacted]

*Id.*[4] The government has not yet produced *Brady* material from Goodgame's more recent proffers.

### E. Current Status of Discovery

The government has made 15 productions since February 19. Not counting the hundreds of thousands of documents received from the government pursuant to its review and production of "responsive" material from Mr. Chu's seized electronic devices and iCloud accounts, Mr. Chu has received the following sets of documents produced by third parties pursuant to grand jury subpoenas since the February 19 cut-off for his Initial Motions: 8,558 on February 25; 34,503 on March 10; 40,769 on April 3; 107,132 on May 8; 151,432 on May 26; 11,363 on May 29; 400,185 on June 19; 21,174 on July 1, and 67,776 on July 6. Schwartz Decl. ¶¶ 19–27.

At the June 30, 2026 status conference, the Court directed the government to inform grand jury subpoena recipients that "if their returns are not complete by the last business day in the month of July, this may present grave problems to the government and its case . . . ." Ex. 6 at 29:15–20. Despite this warning, the government did not commit to completing grand jury subpoena discovery by any particular date, although it did recognize "that there's going to come a point where we are at risk of having the documents precluded." *Id.* at 29:12–14. Nevertheless, the government has thus far declined to state that it has concluded its investigation and corresponding use of grand jury subpoenas, and has specifically left open the possibility of receiving documents pursuant to grand jury subpoena beyond the end of the month. Schwartz Decl. ¶¶ 41–44.

Here, the government issued subpoenas of virtually unlimited scope both before and after returning the first indictment, and there is every reason to believe that it continues to request and

---

[4] Goodgame pleaded guilty to making false statements during the October 2025 interview, but that charge did not encompass what Goodgame told the government about Mr. Chu; it covered "false statements about the existence, nature, and value of Tricolor's pledged collateral." ECF No. 78 ¶ 10.

collect documents under those subpoenas even after returning the Superseding Indictment. While Mr. Chu is not in possession of all the subpoenas the government has caused the grand jury to issue, based on the information he has received, it is clear that the government has egregiously misused the grand jury to continue to investigate crimes already charged, including through extremely broad subpoenas for which the government has declined to enforce return dates. Instead, the government has elected to permit months and months of rolling productions, which has enabled the government to keep investigating the charged offenses long after the grand jury purportedly assigned to investigate had concluded its investigation and returned an indictment.

For instance, based on productions from third parties, Mr. Chu is aware that Tricolor and JPMorgan Chase Bank, N.A. ("JPMorgan") were subpoenaed in September 2025. *See* Exs. 7 & 8. However, the government has continued to obtain documents from these entities as recently as July 1, 2026 from Tricolor and July 6, 2026 from JPMorgan. Schwartz Decl. ¶ 26–27. Similarly, Mr. Chu is aware that CBIZ, Inc. ("CBIZ") and Ares Management Corporation ("Ares") were subpoenaed on November 4 and December 14, 2025, respectively, yet the government has provided twelve productions from these entities, including in the government's latest production of July 6, 2026. *Id.* ¶ 27; Exs. 9 & 10.

The two grand jury subpoenas Mr. Chu has been able to review, issued to Wells Fargo Bank, N.A. ("Wells Fargo") and Dropbox, Inc. ("Dropbox"), further demonstrate how broadly the government's requests were drafted—enabling the government to use the same subpoenas to continue accumulating evidence of the charged offenses long after the indictment, and even after the Superseding Indictment was returned.

The subpoena to Wells Fargo, dated November 13, 2025, requests a litany of information, [redacted]

[redacted] Ex. 11.

Mr. Chu received the Dropbox subpoena directly after requesting a copy pursuant to the company's notice procedure. *See* Schwartz Decl. ¶ 33. Dated April 13, 2026—almost four months after initially charging Mr. Chu—the Dropbox subpoena requests "any documents/records in your care, custody or control related to any Dropbox accounts associated with" certain email addresses. Ex. 12. The Dropbox subpoena further requests an array of information associated with Mr. Chu's accounts, including social security numbers, session times and durations, the length of service and types of service utilized, the means and source of payments, account notes and logs, and investigative files or user complaints. *Id.* The Dropbox subpoena does not purport to limit the information sought to any certain date, conduct, or records that would be relevant to not-yet-charged offenses.

Both the Wells Fargo and Dropbox subpoenas set the date to appear before the grand jury exactly two weeks after service, unless the records are produced before then. The government presumably included similar two-week deadlines in the other grand jury subpoenas issued in this case. But the government has been disregarding these deadlines to an egregious extent.

For example, the government's July 6 production contains subpoena returns from Tricolor, JPMorgan, CBIZ, and Ares. The government subpoenaed these entities in September, November, and December 2025, respectively. Exs. 8–10. Therefore, the government has been accepting subpoena returns from these entities for seven to ten months.

### F. Pre-Motions Meet and Confer, and the Government's Ongoing Use of the Grand Jury

In a July 10, 2026 letter, counsel for Mr. Chu requested to meet and confer with the government pursuant to Local Criminal Rule 16.1. Ex. 13 ("July 10 Letter"). The parties met and conferred on July 14, 2026. Schwartz Decl. ¶ 37 ("July 14 Meet and Confer"). During the July 14 Meet and Confer, the government would not confirm or deny whether it was continuing to use the grand jury to investigate any additional conduct or potential defendants. *Id.* ¶¶ 41, 43–44. The government also refused to commit to seeking to enforce outstanding subpoenas or stop accepting rolling productions. *Id.* ¶ 42. The government likewise refused to provide any information about what evidence was presented to the grand jury in connection with the superseding indictment. *Id.* ¶ 46.

In the July 10 Letter, Mr. Chu also renewed his requests for a bill of particulars as to Counts One through Four, which were initially alleged in the original indictment, and similarly requested a bill of particulars as to Counts Five through Eight. Ex. 13 at 5. At the July 14 Meet and Confer, the government declined to provide additional information as to Counts One through Six but indicated willingness to consider providing additional information as to the misrepresentations at issue in the securities fraud offenses. Schwartz Decl. ¶ 38.

In a July 15, 2026 letter, the government provided additional information regarding those charges in the form of a "non-exhaustive" list of the "securitizations at issue," as well as—by reference to the Bates numbers of previously produced documents—a "non-exhaustive set of transaction documents," three examples of "TAST monthly servicer reports," and two examples of "Tricolor's investor presentations." Ex. 14 (the "July 15 Letter"). The government refused to provide additional information regarding the identities of any individuals implicated in the

securities fraud counts, including the period of such individuals' participation, indicating only that the Superseding Indictment "names three co-conspirators who are cooperating witnesses." *Id.*

## ARGUMENT

### I. RENEWED MOTION TO DISMISS COUNT ONE OR, ALTERNATIVELY, FOR A BILL OF PARTICULARS AS TO COUNT ONE[5]

Count One, the Section 225 charge, should be dismissed. Since its passage following the savings and loan crisis of the 1980s, Section 225 has been charged only a handful of times anywhere. That statute, sometimes referred to as the "financial kingpin" statute, imposes a sentence of no less than ten years' imprisonment, and up to life, for someone who leads a "continuing financial crimes enterprise." But despite pages of speaking allegations, the Superseding Indictment here has numerous facial deficiencies. It does not identify what the relevant enterprise is; who was a part of it; how it operated; how Mr. Chu supposedly directed it; or how he allegedly profited from it—all elements of the offense. The charge should therefore be dismissed. Short of that, Mr. Chu is entitled to a bill of particulars that tells him, at minimum, the nature of the charges against him.

#### A. Legal Standards

##### 1. Dismissal of the Superseding Indictment

Pursuant to Federal Rule of Criminal Procedure 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Federal Rule of Criminal Procedure 12(b)(3)(B) requires dismissal of an indictment for "lack of specificity" or "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B).

---

[5] This motion renews and incorporates the arguments made in Mr. Chu's Initial Motions. ECF No. 46 at 13–32. That brief is attached hereto as Exhibit 3.

"In determining a motion to dismiss, the Court accepts as true the facts alleged in the indictment." *United States v. Crawford*, 2023 WL 3244599, at *3 (S.D.N.Y. May 4, 2023). "However, a charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged." *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (alteration adopted) (quoting *United States v. Litvak*, 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013)).

"Since federal crimes are 'solely creatures of statute,'" "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (quoting *Dowling v. United States,* 473 U.S. 207, 213 (1985)). "Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a narrow interpretation appropriate." *Id.* at 76 (quoting *Dowling*, 473 U.S. at 213).

"Although the language of the statute may be used to describe the offense, the description 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" *United States v. Lopez*, 2019 WL 4733603, at *2 (S.D.N.Y. Sept. 27, 2019) (quoting *Hamling v. United States*, 418 U.S. 87, 117–18 (1974)). An indictment must be dismissed where it provides no details on the "facts and circumstances" on the essential elements of the offense such that the defendant's alleged conduct is "left to speculation." *United States v. Ashley*, 905 F. Supp. 1146, 1159 (E.D.N.Y. 1995); *see also id.* (citing *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir. 1974) ("[s]ome substantial indication of the nature or character of any scheme or artifice to defraud, or to obtain money or property by means of false pretenses, representations or promises

is requisite.")); *United States v. Berlin*, 472 F.2d 1002, 1007 (2d Cir. 1973) (failure to allege essential element of offense, such as knowledge of falsity of statement when made, requires dismissal).

