**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

DANIEL CHU,

Defendant.

Case No. 25 Cr. 579 (PKC)

# DANIEL CHU'S OMNIBUS REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS INITIAL PRETRIAL MOTIONS

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Daniel Chu*

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

I. MOTION TO SUPPRESS EVIDENCE, OR FOR A *FRANKS* HEARING ........ 2

A. The Kollar Omissions Are Exculpatory and Material. ........ 3

B. Kollar's Exculpatory Statements Were Not Disclosed In the Search Warrant Affidavits. ........ 6

C. The Seibold Omissions Were Material ........ 8

D. The Omission of Kollar's History of Fraud Is Material to Credibility ........ 9

E. Mr. Chu Is Entitled to the Unredacted FBI 302s and Underlying Notes. ........ 11

F. The Affidavits Did Not Otherwise Establish Probable Cause ........ 12

G. The Challenge to the Seizure Warrant Affidavit Is Not Frivolous. ........ 14

II. MOTION TO SUPPRESS EVIDENCE SEIZED BEYOND THE SCOPE OF THE PREMISES WARRANT ........ 15

CONCLUSION ........ 17

# TABLE OF AUTHORITIES

**Cases**

*Franks v. Delaware*,
438 U.S. 154 (1978) ........ *passim*

*United States v. Akparanta*,
2019 WL 5616875 (S.D.N.Y. Oct. 30, 2019) ........ 11

*United States v. Davis*,
2014 WL 5305984 (D. Vt. Oct. 15, 2014) ........ 11, 16

*United States v. Djibo*,
2019 WL 1517086 (E.D.N.Y. Apr. 8, 2019) ........ 8

*United States v. Gonzalez*,
814 F. Supp.3d 214 (D. Mass. 2026) ........ 14

*United States v. Halsey*,
257 F. Supp. 1002 (S.D.N.Y. 1966) ........ 16

*United States v. Lahey*,
967 F. Supp. 2d 698 (S.D.N.Y. 2013) ........ 3

*United States v. Mahaffy*,
693 F.3d 113 (2d Cir. 2012) ........ 8

*United States v. Matias*,
836 F.2d 744 (2d Cir. 1988) ........ 18

*United States v. Messalas,*
612 F. Supp. 3d 93 (E.D.N.Y. 2020) ........ 12

*United States v. Morgan*,
2017 WL 4621632 (S.D.N.Y. Oct. 12, 2017) ........ 12

*United States v. Nejad*,
436 F. Supp. 3d 707 (S.D.N.Y. 2020) ........ 3

*United States v. Perez*,
247 F. Supp. 2d 459 (S.D.N.Y. 2003) ........ 3, 9

*United States v. Rajaratnam*,
719 F.3d 139 (2d Cir. 2013) ........ 14

*United States v. Reilly*,
76 F.3d 1271 (2d Cir. 1996) ........ 15

*United States v. Rivas*,
377 F.3d 195 (2d Cir. 2004) ........ 8

*United States v. Shields*,
783 F. Supp. 1058 (N.D. Ill. 1991) ..................................................................................... 14

*United States v. Soto*,
52 F. App'x 534 (2d Cir. 2002).............................................................................................. 12

*Wilson v. Russo*,
212 F.3d 781 (3d Cir. 2000).............................................................................................. 3, 9

Daniel Chu respectfully submits this reply memorandum of law in further support of his initial pretrial motions (i) to suppress evidence, or for a *Franks* hearing, and (ii) to suppress evidence seized beyond the scope of the search warrant for Mr. Chu's residence. Mr. Chu addressed the government's arguments in opposition to his remaining initial pretrial motions in his Second Pretrial Motions, filed on July 16, 2026, ECF No. 99.

## PRELIMINARY STATEMENT

The government's opposition, ECF No. 83 ("Opp."), does nothing to meaningfully address the serious constitutional defects identified in Mr. Chu's initial pretrial motions. The government in fact confirms that the magistrate judges who authorized the Search Warrants for Mr. Chu's home and online accounts were never told critical facts—unquestionably known to the government at the time—that undermine the credibility and reliability of the proof offered by the government to establish probable cause: the exculpatory statements made by the government's key witnesses—Jerome Kollar and Ameryn Seibold. Kollar described Mr. Chu as appearing "shocked" when confronted with the alleged double pledging scheme and acknowledged that a key communication the government relies on may have had an innocent explanation. (The government's latest cooperator, David Goodgame, had told the government the same thing prior to the time it obtained the warrants.) Meanwhile, Seibold later admitted that he never personally observed conversations between Chu and Kollar about loan misrepresentations. The government does not deny these omissions. Instead, it asks the Court to accept its post hoc assessment that those omitted facts were unimportant. That assessment should have been made by the magistrate judges at the time, not by the government after the fact.

