**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

DANIEL CHU,

Defendant.

Case No. 25 Cr. 579 (PKC)

**DANIEL CHU'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE DERIVED FROM HIS SEIZED ELECTRONIC DEVICES AND ICLOUD ACCOUNTS**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Daniel Chu*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................... **ii**

**PRELIMINARY STATEMENT** .................... **1**

**RELEVANT BACKGROUND** .................... **2**

A. The Government Obtains the Search Warrants .................... 2

B. The Search Warrants Limit the Government's Review .................... 4

C. The Government Searched the Chu Images for Nine Months, But It Won't Say How .................... 5

D. The Government Searched Through and Produced as "Responsive" *Thousands* of Irrelevant Documents—And Says It Will Look For More .................... 8

**LEGAL STANDARD** .................... **12**

**ARGUMENT** .................... **14**

I. The Government's Responsiveness Review Resulted in the Production of Material Not Within the Scope of the Search Warrants .................... 15

A. "Responsive" Material Highly Invasive of Mr. Chu and His Family .................... 17

B. "Responsive" Material Protected by the Spousal Privilege .................... 18

C. "Responsive" Material Irrelevant to the Subject Offenses .................... 20

II. The Government's Responsiveness Review Was Not Conducted in Good Faith .................... 21

III. At the Very Least, an Evidentiary Hearing Is Needed .................... 23

**CONCLUSION** .................... **25**

## TABLE OF AUTHORITIES

**Cases**

*Andresen v. Maryland*,
427 U.S. 463 (1976) .......... 19

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
403 U.S. 388 (1971) .......... 12

*Blau v. United States*,
340 U.S. 332 (1951) .......... 19, 20

*Boyd v. United States*,
116 U.S. 616 (1886) .......... 2

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... 12

*In re Witness Before Grand Jury*,
791 F.2d 23 (2d Cir. 1986) .......... 18

*Marron v. United States*,
275 U.S. 192 (1927) .......... 1, 12

*Riley v. California*,
573 U.S. 373 (2014) .......... 13

*Schwenk v. Kavanaugh*,
4 F. Supp. 2d 110 (N.D.N.Y. 1998) .......... 21

*Stanford v. Texas*,
379 U.S. 476 (1965) .......... 1, 12

*United States v. Debbi*,
244 F. Supp. 2d 235 (S.D.N.Y. 2003) .......... passim

*United States v. Ganias*,
755 F.3d 125 (2d Cir. 2014) .......... 13, 14

*United States v. Heldt*,
668 F.2d 1238 (D.C. Cir. 1981) .......... 15

*United States v. Irons*,
646 F. Supp. 2d 927 (E.D. Tenn. 2009) .......... 20

*United States v. Liu*,
239 F.3d 138 (2d Cir. 2000) .......... 14

*United States v. Lustyik*,
57 F. Supp. 3d 213 (S.D.N.Y. 2014) .......... 23

*United States v. Matias*,
836 F.2d 744 (2d Cir. 1988) ........ 23

*United States v. Metter*,
860 F. Supp. 2d 205 (E.D.N.Y. 2012) ........ 13, 14

*United States v. Montgomery*,
384 F.3d 1050 (9th Cir. 2004) ........ 20

*United States v. Patel*,
2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017) ........ 19

*United States v. Pinto-Thomaz*,
352 F. Supp. 3d 287 (S.D.N.Y. 2018) ........ 23, 24

*United States v. Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y.*,
71 F.3d 1067 (2d Cir. 1995) ........ 19

*United States v. Pugh*,
945 F.3d 9 (2d Cir. 2019) ........ 19

*United States v. Suggs*,
531 F. Supp. 2d 13 (D.D.C. 2008) ........ 19

*United States v. Triumph Cap. Grp., Inc.*,
211 F.R.D. 31 (D. Conn. 2002) ........ 23

*United States v. Wey*,
256 F. Supp. 3d 355 (S.D.N.Y. 2017) ........ 13, 14, 17

*Wolf v. United States*,
291 U.S. 7 (1934) ........ 19

**Other Authorities**

William Shakespeare, *Henry IV, Part 1*, Act 5, Scene 4 ........ 23

**Rules**

Fed. R. Crim. P. 41 ........ 13

Daniel Chu respectfully submits this memorandum of law in support of his motion to suppress evidence derived from his electronic devices and iCloud accounts.

## PRELIMINARY STATEMENT

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). This bedrock Fourth Amendment principle—that the government may only seize what a judge has expressly authorized by warrant—"is to be accorded the most scrupulous exactitude when the 'things [to be seized]' are books, and the basis for their seizure is the ideas which they contain," as opposed to physical evidence such as guns or money. *Stanford v. Texas*, 379 U.S. 476, 485 (1965).

The government ran roughshod over these principles, and Mr. Chu's rights, when it executed the search warrants in this case. Pursuant to judicially authorized search warrants, the government obtained the full contents of two iCloud accounts associated with Mr. Chu and twenty-one electronic devices seized from his and his family's home. As we have described elsewhere, those warrants were improperly obtained by withholding material information from the reviewing magistrates, and should never have been issued in the first place. But they were issued, and those warrants—which, of course, the government itself drafted—contain strict limits on the government's review, essentially confining its search to evidence of the alleged fraud at Tricolor ultimately charged in the indictment. The actual search conducted by the government, however, ignored those limits entirely.

