**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DANIEL CHU,<br><br>Defendant. | S1 25 Cr. 579 (PKC) |

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DANIEL CHU'S MOTION TO SUPPRESS EVIDENCE**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.

Micah F. Fergenson
Shiva H. Logarajah
Justin V. Rodriguez
Assistant United States Attorneys
- *Of Counsel* -

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................ iii

BACKGROUND ........................................................................................................ 2

A. The Search Warrants ............................................................................................ 2
B. The FBI Accessed 13 of 21 Seized Devices. ......................................................... 4
C. Agents Briefly Reviewed 3 of the 13 Accessed Devices and Designated No Responsive Material in Those 3 Devices. ........................................................................ 4
D. The FBI Imaged the Remaining 10 of 13 Accessed Devices, ...................................... 5
E. The Filter Team Process ........................................................................................ 5
F. The Responsiveness Review Process for the 10 Imaged Devices and the Two iCloud Accounts. ........................................................................................................ 6
G. The Return of Devices ........................................................................................... 9

ARGUMENT ............................................................................................................ 9

I. Agents Conducted a Reasonable, Good Faith Search and Seizure of Voluminous Electronic Evidence That Complied with the Fourth Amendment. ............................................... 9

A. Applicable Law ..................................................................................................... 10
B. Discussion ............................................................................................................ 12
1. The Agents' Process was Reasonable and Conducted in Good Faith. ..................... 12
2. The Amount of Material Designated Responsive is Further Evidence of Reasonableness and Good Faith. ........................................................................ 16
3. Chu's Arguments About the Agents' Process Do Not Establish Unreasonableness or Bad Faith. ....................................................................................................... 18
4. Suppression of Specific Nonresponsive Materials, Not Blanket Suppression, is Appropriate. ....................................................................................................... 20

II. Chu Identifies Specific Documents in His Motion That Are, In Fact, Responsive ........... 21

III. No Hearing is Necessary or Appropriate. ............................................................... 25

CONCLUSION ......................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Dalia v. United States*,
441 U.S. 238 (1979) ........ 19

*Grand Jury Subpoena of Ford v. United States*,
756 F.2d 249 (2d Cir. 1985) ........ 18

*Martino v. United States*,
No. 24-1404, 2024 WL 3963681 (3d Cir. Aug. 28, 2024) ........ 19

*Trammel v. United States*,
445 U.S. 40 (1980) ........ 18

*United States v. An*,
733 F. Supp. 3d 77 (E.D.N.Y. 2024) ........ 15, 18

*United States v. Bowen*,
689 F. Supp. 2d 675 (S.D.N.Y. 2010) ........ 19

*United States v. Chen*,
979 F.2d 714 (9th Cir. 1992) ........ 11, 16

*United States v. Ganias*,
824 F.3d 199 (2d Cir. 2016) ........ 15, 19

*United States v. Garlick*,
No. 22 Cr. 540 (VEC), 2023 WL 2575664 (S.D.N.Y. Mar. 20, 2023) ........ 16

*United States v. Hampton*,
No. 24-2805-CR, 2026 WL 1689485 (2d Cir. June 11, 2026) ........ 12

*United States v. Irons*,
646 F. Supp. 2d 927 (E.D. Tenn. 2009) ........ 18

*United States v. Lumiere*,
No. 16 Cr. 483 (JSR), 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016) ........ 16, 20

*United States v. Maali*,
346 F. Supp. 2d 1226 (M.D. Fla. 2004) ........ 20

*United States v. Matias*,
836 F.2d 744 (2d Cir. 1988) ........ 10, 20

*United States v. Medlin*,
842 F.2d 1194 (10th Cir. 1988) .................................................................................. 10

*United States v. Messalas*,
No. 17 Cr. 339 (RRM), 2020 WL 4003604 (E.D.N.Y. July 14, 2020) ................................... 17

*United States v. Motovich*,
No. 21-CR-497 (WFK), 2024 WL 2943960 (E.D.N.Y. June 11, 2024)....................... 11, 17, 25

*United States v. Oztemel*,
No. 3:23 Cr. 00026 (KAD), 2024 WL 3090251 (D. Conn. June 21, 2024) ....................... 13, 20

*United States v. Pinto-Thomaz*,
357 F. Supp. 3d 324 (S.D.N.Y. 2019)................................................................... 11, 25

*United States v. Ray*,
541 F. Supp. 3d 355 (S.D.N.Y. 2021).......................................................................... 15

*United States v. Schulte*,
No. 17 Cr. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019).................................... 15

*United States v. Shi Yan Liu*,
239 F.3d 138 (2d Cir. 2000)............................................................................... passim

*United States v. Squillacote*,
221 F.3d 542 (4th Cir. 2000) ........................................................................... 18

*United States v. Triumph Cap. Grp., Inc.*,
211 F.R.D. 31 (D. Conn. 2002)............................................................................ 11

*United States v. Wilson*,
505 F. Supp. 3d 3 (D. Mass. 2020) ....................................................................... 18

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Daniel Chu's motion to suppress evidence seized from his iCloud accounts and devices. *See* ECF Doc. Nos. 108 (notice of motion) and 111 (memorandum of law).[1]

Agents in this case searched and seized voluminous electronic evidence in compliance with the Fourth Amendment. The agents did not conduct warrantless intrusions: magistrate judges authorized the agents to search Chu's electronic devices and iCloud accounts and to seize, as evidence, fruits, and instrumentalities of defined crimes, 13 categories of electronically stored information. And the agents hewed to the authority granted them: The agents effected the seizure of such information (such as emails and attachments and text message threads) by designating or tagging the material as "responsive," meaning the evidence fit one or more of the 13 categories of information set forth in the warrants, employing reasonable strategies to try and locate responsive material within a high volume of other data. The attached Declaration of Special Agent Nicholas Kroll (the "Kroll Declaration") details the agents' considered approach to identifying material responsive to the warrants in this case. In the end, agents designated as responsive to the warrants approximately 0.08% of the total seized device and iCloud data that the Government produced to the defendant.

