**CAUSE NO. DC-15-14542**

| | | |
|---|---|---|
| **DANIEL CHU,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SERENT CAPITAL, TAG HOLDING COMPANY, LLC., TAG INTERMEDIATE HOLDING COMPANY, MAURICIO DELGADO, KEVIN FRICK, WALTER STEVEN JONES, LAWRENCE A. MARSIELLO, MARTIN MINDLING, and JAMES MCKENNA,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **IN THE DISTRICT COURT**<br><br><br><br><br><br>**DALLAS COUNTY, TEXAS**<br><br><br><br><br>**160th JUDICIAL DISTRICT** |

**DECLARATION OF DANIEL CHU**

Subject to the penalty of perjury, Daniel Chu declares as follows:

1. I am Daniel Chu, Plaintiff in the above styled and captioned lawsuit. I am over the age of 21 years, have never been convicted of a crime involving moral turpitude, and am fully competent to make this declaration. The statements of fact contained herein are within my personal knowledge except where stated on information and belief and the statements of fact are true and correct.

2. I still own approximately 5% of the shares in Tricolor. I brought this lawsuit individually and on behalf of my fellow shareholders in TAG Holding Company, LLC, complaining of the entities called Serent Capital ("Serent"), TAG Holding Company, LLC ("Tricolor")and TAG Intermediate Holding Company ("TAG Intermediate"), and of individuals who are directors and control persons of the entities whose names are Mauricio Delgado, Kevin Frick, Walter Steven Jones, Lawrence A. Marsiello, Martin Mindling, and James McKenna.

3. In late 2007, I founded Tricolor as a chain of "buy here-pay here" car dealerships that sells used vehicles and offers in-house financing. Under my leadership, Tricolor grew to become one of the largest independent dealers in Texas. The Company at an average annualized compounded growth rate of approximately 40%, achieving sales of $150 million. Under my direction, Tricolor opened seventeen dealerships in five metropolitan markets in Texas.

4. In 2010, Serent acquired a majority of Tricolor, and then formed TAG Holding Company, LLC, a holding company for Tricolor and its related subsidiaries. Once Serent invested, the principals of Serent began to gradually pursue their own agenda, which included self-dealing. As a result, Tricolor's corporate overhead increased over 8 times, and Serent's initiatives caused operating losses of approximately $5 million within the first four years of its ownership..

5. Until September 2014, I remained CEO of Tricolor, but was subject to the control of Kevin Frick and Serent. In a face-to-face meeting in San Francisco on September 1, 2014, I gave Kevin Frick, the individual who exercises almost total control, a letter in which I presented facts supporting my position that Serent's direction had been destructive. Serent's influence not only resulted in losses but it also destroyed Tricolor's brand value with its target consumer. I then offered, on behalf of an investor who desired to back management in a buyout, to purchase the Company from Serent for between $40-50 million dollars, which would correspond to a return of 2.8-3.4 times their investment for Serent and a rate of return of 30-38%. According to another partner at Serent, this would have represented an above average return for Serent given its investment parameters.

6. Frick refused to even consider the offer, rejecting it immediately. I persisted to attempt to persuade Frick to consider the offer, but Frick was steadfast in his unwillingness to even entertain

the possibility. Instead, Frick contrived a way for Serent to purchase two-thirds of my shares in Tricolor and induce me to resign from Tricolor. Frick induced me to sign a Term Sheet on September 9, 2014, by making the false promises in the Term Sheet that I later learned neither he nor Serent ever intended to keep. I relied upon the Term Sheet and the representations of Frick and Serent to resign from my positions with Tricolor. I formed Tricolor California Auto Group with the promise of funding to help get started.

7. In the Term Sheet, Serent agreed to finance my new venture in California by funding a total of $6 million (in two tranches of $3 million each). I relied on the Term Sheet and the representations of Frick and Serent which were inducement to me to resign from my positions with Tricolor. After my resignation, the California deal was unilaterally changed by Serent and at closing, Serent only funded $1.2 million for the new California venture. Had Frick been honest with me and made full, complete and honest disclosure to me, I would not have signed the Term Sheet and would not have resigned from my positions at Tricolor. I felt forced to close the funding of the California venture under duress. In my lawsuit, I seek the recovery of property obtained by Serent under false pretenses.

8. As part of a subsequent transaction dated as of October 31, 2014, Tricolor and I executed an agreement called the Redemption and Exchange Agreement. I bargained for and was granted, the right through September 10, 2015, to attend all meetings of the Board of Directors of Tricolor as an observer of the Board (the "Board Observation Rights"). I negotiated for this valuable right in order to protect the value of my remaining shares in Tricolor and to insure that I could maintain some accountability for the honesty and integrity of the Board Members.

9. I attended one Board Meeting in Dallas in April, 2015. I planned to attend a subsequent Board Meeting that was scheduled to occur in San Francisco on Monday, July 21, 2015, and notified Frick by email that I planned to attend in person. On the Friday before the meeting, Frick sent a notice which purported to change the scheduled meeting—he shortened the meeting from one full day to one hour. This was an obvious attempt to keep me away from the Board Meeting and discourage me from attending the Board Meeting in person.