**2. Bill of Particulars**

Federal Rule of Criminal Procedure 7(f) provides that "a court may direct the government to file a bill of particulars." A bill of particulars is meant to enable the defendant to prepare for trial, prevent surprise, and allow him to interpose a plea of double jeopardy in a subsequent prosecution. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

While "the decision to grant or deny a bill of particulars is within the sound discretion of the district court," *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), a defendant is entitled to a bill of particulars "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Siddiqi*, 2007 WL 549420, at *2 (S.D.N.Y. Feb. 21, 2007) (internal quotation marks omitted). These principles are to be "applied with some care" when the government charges criminal offenses under broad statutes, because where the prosecution has "wide latitude" to "frame a charge," there is "an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope." *Davidoff*, 845 F.2d at 1154 (discussing RICO); *see also United States v. Hennessy*, 1993 WL 137766, at *3 (S.D.N.Y. Apr. 23, 1993) (requiring bill of particulars to identify victims of each allegedly unlawful act taken in furtherance of conspiracy); *see also United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) ("The indictment . . . must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.") (internal quotation marks omitted).

Discovery, even where voluminous, does not fulfill or replace the requirement that the indictment give adequate notice. "[T]he Second Circuit has made clear that the Government does 'not fulfill its obligations merely by providing mountains of documents to defense counsel who were left unguided' as to the nature of the charges pending." *United States v. Reddy*, 190 F. Supp. 2d 558, 565 (S.D.N.Y. 2002) (quoting *Bortnovsky*, 820 F.2d at 575). To the contrary, "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008). "[I]f necessary to give the defendant enough information about the charge to prepare his defense, a bill of particulars will be required even if the effect is disclosure of the Government's evidence or theories." *Reddy*, 190 F. Supp. 2d at 565 (citation omitted); *see also Bin Laden*, 92 F. Supp. 2d at 237 ("we do not believe that because the Government might be unable to provide a complete response to a Defendant's request for information, it should therefore not provide any information at all").

**B. The Indictment's Allegations As To Count One Are Insufficient**

Mr. Chu renews his motion to dismiss Count One. Neither the government's Initial Opposition, nor its addition of a single factual allegation—paragraph 17—in the Superseding Indictment save this charge from the numerous deficiencies Mr. Chu raised in his Initial Motions. *See* ECF No. 46 at 17–32.

The text of Section 225 provides:

(a) Whoever—

> (1) organizes, manages, or supervises a continuing financial crimes enterprise; and
>
> (2) receives $5,000,000 or more in gross receipts from such enterprise during any 24-month period,

> shall be fined not more than $10,000,000 if an individual, or $20,000,000 if an organization, and imprisoned for a term of not less than 10 years and which may be life.
>
> (b) For purposes of subsection (a), the term "continuing financial crimes enterprise" means a series of violations under section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4 persons acting in concert.

There is scant caselaw, and no form jury instructions, concerning Section 225. But it is clear from the face of the statute that to be guilty, a defendant must (1) "organize[], manage,[] or supervise[]" (2) an "enterprise" (3) consisting of four or more persons "acting in concert" (4) who commit a series of violations of specified crimes, and must also (5) receive $5 million or more in gross receipts (6) "from such enterprise" (7) during any 24-month period. It is also clear that the defendant must do so willfully; there is no other way to "organize[], manage[], or supervise[]" the kinds of crimes at issue here. The government's Superseding Indictment, like the original, fails to adequately allege these elements.

**1. The Superseding Indictment Does Not Adequately Allege An "Enterprise."**

The Indictment insufficiently pleads the "enterprise" itself. Because "the term 'continuing financial crimes enterprise' means a series of violations . . . committed by at least 4 persons acting in concert," 18 U.S.C. § 225(b), the Indictment must identify both the four persons that committed the underlying violation(s), as well as the underlying violations, that formed part of the series in order to state the offense. The Superseding Indictment does neither.

As described in his Initial Motions, Mr. Chu previously sought clarification as to the nature of the "enterprise" the government intends to prove at trial, but received none. May 20 Schwartz Decl. ¶¶ 39, 41, 50. In response to the Initial Motions, the government refused to clarify whether the alleged enterprise is made up of only four individuals, the entire company, or somewhere in between. *See* Initial Opposition at 9.

The government's unwillingness to reveal even the basics of its theory of liability as to the most serious charge facing Mr. Chu is telling. The government must sufficiently plead the enterprise with which Mr. Chu stands accused of directing. *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments."); *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) ("The Indictment Clause of the Fifth Amendment 'requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury.'") (quoting *United States v. Abrams*, 539 F. Supp. 378, 384 (S.D.N.Y. 1982)). Confirming the government's theory regarding the definition and scope of the enterprise before trial is reasonable here, and would also avoid potential inconsistencies in the government's trial evidence and any resulting appeals. *See United States v. Davis*, 2017 WL 3328240, at *29 (S.D.N.Y. Aug. 3, 2017) ("the Government's ever-shifting theory on a crucial element of the case—the intent to defraud—requires that the convictions be vacated").

The government contends that it is not required to define the "enterprise" at all. Initial Opposition at 11. Instead, the government simply points to the Superseding Indictment's tables listing ten alleged underlying violations. *See* ECF No. 83 at 9–10; *see also* Superseding Indictment ¶¶ 28–29 (the "Violations Tables"). However, the Violations Tables do not come close to providing Mr. Chu with adequate notice to permit him to prepare for trial.

For one, the Violations Tables do not allege which individual, if any, committed each underlying violation. Such information is critical to Mr. Chu's trial preparation given his limited role—even according to the government's incorrect narrative—in the underlying violations. Mr. Chu is not alleged to have personally carried out the conduct listed on the Violations Tables. *See,*

*e.g.*, Superseding Indictment ¶¶ 10 (alleging that Mr. Chu "instructed Kollar to pledge delinquent loans to the Lender-1 Credit Line" and "directed Kollar to create a fictitious portfolio company"), 13 ("CHU directed Kollar to fraudulently obtain more liquidity"), 14 ("Kollar, Seibold, and others manually edited collateral data in borrowing base reports"), 15 ("At the direction of DANIEL CHU, the defendant, Kollar and Seibold also double-pledged the same loans as collateral to multiple lenders and securitizations"), 16 ("with the knowledge of DANIEL CHU, the defendant, and Goodgame, Kollar and Seibold fabricated and falsified backup records"). Therefore, the government's argument as to Mr. Chu's liability likely boils down to the allegation that Mr. Chu generally instructed another member of the alleged enterprise to carry out a fraud, which was then executed by other members. Given the elements of the Section 225 offense, the government must allege that conduct with specificity. *See United States v. Johnson*, 225 F. Supp. 2d 982, 1004 (N.D. Iowa 2002) (ordering bill of particulars under the continuing criminal enterprise statute, 21 U.S.C. § 848(c), for "the location(s), substance, time, place, and date of each overt act upon which the government intends to rely to prove the CCE underlying the offenses charged in Counts 6 through 10 of the second indictment"). Allowing the government to simply list alleged statutory violations without identifying Mr. Chu's role, if any, hardly provides adequate notice of how Mr. Chu is alleged to have led this supposed enterprise.

It is obvious enough that the aggressive CFCE offense charged is ill-fit to the facts of this case. But the government must adequately contend with its decision to bring such a rare charge. Caselaw interpreting the common bank fraud and wire fraud statutes is not decided under the weight of a CFCE charge and its maximum penalty of life imprisonment, and the statutory "enterprise" requirement is entirely different from the requirement in ordinary conspiracy law that

the defendant must have agreed with at least one other individual.[6] At the very least, the government's allegations supporting Count One must be particularized.

### 2. The Superseding Indictment Does Not Allege Who Acted "In Concert" With Mr. Chu to Comprise the Enterprise.

The government must be able to prove that four persons were acting in concert while committing the series of violations. Otherwise, there is no enterprise. Assuming that the government intends to rely only on its own cooperating witnesses—Kollar, Seibold, and Goodgame—to fill out its four-person enterprise, the allegations in the Superseding Indictment are insufficient to establish a violation of Section 225. If, for example, Mr. Chu demonstrated at trial that Goodgame was unaware of Kollar's fraud until 2025 (as Goodgame told the government), or that Seibold had no involvement whatsoever until 2021, the government necessarily could not satisfy the four-person requirement in or around 2018, when the crime is alleged to have begun.

Perhaps recognizing the problems inherent in its theory of the four-person enterprise, the government has steadfastly refused to name any other individuals that it may attempt to prove were also members of the enterprise, but nor has it limited itself to the four identified individuals. *See* May 20 Schwartz Decl. ¶¶ 39, 41, 49; *see also* Initial Opposition at 12–13. The government instead relies on oblique references to "others" it may attempt to bring within the enterprise should one of its three cooperating witnesses fail to deliver. *See* Superseding Indictment ¶ 9 ("For years, DANIEL CHU, the defendant, and David Goodgame, Tricolor's chief operating officer, Jerome Kollar, Tricolor's chief financial officer, and Ameryn Seibold, Tricolor's senior director of finance, *and others*, engaged in a series of frauds directed at each of Tricolor's lenders.") (emphasis added); *id.* ¶ 13 ("From at least in or about 2022, DANIEL CHU and Goodgame, Kollar, Seibold,

---

6 *See* Initial Opposition at 19 (citing *United States v. Levy*, 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013), and *United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985)).