The Court should suppress the resulting evidence or, at a minimum, grant a *Franks* hearing and the related discovery necessary to test the validity of the warrants.

Nor does the government's opposition offer any meaningful justification for the seizure of materials beyond what was authorized by the Premises Warrant. It does not dispute that agents photographed personal items—including [redacted] and other materials plainly unrelated to the categories authorized by the warrant. The government does not defend these seizures. Instead, and as with so much else about this case, the government conducted a sloppy and constitutionally deficient investigation and then argues "no harm, no foul" because it vows not to use certain material. That promise does not cure a Fourth Amendment violation or moot a suppression motion. The government is not entitled to possess those materials or use them for any purpose. The Court should suppress the photographs of personal materials seized beyond the scope of the Premises Warrant.

## ARGUMENT

### I. MOTION TO SUPPRESS EVIDENCE, OR FOR A *FRANKS* HEARING

The government does not dispute three critical facts. First, the Search Warrant Affidavits relied predominantly on summaries of statements by Kollar and Seibold to establish probable cause that Mr. Chu knowingly participated in the alleged fraud. Second, the Search Warrant Affidavits omitted the statements identified in Mr. Chu's opening brief, which were disclosed only later in the government's *Brady* Letter. That omitted information was never presented to either issuing magistrate judge. And third, the government was well aware of that information at the time, and could have disclosed it to the magistrates.

The only remaining questions are whether those omissions were made with reckless disregard for the truth and whether they were material. Under *Franks*, Mr. Chu need only make a "substantial preliminary showing" on those issues to obtain a hearing. *See Franks v. Delaware*, 438 U.S. 154, 170 (1978); *United States v. Nejad*, 436 F. Supp. 3d 707, 718–19 (S.D.N.Y. 2020). He has done so here.

### A. The Kollar Omissions Are Exculpatory and Material.

The government attempts to recast the omitted statements from Kollar as either immaterial or speculative. But that argument misconstrues the limited inquiry presently before the Court. At this stage, the Court need not decide whether the government's interpretation of Kollar's statements is ultimately correct. The question is whether a reasonable magistrate judge would have wanted to know that Kollar made statements that materially qualify and, in some instances, contradict, the narrative presented in the Affidavits. *United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003) (internal quotation marks omitted) (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)) ("[O]missions . . . are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know."). At a minimum, any competing interpretations create precisely the sort of factual dispute that warrants a *Franks* hearing. *See, e.g.*, *United States v. Lahey*, 967 F. Supp. 2d 698, 723–30 (S.D.N.Y. 2013).

*First*, the government argues that Kollar's statement that Mr. Chu "seemed to be shocked at the amount, the size of what it had grown to be," Ex. 19[1] (*Brady* Letter) at 4, refers only to the magnitude of the scheme, not its existence. *See* Opp. at 27–28. But the government's self-serving assessment says nothing of what a reasonable magistrate would conclude as to Mr. Chu's purported involvement in an agreement to commit fraud and the other subject offenses. Kollar's own characterization of Mr. Chu being "shocked" is markedly inconsistent with the idea that Mr. Chu was directing the fraud for years and undermines a finding of probable cause as to the requisite intent for the subject offenses of the warrant.

---

[1] All references to "Ex. __" refer to exhibits to the Declaration of Matthew L. Schwartz in Support of Daniel Chu's Initial Pretrial Motions, dated May 20, 2026 ("Schwartz Decl."); *see also* ECF No. 44 (redacted version on the public docket).