The materials that the government reviewed and produced as purportedly "responsive" to the warrants just . . . isn't. No one could reasonably believe otherwise. That material includes

thousands of documents that are plainly irrelevant and, in numerous instances, highly personal and/or sensitive in nature. More than 44% of all of the emails produced as "responsive" are in fact either junk mail, or emails with headers but no body text. Those that have substance cover an array of irrelevant subjects. And many of the "responsive" documents are privileged, including communications solely between husband and wife about their marriage, their children, their health, and all of the other topics—from the intimate to the mundane—that husbands and wives discuss. This is at the very heart of what the Fourth Amendment protects: "the sanctity of a man's home and the privacies of life. It is not the breaking of his doors and the rummaging of his drawers that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property . . ." *Boyd v. United States*, 116 U.S. 616, 630 (1886).

The government's flagrant disregard for the warrants, and corresponding lack of good faith, is clear. Its conduct amounts to a profound invasion of Mr. Chu's privacy, and the privacy of his family members who stand unaccused. The Court should suppress any evidence derived from the government's irresponsible execution of the warrants.

## RELEVANT BACKGROUND

### A. The Government Obtains the Search Warrants

The government obtained the relevant search warrants in the fall of 2025, shortly after beginning its investigation. At the time, the government had hardly begun to review documents from Tricolor or other third parties; its showing of probable cause relied almost entirely on the say-so of two men who would become cooperators, Jerome Kollar and Ameryn Seibold. As Mr. Chu has explained in his pending *Franks* motion, ECF No. 46, Kollar and Seibold had both shared with the government material exculpatory information that substantially undercut the warrant affidavits' showing of probable cause, but which the government chose not to disclose to the

reviewing magistrates. Nor did the government disclose Kollar's history of fraud. *Id.* at 41. In short, the warrants should never have been issued in the first place.

But the government did conceal material information from the magistrates, and it got its warrants. First, on September 26, 2025, the government sought and obtained a search warrant for Mr. Chu's iCloud accounts. Ex. C[1] (USAO_01_00000104–28 (the "iCloud Warrant Affidavit")); Ex. A (USAO_01_00000129–34 (the "iCloud Warrant")). Pursuant to the Stored Communications Act, 18 U.S.C. § 2703, the iCloud Warrant was served on Apple, Inc. *See* Ex. C (iCloud Warrant Affidavit) at -104. In response, Apple provided the government with a full image of the two iCloud accounts specified in the iCloud Warrant. Those complete images, totaling 4.3 terabytes of data, were produced to Mr. Chu on January 30, 2025. Schwartz Decl. ¶ 9.

On October 7, the government sought and obtained a search warrant for Mr. Chu's personal residence to seize electronic devices. Ex. D (USAO_01_00000196–222 (the "Premises Warrant Affidavit")); Ex. B (USAO_01_00000223-27 (the "Premises Warrant")) (collectively, along with the iCloud Warrant Affidavit and the iCloud Warrant, the "Search Warrant Affidavits" and the "Search Warrants"). That same day, the Premises Warrant was executed at Mr. Chu's residence. Schwartz Decl. ¶ 8. During the search, the government seized numerous electronic devices belonging to Mr. Chu and to other family members, including his young children, who live at the residence. *Id.* Of the twenty-one devices seized, the government has returned eight to Mr. Chu and has apparently been unable to access another three. *See* Ex. E (March 19, 2026 Tr.) at 4:24–5:20. The remaining ten devices were imaged and those images—totaling another 3.57 terabytes of data—were produced to Mr. Chu on February 3, 2026. Schwartz Decl. ¶ 10.

---

[1] All references to "Ex. __" refer to exhibits to the Declaration of Matthew L. Schwartz, dated July 24, 2026.

### B. The Search Warrants Limit the Government's Review

The Search Warrants permitted the government to obtain the entirety of the iCloud accounts and the twenty-one physical devices from Mr. Chu's home (which we refer to collectively in this motion as the "Chu Images"), but to "review" them—that is, search them—only for [redacted] Ex. A (iCloud Warrant) at -133; Ex. B (Premises Warrant) at -225.

The Search Warrants then specifically [redacted] that the government was permitted to review:[2]

1. [redacted]
2. [redacted]
3. [redacted]
4. [redacted]
5. [redacted]
6. [redacted]

[2] These categories are identified as a–m in the iCloud Warrant and 1–13 in the Premises Warrant.

7. [redacted]

8. [redacted]

9. [redacted]

10. [redacted]

11. [redacted]

12. [redacted]

13. [redacted]

Ex. A (iCloud Warrant) at -133–34; Ex. B (Premises Warrant) at -226–27.

### C. The Government Searched the Chu Images for Nine Months, But It Won't Say How

Despite obtaining the iCloud Warrant on September 26, 2025, and executing the Premises Warrant on October 7, 2025, the government's search spanned more than nine months. And the government did not bother to look at a single document that it had seized pursuant to the Search Warrants until long after it had obtained an indictment against Mr. Chu, in December.