---

[1] "Chu Br." refers to Chu's memorandum in support of his motion. "ECF Doc." refers to an entry on the docket of this case. "Kroll Decl." refers to the Declaration of Federal Bureau of Investigation Special Agent Nicholas Kroll, which accompanies this opposition. "Logarajah Decl." refers to the Declaration of Assistant United States Attorney Shiva H. Logarajah which also accompanies this opposition. "Schwartz Decl." refers to the Declaration of Matthew L. Schwartz in Support of Daniel Chu's Motion to Suppress Evidence Derived from His Seized Electronic Devices and iCloud Accounts. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

As the process and results make clear, the agents did not "flagrantly disregard" the terms of the warrants, act in bad faith, or conduct a general search, which are the requirements for the "extraordinary" remedy of wholesale suppression under governing Second Circuit precedent. Some of the specific materials that Chu claims are not responsive to the warrants are, in fact, responsive. Some are not. But for any materials that are not, in fact, responsive to the warrants, the proper remedy is suppression of those specific materials at the motion in limine stage, not blanket suppression of all evidence obtained from the devices and accounts.

Accordingly, Chu's motion for blanket suppression should be denied.

## BACKGROUND

### A. The Search Warrants

On September 26, 2026, United States Magistrate Judge Sarah L. Cave of the Southern District of New York signed a search warrant for two iCloud accounts (the dchu@tricolor iCloud account and dchu@tricolorauto iCloud account) associated with Chu (the "iCloud Warrant"). *See* Kroll Decl. ¶ 4, Ex. 1. Then, on October 7, 2025, United States Magistrate Judge Ellen F. D'Angelo signed search warrants for Chu's person and personal residence to seize, among other things, electronic devices (the "Device Warrants," and together with the iCloud Warrant, the "Warrants"). *See* Kroll Decl. ¶ 5, Exs. 2 and 3. The Warrants set forth 13 categories of electronically stored information which agents could seize, or mark "responsive" to the warrants:

1. Evidence of the knowledge of Tricolor executives and employees of a scheme to make misrepresentations relating to the collateral Tricolor pledged to lenders, by double pledging loans to multiple lenders and/or securitizations, and manipulating the data related to the pledged loans.

2. Evidence of Tricolor's lending arrangements, such as loan documents, loan payment files, and loan value computations.

3. Evidence of Tricolor's securitizations and related collateral, such as legal documentation, offering materials, and collateral reports.

4. Evidence of the identities of co-conspirators in the Subject Offenses and information about any electronic devices and online accounts (such as email and chat accounts) used by those co-conspirators.

5. Meeting invitations, calendar appointments, and video-conferencing invitations reflecting (a) internal Tricolor meetings and conversations about Tricolor's loans and securitizations or other access to capital, or (b) meetings with auditors, lenders, underwriters, or investors about Tricolor's loans and securitizations or other access to capital.

6. Audio or video recordings of calls or meetings relating to Tricolor's loans, securitizations, working capital, or borrowing base.

7. Evidence of the receipt, transfer, disposition or location of funds used in, or constituting proceeds of, the Subject Offenses.

8. Evidence relating to efforts to evade detection by law enforcement and/or regulatory agencies in connection with the Subject Offenses, such as evidence of deleted messages.

9. Information that would assist in identifying and locating investors or prospective investors in Tricolor, and investors who purchased securities backed by Tricolor's auto loan receivables.

10. Evidence concerning any proceeds or benefits received as a result of the commission of the Subject Offenses.

11. Evidence of the financial condition of Tricolor from January 1, 2018 to the present, including communications about revenue, profits, sales, expenses projections, and available collateral for loans from January 1, 2018 to the present.

12. Evidence of the motive to commit the Subject Offenses, including liquidity constraints at Tricolor and market conditions, executive compensation packages, or pressure from investors or lenders to maintain or improve business performance.

13. Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place co-conspirators and aiders and abettors, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times.

*See* Kroll Decl. ¶¶ 4-5, Exs. 1-3.

On October 7, 2025, FBI agents executed the Device Warrants and seized 21 electronic devices. Each seized electronic device was later assigned an item number from 1B1 to 1B21. *See* Kroll Decl. ¶ 6. On October 30, 2025, Apple produced the records called for by Section II of Attachment A to the iCloud Warrant. *See* Kroll Decl. ¶ 7.

**B. The FBI Accessed 13 of 21 Seized Devices.**

After the 21 electronic devices were seized, agents worked with the FBI's Computer Analysis and Response Team ("CART") to determine which seized devices could be accessed. *See* Kroll Decl. ¶ 8. The contents of some seized electronic devices sometimes cannot be accessed for various reasons, for example, if the device is damaged or if the device is encrypted in certain ways. *Id.* In total, the FBI, to date, has been able to access 13 of the 21 seized devices. Kroll Decl. ¶ 9. Those 13 accessed devices are identified in the table in Appendix A to the Kroll Declaration.

**C. Agents Briefly Reviewed 3 of the 13 Accessed Devices and Designated No Responsive Material in Those 3 Devices.**

Once a seized device is accessed, generally, the next step is to create a forensic image of the device. Kroll Decl. ¶ 10. The case team considered whether it should not create an image of any of the 13 accessed devices. *Id.* To that end, shortly after the execution of the Device Warrants, as part of its reasonable, good-faith efforts to limit its search and seizure to responsive materials, the case team invited Chu's counsel to identify any seized devices that were unlikely to contain responsive materials. *Id.* To that end, an agent prepared (1) a spreadsheet that contained, for each of the 21 seized devices, the item number, a description of the device, a description of where the device was seized, and pictures of the devices in its location before it was seized; and (2) a sketch of Chu's residence that indicated where devices were found. *Id.* On October 24, 2025, a member of the case team emailed the spreadsheet and sketch to Chu's counsel at the time, Daniel W. Levy,

Esq. *See* Kroll Decl. ¶ 11. On October 28, 2025, Mr. Levy identified certain devices that were unlikely to contain responsive material and requested their return. *See* Kroll Decl. ¶ 12.

Based on information from Chu's counsel and other information obtained during the course of the investigation, the case team decided not to image three of the 13 accessed devices—Items 1B13 (iPad), 1B14 (laptop), and Item 1B20 (laptop). *See* Kroll Decl. ¶ 13. Instead, agents conducted brief manual reviews of these three devices and designated no material as responsive to the Device Warrants. *Id.*

Prior to reviewing the contents of any seized devices or accounts, each agent on the Tricolor Case Team reviewed the Warrants, including the attachments to the Warrants, which set out the categories of evidence subject to seizure. *See* Kroll Decl. ¶ 14. The agents understood that the categories of evidence set forth therein dictated what could be designated responsive to the Warrants. *Id.*

### D. The FBI Images the Remaining 10 of 13 Accessed Devices,

After excluding the three devices discussed above, the FBI created forensic images of the ten remaining accessed devices. *See* Kroll Decl. ¶ 15. Those 10 imaged devices are identified in the table in Appendix A to the Kroll Declaration.