10. When I appeared for the July 2015 Board Meeting, Frick refused to answer any of my questions about the board materials which had been prepared for the meeting, denied that there were any other materials which were not distributed to me, and denied that any other gathering or meeting would be taking place amongst the Board Members. Frick's representations to me turned out to be a blatant lie. After the so-called Board Meeting, Frick then gathered the Board of Directors of Tricolor, minus me, at another site and proceeded to hold another meeting with every member of the Board of Directors of Tricolor except me. I later learned why.

11. Tricolor has completed two securitizations of its loans with Wells Fargo Bank. The loans are held in an SPV (or Special Purpose Entity) which is bankruptcy remote. The depository accounts for these loans exist in Texas. The structure requires Tricolor to act as the servicer of the loans and "trustee" of the payments collected. In other words, Tricolor is required by the servicing agreement to collect the payments, and then remit the proceeds to the securitization trust account. Defendants have breached their legal responsibility under their agreement.

12. On information and belief, Serent and the individual Defendants have caused Tricolor to generate significant multi-million dollar losses during the past year and consequently, in excess of $10 million of Tricolor's liquidity has evaporated. I have asked this Court to order an accounting

and impose a constructive trust in order to stop the bleeding. The situation is so bad that Tricolor has been commingling funds in order to satisfy its liquidity and working capital needs. Rather than remit the funds collected in a timely manner as the servicing agreement with Wells Fargo Bank requires, Tricolor is using these funds which are the property of the securitization trust to meet its day-day operational and working capital needs, while continuing to feather the nests of the directors. This not only represents a breach of covenants with Wells Fargo Bank, but it may be illegal, given those funds do not belong to Tricolor.

13. As an example of the self-dealing conduct I'm complaining about, Jones was named Executive Chairman when I departed. He promised and committed 40% of his time, and demanded and received a lucrative compensation package; then, after less than3 months, he stopped making trips to Tricolor altogether while still maintaining his compensation. In fact, Jones continued to collect this salary, even though he was no longer investing the time and effort which he committed, while the Board directed the company to terminate many low wage earning employees. Also to demonstrate the power of Frick, while the appointment of Jones as Executive Chairman was both a major decision and investment for the company, Frick approved the appointment and compensation without Board approval. This is a clear example of the self-dealing which took place among the directors.

14. Jones participated in the misleading representations made to me. In San Francisco during the time of the July 2015 Board Meeting, Jones asked me to meet in person. Jones admitted that the Board had conducted another "Board Meeting" and purposely excluded me, but told me that I should not be concerned because the company is worth "a lot more than when you left." This statement was false and was a ruse meant to aid the Board Members' conspiracy to prevent me

from attending the Board Meetings I was entitled to attend, and to allow the Jones to continue his self-dealing at the expense of the Company.

15. Tricolor's performance today is weak with little prospect of improving. Sales at its dealerships are at an all-time low and its sales continue to decline. Net credit losses in its portfolio have reached unprecedented levels. Company morale is at an all-time low and Company executives have lost confidence in Serent and, on information and belief, are looking for employment elsewhere. Tricolor is losing money at an increasing rate. The company's culture, once the foundation of its brand, has deteriorated to a point where it is virtually non-existent. Management has effected so many Board-driven personnel cuts that the sustainability of the business model has been jeopardized.

16. Now, Serent and the Board are conducting an accelerated "fire" sale of the Company to dump and run—to dump Tricolor, run back to San Francisco, and cover-up its mistakes with the hope that the remaining shareholders won't uncover Serent's and the Board of Directors of Tricolor's wrongful acts. As a result of the commingling, Tricolor is now out of compliance with its lender. Rather than fulfill its obligation and inject capital in order to remedy the commingling, Serent and the Board of Directors have elected to "fire sale" the Company, a decision which will irreparably injure Tricolor and yield a horrendous return for the shareholders.

17. Serent has targeted a sale of the Company by December 10, 2015. I cannot stand by and see the company I founded ruined in a reckless and dangerous act of these Defendants. If Serent and the other Defendants are not subject to this court's powers in equity, they will effectively destroy Tricolor and leave shareholders like me with no effective remedy at law. In my opinion, Tricolor will likely end up in the hands of a party with a liquidation strategy rather than a party

with the vision and capacity to maximize shareholder value---in fire sales, the only buyers you attract usually look to buy assets at a discount then liquidate.

18. Another reason I seek temporary relief from the court is that I believe Serent has structured its ownership and Board involvement of its portfolio companies in such a way as to insulate itself from any vicarious liability from the company---so once they are no longer owners, my ability to hold defendants accountable for damages to me and the other shareholders will be adversely and irretrievably minimized. The structure incorporating TAG Intermediate Holding Company----Defendants use the term "blocker"---could be argued to limit Serent's liability if Serent no longer owns the asset.

19. The active misconduct and self-dealing are demonstrated by the ongoing losses and the resulting commingling. Due to Defendants' wrongful actions or inactions, the company's value has crashed. For these reasons and more, I ask the court to order temporary relief to preserve the situation until I can discover the full extent of the harm done and seek remedies appropriate to the wrongful conduct of these Defendants.

Signed under penalty of perjury on December 6, 2015.

Daniel Chu