*and others* repeatedly manipulated borrowing base data . . .") (emphasis added); *id.* ("Kollar and Seibold, *sometimes with the assistance of others*, executed the schemes to defraud") (emphasis added); *id.* ("Kollar, Seibold, *and others* submitted borrowing base reports with false and manipulated data or already-pledged loans") (emphasis added); *id.* ¶ 14 ("Kollar, Seibold, *and others* manually edited collateral data in borrowing base reports") (emphasis added); *id.* ¶ 18 ("The difference—consisting of approximately $800 million in bogus collateral—resulted from the series of schemes and the conspiracy in which DANIEL CHU, the defendant, and Goodgame, Kollar, Seibold, *and others* participated.") (emphasis added).

That *might* work for a conspiracy charge, but it cannot work for Section 225, where the "enterprise" itself is, by statute, defined as the people who are unlawfully "acting in concert." And even in the much more forgiving conspiracy context, the government's Initial Opposition does not even attempt to engage with the six factors that govern this analysis as laid out by Judge Scheindlin in *United States v. Nachamie,* 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000). All factors weigh in favor of disclosure here. First, "it is uncertain how many co-conspirators are involved here," so "[t]he potential for unfair surprise looms large . . . ." *United States v. Barrett*, 153 F. Supp. 3d 552, 572–73 (E.D.N.Y. 2015). Second, identifying the members of the "long-running conspiracy . . . will help [Mr. Chu] focus his investigation and prepare for trial." *Nachamie*, 91 F. Supp. 2d at 572–73. Third, the government has not provided adequate notice by other means, such as through the meet and confer process, or in its Initial Opposition. Nor, given the opportunity to provide more detail when it returned the Superseding Indictment, did the government choose to do so. Fourth, the voluminous discovery requires disclosure, as "it would meaningfully alter the nature of the charges and, accordingly, [Mr. Chu's] preparation for trial if it were revealed that the Government considered him to be conspiring with other individuals" not named in the Indictment. *United*

*States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 (S.D.N.Y. 2018). Fifth, Mr. Chu has not been charged with a violent offense, and the alleged crime is not ongoing. Sixth, there is no potential harm to the government's investigation given the return of a Superseding Indictment.

Furthermore, disclosure of unindicted co-conspirators—to the extent that the government reserves the right to contend that they are people who "acted in concert" and thus form the "enterprise" for purposes of the Section 225 charge—is especially warranted considering the gravity of the Section 225 charge and the government's refusal to clarify whether it will attempt to prove that Mr. Chu was in a criminal enterprise with factually innocent persons. *See* Initial Motions at 54; May 20 Schwartz Decl. ¶ 49. In short, the government has offered no good reason for withholding this information, and "earlier disclosure of these names would better ensure that the trial will proceed smoothly and efficiently." *United States v. McGuinness*, 764 F. Supp. 888, 894 (S.D.N.Y. 1991).[7]

---

[7] The government's cited caselaw (Initial Opposition at 18–19) is inapposite. In *United States v. Rittweger*, the court found that the defendant's requested bill of particulars "is really a request for a list of the witnesses that the Government intends to call at trial . . . ." 259 F. Supp. 2d 275, 292 (S.D.N.Y. 2003). Here, Mr. Chu is already aware of three cooperating witnesses who may testify at trial, but the government has insisted that it may attempt to prove others were part of the enterprise, even without those others' testimony. *United States v. Amendolara*, 2002 WL 31368279 (S.D.N.Y. Oct. 21, 2002) and *United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) do not describe the volume of discovery involved in those cases as exceedingly broad. This case, in contrast, undoubtedly involves vast quantities of discovery, while "the Second Circuit has made clear that the Government does 'not fulfill its obligations merely by providing mountains of documents to defense counsel. . . .'" *Reddy*, 190 F. Supp. 2d at 565 (quoting *Bortnovsky*, 820 F.2d at 575); *Bin Laden*, 92 F. Supp. 2d at 234 ("sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars."). Similarly, *United States v. Rodriguez* involved narcotics offenses, for which the government alleged six overt acts that "d[id] not describe any activities by unindicted co-conspirators." 1999 WL 820558, at *1 (S.D.N.Y. Oct. 13, 1999). The government here repeatedly does. *See* Superseding Indictment ¶¶ 9, 13, 14, 18.

### 3. The Alleged Duration of the Enterprise, Eight Years, Compounds the Problem.

The government alleges a continuing enterprise from 2018 through 2025. Superseding Indictment ¶ 1. To prove the charge, the government must allege that four persons acted in concert while committing the series of violations. 18 U.S.C. § 225. However, the Superseding Indictment does not allege *any* conduct among four people until 2022. *See* Superseding Indictment ¶¶ 10 (two people in 2018), 11 (two people in 2021), 12 (two people in 2021), 13 ("From at least in or about 2022, DANIEL CHU and Goodgame, Kollar, Seibold, and others repeatedly manipulated borrowing base data").

The government attempts to portray Mr. Chu's argument as being focused on "different people acting in concert at different times." Initial Opposition at 12. Not so. The government alleges that the enterprise started in 2018, but does not describe conduct among four people until 2022. The government thereby fails to state "the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

The government's 2018 start date is further unsupported by document discovery. The government has previously disclosed the precise name of the "fictitious portfolio company" that, in 2018, Mr. Chu allegedly "directed Kollar to create . . . , transfer the charged-off loans to . . . , and arrange for other Tricolor employees to manually enter fake payments on . . . ." Superseding Indictment ¶ 10. *See* May 20 Schwartz Decl. ¶ 41. However, that company name does not appear in any discovery provided by the government. *Id.* ¶ 42. No document has since been produced containing that name. Schwartz Decl. ¶ 34. And, to be clear, that is the *only* factual allegation in the Superseding Indictment that relates to the alleged start of the charged enterprise. In short, the government's identified starting point of the enterprise concerns an event uncorroborated by a

single one of the over 2 million documents produced in discovery to date, which allegedly involved only two people.

If the government has any reason to charge Mr. Chu with an enterprise dating back to 2018, it should give it. Otherwise, the charge fails.

#### 4. The Superseding Indictment Also Does Not Adequately Allege That Mr. Chu Organized, Managed, or Supervised the "Enterprise," as Opposed to the Company.

The government must adequately allege how Mr. Chu organized, managed, or supervised the continuing enterprise. 18 U.S.C. § 225(a)(1). Here, Mr. Chu's leadership is asserted entirely generically. *See, e.g.*, Superseding Indictment ¶¶ 13 ("CHU directed Kollar to fraudulently obtain more liquidity"), 14 ("to achieve CHU's overarching directives, Kollar and Seibold would manually change the data fields in borrowing base reports").

Consistent with its inadequate pleading, the government concedes that it did "little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Initial Opposition at 13 (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)). But *Alfonso* concerned conspiracy to commit robbery, a charge quite different from an eight-year continuing financial crimes enterprise. In addition, the nine allegations copied by the government in its Initial Opposition do not sufficiently allege Mr. Chu's leadership. For example, one of the allegations confusingly implies that Mr. Chu *personally* carried out the fraud rather than directed it. Superseding Indictment ¶ 11 ("Over time, DANIEL CHU, the defendant, addressed liquidity constraints by repeatedly falsifying information regarding ineligible collateral to make it appear eligible to use as collateral.") (quoted in Initial Opposition at 14). The government's vague and contradictory allegations cannot form the basis for a Section 225 charge.

Further, the government cannot be allowed to conflate Mr. Chu's leadership of Tricolor and his alleged directives to obtain liquidity—entirely normal behavior by a CEO of a growing company—with Mr. Chu's alleged leadership of the fraudulent scheme. *Reddy*, 190 F. Supp. 2d at 569 (ordering bill of particulars where indictment alleged the defendant "directed the creation of fraudulent claims" and "[t]he [i]ndictment provide[d] no further facts with respect to this allegation"). The government should instead be required to provide notice of each specific action it intends to rely on as evidence of Mr. Chu's organization, management, or supervision of an underlying violation.

The government's response is that it cannot be compelled to disclose its trial evidence or theories. Initial Opposition at 18, 20. That argument simply ignores the law. "[I]f necessary to give the defendant enough information about the charge to prepare his defense, a bill of particulars will be required even if the effect is disclosure of the Government's evidence or theories." *Reddy*, 190 F. Supp. 2d at 565 (citation omitted).

**5. The Superseding Indictment Fails to Adequately Allege the Gross Receipts Element of Count One.**

The government also fails to allege, as it must, that Mr. Chu "receive[d] $5,000,000 or more in gross receipts from such enterprise during any 24-month period." 18 U.S.C. § 225. Instead, as detailed in Mr. Chu's Initial Motions at 29–30, the government merely identifies general compensation Mr. Chu received in the normal course of his employment.

Notwithstanding its reference to *United States v. Harris*, 1993 WL 300052, at *8 (S.D.N.Y. July 30, 1993) (cited in Initial Opposition at 15), the government cannot sidestep the statutory requirement that gross receipts be received "from such" enterprise rather than from duly authorized compensation provided in the ordinary course of business. *See United States v. Bennett*, 2006 WL 8435170, at *3 (C.D. Cal. May 24, 2006) ("the $5 million element of the offense [i]s 'tied to the

series of violations,' *i.e.*, the $5 million or more in receipts should come 'from the series of violations during any 24-month period.'") (quoting *United States v. Harris*, 79 F.3d 223, 230 (2d Cir. 1996)); *see also United States v. Lefkowitz*, 125 F.3d 608, 618 (8th Cir. 1997) (in a case alleging fraud on the investors, "[t]he jury found that Lefkowitz violated § 225 when CEG raised more than $5,000,000 *from FSM–VI and FSM–VIII investors* within a two-year period.") (emphasis added). The government also continues to refuse to commit to which gross receipts it will rely on at trial. *See* Initial Opposition at 15. It should be required to do so.