The surrounding context of the statement underscores that point. According to the *Brady* Letter, Kollar stated that he was [redacted] when Mr. Chu "seemed to be shocked at the amount, the size of what it had grown to be." Ex. 19 (*Brady* Letter) at 4. Kollar further told the government that [redacted] *Id.* The government's opposition tellingly ignores the latter statement entirely. And it is worth noting that Goodgame himself had told the government back in October 2025, before the Search Warrants were obtained, that Mr. Chu was surprised to learn about the fraud. Goodgame said that [redacted] ECF No. 98-2 at 2. Just as Kollar told the government that Mr. Chu was "shocked," Goodgame also explained that when the fraud was revealed in the summer of 2025, Mr. Chu was surprised:

[redacted]

*Id.*[2] None of this was disclosed to the magistrate judges. And while Goodgame was not a cooperator at the time and his statements were not principally relied upon in the Search Warrant Affidavits, the fact that the government had heard from other insiders—including one that they

---

[2] Goodgame pleaded guilty to making false statements during the October 2025 interview, but that charge did not encompass what Goodgame told the government about Mr. Chu; it covered "false statements about the existence, nature, and value of Tricolor's pledged collateral." ECF No. 78 at ¶ 10.

subsequently embraced as a cooperator—the same exculpatory material as they had heard from Kollar, underscores the recklessness of the omission.

A magistrate judge reasonably could view Kollar's statements together and conclude that Mr. Chu was shocked not merely at the "size" of the double-pledging, but at the existence of conduct he did not know was occurring. If Kollar's account was consistent with Mr. Chu's longstanding knowledge and oversight over the alleged fraud, there would be no reason for [redacted] The omitted statement directly contradicts the Affidavits' representations that Kollar told investigators the alleged fraud [redacted] *See* Ex. 1 at 15; Ex. 3 at 7. A magistrate judge would have wanted to know that the same witness later described Mr. Chu as appearing shocked upon learning the scope of the conduct, and that Kollar had recounted Goodgame's statement suggesting neither he nor Mr. Chu previously knew about it.

*Second*, the government's dismissal of Kollar's September 2025 Statement as "speculation" about a "one-off" text message is likewise wrong. *See* Opp. at 28. The *Brady* Letter disclosed Kollar's acknowledgment that a July 2021 text message from Chu referencing double-pledging "may have an innocent explanation." Ex. 19 (*Brady* Letter) at 4. But the government fails to address that the *Brady* Letter also disclosed Kollar's explanation of why. According to Kollar:

- [redacted]
- [redacted]
- [redacted]
- [redacted]

*Id.* at 4. In other words, Kollar described a corporate remediation process that involved disclosure of an issue to Mr. Chu and a legitimate effort to resolve it; he supplied a nonspeculative (and innocent) explanation for the very communication the Affidavits relied upon as evidence of criminal knowledge. A magistrate judge evaluating probable cause would undoubtedly wish to know both sides of that story.

*Third*, subsequent statements from Kollar only further established the exculpatory value of his earlier statements. For instance, the government entirely ignores the additional exculpatory statement from Kollar's November 20, 2025 interview, in which he acknowledged [redacted] Ex. 19 (*Brady* Letter) at 4. Unlike the statements cited above, this statement post-dated the judicial authorization of the warrants. However, it strongly suggests that Kollar's earlier disclosure regarding Mr. Chu's shocked reaction was not a one-off. Given the multiple exculpatory statements Kollar made in the span of two short months—including in the immediate lead up to the return of the initial indictment of the case—the government's repeated reliance on his purportedly inculpatory statements is troubling. In these circumstances, Mr. Chu should not be left to rely on the government's independent assessment of which representations constitute *Brady* material or may be helpful to the defense.

**B. Kollar's Exculpatory Statements Were Not Disclosed In the Search Warrant Affidavits.**

The government also asserts that the Search Warrant Affidavits "already included Chu's disclaimer of any knowledge" because a footnote informed the magistrate judges that "[t]o Tricolor's outside counsel, CHU has denied any knowledge of Borrowing Base misrepresentations" and that "[i]ndividual counsel for CHU has told an Assistant U.S. Attorney that Chu is committed to being cooperative and is 'the good guy.'" Opp. at 28 (quoting Ex. 1 at

p. 13 ¶ 11 n.2 and Ex. 3 at p. 5 ¶ 7 n.2); *see also id.* ("In short, the point Chu claims was recklessly omitted from the Search Affidavits was made explicitly to the reviewing magistrates."). This argument fundamentally mischaracterizes the nature of the omissions and the entire *Franks* analysis.