Six months after the indictment was returned, by May 18, 2026, the government had produced a grand total of only 566 responsive documents from the 8.87 terabytes of total data in the Chu Images, as follows:

a. On February 9, 2026, the government produced one "responsive" document from the voice recorder seized at Mr. Chu's home. Schwartz Decl. ¶ 13.

b. On February 25, 2026, the government produced 63 "responsive" records from the dchu@tricolor.com iCloud account and 63 "responsive" records from the image of a MacBook seized at Mr. Chu's home (labeled "1B10"). Schwartz Decl. ¶ 14.[3]

c. On March 12, 2026, the government produced 440 "responsive" emails from the dchu@tricolorauto.com iCloud account. Schwartz Decl. ¶ 15.

At a March 19, 2026 status conference, in response to questions about the government's slow motion responsiveness review, *see* Ex. E (March 19, 2026 Tr.) at 6–9, the government claimed, "We are ready for trial. We are prepared to try this case as early as July," *id.* at 12:7–8. In the three and a half months that have followed, the government has produced 221,506 additional "responsive" documents from the Chu Images, as recently as July 1:

a. On May 19, 2026, the government produced 49,387 "responsive" records from an iPhone 11 Pro Max (labeled "1B1"), 14,815 "responsive" records from an iPhone XS Max (labeled "1B5"), and 2,903 "responsive" records from an iPhone (labeled "1B21"). Schwartz Decl. ¶ 21.

b. On June 12, 2026, the government produced 138,131 additional "responsive" records from the iPhone 1B21. Schwartz Decl. ¶ 22.

c. On July 1, 2026, the government produced 3,844 additional "responsive" records from the dchu@tricolorauto.com iCloud account, 6,500 additional "responsive" records from 1B1, and 5,926 additional "responsive" records from 1B5. Schwartz Decl. ¶ 23.

---

[3] Only two of these 126 documents are relevant "Cellebrite Extraction Reports," while the remaining 124 documents are largely unreadable byproduct of creating the reports. Schwartz Decl. ¶ 14.

During the same period of time, the government produced extraordinary amounts of other discovery, illustrating what was obvious: it conducted scant investigation before charging Mr. Chu other than taking the word of its cooperators, leaving the real work for later. Its productions between May 26 and July 6 included 651,930 new documents produced by third parties pursuant to grand jury subpoenas. ECF No. 98 ¶¶ 23–27.

Finally, at a conference on June 30, the government declared that, as of the day before, it "ha[d] now completed its responsiveness review." Ex. I (June 30, 2026 Tr.) at 6:13–14. To be clear, the government had *not* actually finished reviewing the devices; it had just run out of time. And so, "yesterday, the government decided, okay, that's it, we're completing our responsiveness review." *Id.* at 6:18–19. *See also id.* at 7:20–25 ("we've completed the review. . . That process is done.").

The government has thus far declined to explain *how* it conducted its review. At the June 30 status conference, the government represented to the Court that "[t]he agents, as part of executing the search warrant, have to review the entirety of the devices to see what is actually responsive to the warrant." *Id.* at 7. But it is not clear what that means. In correspondence to the Court in advance of the June 30 conference, the government acknowledged that it had used "search terms . . . during the responsiveness review." ECF No. 85 at 4 (identifying "bleed" and "bonus" as two such search terms). The government also said that it was "flat-out wrong" that "the Government 'rush[ed] to finish the [responsiveness] review' and may have 'simply outsourced its constitutional obligations to AI," *id.* at 3 n.2 (quoting ECF No. 84), although it did not deny that it had used AI as part of its review.

At a meet-and-confer in advance of this motion, the government refused to shed any light on the way that it conducted its review. Among other things, it declined to say (1) whether it had

used artificial intelligence as part of its responsiveness review; (2) what search terms, other than "bleed" and "bonus," it used; (3) and to what extent, if any, any human being—prosecutor, agent, or otherwise—was involved in the responsiveness review. Schwartz Decl. ¶ 48. The government declined to answer, for example, whether its search terms included extraordinarily broad words such as "Tricolor," "Chu," or even "the." *Id.* The government also refused to say whether human beings reviewed *any* documents for responsiveness, even for example documents that were identified by necessarily over-inclusive search terms such as "bleed." *Id.* . In response to the government's statement that Mr. Chu had a sufficient record to make his motion, counsel pointed out that the government's refusal to provide information even left open the possibility that it had employed the search term "the" and then had deemed every hit responsive, without any human being looking at the output. *Id.* ¶ 48. The government replied that it would provide further information only in response to this motion if it deemed it appropriate to do so, or if ordered by the Court. *Id.*

### D. The Government Searched Through and Produced as "Responsive" *Thousands* of Irrelevant Documents—And Says It Will Look For More

However the government may have conducted its review, it is clear that the materials produced as "responsive" include *tremendous* volumes of materials that are not. As previously explained, Mr. Chu's initial review of the government's productions revealed that (1) at least a full 20% of the "responsive" documents are junk or mass emails; (2) many contain no readable text at all; and (3) of those that have substance, many are plainly non-responsive, irrelevant, and intrude on Mr. Chu's privacy—and in some cases, privilege. *See* ECF No. 84 at 3.