### E. The Filter Team Process

A filter team from the U.S. Attorney's Office was used to screen material that is potentially protected by the attorney-client privilege from imaged devices and the full iCloud search warrant returns. *See* Kroll Decl. ¶ 16. To that end, at the request of the case team, on November 20, 2025, Chu's prior counsel provided a list of attorneys and firms to be used by the filter team. *Id.* That list was later amended several times by Chu's current attorneys. *Id.* The filter team released to the case team, on a rolling basis, versions of imaged devices with material that the filter team had screened out. *See* Kroll Decl. ¶ 17.

### F. The Responsiveness Review Process for the 10 Imaged Devices and the Two iCloud Accounts.

The ten imaged devices and the two full iCloud accounts consist of a very large volume of data—7.87 terabytes of data, according to Chu. *See* Schwartz Declaration ¶¶ 9-10. Agents on the case team took reasonable and appropriate steps to conduct a targeted search of those imaged devices and accounts to try and identify material that is responsive to the Warrants. *See* Kroll Decl. ¶ 18.

First, with respect to two of the 10 imaged devices (1B15 (iPad), 1B19 (iPad)), agents conducted brief manual reviews of the devices, rather than extensive reviews of the device images. *See* Kroll Decl. ¶ 19. After doing so, agents designated no material in these two devices as responsive to the Device Warrants. *Id.*

Second, the case team has declined to conduct any search of the contents of another imaged device, Item 1B2 (laptop), because a version of that laptop was previously imaged in September 2026, at the direction of counsel for Tricolor, and produced in response to a subpoena. *See* Kroll Decl. ¶ 20. Accordingly, agents have not designated any material from Item 1B2 (laptop) as responsive to the Device Warrants. *Id.*

Third, with respect to Item 1B3 (a voice recorder), agents reviewed 14 audio recordings, but designated only one of those recordings as responsive to the Device Warrants. *See* Kroll Decl. ¶ 21.

Fourth, with respect to the six remaining imaged devices—1B1 (iPhone), 1B4 (iPhone), 1B5 (iPhone), 1B7 (iPad), 1B10 (laptop), and 1B21 (iPhone)—and the two iCloud accounts, in light of the volume of materials in the search warrant returns, a file-by-file review of the data was impractical. Thus, in accordance with the applications for the Device Warrants, agents used the document review platforms, Cellebrite, which is a platform specifically designed for reviewing

and tagging cellphone (or tablet) extractions, Relativity, which is a document review platform regularly used to review emails, chats, and other documents, and Axiom, which is a review platform commonly used for computer images. *See* Kroll Decl. ¶ 22, Ex. 4 ¶ 20 ("In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to . . . document review programs"). No artificial intelligence models or tools were used in the responsiveness review. *See* Kroll Decl. ¶ 22.

In addition, agents developed a list of search terms based on the categories of evidence in the Warrants and their familiarity with the factual background of the investigation. *See* Kroll Decl. ¶ 23, Ex. 4 ¶ 20 ("In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to . . . keyword searches [.]"). A list of approximately 65 search terms that were used is appended as Appendix 2 to the Kroll Declaration.

On the Cellebrite platform, the review employed search terms but also used a number of different techniques to review data. *See* Kroll Decl. ¶ 24. For example, date filters were used to search around critical periods of the fraud scheme under investigation. *Id.* The review on Cellebrite also involved manual review for documents that were responsive to the warrant, including investor materials, Tricolor board decks, and lender updates. *See* Kroll Decl. ¶ 25. The review then searched responsive communication around those materials. *Id.* Finally, the review on Cellebrite examined communications to and from key individuals, such as other Tricolor employees, known lenders and investors, potential lenders and investors, and business associates. *See* Kroll Decl. ¶ 26.

On the Relativity platform, agents ran search terms across the relevant data sets to try and locate responsive materials. *See* Kroll Decl. ¶ 27. Agents then reviewed samplings of the results of those searches to check for responsiveness. *Id.* The search term "Tricolor" was run only after

the other search terms had been used. *Id.* Samples of the results of the "Tricolor" search were reviewed, and, based on that sampling, the agents sought to remove certain nonresponsive materials from the "Tricolor" search results, such as attempting to identify and remove identified spam or junk emails. *Id.*

On both the Cellebrite and Relativity review platforms, chats (such as text messages) were presented during the review as continuous threads containing the full conversation between or among the participants from the inception of the chat to the conclusion of the chat. *See* Kroll Decl. ¶ 28. Thus, for example, a chat extending over several years was reviewed as a single chat thread, and not segmented into shorter time periods, such as being segmented by day. *Id.* Such long chat threads often consist of both responsive messages or exchanges, and nonresponsive messages or exchanges (such as personal messages). *Id.* Making message-by-message responsiveness designations within a chat thread would not have been practical and, on the Relativity platform, not possible. As is customary, to ensure that messages may be considered in context, where a chat thread contained responsive material, the full chat thread was designated responsive. *Id.*

The results of the responsiveness review with respect to the six remaining imaged devices and the two iCloud accounts are summarized as follows:

- No material was designated responsive on two of the six devices: Item 1B4 (iPhone) and 1B7 (iPad). *See* Kroll Decl. ¶ 29 (a).

- Item 1B10 (laptop) was reviewed using the review platform Axiom. A subset of materials on 1B10 was designated responsive. *See* Kroll Decl. ¶ 29 (b).[2]

- Item 1B21 (iPhone): This device was believed to be the cellphone that Chu had been actively using at the time of the premises search. The responsiveness review of 1B21 was conducted primarily on Cellebrite, with the exception of the emails contained on 1B21, which were instead reviewed on Relativity. The Cellebrite responsiveness review of 1B21 included media on the device, such as images, videos, and audio files, as well as other data in the Cellebrite extraction. *See* Kroll Decl. ¶ 29 (c).