## II. RENEWED MOTION FOR A BILL OF PARTICULARS ON COUNTS TWO TO FOUR[8]

Mr. Chu renews his motion for a bill of particulars on the bank fraud and wire fraud charges concerning SPV4, and the conspiracy to commit bank fraud and wire fraud charge. These charges are unchanged in the Superseding Indictment, and the Initial Opposition fails to justify their infirmities.[9]

The government does not attempt to allege facts sufficient to show specific intent, a necessary element for all three charges. *See United States v. Hussain*, 785 F. Supp. 3d 9, 13 (D. Vt. 2025) (citing *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984)) (conspiracy); *United States v. Priolo*, 812 F. Supp. 3d 250, 258 (E.D.N.Y. 2025) (bank fraud and wire fraud).

For example, in *United States v. McDermott*, the court reversed a conviction for conspiracy to commit insider trading where the defendant had no knowledge that the information he passed to one person was then passed to several others. 245 F.3d 133, 137–38 (2d Cir. 2001). Here, the

---

[8] This motion renews and incorporates the arguments made in Mr. Chu's Initial Motions. ECF No. 46 at 32–35. That brief is attached hereto as Exhibit 3.

[9] In the July 10 Letter, Mr. Chu renewed his requests for a bill of particulars as to all the charges from the original indictment that are re-alleged in the Superseding Indictment. Ex. 13 at 5. The government has declined to provide any additional information. Schwartz Decl. ¶ 38.

Indictment fails to connect Mr. Chu's alleged requests that his CFO "obtain more liquidity" with Kollar's conduct in which he "directed Seibold to submit fraudulent borrowing base reports." Superseding Indictment ¶ 13. Simply put, the government offers no explanation for how Mr. Chu's communications with Kollar were—or reasonably could have been—interpreted as directives to commit fraud.

To be clear, Mr. Chu does not dispute that the Superseding Indictment adequately alleges the means by which the government's cooperating witnesses, Kollar and Seibold, carried out the fraud for purposes of these counts. The Superseding Indictment describes how Kollar and Seibold "manually edited collateral data in borrowing base reports," "double-pledged the same loans as collateral to multiple lenders and securitizations," and "fabricated and falsified backup records . . . ." Superseding Indictment ¶¶ 14–16. However, such detail is lacking in the government's description of Mr. Chu's involvement. The government only says that Mr. Chu generally directed or had knowledge of Kollar and Seibold's conduct. Mr. Chu "is aware that a Bill of Particulars is not meant to be a tool to compel disclosure of the Government's case before trial. However, a bill of particulars should be required where the charges of the indictment are so general that they do not advise *the defendant* of the specifics acts of which *he* is accused." *United States v. Reale*, 1997 WL 580778, at *14 (S.D.N.Y. Sept. 17, 1997) (alteration adopted) (citations and internal quotation marks omitted) (emphases added). The government's Initial Opposition overlooks *United States v. Lino*, which states that courts "routinely award" bills of particulars identifying each false statement the government may attempt to prove at trial. 2001 WL 8356, at *6 (S.D.N.Y. Jan. 2, 2001) (collecting cases). Here, the Superseding Indictment does not advise Mr. Chu as to how he instructed or became aware of his subordinates' misconduct. Therefore, a bill of particulars on Counts Two to Four is needed.

## III. MOTION FOR A BILL OF PARTICULARS ON COUNTS FIVE AND SIX

Like Counts Three and Four, Counts Five and Six simply recite the statutory elements for bank and wire fraud affecting a financial institution, the difference being that Counts Three and Four are directed to SPV4 whereas Counts Five and Six are directed to SPV5. Superseding Indictment ¶¶ 38–41. Therefore, for the same reasons that support Mr. Chu's motion for a bill of particulars on Counts Three and Four described above, the government must provide a bill of particulars on Counts Five and Six.

## IV. MOTION FOR A BILL OF PARTICULARS ON COUNTS SEVEN AND EIGHT

The securities fraud charges (and the related factual allegation in paragraph 17) constitute the main substantive additions in the Superseding Indictment. Yet despite the government's investigation nearing the one-year mark, along with the benefit of a supposedly narrowed investigatory focus after the initial charges were filed, the government's allegations on Counts Seven and Eight are also insufficiently pled. The government's July 15 Letter, while providing some additional information, does not remedy these deficiencies.

For Count Eight, the government omits key details regarding the charges, even for the select misrepresentations the government offered as examples in its July 15 Letter. Who prepared or made those misrepresentations? Who conveyed those misrepresentations to third parties? Who were those third parties? Similarly, for Count Seven, the government does not attempt to allege how Mr. Chu joined or furthered the conspiracy, and who the other members of the conspiracy were. In all, the government fails to fulfill "[t]he purpose of th[e] requirement" to inform the defendant of the charges, which is simply "'to enable him to prepare a defense.'" *United States v. Kandic*, 134 F.4th 92, 100 (2d Cir. 2025) (quoting *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992)).

The government's two alleged overt acts in Count Seven are likewise insufficient to provide adequate notice of the securities fraud charges. *See* Superseding Indictment ¶ 45. "In cases involving fraud, courts have required the Government to specify through a bill of particulars which document or transactions it intends to prove are fraudulent if this information is not ascertainable; otherwise, in effect, 'the burden of proof impermissibly may shift' to the defendant to prove the documents or transactions are not fraudulent." *United States v. Vaid*, 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (quoting *Bortnovsky*, 820 F.2d at 575) (alterations adopted). Without such specifics, Mr. Chu "will be forced to comb through this veritable mountain of documents and to attempt to guess which of the numerous transactions documented therein, and conducted over a six[-plus]-year period, are alleged by the government to have been improper." *United States v. Savin*, 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001).[10]

Notably, both of the overt acts identified in the Superseding Indictment occur within several months of each other in 2025, at the tail end of the alleged relevant period. This hardly provides any notice as to the government's theory of Mr. Chu's alleged eight-year commission of

---

[10] *See also United States v. Holmes*, 2020 WL 666563, at *9 (N.D. Cal. 2020) (ordering bill of particulars identifying "(1) the specific implicit and explicit false and fraudulent misrepresentations in the advertisements and marketing materials, (2) what about them is false, (3) who made them, and (4) how Defendants caused them to be made."); *United States v. Nacchio*, 2006 WL 2475282, at *6 (D. Colo. 2006) (ordering bill of particulars identifying "all material nonpublic information that the Government claims Defendant was aware of between December 4, 2000 and September 10, 2001," which was "necessary to defend against these fortytwo [sic] charges, because the indictment right now simply charges that he was aware of this information without saying when he became aware of it or without tying it to any particular count in the indictment.") (alterations adopted); *United States v. Trie*, 21 F. Supp. 2d 7, 21–22 (D.D.C. 1998) ("A defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against or which contributors may be witnesses against him at trial when the government knows precisely the statements on which it intends to rely and can easily provide the information. The government must provide information as to exactly what the false statements are, what about them is false, who made them, and how [the defendant] caused them to be made.") (citations omitted).

securities fraud offenses, especially in light of the fact that the Superseding Indictment identifies no specific alleged misrepresentations.

And the overt acts themselves also provide little information about how the government alleges Mr. Chu committed the offenses. The first overt act—Mr. Chu's execution of a sale and servicing agreement on March 1, 2025—is a neutral act that without more does not provide notice as to the unlawful nature of the conspiracy. The second overt act—Mr. Chu's statement on August 17, 2025—occurred after the fact, and thus cannot form the basis of a securities fraud charge. *See, e.g.*, *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 444 (S.D.N.Y. 2019) ("the alleged acts of concealment were all done allegedly to cover the defendants' tracks after the goal of the alleged conspiracy had been attained. Therefore, they cannot be found to be predicate acts for the purposes of the DNC's RICO claim."); *Savin*, 2001 WL 243533, at *4 (allegations concerning "how the wrongdoing . . . was covered up. . . . do not provide notice concerning the particulars of that wrongdoing itself"); *United States v. Gabriel*, 920 F. Supp. 498, 506 (S.D.N.Y. 1996), *aff'd,* 125 F.3d 89 (2d Cir. 1997) ("Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement upon the conspirators.") (quoting *Grunewald v. United States*, 353 U.S. 391, 402 (1957)).

In sum, the Superseding Indictment and July 15 Letter provide no meaningful detail regarding the securities fraud charges, despite the government's insistence that it has [redacted] the same set of facts for the past ten months. ECF No. 44-26, May 20 Schwartz Decl. Ex. 26 at 6. The government must sufficiently particularize its new charges. Its inability to do so lays bare the impropriety of charging Mr. Chu with securities fraud dating back to 2018. The government should be required to identify *each* false statement it plans to prove at trial—not

a few "[e]xamples" or a "non-exhaustive set" (Ex. 14)—that it contends constitutes securities fraud, and each overt act committed in furtherance of the securities fraud conspiracy. And with respect to Count Seven, the conspiracy count, the government should be required to provide Mr. Chu with information regarding the identities of his co-conspirators and when they joined the conspiracy. Merely alluding to other people referenced in speaking allegations preceding a different count, who may or not overlap with the securities fraud co-conspirators, is insufficient. While it is entirely possible that the government claims that the conspiracies charged in Counts One, Two, and Seven are entirely overlapping in membership, it is equally possible that the members across the charged conspiracies varied. Of course, depending on the answer, the Superseding Indictment might suffer from duplicity or multiplicity problems, as well. There is no persuasive reason why the government cannot provide clarification and it should be directed to do so.