Mr. Chu does not contend that the Affidavits should have included his own truthful denials—even though they further undermine the finding of probable cause. The issue before the Court, however, is that the government improperly and artificially inflated the credibility of its cooperating witnesses by omitting from the Affidavits their exculpatory statements. Those statements corroborate Mr. Chu's denials and contradict the inculpatory narrative that the Affidavits present. While a magistrate may be willing to dismiss a denial made by the target of an investigation, exculpatory statements by the government's own cooperating witnesses carry particular significance because those witnesses are also the government's chosen source of inculpatory information. *Cf. United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) ("the fact that [the cooperating witness] brought the narcotics on board might well have been viewed by the jury as a critical piece of evidence supporting the defense theory"); *United States v. Djibo*, No. 15 CR 00088 (RJD), 2019 WL 1517086, at *9 (E.D.N.Y. Apr. 8, 2019) ("*Brady* evidence is material if it would have done more than merely provide an additional basis for impeachment but rather would have called squarely into question the credibility of . . . the government's key cooperating witness, regarding his claim that he [only ever smuggled drugs with Djibo].") (internal quotation marks omitted) (quoting *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012)). That is particularly so here, where the Search Warrant Affidavits relied overwhelmingly on Kollar's statements to inculpate Mr. Chu.

Here, Kollar's own statements—that Mr. Chu "seemed to be shocked," that there "may have been an innocent explanation" for the text, and that Kollar [redacted]—come from the very witness upon whom the Affidavits rely. Ex. 19 (*Brady* Letter) at 4. They are qualifications on Kollar's *own* account, not Mr. Chu's. And the significance of the exculpatory statements is only underscored by the incentives that the cooperating witnesses had to provide inculpatory evidence. Both Kollar and Seibold faced enormous criminal exposure and had every incentive to minimize their own culpability by portraying Mr. Chu as responsible. The footnote cited by the government does nothing to cure those omissions. *See Perez*, 247 F. Supp. 2d at 474 (an omission is made with reckless disregard for the truth when "'any reasonable person would have known that this was the kind of thing the judge would wish to know'") (quoting *Wilson*, 212 F.3d at 788).

### C. The Seibold Omissions Were Material.

The government next argues that the omitted Seibold statements "add nothing more" to the reviewing magistrates' probable cause determination because the Affidavits "disclose exactly how Seibold learned the information conveyed in the Seibold statements." Opp. at 29–30. Not so.

The Affidavits disclosed that Seibold (i) overheard a conversation between Chu and Kollar, and (b) was told by Kollar that others in management knew about the misrepresentations. Ex. 1 ¶¶ 11.c, 13.b; Ex. 3 ¶¶ 7.c, 9.b. But the Affidavits did *not* disclose what the *Brady* Letter revealed: "Seibold never witnessed Chu and Kollar speaking about loan misrepresentations to each other. Seibold never spoke with Chu about Chu's conversations with Kollar." Ex. 19 (*Brady* Letter) at 5. In other words, everything Seibold knew about Mr. Chu's alleged knowledge came from Kollar, making Seibold's testimony duplicative hearsay from the same cooperator whose own material statements were themselves omitted. Put differently, Seibold's testimony was presented as additive and corroborative of Kollar, but that corroboration is entirely illusory. The government's

argument that these omissions "add nothing" to what was disclosed is therefore backwards; the omissions would have negated the supposedly independent evidentiary value of Seibold's statements to the Affidavits—and the scope of Seibold's knowledge is something a magistrate judge would plainly "wish to know" before crediting Seibold. *Perez*, 247 F. Supp. 2d at 474.

The government separately contends that it only received the "Seibold Text Message"—in which Seibold texted his mother in August 2025, [redacted] Ex. 24—after both Search Warrant Affidavits were sworn. *See* Opp. at 29 n.5. But this assertion rests on nothing more than unsworn representations by the prosecution team. The government has offered no sworn declaration or other evidentiary proof that establishes when the text message was obtained. Moreover, Seibold was actively proffering and cooperating with the government while it was seeking the Search Warrants. Indeed, Seibold was interviewed on September 6, 2025. *See* Ex. 19 (*Brady* Letter) at 5. The government could have and should have asked its cooperator for contemporaneous communications bearing on his credibility to support its warrant applications. The government fails to explain why it did not, and its undocumented and unsworn statements obviously cannot overcome Mr. Chu's showing and negate the need for an evidentiary hearing.