A more thorough review of the materials produced by the government confirms that its responsiveness review includes thousands of documents that are not responsive to the Search Warrants.[4] Of the 21,473 emails produced by the government as purportedly "responsive":

- 7,284 of them—or 33.9%—contain a header but no readable body text, *i.e.*, are blank emails. Schwartz Decl. ¶ 54; Schwartz Decl., Appendix A.
- Another 2,158—9.4%—are irrelevant mass marketing communications. Schwartz Decl. ¶¶ 56–57; Schwartz Decl., Appendix B.
- Of the documents that do have substance, at least hundreds of the emails and chat chains produced as "responsive" in fact bear no relation to the thirteen categories of information within the scope of the Search Warrants. Schwartz Decl. ¶ 44; Schwartz Decl., Appendix C.

The documents in the later category include not only material that is irrelevant and non-responsive, but that is severely invasive, and in many cases privileged.[5] Those documents include communications regarding Mr. Chu's health, wellbeing, and personal relationships of his family members. Out of respect for Mr. Chu's privacy, we do not dwell on the many communications that fall into this category, a sample of which are attached as Exhibits Q–AI. But to take a few of the more egregious examples, the government marked "responsive":

- A text chain between Mr. Chu and his wife that includes discussion of [redacted] Ex. AA
- Another text chain between Mr. Chu and his wife that includes a discussion of [redacted] Ex. BB-1.
- Emails between Mr. Chu, his wife, and [redacted] Ex. BB-19.

---

[4] In advance of a meet-and-confer and the subsequent filing of this motion, and as counsel promised the Court we would do, the defense sent the government a letter with a preliminary spreadsheet of non-responsive documents, which had 9,830 entries. *See* Ex. M; Schwartz Decl. ¶ 44.

[5] By referring to and attaching privileged documents, which Mr. Chu has moved for leave to file under seal, Mr. Chu does not waive privilege.

- Emails between Mr. Chu and his doctor regarding [redacted] Exs. S-11–S-16.

- A text chain between Mr. Chu and his siblings in which they share the news that their mother has died, and begin to make arrangements. Ex. T.

- Dozens and dozens of text chains and emails between Mr. Chu and his adult children about their lives, their romantic partners, their health, their jobs, and the like. Among other things, these include numerous conversations about [redacted] Exs. V, W, X.

- Emails between Mr. Chu, his wife, and their young children's schools. Ex. GG. For example, one notes that [redacted] Ex. GG-8.

- Emails in which Mr. Chu helps plan his wife's baby shower. Ex. EE-6.

- At least two dozen emails from Mr. Chu to himself that have no content,[6] but attach photographs of either his infant child or his pregnant wife. Ex. Q.

- Emails from Mr. Chu to himself that have no content, but attach his wife's social security card and driver's license. Ex. U.

- Several emails from Mr. Chu to himself that have no content, but attach pictures of his adult son. Ex. R.

- A series of [redacted] Ex. FF.

Meanwhile, the government almost immediately back-tracked on its representations to the Court that (a) it "ha[d] now completed its responsiveness review," Ex. I (June 30, 2026 Tr.) at 6, and (b) "[g]iven the likelihood of duplication and in the interest of expediency, the Government will not . . . conduct further review of" 1B10, "the search-warrant-seized-and-imaged version of Chu's Tricolor laptop and will instead limit its review to the version of that laptop that was imaged"

---

6 The emails that have no content do include Mr. Chu's Tricolor signature block, which strongly suggests the troubling possibility that the government's search terms or automated review hit on generic terms like "Tricolor" or "Chief Executive Officer," and that no person then reviewed the positive hits to determine if they were actually responsive.

by Alvarez and Marsal in September 2025 "and produced to the Government's pursuant to subpoena." ECF No. 85 at 2 n.1.

Just one day after the Court granted an adjournment, the government emailed counsel for Mr. Chu: "As set forth in our June 29 letter, we agreed not to conduct further review of the search-warrant-seized-and-imaged version of Chu's Tricolor laptop given the likelihood of duplication and in the interest of expediency. Given the adjournment of the trial date, there is no longer the same need for expediency. Accordingly, after your privilege assertions are adjudicated, we may review the search-warrant version of the laptop for responsive materials that post-date A&M's September 4, 2025 imaging." Ex. J at 1.

Taken aback by this one-eighty, Mr. Chu sought to meet-and-confer with the government. Schwartz Decl. ¶¶ 38–39; *see also* Ex. K (July 10, 2026 letter). The parties spoke on July 14. Schwartz Decl. ¶ 39. Counsel for Mr. Chu asked whether the government had completed its responsiveness review of Mr. Chu's accounts and devices, as it had represented to the Court, or whether it intended to conduct further review, as it had subsequently written. *Id.* ¶ 40. The government stated that its responsiveness review of the Alvarez & Marsal-imaged version of Mr. Chu's laptop remained subject to its pending privilege motion, and that it was considering whether to continue a responsiveness review of 1B10 (the other version of the imaged laptop). *Id.* The government also said that it reserved the right to conduct further responsiveness review of other devices and accounts depending on the outcome of the privilege motion, and that it would continue to attempt to access certain of the seized devices and, if successful, conduct a responsiveness review. *Id.* ¶ 41. On July 22, the government followed up with a letter in which it stated that, notwithstanding its representations to the Court about being finished with its responsiveness

review, it intends to seek the Court's approval to conduct additional responsiveness review of the laptop (1B10) seized pursuant to the Premises Warrant. Ex. L at 3.

## LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." It "confines an officer executing a search warrant strictly within the bounds set by the warrant." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971); *see also Marron*, 275 U.S. at 196 ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.").