[2] No materials from Item 1B10 that were designated responsive are included in the appendices to Chu's motion.

- Item 1B1 (iPhone), Item 1B5 (iPhone), and the two iCloud Accounts: The materials from these devices and accounts were voluminous and there was potential for duplication with Item 1B21 due to Apple devices syncing via iCloud backups. Thus, only emails, chats, and documents were extracted from 1B1, 1B5, and the iCloud accounts were loaded to Relativity for review, and the other contents of these devices and accounts were excluded from review.[3] *See* Kroll Decl. ¶ 29 (d).

In summary, the total amount of data marked responsive to the iCloud Warrant is approximately 0.0075 terabytes—or approximately 0.001% of the overall size of the iCloud accounts. *See* Kroll Decl. ¶ 30. In addition, the total amount of data marked responsive to the Device Warrants is approximately 0.051 terabytes—or approximately 1.4% of the total size of the devices seized and imaged pursuant to the Device Warrants. *Id.* The total volume of data marked responsive to the Warrants is approximately 0.08%. *Id.*

### G. The Return of Devices

In April 2026, the FBI returned eight seized devices to Chu. *See* Kroll Decl. ¶ 31. Two (Item 1B6 and 1B17) of those eight devices, the FBI was unable to access at all. *Id.* The other six devices (Items 1B4, 1B13, 1B14, 1B15, 1B19, and 1B20) were reviewed as described above and no responsive material was designated. *Id.*

## ARGUMENT

### I. Agents Conducted a Reasonable, Good Faith Search and Seizure of Voluminous Electronic Evidence That Complied with the Fourth Amendment.

Agents conducted a reasonable, good faith search of a large volume of electronically stored evidence to seize materials responsive to the Warrants. The search was anchored in the categories for seizure expressly stated in the Warrants and the facts uncovered in the investigation relating to those categories, and it was calibrated based on the likelihood that devices or accounts would

[3] No materials from the dchu@tricolor iCloud account that were designated responsive are included in the appendices to Chu's motion.

contain responsive evidence. The Government even engaged with defense counsel to identify devices unlikely to contain responsive material, and several seized devices that the Government determined were unlikely to contain responsive evidence were returned to the defense in their entirety. Throughout the search, the seized devices and accounts were reviewed using search techniques, such as the use of "search terms," "document review programs," and "cursor[y] review," that were explicitly described in the applications for the Device Warrants. *See, e.g.,* Ex. 4 to Kroll Decl., ¶ 20. The outcome of this reasonable and good faith search was that approximately 0.08%. of the evidence seized and imaged was designated responsive—hardly the sort of bad faith general search that Chu alleges.

**A. Applicable Law**

"A search must be confined to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). When the agents executing a search exceed a warrant's authority in the scope of their search, "the normal remedy is suppression and return of those items, not invalidation of the entire search." *Id.*

"[T]he drastic remedy of the suppression of *all* evidence seized is not justified unless those executing the warrant acted in flagrant disregard of the warrant's terms." *Matias*, 836 F.2d at 747 (2d Cir. 1988) (emphasis in original). Such disregard only occurs when (1) agents "effect a widespread seizure of items that were not within the scope of the warrant and (2) do not act in good faith." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000). "[T]o satisfy the first prong of the two-part test . . . the search conducted by government agents must *actually resemble* a general search." *Liu*, 239 F.3d at 141. That is because "[t]he cornerstone of the blanket suppression doctrine is the enduring aversion of Anglo American law to so-called general searches." *Id.; see also United States v. Medlin,* 842 F.2d 1194, 1199 (10th Cir. 1988) ("The basis of those decisions which hold that blanket exclusion is appropriate when a search warrant is

executed with 'flagrant disregard' for its terms is found in our traditional repugnance to 'general searches' which were conducted in the colonies pursuant to writs of assistance.").

General searches are characterized by their "wide-ranging exploratory" nature or the product of "indiscriminate rummaging[]." *Liu*, 239 F.3d at 140. Put differently, "an impermissible general search" is one where executing officers "ignor[e] the terms of the warrant and engag[e] in indiscriminate fishing." *United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992). "To satisfy the second prong" of the test set forth by the Circuit in *Liu* "it is not the search *itself* that must resemble a general search. Rather, the search must resemble a general search in the sense that it—like a general search—is not conducted in good faith." *Liu*, 239 F.3d at 141 n. 2. Accordingly, "[e]gregious, callous, and reckless conduct must be shown to justify blanket suppression." *United States v. Triumph Cap. Grp., Inc.*, 211 F.R.D. 31, 61 (D. Conn. 2002).

Courts in this Circuit also weigh "the benefits of deterrence . . . against the costs of suppression" and "suppress[] only where the benefits of deterring the Government's unlawful actions appreciably outweigh the costs of suppressing evidence." *United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324, 331 (S.D.N.Y. 2019). In other words, "[e]ven if a court determines the Government flagrantly disregarded the terms of the warrant, it should only grant blanket suppression after weighing the deterrent benefit of that remedy against the costs of suppressing valuable evidence." *United States v. Motovich*, No. 21-CR-497 (WFK), 2024 WL 2943960, at *14 (E.D.N.Y. June 11, 2024); *see also Pinto-Thomaz*, 357 F. Supp. 3d at 330 ("Exclusion has always been our last resort, not our first impulse, and applies only where it results in appreciable deterrence - in other words, where police conduct is sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").

To be sure, a defendant has recourse "[w]hen items outside the scope of a valid warrant are seized." *United States v. Hampton*, No. 24-2805-CR, 2026 WL 1689485 (2d Cir. June 11, 2026). "[T]he normal remedy" in that circumstance "is suppression and return of those items, not invalidation of the entire search." *Id*. Stated plainly, then, "blanket suppression" is an "extreme remedy" which is only "imposed in the most extraordinary of cases." *Liu*, 239 F.3d at 142.

**B. Discussion**

**1. The Agents' Process was Reasonable and Conducted in Good Faith.**

Far from "flagrant[ly] disregard[ing]" the Warrants' terms, or "indiscriminate[ly] rummaging[]" through the data, or acting in bad faith, from the outset, executing agents took multiple reasonable steps to target their review of the seized electronic evidence in the search for responsive material. *Liu*, 239 F.3d at 140.