## V. RENEWED MOTION TO UNSEAL AND DISCLOSE GRAND JURY RECORDS OR, ALTERNATIVELY, FOR *IN CAMERA* REVIEW[11]

Mr. Chu respectfully renews his motion, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), for disclosure of the grand jury record—specifically, (i) the transcripts of all grand jury proceedings, and (ii) all legal instructions provided to the grand jury—or, at a minimum, *in camera* review of those materials in the first instance. This motion is renewed as applied to the Superseding Indictment and directly addresses the government's arguments in opposition to Mr. Chu's original motion.

[11] This motion renews and incorporates the arguments made in Mr. Chu's Initial Motions. ECF No. 46 at 46–54. That brief is attached hereto as Exhibit 3.

### A. The Superseding Indictment Does Not Moot This Motion

The government's primary argument in its Initial Opposition is that Mr. Chu's motion was rendered "moot" by the filing of the Superseding Indictment. *See* Initial Opposition at 35. This argument fails.

The Superseding Indictment was filed on June 24, 2026—earlier on the same day as David Goodgame's guilty plea. Perhaps the Superseding Indictment was returned by the same grand jury as the original; perhaps a new grand jury got a read-back of the evidence before the original grand jury; or perhaps the government did a fresh presentation of evidence. Regardless of how it got there, the government obtained a Superseding Indictment with *identical* allegations and charging language as to the charges contained in the original indictment (minus Goodgame), plus a single new paragraph (17) of factual allegations related to the securities counts, and charging language for four new counts. It is therefore reasonable to infer that the evidence presented to the grand jury that returned the Superseding Indictment was either literally the same as for the original indictment, or a facsimile re-presentation.

The government has not indicated that any deficiency was corrected with respect to the grand jury's return of the Superseding Indictment. During the July 14 Meet and Confer, the government expressly refused to acknowledge whether the exculpatory information identified by Mr. Chu in his Initial Motions was presented to the grand jury. Schwartz Decl. ¶ 46. The Initial Opposition is likewise silent on whether the cooperators' exculpatory statements—now including Goodgame, who explained to the jury that Mr. Chu was surprised to learn about the fraud and asked questions to try to understand it—were presented to the grand jury. It is equally silent on whether the grand jury received correct instructions on the elements of Count One, 18 U.S.C. § 225, a statute for which no model jury instructions exist. That silence is telling. If the government had corrected the identified deficiencies before seeking the Superseding Indictment, one would

expect it to say so. And its failure to say so suggests the same problems that infected the original grand jury proceedings persisted when the Superseding Indictment was obtained. The Court should not permit the government to use the Superseding Indictment—filed just two days before its Initial Opposition—to insulate defective grand jury proceedings from judicial scrutiny.

**B. There Is a Particularized Need to Disclose the Grand Jury Record.**

Next, the government argues that Mr. Chu's motion rests on "pure speculation" and therefore "comes nowhere near meeting the standard for breaking grand jury secrecy." Initial Opposition at 33, 35–37. This argument is wrong on both the law and the facts.

Adopting the government's argument would effectively make it impossible for any defendant to obtain grand jury materials. The government urges that Mr. Chu's motion rests on "speculation" because he cannot identify with certainty what occurred before the grand jury. But that is precisely the point; a defendant who lacks access to grand jury materials can, almost by definition, only argue by inference from surrounding facts. That is exactly what Rule 6(e)(3)(E)(ii) contemplates. The Rule authorizes disclosure of matters occurring before a grand jury, "at the request of the defendant, upon a showing that grounds *may* exist for a motion to dismiss the indictment because of matters occurring before the grand jury." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 220 n. 11 (quoting Fed. R. Crim. P. 6(e)) (emphasis added). The Rule does not require a defendant to *prove* what actually occurred in the grand jury for a defendant to *examine* the grand jury record.

Parties seeking such disclosure must show: (i) "that the material they seek is needed to avoid a possible injustice in another proceeding," (ii) "that the need for disclosure is greater than the need for continued secrecy," and (iii) "that their request is structured to cover only material so needed." *Douglas Oil Co.*, 441 U.S. at 222; *see also United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001) (to obtain disclosure, "a defendant must demonstrate some grossly prejudicial

irregularity or some other particularized need or compelling necessity"). This standard applies to both *in camera* review and disclosure to the parties of grand jury minutes. *United States v. Dunn*, 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005). Here, there is a particularized need for the grand jury record, including transcripts and instructions.

*First,* far from speculation, Mr. Chu's motion is grounded in the government's own disclosures: the Search Warrant Affidavits that already distorted Kollar's and Seibold's witness evidence to secure the Search Warrants. As demonstrated at length in Mr. Chu's Initial Motions at 46–54, the government's Search Warrants omitted material exculpatory statements from Kollar and Seibold that the government possessed at the time of the warrant applications. Specifically:

- Kollar's September 16, 2025 statement that, during an August 2025 call in which "Kollar was walking through the extent of the double-pledging," Mr. Chu "seemed to be shocked at the amount, the size of what it had grown to be" and [redacted] (Ex. 1 (*Brady* Letter) at 4).
- Kollar's statement that he [redacted] (*Id.*).
- Kollar's acknowledgment that a July 28, 2021 text from Mr. Chu [redacted] "may have had an innocent explanation," [redacted] (*Id.*).
- A September 3, 2025 recorded call in which Mr. Chu told Kollar: [redacted] (*Id.*; *see also* ECF No. 44-20, May 20 Schwartz Decl. Ex. 20).
- Seibold's September 6, 2025 statement that he "never witnessed Chu and Kollar speaking about loan misrepresentations to each other" and "never spoke with Chu about Chu's conversations with Kollar." (Ex. 1 (*Brady* Letter) at 5).
- Kollar's history of alleged fraud as CFO of Mach Speed Holdings, LLC, the subject of a 2017 trustee lawsuit alleging breach of fiduciary duty, fraudulent transfers, and "malicious, willful, and fraudulent conduct"—not disclosed in

the Search Warrant Affidavits. (ECF No. 44-29, May 20 Schwartz Decl. Ex. 29).

The government cannot (and does not) dispute that these statements were omitted from the Search Warrant Affidavits, despite the Affidavits relying predominantly on summaries of Kollar's and Seibold's interviews to establish probable cause. *See* Initial Opposition at 26–27. The original indictment was returned only months after the Search Warrants were obtained, based on the same core narrative drawn from the same cooperating witnesses.

And in the time between the Search Warrants and the original indictment, the government had obtained even more exculpatory information. For instance, the government learned in Kollar's November 20, 2025 interview that he acknowledged Mr. Chu [redacted] Ex. 1 (*Brady* Letter) at 4. But the government rushed to indict Mr. Chu less than a month later, having reviewed little third-party document discovery and none of the data seized from Mr. Chu's own devices. There is no indication that the government presented that evidence to the grand jury that returned the original indictment, let alone the Superseding Indictment. If that evidence was presented, the government should have no objection to disclosing that fact.

Likewise, although the government knew about Goodgame's October 2025 exculpatory statements about Mr. Chu at the time it obtained its original indictment, Goodgame was not a cooperator. But on the same day as the grand jury was asked to return the Superseding Indictment, the government consummated its cooperation agreement with Goodgame, who pleaded guilty. When a criminal defendant with whom the government has entered into a cooperation agreement and whom the government intends to rely upon at trial has provided material exculpatory evidence, that exculpatory material should be disclosed to the grand jury. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988) ("if there is grave doubt that the decision to indict was free from

such substantial influence, the violations cannot be deemed harmless"); American Bar Association, Standards for Criminal Justice, Prosecution Function (3d ed. 1993), Standard 3-3.6(b) ("No prosecutor should knowingly fail to disclose to the grand jury evidence which tends to negate guilt or mitigate the offense."). Based on the entirely unchanged factual allegations in the Superseding Indictment, it is appropriate to conclude that the government did otherwise.

Indeed, we now know more about how little investigation the government had done by the time it indicted other than speaking to Kollar, Seibold, and Goodgame. As discussed *infra*, it appears that the government obtained the majority of the third-party records it produced in discovery *after* the original indictment was returned. This makes Kollar, Seibold, and Goodgame's statements all the more weighty to the grand jury's determination of probable cause.

We cannot know for certain whether the grand jury was misled by the same cooperating witnesses, or government agents who selectively summarized the cooperators' statements, without disclosure of the omitted *Brady* information. But if, as it is reasonable to infer, the grand jury heard testimony consistent with the Search Warrant Affidavits before it deliberated as to whether to indict Mr. Chu, then both grand jury proceedings are defective because they were based on misleading testimony. *See United States v. Hogan*, 712 F. 2d 757, 761 (2d Cir. 1983) ("Heavy reliance on secondary evidence is disfavored precisely because it is not first-rate proof."); *see also, e.g.*, *United States v. Peralta*, 763 F. Supp. 14, 18–21 (S.D.N.Y. 1991) (dismissing indictment on supervisory grounds and holding that cumulative effect of inaccurate hearsay testimony and erroneous legal instructions warranted this relief even midtrial); *United States v. Vetere*, 663 F. Supp. 381, 387–87 (dismissing indictment even after trial jury returned guilty verdict where the hearsay testimony presented in the grand jury "crossed the line" in being presented specifically to "push a wavering grand jury over the edge"); *see also United States v. Basurto*, 497 F.2d 781, 787

(9th Cir. 1974) (reversing conviction where indictment was obtained in part on perjured testimony in front of grand jury).