**D. The Omission of Kollar's History of Fraud Is Material to Credibility.**

The Court should likewise reject the government's argument that Kollar's prior involvement in a strikingly similar fraud is not "clearly critical" to the probable cause determination because it was settled without any admission by Kollar. *See* Opp. at 30; *see also* Ex 29 (*Mach Speed* Complaint).

That the *Mach Speed* claims were settled without any admission of wrongdoing does not render them immaterial—it simply means that the allegations were never adjudicated. The question is whether a magistrate judge would wish to know that the witness, whose statements

most heavily implicated Mr. Chu, previously served as CFO of another company that collapsed amid allegations of fraudulent transactions, breach of fiduciary duty and fraudulent transfers. *See United States v. Davis*, 2014 WL 5305984, at *13 (D. Vt. Oct. 15, 2014) (holding affidavit's omissions, including that "the CI was facing two pending charges of false information to a police officer, when juxtaposed against the Affidavit's affirmative statements that the CI was seeking to change his lifestyle and maintain sobriety," were either reckless or intentional and "[i]f disclosed, this information would have caused a neutral and detached judge to discredit either all or part of the CI's uncorroborated information"). The answer is clearly yes. These allegations bear directly on the type of misconduct at issue here and on Kollar's motive to shift responsibility, particularly when facing substantial sentencing exposure on seven felony counts. The omitted information was uniquely relevant to assessing whether Kollar was a reliable source of information against Mr. Chu.

The government's cited authorities are all readily distinguishable. In *United States v. Akparanta*, the only omission at issue was a cooperating witness's unspecified criminal history, which the court reasoned was deliberately withheld from the affidavit "presumably to protect her anonymity as both an informant and an alleged victim of [d]efendant's crime" of the sexual abuse of inmates. 2019 WL 5616875, at *6 (S.D.N.Y. Oct. 30, 2019). No anonymity concerns exist here: Kollar is not a confidential source and certainly not a victim, but rather the named former CFO of Tricolor, who pleaded guilty, cooperated with the government, and whose statements were already expressly attributed to him by name in the Search Warrant Affidavits. *See, e.g.*, Ex. 1 ¶ 14; Ex. 3 ¶ 10.

The government's reliance on *United States v. Morgan*, 2017 WL 4621632 (S.D.N.Y. Oct. 12, 2017) is equally inapposite. There, the *Morgan* court explained that a search warrant

application need not disclose an informant's criminal history "if that history does not bear upon the informant's veracity, and if the informant had first-hand knowledge that was corroborated in some way." *Id.* at *5 (quoting *United States v. Soto*, 52 F. App'x 534, 535 (2d Cir. 2002)). The *Morgan* court found the informant's information to be substantially corroborated, based in part on law enforcement's discovery of hidden compartments, as well as accurate descriptions of the defendant, his vehicle, and the drugs recovered. Here, by contrast, Kollar's inculpatory statements are not only uncorroborated, they are contradicted by Kollar's own omitted statements. And unlike the confidential informant in *Morgan*, Kollar is a named cooperator with an obvious motive to curry favor with the government, making his history of fraud allegations all the more likely to "bear upon [his] veracity." *Id.*

Nor does *United States v. Messalas* support the government's argument. 612 F. Supp. 3d 93, 103 (E.D.N.Y. 2020). The affidavit in that case specifically disclosed that the cooperating witness was charged with and pled guilty to wire fraud pursuant to a cooperation agreement and that he is "currently cooperating in hopes of receiving leniency at sentencing." *Id.* The court held that a *Franks* hearing was unnecessary because the affidavit's probable cause showing primarily relied on physical evidence, including recordings of conversations—"not the CW's say-so"—and there was "no need to expound at length on the CW's credibility." *Id.* By contrast, here, the Search Warrant Affidavits rely centrally on Kollar's own uncorroborated statements—in other words, his "say-so" is necessary to establish Mr. Chu's knowledge and direction of the fraud and the primary evidentiary basis for the finding of probable cause.

**E. Mr. Chu Is Entitled to the Unredacted FBI 302s and Underlying Notes.**

The government argues that Mr. Chu's request for the unredacted FBI 302s and underlying notes of the Kollar and Seibold interviews is foreclosed by the Jencks Act. *See* Opp. at 30–31. But Mr. Chu does not seek these materials as Jencks Act discovery; he seeks *Franks*-related

evidence of what the *government* knew at the time it sought judicial authorization for the warrants. The most reliable evidence of that knowledge is the contemporaneous 302s and agent notes from the very interviews upon which the affidavits relied.