"As technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes, this Court has sought to assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (citation modified). At that time, the Fourth Amendment protections surrounding an individual's personal papers were particularly strong:

> [W]hat th[e] history [of the Fourth Amendment] indispensably teaches is that the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain. No less a standard could be faithful to First Amendment freedoms. The constitutional impossibility of leaving the protection of those freedoms to the whim of the officers charged with executing the warrant is dramatically underscored by what the officers saw fit to seize under the warrant in this case.

*Stanford*, 379 U.S. at 485 (citation modified). In the digital age, cell phones and computer files are accorded the same protection, and subject to the same "scrupulous exactitude." "Like 18th

Century 'papers,' computer files may contain intimate details regarding an individual's thoughts, beliefs, and lifestyle, and they should be similarly guarded against unwarranted Government intrusion. If anything, even greater protection is warranted." *United States v. Ganias*, 755 F.3d 125, 135 (2d Cir. 2014) *rev'd on other grounds*, 824 F.3d 199 (2d Cir. 2016); *see also Riley v. California*, 573 U.S. 373, 386, 394–95 (2014) (recognizing that cell phones contain "vast quantities of personal information," are "digital record[s] of nearly every aspect of their [owners'] lives—from the mundane to the intimate," and "[t]he sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions"); *id.* at 396–97 ("A cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." (emphasis in original)); *United States v. Wey*, 256 F. Supp. 3d 355, 383 (S.D.N.Y. 2017) (citation modified) (electronically stored information "can give the government possession of a vast trove of personal information about the person to whom the [information] belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure," and "the potential for privacy violations occasioned by an unbridled, exploratory search . . . is enormous.").

Given the unique nature of electronically stored information, the Federal Rules of Criminal Procedure provide that a warrant may authorize the government to, first, seize or copy such information in bulk, and then "later review . . . the information consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B); *see also United States v. Metter*, 860 F. Supp. 2d 205, 214 (E.D.N.Y. 2012). The government must, as part of its later review, review the search warrant returns for responsiveness—*i.e.*, separate data that is responsive to the search warrant from data that is

unresponsive to the search warrant. *See Wey*, 256 F. Supp. 3d at 383; *United States v. Debbi*, 244 F. Supp. 2d 235, 237–38 (S.D.N.Y. 2003); *Metter*, 860 F. Supp. 2d at 215. Unresponsive data must then be placed outside the scope of subsequent government review to avoid treating the search warrant as a general warrant. *See Wey*, 256 F. Supp. 3d at 405–06.

When the government "flagrantly disregard[s]" the terms of a warrant, "wholesale suppression" is required. *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000). "The rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search." *Id.* at 141; *see also Ganias*, 755 F.3d at 149 ("If the [g]overnment could seize and retain non-responsive electronic records indefinitely . . . every warrant to search for particular electronic data would become, in essence, a general warrant.").

## ARGUMENT

The government's review process has resulted in the unlawful seizure of thousands upon thousands of wholly non-responsive communications and attachments. In total, the number of personal, irrelevant, blank, junk files, and mass emails makes up at least 21% of the universe of identified "responsive" materials from the Chu Images and more than 44% of all emails produced by the government. What's more, the non-responsive documents include many highly personal and sensitive communications with Mr. Chu's immediate family members that bear no relation to this criminal case, no less the limited categories of evidence permitted to be seized by the applicable warrants. Much of it is covered by husband-wife privilege and doctor-patient confidentiality. Both the scale of the lawless seizures—evincing the "widespread seizure" of items beyond the warrant' scope—as well as the sensitivity of some of the unlawfully seized materials demonstrate very clearly that the government recklessly carried out the searches without regard to Mr. Chu's constitutional rights.

The government's carelessness and lack of good faith is plain from the way that the Search Warrants were executed. It is undeniable in the context of the way it has conducted its investigation and produced discovery, including its delay in producing relevant discovery, its refusal to enforce grand jury subpoena return dates, rushing out lopsided productions in a naked attempt to prevent an adjournment of trial, and flip-flopping on its representations to the Court. The problems have only kept mounting in recent months, including most recently when the government committed on June 30 to being done with responsiveness review—or more accurately, to "decid[ing]" to be done the day before a hearing, so that it could tell the Court it was done—and to foregoing review of one of the imaged laptops, only to immediately backtrack on that commitment. Through that lens, it is clear that the government's productions of "responsive" material were rushed and the result of an unconstitutional process.

Because the agents and prosecution team members who executed the searches "flagrantly disregard[ed]" the terms of the warrants, the consequence must be wholesale suppression. Short of immediate and total suppression, and if the Court seeks further clarity on the government's misconduct, Mr. Chu invites an evidentiary hearing.

## I. The Government's Responsiveness Review Resulted in the Production of Material Not Within the Scope of the Search Warrants

The government flagrantly disregarded the Search Warrants by inexplicably producing a massive amount of irrelevant and, in many cases, intrusive material.

"A proper execution of a search warrant for numerous documents requires three things: adequate preparation; obedience to area limitations; and restrictions on seizure of items not mentioned particularly in the warrant." *United States v. Heldt*, 668 F.2d 1238, 1261 (D.C. Cir. 1981) (per curiam). As to the first requirement: "In order for a warrant's limitations to be effective, those conducting the search must have read or been adequately apprised of its terms. . . .