*First*, before reviewing the contents of any electronic devices or accounts, agents reviewed the Warrants and understood that the categories of evidence in the Warrants' attachments determined what could be designated responsive. *See* Kroll Decl. ¶ 14.

*Second*, in October 2025, the Government provided information to Chu's counsel about the premises search and the seized devices so that Chu's counsel could identify any devices that were unlikely to contain responsive material. *See* Kroll Decl. ¶¶ 10-13. Armed with information from Chu's counsel, agents conducted only brief manual reviews of six devices (Items 1B13 (iPad), 1B14 (laptop), 1B15 (iPad), 1B19 (iPad), and Item 1B20 (laptop)) and conducting extensive reviews of those images. *See* Kroll Decl. ¶¶ 13, 19. With respect to these six devices, agents did not "effect a widespread seizure of items that were not within the scope of the warrant." *Shi Yan Liu*, 239 F.3d at 140. They did the opposite. They designated no material responsive in these devices.

*Third*, a filter team from the U.S. Attorney's Office was used to screen material that is potentially protected by the attorney-client privilege. *See* Kroll Decl. ¶ 16. To that end, the Government solicited and Chu's counsel has provided (and later amended) a list of attorneys and firms to be used by the filter team. *See* Kroll Decl. ¶ 17. Needless to say, these are not the actions of law enforcement officials who are conducting an impermissible general search and acting in flagrant disregard of a warrant. Rather, they reflect how agents were acting reasonably and in good faith in an effort to locate evidence responsive to the Warrants.

*Fourth*, agents declined to conduct any search of the contents of Item 1B2, a laptop, because a version of that laptop was previously imaged in September 2026, at the direction of counsel for Tricolor, and produced in response to a subpoena. *See* Kroll Decl. ¶ 17. Accordingly, agents have not designated any material from Item 1B2 as responsive to the Device Warrants. *Id.* Again, this was the opposite of "a widespread seizure of items that were not within the scope of the warrant." *Shi Yan Liu*, 239 F.3d at 140.

*Fifth*, to identify responsive evidence amidst a vast volume of data, agents employed reasonable techniques that were explicitly disclosed in the applications for the Device Warrants, such as "search terms," "document review programs," and "cursor[y] review." *See, e.g.* Kroll Decl. ¶ 22, Ex. 4 ¶ 20. Courts have specifically approved the use of search terms to designate responsive material. For example, in *United States v. Oztemel*, the court found that "a conscious choice to employ [257] targeted search terms" on an electronic account which yielded responsive designations of more than half of the account's contents was "reasonable" over defense claims that "the search protocol produced a large number of . . . strictly personal [] documents." No. 3:23 Cr. 00026 (KAD), 2024 WL 3090251, at *10 (D. Conn. June 21, 2024). As described above and in the Kroll Declaration, the review included the use of approximately 65 search terms to designate materials as responsive, including the term "Tricolor." *See* Kroll Decl. ¶¶ 23, 27. The use of that

search term was far from unreasonable. For one, the Government's investigation had revealed that Tricolor operated for years "through systematic fraud" on its lenders and investors, to Chu's personal enrichment. *See* Superseding Indictment ¶ 1. The Warrants also permitted the seizure of broad categories of evidence related to Tricolor, such as:

- "the financial condition of Tricolor" since 2018;
- "the receipt, transfer, disposition or location of funds used in, or constituting proceeds of, the" fraud at Tricolor (*e.g.*, Chu's and others' compensation from Tricolor in the relevant time period);
- "any proceeds or benefits received as a result of the commission of the" fraud at Tricolor (again, *e.g.*, Chu's and others' compensation from Tricolor in the relevant time period);
- "Tricolor's lending arrangements";
- "Tricolor's securitizations and related collateral";
- "the identities of co-conspirators" in the crimes committed systematically at Tricolor; and
- "the motive to commit" the crimes at Tricolor, including "executive compensation packages."

*See* Kroll Decl. ¶¶ 4-5, Exs. 1-3. Nevertheless, agents took additional reasonable steps with respect to the "Tricolor" search term, running it as the last term in the search and sampling the search term hits in an effort to remove categories of nonresponsive material. *See* Kroll Decl. ¶ 27. All these steps were reasonable and undertaken in good faith.

*Sixth*, the review team's method of identifying responsive chat threads (such as text message exchanges) was reasonable and, indeed, best practice. As set forth in the Kroll Declaration, where a chat thread contained responsive material, the full chat thread was designated responsive, even if some text messages in the chat thread were about personal or otherwise irrelevant matters. *See* Kroll Decl. ¶ 28. That method was reasonable, in part, because it is consistent with how the chat threads were presented in the document review platforms used by the

Government during the review. On the Cellebrite platform, a given text chain is presented in its entirety and not in day-by-day snips. *Id.* That means, for example, that if Chu started messaging with a person starting back in 2012 and retained those messages to the time of seizure in October 2025, the entire 13-year history would be in one continuous text chain. The same is true of how text chains were presented in the Relativity platform, in which the only option available for tagging responsive documents was by full text chain. *Id.* It cannot be the case that utilizing the only option available on Relativity—designating full text chains as responsive—was somehow unreasonable, much less done in bad faith.

In fact, tagging by chain is the norm and consistent with best practices. It is no different, for example, than seizing a notebook that contains "evidence . . . . intermingled [with] irrelevant or privileged information." *United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994, at *3 (S.D.N.Y. Oct. 18, 2019); *see also United States v. Ray,* 541 F. Supp. 3d 355, 396 (S.D.N.Y. 2021) (rejecting defendant's argument that "Government seized notebooks that had nothing to do with subject offenses" because "notebooks contain" relevant evidence). And, in fact, "[i]t would have been impracticable for the Government to have not marked chat or text threads responsive when nonresponsive material was interspersed throughout the thread." *United States v. An*, 733 F. Supp. 3d 77, 105 (E.D.N.Y. 2024) (citing *United States v. Ganias*, 824 F.3d 199, 213 (2d Cir. 2016) (en banc)). There are additional commonsense and practical benefits: tagging by chain preserves the ability of both the Government and the defense to present any potential arguments about the context surrounding any given responsive message or text conversation, as well as allowing for the adjudication of any disputes over trial exhibits and the rule of completeness.