For instance, Mr. Chu must be equipped to assess whether—like the magistrate judges by the Search Warrant Affidavits—the grand jury was misled about the limits of Seibold's claimed knowledge. Although the Indictment alleges that Kollar and Seibold acted at Mr. Chu's direction, *see, e.g.*, Superseding Indictment ¶ 14, Seibold stated in his pre-indictment interview that he "never witnessed Chu and Kollar speaking about loan misrepresentations to each other" and "never spoke with Chu about Chu's conversations with Kollar," Ex. 1 (*Brady* Letter) at 5. The grand jury "must not be 'misled into thinking it is getting eye-witness testimony from the agent whereas it is actually being given an account whose hearsay nature is concealed.'" *United States v. Estepa*, 471 F.2d 1132, 1134–37 (2d Cir. 1972) (dismissing indictment after finding that sole grand jury witness, a police officer with severely limited personal knowledge of a drug transaction, testified "at length and in detail" about events he had not seen or heard without any indication to the grand jury of the limits on his knowledge); *see also Hogan*, 712 F.2d at 761("[O]ur decision in [*Estepa*] indicates that extensive reliance on hearsay testimony is disfavored" and "the government prosecutor, in presenting hearsay evidence to the grand jury, must not deceive the jurors as to the quality of the testimony they hear").

*Second*, the lack of corroborating documents makes the grand jury record even more critical. Despite producing massive volumes of data, the government has identified only small subsets as responsive from Mr. Chu's custody (and of that, much of it is not actually responsive), and has pointed to no contemporaneous documentary evidence substantiating its central allegation that Mr. Chu participated in, let alone directed, the fraud. For example, the Superseding Indictment's allegation that Mr. Chu "directed Kollar to fraudulently obtain more liquidity, and

Kollar, in turn, directed Seibold to submit fraudulent borrowing base reports," Superseding Indictment ¶ 13, is unsupported by any discovery identified to date that shows Mr. Chu directing Kollar to fraudulently obtain more liquidity. Given the lack of documentary or other evidence, there is a substantial risk that the grand jury's decision hinged on the narratives of cooperating witnesses.

Further, whatever sparse documentary evidence the government had in hand at the time of the original indictment was likely only explained to the grand jury by the cooperators themselves (almost certainly as hearsay, via a government agent). And we have no basis to believe that the government corrected these issues when it went back to obtain the Superseding Indictment. Based on the almost identical factual allegations in both versions of the indictment, it is much more reasonable to infer that the government relied on the same proof, including most notably on their cooperator's interpretation of the evidence.

For instance, the Superseding Indictment references a text message from Mr. Chu to Kollar—"Can we work the >60s"—and alleges that this meant Mr. Chu is "asking whether Kollar could manipulate data for loans over 60 days past due to make them appear eligible." Superseding Indictment ¶ 14. Without more, whether that message is inculpatory depends almost entirely on Kollar's say-so—precisely the kind of cooperator testimony that must be evaluated for completeness and reliability.

*Third*, the cooperators' incentives heighten the danger of a misleading presentation to the grand jury. Kollar and Seibold are not disinterested observers; they were senior insiders who pleaded guilty and agreed to cooperate. Their sentencing exposure provides powerful incentives to minimize their roles and instead blame Mr. Chu, particularly on issues of knowledge and

intent.[12] The *Franks* record already shows that when the government sought judicial authorization for sweeping searches, it presented these cooperators' accounts in a manner that emphasized inculpatory interpretations while withholding key limitations and qualifying facts. Their bias underscores the need for heightened scrutiny.

If anything, the likelihood that critical information about Kollar and Seibold's testimony was withheld from the grand jury is even more material than with respect to the Search Warrant Affidavits. While the Search Warrant Affidavits relied on the cooperators to establish probable cause to believe that Mr. Chu's home, devices, and cloud storage accounts might have evidence of crime, the grand jury was asked to rely on those same cooperators to find probable cause to believe (among other things) that Mr. Chu "organized, managed, or supervised" a continuing financial crime enterprise. Any evidence of Mr. Chu's alleged supervisory role, particularly in light of the absence of inculpatory documentary evidence on this point, necessarily came from the other members of the alleged enterprise. And the only members of the enterprise that the government has identified are three cooperators. The government's presumed failure to inform the grand jury of the information contained in its *Brady* disclosures, of Goodgame's entirely exculpatory interview, related evidence that corroborates those disclosures—such as the September 3, 2025 recorded call with Mr. Chu and Kollar—and information concerning Kollar's prior fraud, necessarily tainted the Superseding Indictment.

---

[12] Goodgame, who spoke with the government before he began cooperating, was subject to a different set of incentives. But Goodgame didn't inculpate Mr. Chu *at all* in the one interview disclosed to the defense.

### C. The Grand Jury Record Is Necessary to Assess the Integrity of the Probable Cause Determination

For the reasons stated above, the unsealing of the grand jury transcripts is necessary to assess the grand jury's determination of probable cause. Mr. Chu recognizes the Court's responsibility to safeguard grand jury secrecy. *See* Fed. R. Crim. P. 6(e)(3)(E) (authorizing Court to structure disclosure "at a time, in a manner, and subject to any other conditions that it directs"); *see also In re Petition of Craig*, 131 F. 3d 99, 103 (2d Cir. 1997) (the court has the power to order grand jury disclosures in its "sound discretion under the special circumstances of each case") (alteration adopted) (citation omitted). However, given the novelty and lack of model jury instructions on the elements of the Section 225 charge, and the disconnect between the allegations in the Indictment and the elements of the offense, there are important questions regarding the grand jury's basis for finding probable cause on that offense, which the government has failed to answer.

The Court may, of course, impose appropriate limitations, authorize targeted redactions or conduct *in camera* review in the first instance. *See, e.g.*, *United States v. Hoey*, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (Castel, *J.*). In the alternative, if the Court determines broader disclosure of the transcripts is unnecessary at this stage (it is not), Mr. Chu respectfully requests the disclosure of materials limited to Kollar, Seibold, and Goodgame, and any other subjects bearing on Mr. Chu's alleged knowledge and intent.

The grand jury instructions are independently necessary to assess whether the grand jury applied a correct legal framework to the government's evidence, particularly on the Section 225 charge. Erroneous legal instructions can constitute such a ground, provided that there is "grave doubt that the decision to indict was free from such substantial influence" of the defect. *Bank of Nova Scotia*, 487 U.S. at 263.

Based on the inherently prejudicial impact of mis-instructing a grand jury, courts have ordered dismissal of an indictment based, at least in part, on erroneous or misleading legal instructions. *See, e.g.*, *Peralta*, 763 F. Supp. at 21 (dismissing indictment where there was "grave doubt that the decision to indict was free from the substantial influence" of the prosecutor's "misleading statements of law" regarding constructive possession of a firearm, notwithstanding the fact that the prosecutor had also read the statute to the grand jury); *Vetere*, 663 F. Supp. at 387 (dismissing indictment, even after a guilty verdict at trial, on grounds that the independent role of the grand jury was impaired based on the prosecutor's misleading "presentation both with respect to the facts and the law"); *United States v. Twersky*, 1994 WL 319367, at *4 (S.D.N.Y. June 29, 1994) (an indictment "will not be permitted to stand" if the prosecutor's instructions are "misleading due to mistakes or omissions" (internal quotation marks and citations omitted)). At a minimum, *in camera* review of the grand jury instructions is warranted. *See Hoey*, 2014 WL 2998523, at *3 (ordering *in camera* review of grand jury instructions because a significant "change in the law" made it possible that "the grand jury did not receive the proper instructions"); *United States v. Ho*, 2009 WL 2591345, at *3–5 (D. Haw. Aug. 20, 2009) (inspecting grand jury instructions in camera because the prosecutor had made "on-the-record statements" reflecting a misunderstanding of a necessary element and, as a result, the court could not "rule out that the government did not properly instruct the grand jury").

That is especially so for the rare Section 225 charge, as to which the government has failed to articulate a coherent view of the law and no indication from the government as to whether the second grand jury received proper legal instructions on its elements. For example, the jury needed to have been properly instructed that a continuing financial crime enterprise requires at least four persons acting in concert, and what it means to "act in concert." During the parties' May 15, 2026

meet and confer, however, the government explained that it believes that a person can "act in concert" without having co-conspirator or even aiding-and-abetting liability. *See* May 20 Schwartz Decl. ¶ 49. And when asked whether a factually innocent person can count as one of the four people "acting in concert" as part of the enterprise, the government declined to answer. *See id*. The government likewise declined to answer how, and even *whether*, the grand jury had been instructed on what it means to "act in concert." *See id.*[13]

Despite filing the Superseding Indictment, the government has still not articulated its basis for bringing a continuing financial crimes enterprise charge against Mr. Chu. Mr. Chu "has come forward with more than mere speculation that the grand jury did not receive the proper instructions," because there the requirements under Section 225 are "non-obvious to the reader from the face of the statute." *Hoey*, 2014 WL 2998523 at *3.