The *Brady* Letter's summaries of the Kollar and Seibold interviews were drafted by the same prosecution team that prepared the Search Warrant Affidavits, and the same team whose selective presentation of those interviews is the basis of the present *Franks* challenge. The full record—the 302s and underlying notes—is necessary to establish the complete scope of what the government knew and withheld when it sought judicial authorization for the sweeping searches at issue. *See United States v. Gonzalez*, 814 F. Supp.3d 214, 229 (D. Mass. 2026) (finding defendant "was significantly hindered in developing a comprehensive challenge to the search warrant because he was not provided the DEA-6 Investigative Report" that contained information omitted from the search warrant affidavit); *United States v. Shields*, 783 F. Supp. 1058, 1066 n.5 ("[T]he Court may consider the content of the 302 forms in determining whether *Franks* hearing is necessary.").

**F. The Affidavits Did Not Otherwise Establish Probable Cause.**

The government's fallback argument that "ample" probable cause existed even with the omissions included fails upon examination of its own purportedly "unchallenged evidence." Opp. at 31–32. Under *Franks*, the Court must determine whether, once the omitted truths are included, the remaining allegations are "sufficient to support [] probable cause." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013).

In fact, the government's own description of the evidence showcases how predominantly Kollar and Seibold's statements featured in the Search Warrant Affidavits. In cataloguing the evidence presented in the Affidavits, the government cites only *one* piece of evidence that was not solely derived from a cooperating witness: that Mr. Chu was copied, among others, on Seibold's

transmittals of the borrowing base reports. Opp. at 31 ("Chu was copied on inaccurate borrowing base reports sent to lenders by Tricolor (specifically, by Seibold) several times a week."). That evidence falls far short of establishing probable cause. That "Chu was copied on inaccurate borrowing base reports sent to lenders," Opp. at 31, does not establish knowledge that the report is inaccurate. Absent evidence that Mr. Chu actually reviewed the voluminous spreadsheets and understood the alleged manipulations within them, the fact that he was copied on the emails establishes at most that Mr. Chu was included in email communications—not that he knowingly participated in any manipulation.[3]

Every other example cited by the government simply relays a statement given by Kollar or Seibold. *Id.* at 31–32. Even by the government's own assessment, its cooperating witnesses' statements were "clearly critical" to the magistrate judges' determination of probable cause. Opp. at 25 (quoting *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996)). And the government's assertions are designed to mislead precisely because they derive from Kollar and Seibold—the very witnesses whose accounts are called into question by the omissions.

Finally, the government's reliance on Kollar's statement to "law enforcement that the loan misrepresentations at Tricolor 'began in or about 2018 at the direction of Chu,'" Opp. at 31–32, must be weighed against Kollar's subsequent statements that [redacted]

[3] Of course, probable cause may be established to search an individual's property or electronic account even if that individual was not personally involved in the alleged wrongdoing, but that was not the government's claim here. The Search Warrant Affidavits, and the government's opposition, assert that Mr. Chu led and participated in the fraudulent conduct himself, and therefore the statements undermining that claim are exculpatory. Moreover, the search warrants obtained were far broader than what would have been permitted had the government not put Mr. Chu squarely at the center of the fraud, encompassing [redacted] Ex. 2 at -132–33, and a search of his family residence for [redacted] Ex. 4 at -225.

[redacted] and that Chu "seemed to be shocked" at the extent of the fraud. *See* Ex. 19 (*Brady* Letter) at 4.

In sum, the government's "unchallenged evidence," once placed alongside the omitted exculpatory statements, does not establish probable cause. At most, it establishes that cooperating witnesses facing substantial sentencing exposure—including one with his own history of fraud—made inculpatory accusations that are materially undermined by their own subsequent statements. That is not probable cause; that is a reason for a *Franks* hearing. *See Davis*, 2014 WL 5305984, at *12–13 (holding defendant satisfied burden under *Franks* where affidavit "omit[ted] certain information that was essential to evaluating the CI's credibility," including "the fact that the CI was facing two pending charges for false information to a police officer," where "the CI was virtually the sole source of the background information set forth in the Affidavit" and "these omissions were clearly relevant to a probable cause determination").