Minimization designed to control the proper scope of the search cannot occur without such knowledge." *Id.* at 1261–62. As to the third requirement, "only items particularly mentioned in the warrant may be seized." *Id.* at 1266.

For example, in *Debbi*, Judge Rakoff found "every preliminary indication" that the standard for blanket suppression was satisfied where the government seized "many items that plainly fell outside these parameters, such as personal and religious files, general correspondence, family financial records, private patient records, etc." 244 F. Supp. 2d at 237–38. The government eventually agreed, as it should here, to suppress all materials seized, even those "that the Government maintains are evidence of [the defendant's] alleged fraud or obstruction of justice." *United States v. Debbi*, 2003 WL 1922928, at *1 (S.D.N.Y. Mar. 31, 2003).

Here, the Search Warrants were limited to [redacted] Ex. A (iCloud Warrant) at -133–34; Ex. B (Premises Warrant) at -225–27; *see also* Ex. D (Premises Warrant Affidavit) at -216 [redacted] Even the broadest categories are tailored to direct evidence of [redacted] Ex. A (iCloud Warrant) at -133–34; Ex. B (Premises Warrant) at -226–27.

While the government declined to share information regarding the processes it used to execute the search warrants here beyond its concession that unidentified search terms were used, the results of the search compel the conclusion that there was little if any human verification of vast quantities of the identified data before it was produced to Mr. Chu. There is also every reason to believe that the search terms employed by the government were either extraordinarily broad—so as to sweep up communications that contained nothing more than irrelevant photographs, but which had Mr. Chu's signature block—or ambiguous without context so as to almost certainly sweep up irrelevant materials—such as one of the two search terms the government acknowledged using, "bleed." Whatever the details of the process used were, it appears that the government wholly failed to adequately prepare its review team (or bots) to ensure compliance with the terms of the Search Warrants. That process was constitutionally deficient and, as a result, seized enormous volumes of material far outside the scope of the Search Warrants.

**A. "Responsive" Material Highly Invasive of Mr. Chu and His Family**

The government produced as "responsive" hundreds of entirely personal and clearly private communications between Mr. Chu and his doctors and family members. The government's production of personal material falling outside the scope of the Search Warrants justifies blanket suppression. *See, e.g.*, *Debbi*, 244 F. Supp. 2d at 237–38; *Wey*, 256 F. Supp. 3d at 403–04.

Here, the review conducted to date by counsel for Mr. Chu has uncovered at least 9,962 documents that are not responsive to the Search Warrants. Schwartz Decl. ¶ 82. And many of those documents are alarmingly non-responsive. The government has produced numerous documents in the following categories of irrelevant personal material:

- Documents related to Mr. Chu's health and medical conditions, including communications between Mr. Chu and his physician. *See* Ex. S.
- Documents related to the health and pregnancy of Mr. Chu's wife. *See* Ex. BB.

- Communications from Mr. Chu announcing the birth of his children to close friends. *See* Ex. EE.
- Photographs of Mr. Chu's infant children. *See* Ex. Q.
- Documents related to the education of Mr. Chu's children. *See* Ex. GG.
- Documents related to the health, well-being, and personal relationships of Mr. Chu's adult daughter. *See* Ex. V. This includes, for example, a chat chain consisting of only two messages, in which Mr. Chu's daughter says [redacted] Mr. Chu responds, [redacted] Ex. V-27.
- Documents related to the health, well-being, and personal relationships of Mr. Chu's adult sons. *See* Exs. W and X.
- Communications between Mr. Chu and his brother concerning the passing of their father. *See* Ex. Y.
- Communications between Mr. Chu and his family concerning the passing of Mr. Chu's father-in-law. *See* Ex. DD.
- Communications regarding the medical conditions of the Chu family pets. *See* Ex. HH.
- Communications regarding the health and passing of Chu family friends. *See* Ex. Z.
- Documents consisting of applications and background information of household staff, and communications with household staff. *See* Ex. II.

**B. "Responsive" Material Protected by the Spousal Privilege**

The government also produced as "responsive" numerous confidential communications between Mr. Chu and his wife, with no indication that those communications were screened for privilege before being reviewed by the prosecution team.

The marital communications privilege protects confidential communications between spouses made during a valid marriage. *In re Witness Before Grand Jury*, 791 F.2d 234, 237 (2d Cir. 1986). The privilege exists to ensure "that all private statements between spouses—aptly called the best solace of human existence—will be forever free from public exposure." *Id.* (citation modified). Either spouse may invoke the privilege. *See United States v. Premises Known as 281*

*Syosset Woodbury Rd., Woodbury, N.Y.*, 71 F.3d 1067, 1070 (2d Cir. 1995); *see also Wolf v. United States*, 291 U.S. 7, 14 (1934) ("The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marital relationship as to outweigh the disadvantages to the administration of justice which the privilege entails.").