Finally, the FBI returned eight seized devices to Chu. *See* Kroll Decl. ¶ 31. Two (Item 1B6 and 1B17) of those eight devices, the FBI was unable to access at all. *Id.* The other six devices (Items 1B4, 1B13, 1B14, 1B15, 1B19, and 1B20), some of which Chu's counsel had requested to

be retuned, were reviewed as described above and no responsive material was designated. *Id.* This is further evidence of good faith. *See United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *5 (S.D.N.Y. Nov. 29, 2016) (finding the fact that the "Government promptly returned devices that [the defendant] requested without burdening defendant or the Court with motion practice" evinced good faith).

In short, the agents acted reasonably and in good faith, conducting a search for responsive material tailored to the large amount of data that needed to be reviewed.

**2. The Amount of Material Designated Responsive is Further Evidence of Reasonableness and Good Faith.**

In addition to the targeted process the agents employed, the amount of material designated responsive is further evidence of their reasonableness and good faith. As Chu lays out, the size of the iCloud accounts received in response to the iCloud Warrant was roughly "4.3 terabytes." *See* Schwartz Decl. ¶ 9. And the overall size of the devices imaged pursuant to the Devices Warrant was approximately "3.57 terabytes." *See* Schwartz Decl. ¶ 10. The total amount of data marked responsive to the iCloud Warrant is approximately 0.0076 terabytes—or approximately 0.001% of the overall size of the iCloud accounts. *See* Schwartz Decl. ¶ 30. In addition, the total amount of data marked responsive to the Device Warrants is approximately 0.058 terabytes—or approximately 1.6% of the total size of the devices seized and imaged pursuant to the Device Warrants. *Id.* The total volume of data marked responsive to the Warrants is approximately 0.08%. *Id.*

These totals are far from what one would expect if the search was marred by "indiscriminate fishing." *Chen*, 979 F.2d at 717. Instead, the responsive set on the Warrants reflects a "concerted effort to separate the wheat from the chaff." *United States v. Garlick*, No. 22 Cr. 540 (VEC), 2023 WL 2575664, at *12 (S.D.N.Y. Mar. 20, 2023). Courts have consistently refused to

employ wholesale suppression on similar facts. For example, in *Garlick*, Judge Caproni declined to suppress two warrants for electronically stored data where "2 percent . . . of records" was marked as responsive on one and ".12 percent of the records" was marked responsive on the other despite defense claims that "the Government marked . . . personal and irrelevant text messages, and irrelevant Facebook comments and messages responsive." *Id.* at *11-12. Similarly, in *Motovich*, the Court—after "assuming *arguendo* all of the documents identified by Defendants . . . were nonresponsive"—refused to suppress warrants for electronically stored data where the Government "marked .4% [of data] responsive" on one and "less than 2.3 GB" out of "154 GB of data" on another. 2024 WL 2943960, at *16. The logic employed by the *Garlick* and *Motovich* courts is compelling and should control the outcome here. The sliver of data marked responsive to the iCloud Warrant and Device Warrants should dispel any notion that the search here "*actually resemble*[d] a general search." *Liu*, 239 F.3d at 141.

Even if the Court were to accept Chu's own tally of purportedly nonresponsive materials—a tally for which there is good reason to doubt, as discussed below—that still does not warrant blanket seizure. Chu asserts that "21% of the universe of identified 'responsive' materials" are, in fact, nonresponsive. Chu Br. at 18. "[C]ourts" in this Circuit, however, "have rejected claims for suppression . . . so long as a majority of the documents seized were within the warrant's scope"—which Chu concedes—"and the search was otherwise executed in a reasonable fashion." *United States v. Messalas*, No. 17 Cr. 339 (RRM), 2020 WL 4003604, at *8 (E.D.N.Y. July 14, 2020). Indeed, in *Messalas*, the Court credited the defendant's assertion that "more than 40% of the . . . documents seized by agents contain nothing responsive to the warrant"—double what Chu is asserting here—but found that there "is no authority for ordering suppression on this basis alone, in the absence of additional evidence that the search was unreasonable." *Id.*

Accordingly, the amount of material designated as responsive, when compared to the broader universe of data at issue, is further evidence of reasonableness and good faith.

**3. Chu's Arguments About the Agents' Process Do Not Establish Unreasonableness or Bad Faith.**

Chu launches several process-based attacks and each one misses the mark.

First, contrary to Chu's suggestion, seized material does not need to be screened for marital privilege. "[T]he marital privilege . . . is derived from the common law and has no equivalent Constitutional stature." *Grand Jury Subpoena of Ford v. United States*, 756 F.2d 249, 255 (2d Cir. 1985). Thus, in the criminal context, marital communications have been used for investigative purposes. *Trammel v. United States*, 445 U.S. 40, 53 (1980) (holding that nothing "prevents the Government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension. It is only the spouse's testimony in the courtroom that is prohibited.") In other words, the marital privilege is a "testimonial or evidentiary . . .not constitutionally based" and accordingly does not require "suppression of evidence derived" from it. *United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000); *see also United States v. Irons,* 646 F. Supp. 2d 927, 957 (E.D. Tenn. 2009) *(*"The marital communications privilege is a product of federal common law. . . . It does not . . . enjoy any constitutional basis.").

As a result, courts have declined to order blanket suppression when material is not filtered for spousal privileges. *See, e.g.*, *United States v. Wilson*, 505 F. Supp. 3d 3, 12 (D. Mass. 2020) ("The government's review and retention of spousal emails seized pursuant to a search warrant is, therefore, neither unreasonable nor grounds for blanket suppression pursuant to a motion to suppress."). That flows from the common-sense principle that, at the time of seizure, the Government does not, of course, "offer[]" the communications "as evidence at trial" and so "has not misused them." *Id.*; *see also An*, 733 F. Supp. 3d at 106 ("Finally, to the extent the Government

reviewed documents protected by the marital communications privilege . . . the Court may exclude such evidence on motions in limine; however, those determinations would be premature at this stage.").

Put simply, the Government was not required to filter for non-Constitutional, evidentiary privileges and Chu has a remedy should the Government seek to introduce any of the materials at trial. *See Martino v. United States*, No. 24-1404, 2024 WL 3963681, at *3 (3d Cir. Aug. 28, 2024) (declining to order a filter team to protect an evidentiary privilege because such "a claim . . . can be addressed if implicated at a future court proceeding").