The government's cases are readily distinguishable. In *United States v. Rodrigues*, the court rejected defendant's argument that inspection of the grand jury minutes was warranted due to a recent change in the law since the grand jury was instructed. 2024 WL 113744, at *5–6 (S.D.N.Y. Jan. 10, 2024). The court determined that the defendant's argument was too speculative where the government's legal theory was distinct from the prior case relied on by the defendant, and there was no change in the law affecting the types of charges against the defendant. *Id.* By contrast, here, Mr. Chu does not rely on a hypothetical change in the law; he relies on the government's own admission that it holds an idiosyncratic view of what it means to "act in concert"

[13] The facial infirmities of the Superseding Indictment coupled with government's steadfast refusal to articulate its basis for bringing a continuing financial crimes enterprise charge against Mr. Chu raises due process concerns and suggests that the statute is unconstitutionally vague as applied to Mr. Chu through the Superseding Indictment. To the extent the Court does not dismiss the Count and the government refuses to cure these deficiencies through a bill of particulars or otherwise, Mr. Chu reserves his rights to make a further application to the Court on this basis.

under Section 225, which the government refused to explain and refused to confirm was ever conveyed to the grand jury. *See* May 20 Schwartz Decl. ¶ 49.

Likewise in *United States v. Da Costa*, the court deemed defendant's motion to be "abandoned" where he cited "no authority to support his motion for access to grand jury materials," made no "concrete allegations of government misconduct," and his "reply memo does not address the government's detailed arguments in opposition." 2024 WL 3014329, at *4 (S.D.N.Y. June 13, 2024). That is not what Mr. Chu does here. His motion is grounded in specific, sworn statements from the Search Warrant Affidavits—a documented pattern of selective disclosure that the government does not meaningfully dispute—and the government's own statements regarding the elements of a rarely charged offense. Further, as set forth throughout this Section, Mr. Chu directly confronts each of the government's arguments made in opposition to his motion.

## VI. MOTION TO PRECLUDE EVIDENCE AND QUASH SUBPOENAS BASED ON ABUSE OF THE GRAND JURY PROCESS

The government's egregious abuse of the grand jury following the original indictment provides a separate and additional basis for relief. As the Court is aware, the government's pre-indictment investigation of this case was hastily conducted in under three months before it returned an indictment charging Mr. Chu with allegedly leading what its press release referred to as an eight-year, $800 million dollar fraud. But at the time it charged Mr. Chu, the government was far from done investigating the charges in the original indictment—because instead of conducting a thorough, neutral investigation of what was indisputably a complex factual situation, the government had made an early, intentional decision to target Mr. Chu. In lieu of ready documentary proof, the government dangled the carrot of cooperation-based leniency to the actual leader of the fraud, Jerome Kollar, in exchange for his statements against the only higher ranking employee at Tricolor—Mr. Chu. The U.S. Attorney was not shy about that fact. At his press

conference announcing the charges, he stressed that "When it comes to combatting fraud, we will meet C-suite cooperation with open arms, working together to root out and remedy criminal conduct." *Supra* note 2 (at 3:03).

The Superseding Indictment was certainly an example of the government "working together" with its cooperating witness. Kollar's uncorroborated and self-serving accusations repackaged by a federal agent's hearsay testimony may have been enough to persuade the grand jury to make a determination of probable cause, but it was surely not enough for trial. So after rushing to indict Mr. Chu, the government finally got around to collecting and reviewing records from relevant parties—including Tricolor and the banks alleged to be victims of the already-charged fraud. The lion's share of those records appear to have been improperly obtained through grand jury subpoenas issued before the grand jury indicted.

Specifically, the government engaged in two related but independently improper practices following the original indictment that went far outside the grand jury's constitutionally sanctioned purpose. First, instead of issuing new grand jury process following the return of the original indictment, the government left perpetually open extraordinarily broad grand jury subpoenas that it had issued before the indictment was returned, continuing to accept rolling productions (crafted in some cases by iterative requests from the government) long after the grand jury's charging function had been fulfilled—including as recently as this month, even *after* the Superseding Indictment was returned. Second, even when the government issued new grand jury subpoenas, those subpoenas sought expansive categories of records that primarily related to the crimes already charged. As cover for both practices, the government elected to wait six months to indict Mr. Chu on securities fraud charges premised, according to the government's own words, on the same core facts alleged in the original indictment. ECF No. 85 at 2. In fact, the government had already

decided in January that it was going to charge Mr. Chu with securities fraud. Schwartz Decl. ¶ 45. The evidence obtained through both improper uses of the grand jury should be suppressed. At a minimum, and as detailed below, the government should be compelled to turn over to the defense all of the grand jury subpoenas issued for documents produced in Rule 16 discovery.

### A. Legal Standard

"The law is settled in this circuit and elsewhere that it is improper to utilize a Grand Jury for the sole or dominant purpose of preparing an already pending indictment for trial." *United States v. Punn*, 737 F.3d 1, 6 (2d Cir. 2013) (quoting *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985)). "The function of the grand jury clearly terminates with the issuance of the indictment. It has no relationship to the trial itself." *United States v. Doss*, 563 F.2d 265, 276 (6th Cir. 1977). There is accordingly "no constitutional, statutory or case authority for employment of the grand jury as a discovery instrument to help the government prepare evidence to convict an already indicted defendant," and "[s]uch a use of the grand jury would pervert its constitutional and historic function." *Id.*

The Justice Manual, which provides Department of Justice-wide guidance to all federal prosecutors, embraces this limitation: "[T]he grand jury cannot be used solely to obtain additional evidence against a defendant who has already been indicted," and may continue to be used post-indictment only where "its investigation is related to a superseding indictment of additional defendants or additional crimes by an indicted defendant." Justice Manual 9-11:120.

Under Second Circuit precedent, a "variety of factors may be relevant in assessing whether trial preparation is the dominant purpose for issuing a grand jury subpoena." *United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023). In particular, "[t]he timing of the subpoena casts significant light on its purposes." *Id.* (quoting *Simels*, 767 F.2d at 29).

To determine whether trial preparation is the "sole or dominant purpose" of a grand jury subpoena, the Second Circuit applies a burden-shifting framework. "The defendant has the initial burden of presenting 'concrete allegations of Government misconduct.' Once a defendant has put forward such allegations, the Government must 'come forward with evidence of specific grand jury activity in connection with the investigation,' and thereby show that the subpoena was not motivated by an improper purpose. The defendant then has the burden of showing that the government's explanation was a pretext for abusing the grand jury process by 'utilizing a grand jury for the sole or dominating purpose of preparing an already pending indictment for trial.'" *Calk*, 87 F.4th at 186 (alterations adopted) (citations omitted).

### B. The Government Improperly Used the Grand Jury To Prepare Its Already-Pending Case Against Mr. Chu for Trial

Mr. Chu readily meets his initial burden by identifying two independent forms of grand jury abuse. The original indictment charged Mr. Chu with the same continuing financial crimes enterprise, bank fraud, and wire fraud counts that remain the core of the case today. *Compare* ECF No. 2 (original indictment) ¶¶ 1–36, *with* ECF No. 77 (Superseding Indictment) ¶¶ 1–41. And while the initial indictment did not include securities fraud charges against Mr. Chu, those violations were clearly within the ambit of the government's investigation at the time. When the original indictment against Mr. Chu was unsealed, the government's two key cooperating witnesses—Kollar and Seibold—had already pled guilty to securities fraud and other offenses arising from the same double-pledging and borrowing-base schemes alleged in the indictment. *See United States v. Kollar*, No. 25 Cr. 584 (S.D.N.Y.); *United States v. Seibold*, No. 25 Cr. 585 (S.D.N.Y.). And the subpoena to Wells Fargo, dated in November 2025, listed securities fraud offenses among the violations being investigated by the grand jury. Ex. 11.

As the Second Circuit instructed in *Calk*, the timing of the grand jury subpoenas is key to the analysis here and sets this case far apart from the routine prosecution where some grand jury returns trickle in after indictment. It appears that the government served grand jury subpoenas on the most relevant third parties, including Tricolor's trustee and various lenders, in advance of the indictment being returned. But by electing to seek an indictment in December, barely three months into the investigation, the government knew that it could not collect—let alone review—eight years' worth of records from Tricolor and other third parties. So to complete its investigation of the charged offenses and attempt to compile sufficient proof to take the case to trial, the government continued using grand jury process long after the grand jury made a finding of probable cause.

*First*, the government abused the grand jury process when it left subpoenas that it had issued before the original indictment open and outstanding for months afterward, and when it continued to request and collect records purportedly responsive to those subpoenas long after the grand jury's charging function had been fulfilled. *See* Schwartz Decl. ¶¶ 41–44; *see also* May 20 Schwartz Decl. ¶ 45 (during May 15 meet and confer, "[t]he government noted that the documents produced from Tricolor to the government were obtained through an iterative process whereby the government and the Tricolor bankruptcy trustee cooperatively identified relevant custodians and search terms."); ECF No. 44-26, May 20 Schwartz Decl. Ex. 26 at 6 [redacted]

Despite the return dates on those subpoenas, the government took no steps to enforce them or bring the grand jury's work to a close. *See* May 20 Schwartz Decl. ¶ 47; *see also* Ex. 7 (referencing subpoena to Tricolor dated September 7, 2025); Ex. 8 (referencing subpoena to JPMorgan dated

September 4, 2025); Ex. 9 (referencing subpoena to CBIZ dated November 4, 2025); Ex. 10 (referencing subpoena to Ares dated December 14, 2025).