**G. The Challenge to the Seizure Warrant Affidavit Is Not Frivolous.**

Finally, the Court should reject the government's argument that Mr. Chu's challenge to the Seizure Warrant Affidavit is "frivolous." Opp. at 32–33. According to the government, "nothing was withheld" because the Affidavit provided in a footnote a "summary" of and "specific citation" to Mr. Chu's publicly docketed emergency letter motion. *Id.*

This argument improperly shifts the affiant's disclosure burden onto the reviewing magistrate. The Fourth Amendment requires that the affiant present "a factual showing sufficient to comprise probable cause." *Franks*, 438 U.S. at 164 (internal quotation marks omitted) (quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966). Simply citing a docket entry and expecting the magistrate to locate, read and independently evaluate a seven-page emergency motion does not satisfy that obligation. The Seizure Warrant Affidavit was required to *describe* the substance of Mr. Chu's constitutional objections and the circumstances of the government's

initial warrantless freeze in order to give the magistrate a complete picture of what she was being asked to authorize: continued seizure of a bank account that had already been frozen without a warrant, without notice, and without exigency, for six weeks after indictment. *See* ECF No. 46 at 42–43. The footnote stated only that Mr. Chu had [redacted] and cited his motion, ECF No. 44-17 at -015 n.4—it did not describe the substance of his constitutional arguments or that the government had frozen the account by informal letter without seeking a warrant. The judges of this District should expect more from the government; that level of disclosure is inadequate to inform the magistrate's assessment of whether continued seizure was appropriate.

## II. MOTION TO SUPPRESS EVIDENCE SEIZED BEYOND THE SCOPE OF THE PREMISES WARRANT

Rather than engage with any of Mr. Chu's arguments, the government devotes a single paragraph to this motion. The government does not dispute that the Premises Warrant authorized seizure only of electronic devices and related items—specifically, [redacted] The government also does not dispute that the 38 photographs at issue depict items that have nothing to do with any of those categories, including [redacted] Nor does the government contend that any exception to the warrant requirement applies to justify the seizure of these photographs. Instead, the government simply asserts that it "does not intend

to offer these photographs in its case-in-chief at trial" and asks the Court to deny the motion as "moot." Opp. at 37.

For one, the government's conclusory assertion that Mr. Chu's "legal arguments are without merit," *id.*, cannot be credited when the government has not identified which arguments lack merit or offered any legal argument in response.

Further, the government's representation that it does not intend to use the photographs "in its case-in-chief" does not moot the motion. The government conspicuously leaves open the possibility that it may seek to use the photographs on cross-examination, for impeachment, on rebuttal, or in connection with sentencing or forfeiture proceedings. The government's representation is also not enforceable. Without a ruling from the Court, the government remains free to reverse course at any time—including during trial itself. The purpose of suppression is to ensure that unlawfully seized evidence may not be used for *any* purpose. Mr. Chu is entitled to more than the government's say-so that it will voluntarily refrain from using illegally obtained evidence in one phase of the proceedings. *See United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) ("[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items.").

Suppression is necessary not only to prevent direct use of the photographs at trial, but also to guard against any derivative investigative use. Mr. Chu reserved in his opening brief the right to bring additional motions if it comes to light that the government took any investigative steps based on information gleaned from the unlawfully seized photographs. *See* ECF No. 46 at 57 n.11. A suppression order is the only adequate safeguard against such derivative use, and the government's representations about its intention for its case-in-chief provides no such protection.

**CONCLUSION**

For the foregoing reasons, Mr. Chu's motions should be granted in their entirety.

Dated: July 17, 2026
New York, New York

Respectfully Submitted,

/s/ *Matthew L. Schwartz*

Matthew L. Schwartz
Craig A. Wenner
Jacqueline C. Kelly
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 303-3646
E-mail: mlschwartz@bsfllp.com
cwenner@bsfllp.com
jkelly@bsfllp.com

Marshall Dore Louis
BOIES SCHILLER FLEXNER LLP
100 Southeast 2nd Street, Suite 2800
Miami, Florida 33131
Telephone: (305) 357-8438
Email: mlouis@bsfllp.com

Adam Fee
WEIL, GOTSHAL & MANGES LLP
1999 Avenue of the Stars, Suite 1800
Los Angeles, California 90067
Telephone: (213) 667-5100
E-mail: adam.fee@weil.com

*Attorneys for Daniel Chu*