Yet the government's productions show that it undertook no meaningful effort to identify or segregate privileged communications between Mr. Chu and his wife before reviewing and producing them. *Cf. United States v. Patel*, 2017 WL 3394607, at *7 (S.D.N.Y. Aug. 8, 2017) ("[U]pon receiving notice that the accounts contained significant numbers of privilege materials, the Government established a 'wall' review wherein a U.S. Attorney not affiliated with the investigation or prosecution of the matter reviewed the emails using search terms and filtered out privileged items before returning the unprivileged portions of the email accounts to the prosecution team and the defense."); *United States v. Suggs*, 531 F. Supp. 2d 13, 23 (D.D.C. 2008) (upon inadvertently recording a privileged call, government sealed the recording, terminated the monitor's duties and reminded other monitors of their minimization obligations); *see also Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976) (noting that in searches of an individual's papers, "responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy"). As with Mr. Chu's communications with his family members and doctors, *see supra* Sec. I.A, the government indiscriminately reviewed private exchanges with his wife. For example, the government produced dozens of intimate personal communications between Mr. Chu and his wife. Exs. BB & DD.

These communications are "presumptively confidential." *Blau v. United States*, 340 U.S. 332, 333 (1951); *see also United States v. Pugh*, 945 F.3d 9, 18 (2d Cir. 2019). They are private exchanges between spouses made during the marriage, with no indication that a third party was present or that the privilege was waived. *See, e.g.*, *United States v. Montgomery*, 384 F.3d 1050, 1054–60 (9th Cir. 2004) (quoting *Blau*, 340 U.S. at 333–34) (reversing conviction where district court failed to exclude from trial a handwritten letter from a wife to a husband, which stated she would not "be part of a dishonest operation" was left on the kitchen counter of couple's home, as it was "of the kind likely to be confidential"); *United States v. Irons*, 646 F. Supp. 2d 927, 958 (E.D. Tenn. 2009) (recommending recorded telephone conversations and voicemails between defendant and his wife be suppressed as confidential marital communications). And for the avoidance of all doubt, the government well knew that Mr. Chu was married: the Premises Warrant Affidavit itself disclosed that [redacted] Ex. D at -204.

The government's review of these facially privileged communications, without any apparent screening process, is yet another example of its complete and utter failure to conduct the search review in good faith.

**C. "Responsive" Material Irrelevant to the Subject Offenses**

The government produced approximately 9,456 emails—over 44% of all of its "responsive" emails—amounting to junk email and/or emails with no visible substance. *See* Schwartz Decl., Appendix A (blank email) & Appendix B (junk email). These blank and junk emails are spread across all three of the government's responsiveness productions that contain emails: 7 in the government's March 12 production; 9,435 in the government's May 19 production; and 14 in the government's July 1 production. *See id.* No human being could have believed these

emails were responsive to the Search Warrants, but the government identified them as "responsive" nonetheless—supporting the strong inference, which the government refused to address before this motion was filed, that no person was involved in the responsiveness review. But as the government itself has acknowledged, in the Search Warrant Affidavits themselves, [redacted] Ex. C at -126; Ex. D at -215 n.4.

## II. The Government's Responsiveness Review Was Not Conducted in Good Faith

The government cannot seriously contest the irrelevance and inadmissibility of the material described above. For sure, in response, we anticipate that the government will try to defend certain of the materials as responsive—and in some cases, it might be right. But there is no credible dispute that the overwhelming volume of this material, which comprises 21 percent of all materials identified as "responsive," is anything but. And the fact that *so much* irrelevant and personal material was identified as "responsive" to the Search Warrants demonstrates that the government did not attempt to ensure compliance with the Warrants' terms. Likewise, the fact that the government apparently conducted absolutely no screen for marital or doctor-patient confidentiality indicates that its review was knowingly deficient and not undertaken in good faith. *See, e.g.*, *Debbi*, 244 F. Supp. 2d at 237–38 (suppressing seizure of "private patient records" for non-Medicare, non-adult-home patients because warrant was limited to fraud charges related to patients covered by Medicare and Medicaid or patients who resided at adult homes); *cf. Schwenk v. Kavanaugh*, 4 F. Supp. 2d 110, 114 (N.D.N.Y. 1998) (finding due process violation and the "prosecution's need for the hospital records in this case was, in reality, merely an illusion" where prosecutors subpoenaed a burglary defendant's psychiatric hospital records even though his mental condition was never at issue in the criminal case and there was no public interest need outweighing the defendant's privacy interests).

The undisputed facts make clear that the government conducted a blatantly arbitrary review process. The government served the Search Warrants in September and October 2025. Between then and May 18, 2026, before Mr. Chu requested an adjournment of trial, the government produced 567 responsive documents. Schwartz Decl. ¶¶ 13–15. Once Mr. Chu indicated that he would move to adjourn trial based on the government's dereliction of its duties under Rule 16 and the Search Warrants, the government produced 220,632 documents in less than two months. *Id.* ¶¶ 20. The reason for that document dump is obvious: the government prioritized completing its production in an attempt to preserve the trial date over compliance with the Search Warrants and Mr. Chu's constitutional rights. The proof is in the productions. As the pace of the productions picked up steam after Mr. Chu's request to adjourn trial, so did the government's recklessness in its execution of the warrants. Out of the 21,287 "responsive" emails produced in May and July, at least 9,496 are outside the Search Warrants' scope. *Id.* ¶ 59. In earlier productions from February and March, at least nine of the 567 documents identified "responsive" and produced are blatantly outside the Search Warrants' scope. *Id.* ¶¶ 58–59; *see* Appendices A–C & Exs. P & X-5.