Chu makes other speculative arguments as well. First, he repeatedly speculates that artificial intelligence was used to conduct responsive reviews here. Chu Br. at 21. As set forth in the Kroll Declaration, artificial intelligence was not used.[4] *See* Kroll Decl. ¶ 22. Chu also criticizes the timing of the production of responsive materials. In one breath, he swipes at the Government for taking "nine months" to conduct the responsiveness review here and, in the next, he claims that the "government's productions were rushed." Chu Br. at 15. The Government has not made it a secret that it wishes to try this case sooner rather than later. Efforts to maintain a previously scheduled trial date are not improper nor do they suggest bad faith.

---

[4] While Chu insinuates that there must be something wrong with the use of artificial intelligence in conducting a responsiveness review, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 239 (1979). As Judge Sand recognized, "[c]ourts are ill-suited to constrain law enforcement to certain search-terms or methodologies in advance." *United States v. Bowen*, 689 F. Supp. 2d 675, 681 (S.D.N.Y. 2010), *aff'd sub nom. United States v. Ingram*, 490 F. App'x 363 (2d Cir. 2012). Ultimately, whether artificial intelligence is used in a review or not, will turn on assessment of reasonableness considering the facts and circumstances of a given case. *United States v. Ganias*, 824 F.3d 199, 213 (2d Cir. 2016) ("In assessing the reasonableness, for Fourth Amendment purposes, of the search and seizure of digital evidence, we must be attuned to the technological features unique to digital media as a whole and to those relevant in a particular case—features that simply do not exist in the context of paper files.").

#### 4. Suppression of Specific Nonresponsive Materials, Not Blanket Suppression, is Appropriate.

Agents' "review need only be reasonable, not perfect, and law enforcement is given significant latitude in determining how to execute a warrant." *United States v. Lumiere*, No. 16 Cr. 483, 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016). "Given the nature and scope of the instant case"—a years-long systematic fraud that brought down the company and caused hundreds of millions of dollars in losses—"seizure of some documents beyond the terms of the warrant was virtually inevitable, and this inevitability has been recognized and tolerated in other large-scale financial fraud cases." *United States v. Maali*, 346 F. Supp. 2d 1226, 1253 (M.D. Fla. 2004), *aff'd sub nom. United States v. Khanani*, 502 F.3d 1281 (11th Cir. 2007). Accordingly, if nonresponsive materials were erroneously designated as responsive, "the normal remedy" is "suppression and return of those items, not invalidation of the entire search." *Matias*, 836 F.2d at 747.

The Government will not offer nonresponsive materials at trial. To start, the Government does not intend to offer any of the emails attached as Exhibits to the Schwartz Declaration at trial. With respect to other documents, if Chu disagrees with any assessment made by the Government of the responsiveness of a particular item to be used at trial, he "may raise this issue by motion *in limine* once the Government discloses its exhibit list." *Oztemel*, 2024 WL 3090251, at *10. And, of course, if Chu seeks earlier return of any nonresponsive material, the Government is happy to engage with counsel on an orderly process to do so.

For all the reasons discussed above, this case is nowhere near "the most extraordinary of cases" that calls for the "extreme remedy" of "blanket suppression." *Liu*, 239 F.3d at 142.

## II. Chu Identifies Specific Documents in His Motion That Are, In Fact, Responsive.

Turning to specific documents, Chu identifies material that is, in fact, responsive to the Warrants.

To start, with respect to text and chat messages, Chu distorts the record. Chu has taken nonresponsive pieces of otherwise responsive chains and painted a misleading picture of how the search was conducted. That is particularly so for Chu's immediate family. *See, e.g.,* Schwartz Decl. ¶ 66 ("Of the 24,656 'responsive' chat message chains produced by the government, 5,256 or 21%, are with Mr. Chu's immediate family members."). For example, a text message chain was tagged in Item 1B21 with Chu's wife because, among other things, Chu discussed his need for liquidity and what he was saying to Tricolor's lenders with his wife—topics which are plainly responsive to the Premises Warrant.[5] A chain with his daughter was tagged in Item 1B21 because of discussions of buying and selling luxury properties with proceeds Chu made from Tricolor, including after the declaration of bankruptcy[6]—activity which has even been the subject of public reporting.[7] And, finally, a chain with Chu's son was tagged in 1B21,[8] in part, because Chu paid hundreds of thousands of dollars in crime proceeds to a university where his son coaches the university's basketball team.[9]

---

[5] Logarajah Decl. Ex. A (excerpts of chain between Chu and his wife).
[6] Logarajah Decl. Ex. B (excerpt of chain between Chu and his daughter).
[7] *See* Isaiah Mitchell, *Inside indicted Tricolor founder Daniel Chu's nationwide luxury home portfolio*, The Real Deal: Real Estate News (March 23, 2026), available at: https://therealdeal.com/texas/2026/03/23/inside-indicted-ceo-daniel-chus-luxury-residential-portfolio/.
[8] Logarajah Decl. Ex. C (excerpt of chain between Chu and his son).
[9] *See* Brendan Marks, *He'd never been a head basketball coach before. A Division I school hired him anyway*, the New York Times (Jan, 13, 2026), available at: https://www.nytimes.com/athletic/6964505/2026/01/13/mens-college-basketball-radford-zach-chu

Chu's papers are chock full of other examples like this. For example, Chu writes that the Government tagged "[c]ommunications from Mr. Chu announcing the birth of his children to close friends." Chu Br. at 22 (citing Schwartz Decl. Ex. EE)). Some of those communications, however, are with representatives of lenders and investors and the birth announcement is a small fragment of responsive chains. *See, e.g.*, Schwartz Decl. Ex. EE-1. As an example, in Exhibit EE-1, the very next message in the chain—after where Chu cuts Exhibit EE-1 off—is a message from Chu where he tells the representatives of a lender, "Glad to get term sheet done. What's next steps?" *See* Logarajah Decl. Ex. D (excerpt of chain between Chu and lender representatives). And in Exhibit FF, Chu asserts that the Government tagged "[a] series of flirty texts with a woman from 2014—four years before the start of the alleged fraud (and before Mr. Chu met his wife)." What Chu omits is that the "woman" is a person he named to be head of Tricolor Financial and the chain is replete with messages about reaching out to victim lenders and other financial institutions for lending relationships. Logarajah Decl. Ex. E (excerpt of chain between Chu and the former head of Tricolor Financial).