The government cannot evade the rule against using a grand jury to prepare an already-pending indictment for trial merely because the subpoenas were issued before the indictment was returned. In other words, "prosecutors cannot . . . . get evidence for an already-indicted criminal case, thus skirting criminal discovery." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 823 F. Supp. 3d 1, 9 (D.D.C. 2026), *reconsideration denied*, 2026 WL 1224046 (D.D.C. Apr. 3, 2026). The government controls when compliance with a subpoena is due, and a grand jury must be sitting to receive the production. Once the original indictment was returned, the government could not leave those subpoenas open indefinitely while it continued to exploit the resulting rolling productions to prepare for trial on the pending charges. Any late subpoena return is therefore improper: "it is plainly seeking relevant evidence, yet it is an improper purpose to use the grand jury to bolster trial testimony." *Id.* at 10.

The superseding indictment does not cure this abuse. As discussed above, the Superseding Indictment added only a limited set of securities fraud charges, and a single new factual allegation. The Superseding Indictment made no material change to the CFCE, bank fraud or wire fraud allegations that were already pending against Mr. Chu, all while the government continued to improperly use the grand jury through new subpoenas and by leaving earlier subpoenas open. In other words, the facts alleged in the Superseding Indictment are virtually identical to those in the first—making it clear that the government was *not* investigating any new conduct when it continued to collect records and issue new grand jury subpoenas from December through the return of the Superseding Indictment. The government therefore cannot credibly claim that months of grand jury activity were aimed at developing the securities fraud charges, especially when the

government has represented that those charges rest on the same alleged factual narrative as the counts charged from the outset, and when it *told* the defense back in January that it had already determined to bring those charges against Mr. Chu. *See* ECF No. 85 at 2; Schwartz Decl. ¶ 45. This is especially true where, as here, the government continued to collect and produce records even after the Superseding Indictment was returned.

*Second*, rather than closing its investigation once it had charged Mr. Chu with the crimes in the original indictment, the government continued to issue new grand jury subpoenas seeking evidence relevant to the very same charges, including as recently as April 2026. *See* Schwartz Decl. ¶ 33; *see also* Ex. 12 (Dropbox subpoena, dated April 13, 2026). Those subpoenas were not designed to investigate potential new charges or new defendants, but—according to the government—were issued because [redacted] the conduct already charged. ECF No. 44-26, May 20 Schwartz Decl. Ex. 26 at 6. When the defense asked the government to explain the nature or scope of its ongoing grand jury activity, including whether additional defendants or additional conduct might be implicated, the government declined to provide any further information. *See* Schwartz Decl. ¶¶ 41, 43–44. Regardless, "[t]he primary purpose of any grand jury is 'to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person.'" *Fulton Cnty. Bd. of Registration & Elections v. United States*, 2026 WL 1959461, at *7 (N.D. Ga. July 7, 2026) (quoting *United States v. Calandra*, 414 U.S. 338, 343–44 (1974)). The government's post-indictment subpoenas necessarily do not fulfill that purpose. Therefore, "there is certainly a strong argument that the prosecution could well have sought to subpoena [the recipients] before the first indictment was issued if the object had been testimony relevant to the indictment and not the trial." *Calk*, 87 F.4th at 187; *see also In re Grand Jury Subpoenas*, 2026 WL 1783899, at *7, 10 (D. Minn. June 22,

2026) (quashing "extraordinarily broad" grand jury subpoenas where their dominant purpose was improper).

The government's conduct, including the timing of its subpoenas and the seemingly endless production periods permitted under their meaningless return dates, raises serious questions regarding the validity of the grand jury subpoenas, and about its investigation overall. *See Calk*, 87 F.4th at 186. These questions provide "valid reasons to question the propriety of the grand jury subpoena[s]." *Id.* at 187. The burden therefore shifts to the government who, at a minimum, needs to answer these questions with "evidence of specific grand jury activity in connection with the . . . investigation" and show that the subpoenas were not motivated by the improper purpose. *Id.* at 186.

Although Mr. Chu has attempted to confer with the government about its continued use of the grand jury, the government has thus far refused to provide any additional information. May 20 Schwartz Decl. ¶¶ 47, 49, 52; Schwartz Decl. ¶¶ 41–44, 46. Where, as here, the defense has met its initial burden, that refusal is unacceptable. The government must come forward with evidence to rebut Mr. Chu's well-founded claims.

And of course, the government's recent refusal to confirm or deny whether the grand jury is still continuing to investigate any federal violations or other individuals in connection with this case speaks volumes. Schwartz Decl. ¶¶ 41, 43. Prior to the return of the Superseding Indictment, and from the very first conference before this Court, the government publicly stated on multiple occasions that it was continuing to investigate and intended to return a superseding indictment. *Id.* ¶ 45. Now, however, the government declines to provide an answer to the same question.

Nor has the government disclosed any further information about the grand jury who issued the subpoenas in this case or returned the indictments. *See id.* ¶¶ 44, 46. We do not know, for

instance, whether the same grand jury has been charged with the investigation since its inception, or if another grand jury has taken its place; nor do we know which grand jury or juries returned the two indictments.[14]

Given the egregious use of grand jury subpoenas during the entire pendency of the case, including the government's steadfast refusal to enforce the return dates on the subpoenas or compel production within reasonable timeframes, the government's proof should include an affidavit setting forth answers to the questions posed herein about the use of the grand jury or grand juries, as well as the production of the underlying grand jury subpoenas themselves.

**C. Remedy**

Where, as here, the grand jury has been used for the sole or dominant purpose of trial preparation, courts may quash the offending subpoenas or, where evidence has already been obtained, suppress it rather than unwind the grand jury's earlier, legitimate work. *See Simels*, 767 F.2d at 30 ("[I]f the rule is to have any meaning, we believe that the subpoena here must be quashed as an abuse of the grand jury process. In some circumstances, it may be appropriate to enforce the rule against using a grand jury subpoena predominantly for trial preparation simply by barring use at trial of evidence obtained pursuant to the subpoena, thereby leaving the grand jury's access to the evidence unimpaired.").

Consistent with the twofold nature of the government's misconduct, Mr. Chu seeks the following relief. First, as to the subpoenas issued before the original indictment but left open for months thereafter, he asks the Court to suppress and preclude at trial any evidence obtained after

[14] If different grand juries were empaneled during the course of the investigation, that may give rise to additional motion practice. For instance, if the grand jury who issued the subpoenas pre-indictment has now expired, the government cannot continue receiving productions of records under those subpoenas. *In re Grand Jury Proceeding*, 971 F.3d 40, 50 (2d Cir. 2020). Mr. Chu reserves all rights to make such a motion if such information is revealed.

December 2025 pursuant to those subpoenas. Second, with respect to the subpoenas issued after the original indictment, Mr. Chu requests that the Court quash any such subpoenas that seek evidence or testimony relating to allegations in the original indictment in addition to precluding the government from using the evidence at trial. At a minimum, based on the extreme facts in this case—where the government's *post*-indictment investigation has been continuing for more than twice the length of its pre-indictment investigation—the defense is entitled to further fact-finding as to the government's continued use of the grand jury.

The government cannot rest on the presumption of regularity where so much about this case—from the charges, to the investigation, to the cooperators, to the search warrants, to the production of discovery, to the grand jury practice—is decidedly irregular. The government should be put to its proof, including by producing to the defense all of the grand jury subpoenas issued that relate to the records produced to Mr. Chu in Rule 16 discovery. To be clear, Mr. Chu is not seeking the production of outstanding grand jury subpoenas relating to other offenses or individuals for which grand jury secrecy may apply. Rather, Mr. Chu seeks only the subpoenas related to the records produced to him in discovery.[15]

## CONCLUSION

For the foregoing reasons, Mr. Chu's motions should be granted in their entirety.

[15] If the government has issued grand jury subpoenas to third parties who have not yet produced any documents—and whose identity is therefore unknown to Mr. Chu—Mr. Chu has no objection to the government producing those to the Court *ex parte* in the first instance. If any such subpoenas exist, however, they would raise additional concerns.

Dated: July 16, 2026
New York, New York

Respectfully Submitted,

/s/ *Matthew L. Schwartz*

Matthew L. Schwartz
Craig A. Wenner
Jacqueline C. Kelly
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 303-3646
E-mail: mlschwartz@bsfllp.com
cwenner@bsfllp.com
jkelly@bsfllp.com

Marshall Dore Louis
BOIES SCHILLER FLEXNER LLP
100 Southeast 2nd Street, Suite 2800
Miami, Florida 33131
Telephone: (305) 357-8438
Email: mlouis@bsfllp.com

Adam Fee
WEIL, GOTSHAL & MANGES LLP
1999 Avenue of the Stars, Suite 1800
Los Angeles, California 90067
Telephone: (213) 667-5100
E-mail: adam.fee@weil.com

*Attorneys for Daniel Chu*

**<u>CERTIFICATE OF GOOD FAITH PURSUANT TO L. CRIM. R. 16.1</u>**

I hereby certify that on July 14, 2026, I conferred with counsel for the government in an effort in good faith to resolve by agreement the issues raised by this motion without the intervention of the Court and have been unable to reach agreement.

/s/ *Matthew L. Schwartz*
Matthew L. Schwartz