The government's misconduct continued even after Mr. Chu raised his objections on June 29 and discussed them with the Court the following day. In its July 1 production, the government continued to produce nonresponsive documents related to Mr. Chu's family. *See* Appendix C at 3–4; Exs. T, X-18, Z-28, BB-20, BB-21, CC-29, CC-30, II-5, II-6. In other words, once explicitly put on notice that its review process violated the Search Warrants, the government was undeterred. The lack of good faith is evident.

Finally, without blanket suppression, the government's ongoing violation of Mr. Chu's Fourth Amendment rights will continue unabated. Despite the government previously saying in its June 29 letter and at the June 30 status conference that it has completed its responsiveness

review (ECF No. 85 at 1; Ex. I (June 30, 2026 Tr.) at 6:7–8:2), the government has since stated that it intends to continue its search of at least two devices. Ex. K at 1 (July 8 email); Schwartz Decl. ¶¶ 40–41. The government cannot be allowed to do so. Blanket suppression of the Chu Images is required.[7]

## III. At the Very Least, an Evidentiary Hearing Is Needed

Should the Court require additional information before ordering blanket suppression of all evidence derived from the Chu Images—such as answers from the government about how it conducted its review, which it has thus far refused to provide to the defense—the Court should order an evidentiary hearing during which the government must present one or more witnesses able to testify regarding the precise process and search terms, and other technology, utilized to conduct its review. *See United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 309 (S.D.N.Y. 2018) (ordering hearing to determine "how law enforcement agents executed Pinto-Thomaz iPhone search warrant.").

At the hearing, the Court and Mr. Chu may explore, among other topics, the propriety of the search terms utilized by the government, whether other tools, including AI or vendor-assisted tools, were used to complete the search, and whether—and to what extent—actual persons

---

[7] Assuming the government will not take Falstaff's advice, *see* William Shakespeare, *Henry IV, Part 1*, Act 5, Scene 4 ("Discretion is the better part of valor."), but will double-down in defending its shoddy work, it will likely argue that even if some non-responsive materials were seized as part of its search, any suppression should be limited to only those materials. That is insufficient for all the reasons stated above, as Mr. Chu will explain further in reply, as necessary. To the extent, however, that the Court considers remedies short of blanket suppression, it should order suppression of all non-responsive documents, prohibit the government from accessing them, and preclude their use by the government at trial. *See United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988); *United States v. Lustyik*, 57 F. Supp. 3d 213, 230 (S.D.N.Y. 2014). Because Mr. Chu thus far been unable to individually review all 220,632 "responsive" documents produced within the past 66 days, Mr. Chu would request a reasonable amount of time to conduct that review, and/or is willing to confer with the government regarding a process for identifying all non-responsive documents within its responsiveness productions.

reviewed the materials identified before they were seized under the warrants and produced as "responsive." *See United States v. Triumph Cap. Grp., Inc.*, 211 F.R.D. 31, 63 (D. Conn. 2002); *Debbi*, 244 F. Supp. 2d at 238 (ordering evidentiary hearing "at which counsel and the Court would have the opportunity to review the pertinent records, question the executing agents, and the like.").

The government's unsworn representations regarding the review process and search terms it utilized, including those in its June 29 letter and any it offers in opposition, should be given no weight. *See Pinto-Thomaz*, 352 F. Supp. 3d at 309 n.11 ("In its opposition to defendants' motions for suppression, the Government makes a number of representations as to how law enforcement agents conducted the searches incompliance [sic] with warrant terms. However, these representations are made unaccompanied by any sworn affidavits by the agents concerned. Accordingly, the Court is unable to consider them as evidence.").

Before the Court grants anything short of blanket suppression, Mr. Chu respectfully submits that he is entitled to uncover the full extent of the government's misconduct at an evidentiary hearing. Even if the Court *does* order immediate blanket suppression, or even if the government does the right thing and (as in *Debbi*) affirmatively agrees that all fruits of the Search Warrants ought to be suppressed, the Court should hold such a hearing to understand how the government strayed so far from the searches approved by the reviewing magistrates.

## CONCLUSION

For the foregoing reasons, Mr. Chu's motion should be granted in its entirety.[8]

Dated: July 24, 2026
New York, New York

Respectfully Submitted,

/s/ *Matthew L. Schwartz*

Matthew L. Schwartz
Craig A. Wenner
Jacqueline C. Kelly
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 303-3646
E-mail: mlschwartz@bsfllp.com
cwenner@bsfllp.com
jkelly@bsfllp.com

Marshall Dore Louis
BOIES SCHILLER FLEXNER LLP
100 Southeast 2nd Street, Suite 2800
Miami, Florida 33131
Telephone: (305) 357-8438
Email: mlouis@bsfllp.com

Adam Fee
WEIL, GOTSHAL & MANGES LLP
1999 Avenue of the Stars, Suite 1800
Los Angeles, California 90067
Telephone: (213) 667-5100
E-mail: adam.fee@weil.com

*Attorneys for Daniel Chu*

[8] Mr. Chu has separately moved to suppress evidence, or for a *Franks* hearing, based on the government's omission of exculpatory information from the Search Warrant Affidavits, *see* ECF No. 46 at 35–45; ECF No. 102 at 2–15, as well as to suppress photographic evidence seized beyond the scope of the Premises Warrant, *see* ECF No. 46 at 54–57. Those motions provide independent grounds for suppression.