Outside of individual exhibits, Chu also offers appendices of what he reports are listings of certain categories of nonresponsive documents. It bears noting Chu's own admission: the "Government might be right" that some of the materials Chu has presented to the Court as nonresponsive are, in fact, responsive to the Warrants. *See* Chu Br. at 25. And that is, without a doubt, correct, as further described below. But more troubling than that: the Appendices Chu has provided to the Court appear to contain materials far afield from what he has represented them to be.

For example, take Appendix B. In his motion, Appendix B is described as a table of "junk email." Chu Br. at 20. But Appendix B contains at least five text message threads, one of which is a thread between Chu and a reporter which was marked responsive to the iCloud Warrant. *See*

Logarajah Decl. Ex. F. In that thread, Chu, over the course of 2023, (1) explains how securitizations work, (2) notes that "transparency is key" for subprime lenders like Tricolor, (3) describes Tricolor's borrowing costs, and (4) explains Tricolor's business model. Logarajah Decl. Ex. F. In other words, that thread contains "[e]vidence of Tricolor's lending arrangements," "[e]vidence of Tricolor's securitizations, "[e]vidence of the financial condition of Tricolor from January 1, 2018 to the present," making it responsive to at least three different categories of evidence the Government was permitted to seize and mark responsive under the iCloud Warrant.

Appendix B also contains at least 52 emails which Chu sends which are not "irrelevant, mass marketing emails" that Chu portends Appendix B to list. *See* Schwartz Decl. ¶ 56. One of the emails that Chu has characterized for the Court as an "irrelevant, mass marketing" email is a March 2020 email, marked responsive pursuant to the Devices Warrants, with a lender victim ("Lender-3" in the Superseding Indictment) where Chu sends a Tricolor management presentation as part of a dialogue about financing. *See* Logarajah Decl. Ex. G. And at least eleven of the emails in Appendix B, marked responsive under the Premises Warrant, are March 2020 emails where Chu is pursuing a lending relationship for Tricolor.[10]

Appendix B also contains materials that have been written off as "junk" that are, in fact, responsive to the Search Warrants. For example, there are news alerts which Chu receives after the bankruptcy which puts Chu on notice of the bankruptcy trustee's allegations of fraud, Tricolor's lending model, and the Department of Justice's investigation. *See, e.g.,* Logarajah Decl.

---

[10] Those emails, appended as Exhibit H to the Logarajah Declaration, are as follows: (1) USAO_REL_09_00140400; (2) USAO_REL_09_00141745; (3) USAO_REL_09_00141917; (4) USAO_REL_09_00142054; (5) USAO_REL_09_00143212; (1) USAO_REL_09_00138866; (2) USAO_REL_09_00140400; (3) USAO_REL_09_00141745; (4) USAO_REL_09_00141917; (5) USAO_REL_09_00142054; (6) USAO_REL_09_00143212; (7) USAO_REL_09_00143315; (8) USAO_REL_09_00143416; (9) USAO_REL_09_00143471; (10) USAO_REL_09_00143523; and (11) USAO_REL_09_00143611

Ex. I; Logarajah Decl. Ex. J. At the very least those emails are evidence of "Tricolor's lending arrangements" and "Tricolor's securitizations and related collateral," if not evidence of "the knowledge of Tricolor executives"—like Chu—"and employees of a scheme to make misrepresentations to the collateral Tricolor pledged to lenders."[11]

The compilation contained in Appendix A also suffers similar flaws. While described by Chu as being a list of "emails with no visible substance," Chu Mot. at 20, "which are necessarily without any content and nonresponsive to the Search Warrants," Schwartz Decl. ¶ 50, that is incorrect. For example, Appendix A contains emails with blank bodies, but with substantive attachments. In total, there are approximately 51 of those emails across Appendix A. Some of these emails are highly relevant. For example, one of the purportedly nonresponsive, blank emails listed in Appendix A is an email where Chu attaches a previously undelivered email to a lender in March 2020. *See* Logarajah Dec. Ex. K. The undelivered email contains a detailed description of Tricolor's business which is plainly responsive to the Search Warrants. *See* Kroll Aff. Exs. 1-3.

Finally, Appendix C contains a list of messages which Chu purports to be "nonresponsive documents related to [his] family." (Chu Mot. at 22). Appendix C contains at least 415 text messages but the texts are not identified in any way that is meaningfully searchable (such as a list of who they are exchanged with). Based on his description, however, it appears that Chu has listed a number of messages with his immediate family in Appendix C. (Schwartz Decl. ¶ 66). The listing of individual messages, or daily snapshots— which Chu appears to have done in Appendix C based on how they are described and based on as Chu presented some of his exhibits—paints a misleading picture.

---

[11] Evidence after Tricolor's collapse is particularly relevant if, for example, makes false denials after the fact and shapes those denials based on what he knows regarding the Trustee's or DOJ's investigation.

## III. No Hearing is Necessary or Appropriate.

Chu requests a hearing on his motion so that he may explore "the propriety of the search terms utilized by the government, whether other tools, including AI or vendor-assisted tools, were used to complete the search, and whether—and to what extent—actual persons reviewed the materials identified before they were seized under the warrants and produced as 'responsive.'" Chu Br. at 24. No hearing is necessary or appropriate on this record, and the Federal Rules of Criminal Procedure do not empower defendants, such as Chu, to waylay their prosecutions through speculative discovery into the Government's investigative steps.

Special Agent Kroll, through the Kroll Declaration, has addressed the pertinent background and events, and Chu has not, and could not, provide any sworn evidence to dispute Special Agent Kroll's account. *See United States v. Pinto-Thomaz*, 357 F. Supp. 3d 287, 309 (S.D.N.Y. 2018) (noting that "sworn affidavits by the agents concerned" could be "consider[ed] as evidence" in deciding a motion on warrant execution). Moreover, given the representations about overall amount of data seized—and the Government's "representations that it will not introduce nonresponsive materials into evidence at trial", there can be no serious question of fact that a hearing will resolve that will transform the remedy here to blanket suppression. *Motovich*, 2024 WL 2943960, at *16.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that Chu's motion should be denied in its entirety.

Dated: New York, New York
August 7, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________
Micah F. Fergenson
Shiva H. Logarajah
Justin V. Rodriguez
Assistant United States Attorneys