BOIES SCHILLER FLEXNER

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

October 16, 2026

**VIA EMAIL**

Honorable P. Kevin Castel
United States District Judge
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 11D
New York, New York 10007

**Re: *United States v. Chu*,**
**Case No. 25 Cr. 579 (PKC)**

Dear Judge Castel:

We represent Daniel Chu and write to set out the defense's view of the evidence introduced at the suppression hearing conducted before Your Honor last week. We respectfully submit that the evidence establishes—and the government certainly has not met its burden to disprove, *see* Tr. 5–7[1]—that "[g]overnment agents flagrantly disregard[ed] the terms of [the relevant] warrant so that wholesale suppression is required" because "(1) they effect[ed] a widespread seizure of items that were not within the scope of the warrant, and (2) d[id] not act in good faith." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (internal citations and quotations omitted).

Over the course of three days, four government agents testified to an extraordinary search: one that had no real parameters, lacked any kind of supervision, and that undisputedly resulted in the seizure of thousands upon thousands of non-responsive documents. Among other things, the evidence at the hearing proved beyond any meaningful dispute that:

- There was absolutely no process. Each agent conducted his search differently, but was unable to meaningfully describe what his search consisted of and did not memorialize it in any way that would allow the Court to reconstruct it.
- The search was almost exclusively conducted with key words, but no one could say—and no one wrote down—what key words were used. And each agent used a different list.
- On March 19—the same day the government declared it was ready for trial and asked the Court to set a quick trial date—the agents declared that they were done with the

[1] References to "Tr." are to the transcript of the suppression hearing that commenced on October 7, 2026. Unless specifically noted, all citations to documents are to exhibits introduced at that hearing, whether denominated Government Exhibits (GX), Defense Exhibits (DX) or, for exhibits that came from the production of Federal Rule of Criminal Procedure 26.2 materials, beginning "3501-". The Court also admitted certain declarations and exhibits previously filed in connection with this motion, which are cited by ECF docket number.

BSF

search. At that point, they had *only* used keywords, including "Tricolor"—which, among other things, was in Mr. Chu's email address and signature block. As a result, the agents marked, in the aggregate, 80% of all documents responsive.

- It was not until a month later that someone suggested that any sort of "QC" needed to be conducted. But, the evidence shows, no meaningful quality control efforts were employed.
- For chats, agents relied entirely on keywords to search most of the devices. At least one of the agents (Rosenman) admitted that he did not actually look at the substance of chats at all; as long as they hit on a keyword, he marked the entire chat responsive. As a result, the government seized extensive and *entirely non-responsive* chats just because they hit on a keyword.
- Other agents claimed to look at the portion of the chat that hit on a keyword to see if it was responsive, but if it was, they tagged the entire thread. This caused the government to mark as responsive chats that lasted for years (including for many years predating the charged fraud) and which contained literally tens of thousands of non-responsive communications, including over 60,000 messages between Mr. Chu and his wife.
- The government's explanation for this practice was the agents' "experience and training," that they did not want to be the "arbiter" of what was responsive, and that seizing the entire chat was important for "context" and to show "relationships," and to do otherwise was "impractical." But the agents admitted that they in fact had no training in how to mark chats and there was no policy; that they *were* the sole arbiters of what was responsive; that they could have (and the filter team in fact did) mark less than the full chat responsive, and that seizing the entire thread was unnecessary to demonstrate context or relationships. One agent (Kroll) admitted that he understood that in other cases, the government did *not* mark complete chat threads responsive. Another agent (Kash) even volunteered, unprompted, that the practice was akin to seizing the "entire drawer" of a filing cabinet just because one page of one document had responsive content—a bad faith process if ever there was one.
- For emails, the process was just as bad. The agents again relied on keywords, which was vastly overinclusive because Mr. Chu's email address and signature block itself contained a keyword. To the extent that the agents did not just stop there, they then—relying almost exclusively on looking at metadata—tried to exclude obvious junk emails, but did not look at the content of emails. As a result, their process could never catch anything other than obvious spam (and not, for instance, emails from Mr. Chu to himself, even if those emails contained nothing but family photos).
- Worse, the agents did not even really try to exclude all of the spam, let alone other non-responsive materials. Instead, they just tried to bring the total responsive hit rate down to about one-third. This ends-oriented approach meant that when the responsiveness rate got to that mark—which is where it landed, almost precisely, for just about every device—the agents just stopped.
- Finally, the evidence demonstrated beyond all doubt that no one was in charge of the search, including the prosecutors. Even when the prosecutors identified that the search had been conducted inappropriately and had captured a tremendous volume of "false positives"—and in particular that one of the agents (O'Rourke), who reviewed the two single largest devices, had basically tagged everything responsive—they exercised no oversight.

This broken search was 100% guaranteed to result in the seizure of massive amounts of nonresponsive materials—and it did. The entire thing should be thrown out.

## I. The Government's Case Team & Lack of Oversight Infected the Review With Unremedied Errors

The government's disorganized and reckless review process all but ensured that the warrants' limits would be applied inconsistently and incorrectly, and that errors, once discovered, would go uncorrected. To date, no one on the government's team has taken responsibility for the failure of the process.

At the time the relevant search warrants were executed and the responsiveness review was completed, the government's case team consisted of AUSAs Rodriguez and Fergenson, and four special agents: Special Agents Nicholas Kroll and Timothy Kash of the FBI, and Special Agents Christopher O'Rourke and Jeremy Rosenman of the FDIC-OIG. Tr. 16:1–4 (Kroll). All four agents testified; *none* could say who was responsible for directing or overseeing the responsiveness review. Asked point-blank who was in charge, Agent Kroll answered only "[t]he case team." Tr. 52:23–24 (Kroll). Kroll, who submitted a sworn declaration describing the process of the entire team, "wouldn't say that any one person is in fact in charge," Tr. 52:15–16, or that "any one person was calling the shots," Tr. 53:21–24. He "was not responsible for oversight into [other agents'] process" nor for ensuring compliance with the warrant for anyone but himself. Tr. 58:4–13; *see also* Tr. 58:14–20 (Agent Kroll testifying "I was not the overseeing party for other people's processes" and he is not aware of any such person). Agent Kash agreed: "It wasn't one point of leadership." Tr. 205:9 (Kash). And when asked whether the buck stopped anywhere, Agent Rosenman simply put it: "No." Tr. 426:25–427:1 (Rosenman).

These demurrals defy reason. A review spanning numerous devices, conducted by at least six team members (plus the filter team, paralegals, the CART team, discovery vendors, digital evidence technicians, and other administrative staff) requires someone in charge to coordinate and oversee the completion of the review, which spanned numerous electronic devices and, in some cases, re-review of certain materials. The agents' uniform refusal to name anyone shows that the decision to proceed this way—and to describe it this way after the fact—was not merely negligent, but intentional: No one was in charge. And as a result of no one being in charge, each agent had no idea what the other was doing other than that "they were looking around for stuff that was responsive to the warrant." *See, e.g.,* Tr. 55:20–25 (Kroll).

This problem started on day one. On September 26 and October 7, 2025, Agent Kash swore out two affidavits in support of the government's application for search warrants of electronic devices found in Mr. Chu's home and on his person, and for two iCloud accounts associated with Mr. Chu's Tricolor email addresses (collectively, the "Search Warrants"). *See* ECF No. 110 (July 24, 2026 Declaration of Matthew L. Schwartz ("Schwartz Decl.")) Exs. C & D. The warrants for Mr. Chu's premises and person were executed on October 7, 2025, the same day they were signed, and the government seized 21 electronic devices. Tr. 60:11–61:1 (Kroll).

Although Agent Kash was the affiant, the AUSAs "did the initial draft" of the affidavits and he disclaimed providing any written edits or comments. Tr. 228:23–229:19 (Kash). Among

BSF

other things, the affidavit in support of the warrants for Mr. Chu's Miami residence and his person stated that "Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant." Schwartz Decl. Ex. D at -216; *see also* Tr. 129:15–21 (Kroll); Tr. 251:15–19 (Kash).

Both Search Warrants list thirteen categories of evidence that can be seized:

> 1. Evidence of the knowledge of Tricolor executives and employees of a scheme to make misrepresentations relating to the collateral Tricolor pledged to lenders, by double pledging loans to multiple lenders and/or securitizations, and manipulating the data related to the pledged loans.
>
> 2. Evidence of Tricolor's lending arrangements, such as loan documents, loan payment files, and loan value computations.
>
> 3. Evidence of Tricolor's securitizations and related collateral, such as legal documentation, offering materials, and collateral reports.
>
> 4. Evidence of the identities of co-conspirators in the Subject Offenses and information about any electronic devices and online accounts (such as email and chat accounts) used by those co-conspirators.
>
> 5. Meeting invitations, calendar appointments, and video-conferencing invitations reflecting (a) internal Tricolor meetings and conversations about Tricolor's loans and securitizations or other access to capital, or (b) meetings with auditors, lenders, underwriters, or investors about Tricolor's loans and securitizations or other access to capital.
>
> 6. Audio or video recordings of calls or meetings relating to Tricolor's loans, securitizations, working capital, or borrowing base.
>
> 7. Evidence of the receipt, transfer, disposition or location of funds used in, or constituting proceeds of, the Subject Offenses.
>
> 8. Evidence relating to efforts to evade detection by law enforcement and/or regulatory agencies in connection with the Subject Offenses, such as evidence of deleted messages.
>
> 9. Information that would assist in identifying and locating investors or prospective investors in Tricolor, and investors who purchased securities backed by Tricolor's auto loan receivables.
>
> 10. Evidence concerning any proceeds or benefits received as a result of the commission of the Subject Offenses.

BSF

> 11. Evidence of the financial condition of Tricolor from January 1, 2018 to the present, including communications about revenue, profits, sales, expenses projections, and available collateral for loans from January 1, 2018 to the present.
>
> 12. Evidence of the motive to commit the Subject Offenses, including liquidity constraints at Tricolor and market conditions, executive compensation packages, or pressure from investors or lenders to maintain or improve business performance.
>
> 13. Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place co-conspirators and aiders and abettors, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times.

Schwartz Decl. Exs. A at -133–34 & B at -226–27.

Once the warrants were signed, Agent Kash made no effort to ensure that the agents tasked with the responsiveness review even had a copy of the warrant. He admitted that he simply operated on "an assumption that everybody would always have a copy of the search warrant before … they conduct a review," and that he did not personally provide a copy of the search warrant to anybody else. Tr. 243:11–17 (Kash). That task, like everything else, was left to each member of the team with no check-in or oversight.[2]

Those agents knew the warrants limited their review, but they disagreed about what those limits meant. Agent Kroll, for instance, testified that while it is "certainly implied not to misuse methods or use gross or egregious methods in order to conduct the search," "the warrant itself does not dictate such parameters by the letter." Tr. 75:1–4 (Kroll); *see also id.* 77:4–8 (Kroll) ("I wouldn't say they dictate that at all"; the warrant's categories are just "general parameters"). According to Agent Kroll, "to delineate or disaggregate what is and is not [responsive], [] would be a gross misuse of time and resources." *Id.* 127:1–13.

The confusion extended to the treatment of privileged spousal communications. Shortly after the premises warrant was executed in Miami, members of the case team conferred with Mr. Chu's counsel about matters related to the responsiveness review, including certain devices that belonged to Mr. Chu's children and wife. Tr. 122:19–123:14 (Kroll). In addition, on November 20, 2025, counsel for Mr. Chu informed the government that Mr. Chu's wife "does not consent to any disclosure of any communications with her husband." Tr. 123:15–23. The government ignored that objection and instead released all of Mr. Chu's communications with his wife to the case team for review. Tr. 123:24–124:10 (Kroll). The end result of this flagrant disregard for the spousal privilege and defense counsel's requests was the seizure of tens of thousands of pages of

---

[2] To be clear, the defense does not argue that the four agents lacked notice of the warrants' restrictions. Each of the agents testified that he was aware of the limits imposed by the warrants, *see* Tr. 20:16–21:7 (Kroll); Tr. 180:8–15 (Kash); Tr. 322:16–22 (O'Rourke); Tr. 412:25–413:3 (Rosenman), and eventually one of the AUSAs sent the team an email attaching the portion of one of the warrants containing the thirteen categories above, 3501-008.

BSF

privileged, non-responsive communications between Mr. Chu and his wife. Even if (as the government argues) the government was entitled to review spousal communications as a matter of law, Agent Kroll admitted that he "understood potential sensitivity around spousal communication," Tr. 22:1–10, but that that sensitivity "did not in any way alter" his search, Tr. 124:7–10.

More generally, there was no written protocol for the review or other written guidance provided by any case team member or supervisor. Tr. 433:3–6 (Rosenman). As Agent Rosenman put it: "There was no formal process." Tr. 448:10–12. The only semblance of written guidance came months after the warrants were authorized in the fall of 2025, in a December 4, 2025 email from one of the prosecutors to the rest of the team:

> We've got the first batch of SW data. Can we discuss responsiveness reviews? . . . it would be great if you guys can start reviewing. For phones, I'd say it's a reasonable combination of search terms, pulling chat threads with relevant contacts, and photo/audio/video review. If there are emails, likely best to export them to Relativity for review there.

3501-015 at 3–4.

Beyond this single email, and another months later that compiled a partial list of search terms, 3501-026, the case team never memorialized how the review was to be conducted. Agent Kroll did not even know "what the first step was in conducting the responsiveness review," and could not recall any discussion of what else should be done, if anything, after running search terms or of quality control ("QC"). Tr. 81:24–25, 100:3–7 (Kroll); *see also* Tr. 261:3–16 (Kash) ("Q. You recall getting other directions from the AUSA? A. I do not recall any other directions."). Nor was the review memorialized after the fact; Agent Kroll did not recall anyone taking notes or any report of any meeting ever about the responsiveness review. Tr. 79:16–81:14 (Kroll). The agents did not even write down which search terms they ultimately used, Tr. 56:10–22, 100:10–22 (Kroll); Tr. 361:16–362:7 (O'Rourke)—which means that they could have used terms that were sure to sweep up too much, like "Chu" or, for that matter, "the."

The case team met remotely a handful of times, but only to discuss the status of review—not how to conduct the review or whether certain documents were responsive. Tr. 259:4–16 (Kash). Agent Rosenman explained the meetings concerned "the status of where we were," but "it was not something that needed copious notes taken." Tr. 429:4–7 (Rosenman). (In fact, no one ever took any notes. Tr. 79:16–81:13, 85:22–24, 87:6–9, 107:12–14, 118:4–10 (Kroll); Tr. 258:1–7 (Kash); Tr. 428:3–11, 429:2–7 (Rosenman).)

By January 9, 2026, more than three months after the Search Warrants were authorized, the case team still had not started reviewing. 3501-016 at 2. A month later, the team still had not made "calls about next steps and responsiveness reviews." 3501-018. But on March 9, 2026, AUSA Rodriguez sought to "reconnect on the status of Tricolor responsiveness reviews." 3501-021. On March 11, the government received "a bunch of NP [non-privileged] docs and emails on PAE [Relativity]." 3501-026 at 2.

With a March 19 pretrial conference approaching, the bulk of the responsiveness review had not begun. The agents then raced to complete as much as possible before the conference—at

which a prosecutor declared the government was "ready for trial." Schwartz Decl. Ex. E at 12:7. Uncoincidentally, the case team barreled through an enormous amount of the ESI—121,206 documents—that same day. 3501-034; 3501-034A.

The pattern repeated in June in advance of another discovery conference. The reviewing agents completed their review of chats shortly after one of the prosecutors reminded the team that "[t]he court has scheduled a conference for June 30 (week from tomorrow) to address the state of responsiveness reviews," and noted, "Anything you can do to get as much done as possible this week would be great." 3501-063 at 1.

As the agents conceded, each reviewer alone decided what was responsive—and each got it very, very wrong. Agent Kroll agreed that the whole responsiveness review was an exercise in him being the arbiter of what is responsive. Tr. 121:10–18 (Kroll). Agent Kash acknowledged that there is "no firm guidance on how a review should be done." Tr. 179:7–13 (Kash). This too was intentional—for instance, and as described further below, even when AUSA Fergenson reported to the prosecutors that there were "issue[s]" with Agent O'Rourke's responsiveness review, which had identified over 86 percent and 75 percent of emails and documents from 1B1 and 1B5 as responsive, he took no active role in ensuring the abjectly erroneous review was corrected. 3501-048; Tr. 445:7–449:2 (Rosenman).

Nor did anyone on the case team seek anyone else's input on what was responsive. Agent Kroll testified that he "consulted with the AUSAs" regarding only the decision to tag the entire chat thread between Mr. Chu and his wife as responsive. Tr. 55:12–18. Agent Kash testified that he "did not discuss with the AUSAs how to use the[] search terms." Tr. 220:21–22 (Kash). Each agent seemingly reviewed their assigned devices and document set as he saw fit. Agent Kroll testified that compliance was each agent's responsibility "for themselves," not "[f]or one another," Tr. 54:3–10 (Kroll), and that he "was not the overseeing party for other people's processes," *id.* 58:17–20 (Kroll) (further testifying he was not "aware of" whether any such person existed); *see also* Tr. 261:3–16 (Kash) ("Typically it's professional and personal responsibility to complete your responsiveness reviews."); Tr. 426:25–427:1 (Rosenman) ("Did the buck stop anywhere?" A. No.").

The agents could barely describe even their own methods. Agent Kroll offered only that "a responsiveness review is a responsiveness review." Tr. 97:15–18 (Kroll). Agent O'Rourke explained: "There is no normal way. There's no set way that anyone ever -- there's no guidebook on how to do it. Everyone does it differently." Tr. 375:2–4 (O'Rourke).

Perhaps the most egregious example of how the government's failure of oversight resulted in constitutional error is Agent Kash's testimony about 1B4, a cellphone seized from Mr. Chu's Miami residence that belonged to his son. The phone contained no material responsive to the warrant—that much was clear before the hearing. ECF No. 125 (August 7, 2026 Declaration of Special Agent Nicholas Kroll ("Kroll Decl.")) ¶ 29.a. Nonetheless, the government chose to extensively question Agent Kash about his review of that phone, strongly suggesting, repeatedly, that the phone belonged to Mr. Chu and that the government had somehow done him a favor by not identifying anything from it as responsive. Indeed, the prosecutor asked Agent Kash repeatedly about the contents—prompting Agent Kash to describe them as "romantic" and "embarrassing." Tr. 182:1–11 (Kash). The questioning lacked any subtlety, and the point was

clear: the government was communicating that they had found a burner phone that Mr. Chu used to conduct romantic affairs, and that they had done him a favor and respected his rights by not reviewing it more thoroughly—although, perhaps to leave their options open later, they *did* image it, Kroll Decl. ¶ 15 & Appendix 1.

But as cross-examination quickly revealed, the government well knew that the phone was not Mr. Chu's at all. Agent Kash testified that he was aware that the phone was associated with Mr. Chu's son. He admitted that the phone contained "pictures and messages" of a "Zachary," whom he "underst[ood] to be [Mr. Chu's] son." Tr. 264:5–15 (Kash); *see also id.* 265:1–3 ("I do not recall the name of Daniel Chu appearing in that phone."). Agent Kash also testified that he had informed the other team members that the government was in possession of an electronic device that did not belong to Mr. Chu. Tr. 267:7–12 (Kash). The government's inexcusable performance at the hearing despite having this knowledge was a deliberate attempt to mislead this Court about the responsiveness review. More, it demonstrates the impact of the absence of guardrails throughout the search process.

## II. The Agents' Techniques for Identifying Responsive Chats and Emails Were Improper and Resulted in Broad Over-Seizures

The four agents' testimony established that not only was the review poorly organized and without oversight, but that the substantive review they completed fell far short of constitutional standards. While the agents all described acting independently and using their own judgment, the review of both chats and emails/documents failed in at least two glaring respects. *First*, the agents' "practice" of identifying and tagging only full chat conversation threads resulted in enormous over-seizures, including of years and years of highly personal communications with immediate family members and of privileged spousal communications. *Second*, the agents' review of emails relying exclusively on search terms and, to a limited extent, the exclusion of identified junk mail also resulted in broad over-seizures of non-responsive emails outside the parameters of the warrant. Moreover, these over-seizures were known to the case team and instead of remediating the errors in the review, the case team reverse-engineered a percentage of emails that appeared "reasonable" and then deliberately stopped their review.

### A. Chat Conversation Threads

#### 1. The Technology

Upon obtaining complete forensic images of certain of Mr. Chu's devices and iCloud accounts, the government had to decide on which platform it would review the information found therein. *See* Tr. 300:21–301:23 (DeBois). The government did not upload the entire contents of any of the devices or the iCloud accounts to any review platform. Instead, the government uploaded certain subsets of data, primarily emails and chat messages, for review. Accordingly, the scope of the agents' responsiveness review was necessarily limited to the material the government chose to upload to the review platforms—a small fraction of the data on the devices and in the accounts. Tr. 144:25–145:5, 145:21–147:1 (Kroll). For this reason, although the total amount of data on all of the devices and iCloud accounts exceeded 7 terabytes, no one could say how much data was actually in the review sets. Tr. 146:8–147:9 (Kroll); Tr. 323:9–14 (O'Rourke); Tr. 430:6–24 (Rosenman).

BSF

Ultimately, the government chose Relativity to review emails and chats from devices 1B1 (a cellphone), 1B5 (a cellphone), and the dchu@tricolorauto.com iCloud account, as well as emails from 1B21 (a cellphone). For chats from 1B21, the phone that the agents believed was Mr. Chu's "primary" device, the government utilized Cellebrite.[3] Tr. 17:9–17; Tr. 102:25–103:1. The choice of platforms, and with respect to Relativity the format in which the ESI was loaded, affected the agents' substantive review.

**i. Cellebrite**

On Cellebrite, and as Agents Kroll and Kash conceded, chat message threads or conversations can be reviewed and identified/ tagged as an entire thread, or on a message-by-message or filtered basis. Tr. 111:20–22 (Kroll); Tr. 190:10–191:2 (Kash); *see also* Tr. 301:17–303:1 (DeBois). Agent Kroll, for example, confirmed that Cellebrite permits the searching, tagging, and export of less-than-all of the individual messages within a given chat thread.

> Q And you would agree with me, talking about Cellebrite, on Cellebrite a chat can be reviewed message by message, correct?
>
> A Reviewed message by message? Yes.
>
> Q And specific messages in a thread can be marked as responsive in Cellebrite, correct?
>
> A Yes.
>
> Q And search terms and other filters like date filters can be applied to identify which particular messages in a thread hit on those filters, correct?
>
> A Yes.
>
> Q And then you can select whatever messages you want, whether it's just the ones that hit on a search term, whether it's all the ones in a particular date range around those terms, whatever, you can select whatever messages you want and you can mark just those messages as responsive, correct?
>
> A Yes.
>
> Q And then you can export just the messages that have been marked responsive, correct?
>
> A I believe so.

---

[3] Other review platforms were also available. For example, Agent Kash initially recommended reviewing the imaged laptops of other Tricolor employees received via grand jury subpoena on Axiom. 3501-005. And of course, as the Court observed, the agents could have reviewed the materials in other ways, too, such as by printing them out. Tr. 281:12–282:9.

Q You are not required to export in Cellebrite the entire chat, correct?

A As a requirement, no.

Tr. 111:17–112:13 (Kroll). *See also* Tr. 129:15–130:13 (Kroll).

Cellebrite also has a "timeline feature" that "allows you to select certain periods or windows of time and search for the device data that existed within that period of time." Tr. 39:2–6 (Kroll).

As described further below, the government did not utilize these features. Instead, it tagged and produced the entire chat thread on Mr. Chu's device as responsive to the warrant—knowing that the Search Warrants prohibited it from doing so—so long as a single message within the thread was responsive.

**ii. Relativity**

The agents used Relativity for both chat and email/document review. With respect to chats, the government proffered without offering evidence that the version available to the government did not permit chat threads to be reviewed except as entire conversations (and not as individual messages). Tr. 278:21–279:2; Tr. 293:4–6. The agents who reviewed chats in Relativity—Kroll, O'Rourke, and Rosenman—similarly testified that individual messages could not be tagged. But as the defense's witness testified, before being uploaded to Relativity, the "UFDR" file from the device or account itself could be segmented so that only a portion is uploaded to Relativity for review. Tr. 303:17–304:8 (DeBois). That is, while it might be true that the version of Relativity possessed by the government only allowed the agents to mark full chat threads as responsive if the threads were loaded as a single document, it *was* possible for the messages to be loaded individually rather than as full threads. Tr. 301:17–303:1 (DeBois). So, for instance, if the government wanted to only upload materials from the relevant period in the Search Warrants, it could have done so. It could even have loaded each message in the complete chat thread separately, in which case they could have been reviewed separately. And, of course, the government conceded that it used an out-of-date version of Relativity—what the prosecutors described as the "dial-up version" of the technology, Tr. 159:24–160:1—that lacked features otherwise available. *See* Tr. 165:13–16 (stipulated fact) ("Relativity asserts that it has a product that allows users to search individual messaging, including message metadata and provide coding messages at the message level.").

And of course, the testimony made clear that the case team chose Relativity for chat review despite message-by-message review being easier in other platforms. Agent Rosenman testified that the government made a deliberate choice to review chats from these devices on Relativity, despite their resulting inability to tag individual messages. Tr. 412:3–10 (Rosenman); Tr. 41:14–23 (Kroll) (testifying that the "only option" was to tag the entire thread and not individual messages within a thread); Tr. 33:7–14 (Kroll) (testifying that the team made the decision to review only 1B21 on Cellebrite, which "allows a more robust review.").

BSF

### 2. The Review

The agents' testimony established how patently improper their "practice" of seizing entire chat threads was in the context of the particular evidence being reviewed in this case. The chats reviewed included, among many other lengthy examples, a chat between Mr. Chu and his wife over a 4 year period and spanning 61,322 messages (DX1); a chat between Mr. Chu and his adult daughter over an 11 year period and spanning 49,631 messages (DX2); a chat between Mr. Chu, his brother, and others concerning the passing of their father (DX61); and a chat between Mr. Chu and a Tricolor board member over a 5 year period and spanning 3,145 messages (DX66). These extremely lengthy conversations, made up of tens of thousands of individual messages, could not reasonably be reviewed and tagged at the full-thread level.

The agents repeatedly referred to their "training and experience" as the reason they tagged entire threads as responsive. Agent Kroll—whose review resulted in the identification of the full chats with Mr. Chu's wife and family members as responsive—insisted that he relied on (1) training and experience, Tr. 118:12–16 (Kroll), and (2) a conversation with AUSA Fergenson. However, Agent Kroll acknowledged that this training was entirely personal rather than official FBI policy. Tr. 119:13–14 (Kroll). But putting a lie to the notion that this "practice" was uniform, Agent Kroll admitted that he understood that "in other cases only parts of chats, sometimes just single messages, are designated as responsive." Tr. 119:15–17 (Kroll).[4]

Notwithstanding Agent Kroll's knowledge of the Cellebrite features available to him, Tr. 111:17–112:13 (Kroll), which could have been used to limit his responsiveness designations to those messages actually responsive to the warrant, he marked entire threads as responsive. Indeed, had Agent Kroll utilized the timeline feature he knew to be available to him, Tr. 39:2–6 (Kroll), he could have limited his review to the time periods he considered relevant—which, as far as he could recall at the hearing, included just two periods each lasting several months. Tr. 124:18–125:8. But instead, Agent Kroll tagged as responsive the entire chat thread between Mr. Chu and his wife, consisting of 61,322 individual messages. DX1; *see also* Tr. 126:2–9 (Kroll). Agent Kroll admitted that not every message with Mr. Chu's wife could be responsive, "as a matter of just numbers." Tr. 120:24–121:1 (Kroll).

The agents also testified repeatedly that tagging entire message threads—even ones that were tens of thousands of pages long—was necessary to show "context" and "relationships." Tr. 237:14–21 (Kash). But none of the agents put any meaningful boundaries around this technique, which effectively guaranteed that troves of Mr. Chu's personal communications would be erroneously identified as responsive. For example, Agent Kroll admitted that seizing the entire chain between Mr. and Mrs. Chu was unnecessary because "[i]n this case, we understand the relationship." Tr. 127:4 (Kroll). And Agent Kash elaborated on the process generally:

---

4 Agent Kroll also testified that one of the prosecutors OK'd his tagging of complete chat threads—not that the prosecutor was in charge. Tr. 117:22–118:10 (Kroll). But he failed to tell the prosecutor that some of the messages went on for years, including for years prior to the start of the charged conduct, and included tens of thousands of messages. *Id.*; *see* DX2.

BSF

> Is it your testimony today that if a chat extends for eight years, that the entire eight-year duration of the chat is necessary to establish relationship? . . .
>
> A I would just reiterate the response that I already gave, which is that the chat would be tagged. So if it was eight years or eight days or eight hours, it would still be tagged. That's the professional practice that we have.
>
> Q So in other words, the chat would be tagged regardless of whether the whole thing was necessary to establish the relationship that you're talking about?
>
> A Yes.

Tr. 238:20–239:7 (Kash). In other words, by prioritizing an unofficial and non-uniform "professional practice," the agents ensured that the categorical limits of what could be seized under the Search Warrants were meaningless. Agent Kash even volunteered:

> A From my practice and my communications with other agents, we typically tag the entire chat, so it would be whenever the start of the chat is to--based on the entire category. If it was to the metaphor of the filing cabinet, it would be taking the cabinet drawer.
>
> Q It would be taking the cabinet drawer?
>
> A Yes, I mean, that would be the equivalent. Because you need to understand the context of where the document fits into it.

Tr. 237:24–238:12 (Kash). In this astonishing moment of honesty, Agent Kash admitted that he knowingly took far more than what the warrant authorized; no agent could believe in good faith that he could seize an entire cabinet drawer of files just because one page of one document was responsive to the warrant.

Anyway, the agents' reliance on a "context" rationale was pretext. When the Court asked how the removal of a hundred messages would affect his review, Agent Kroll responded: "Frankly, it wouldn't affect the conduct of my responsiveness review." Tr. 169:18–170:5 (Kroll). Nor did he "know that [he] would be concerned" that such removals would alter the context of what he was reviewing. *Id.* That very situation in fact occurred when the government filter team tagged and removed individual messages on 1B21, while the remaining non-privileged messages in the chat threads were released to the case team and reviewed by Agent Kroll. Tr. 168:2–8 (Kroll).

The reality, as Agent Kroll admitted, is that the government seized complete chat threads out of expedience: "to delineate or disaggregate what is and is not [responsive], it would be a gross misuse of time and resources." Tr. 127:1–13 (Kroll). This was another bit of amazing honesty, since the entire point of a responsiveness review is to delineate or disaggregate what is and is not responsive.

BSF

In fact, Agent Kroll and Agent O'Rourke conceded that they did not even read the messages they were tagging responsive. Agent Kroll admitted that he "didn't review the entire history of the chat" with Mr. Chu's wife. Tr. 121:2–4 (Kroll); *see also* Tr. 347:5–18 (O'Rourke). And Agent Rosenman admitted that he tagged entire chat threads as responsive simply because they hit on a keyword, without ever so much as looking at *any part* of the chat to confirm that the hit was responsive. Tr. 480:5–13 (Rosenman). This caused him, for example, to mark a chat between Mr. Chu and his siblings about the death of their parents as responsive: midway through the chat, Mr. Chu gave out his email address. Tr. 478:6–481:19 (Rosenman); Schwartz Decl. Ex. T. By relying on overbroad search terms, tagging entire chat threads, and not even opening those threads in some cases, the agents ensured that they could not have possibly confined their review to what the Search Warrants allowed.

And it did not help that the agents' view of what could be called responsive was capacious, if not limitless. For example, confronted with a chat thread (DX58) that consisted of a single message in which Mr. Chu asked an IT support vendor whether he should put a WiFi extender in his apartment to get better reception, Agent Rosenman claimed the document "could be" responsive because "[i]t goes to their relationship" and the IT guy could be a co-conspirator. Agent Rosenman tried to claim that if he conducted the review today, it was "possible" he would "intentionally mark this as responsive." Tr. 485:12–488:10 (Rosenman). Asked whether *any* other person might be an additional coconspirator, Agent Rosenman answered, "It's possible." *Id.* On that view of responsiveness, of course, Mr. Chu's communications of any kind with *anyone* would be responsive to show his "relationship" with a potential co-conspirator.

## B. Email Review

The responsiveness review of emails fared no better. Each agent's responsiveness review boiled down to running search terms and bulk-tagging the documents returned by the search as responsive. Any "quality control" or "QC" review done afterwards was focused on excluding non-responsive junk mail rather than affirmatively identifying responsive emails—and even that exclusion process was inadequate by design, as the agents were more focused on reaching a target responsiveness rate rather than complying with the Search Warrants.

### 1. Overbroad Search Terms

On March 11, 2026, with a pretrial conference just 8 days away and more than 120,000 documents to review, Agent Rosenman proposed a preliminary list of keywords and proposed that the team "use the keywords for responsive review purposes and then review the hits for hot docs if that works." 3501-034 at 5; Tr. 437:18–23 (Rosenman). One of the prosecutors responded, "Sounds good." 3501-034 at 4.

Agent Rosenman admitted, and the other agents understood, that reviewing the search term hits "for hot docs" was *not* part of the responsiveness review; it was for the government's use in its investigation. Tr. 437:18–438:8 (Rosenman) ("Q. Okay. Hot docs is about how material might be used either as evidence or for investigative purposes, it's not about responsiveness; right? A. That's correct."); Tr. 95:21–96:7 (Kroll). That is, Agent Rosenman was suggesting—and the prosecutor agreed—that the team conduct its responsiveness review using *only* keywords.

Agent Rosenman promoted this "review" process despite his acknowledgement—both before beginning his responsiveness review and at the evidentiary hearing—that the documents released to the case team contained documents outside the warrant period, as well as a high amount of blank emails and junk mail. 3501-020 at 1; Tr. 449:3–450:19 (Rosenman) ("And you were actively aware that these datasets likely contained a lot of spam email; correct? A. Correct.").

The defense does not argue that it can never be appropriate to conduct a responsiveness review using search terms alone. But the first item on Agent Rosenman's list was "Tricolor." 3501-034 at 5; Tr. 436:9–21 (Rosenman). The government knew that the term "Tricolor" appears in Mr. Chu's email address and signature block, and that searching the term would thereby return every document sent or received by those email accounts. Tr. 436:9–21 (Rosenman). Agent O'Rourke also knew the search term "Tricolor" would collect any email sent or received by any Tricolor employee or Mr. Chu's email address.

> Q. Well, it's not your testimony, Special Agent O'Rourke, that anything to do with Tricolor was responsive to the warrant, right?
>
> A. That is accurate.
>
> Q. And you knew that Mr. Chu's email address had the word: 'tricolor' in it, right?
>
> A. Yes.
>
> Q. And you knew that any employee from Tricolor, their work email addresses also would have Tricolor in the email itself, right?
>
> A. I assume so, yes.
>
> Q. So any email that Mr. Chu sent or received could have hit on the Tricolor search term, right?
>
> A. Yes.
>
> Q. And when you saw the number of hits, that still didn't give you pause, right?
>
> A. Not that day, no.

Tr. 378:2–18 (O'Rourke). Agent Kash, who swore out the iCloud Warrant for Mr. Chu's accounts, similarly knew that Mr. Chu's iCloud accounts both contained the term "Tricolor." Tr. 218:24–219:7 (Kash).

Remarkably, no one who received Agent Rosenman's list of search terms—neither the two AUSAs, nor the three other agents— questioned the list, or raised the possibility of false positives or QC. *See, e.g.*, Tr. 99:19–100:7 (Kroll). The AUSAs reviewed the search terms, but their only suggestion was to broaden one of the terms. *See* 3501-028 at 3 (AUSA Rodriguez writing: "Only thing that jumps out is 'Waterfall Bank.' Its not a bank so maybe just use waterfall."); *see also* Tr. 436:3–6 (Rosenman). Agent Rosenman believed the term "Tricolor" was appropriate even though he knew it would collect every email to and from Mr. Chu. Tr. 418:1–8 (Rosenman). Agent

BSF

O'Rourke expressly wanted to bring in any document that referenced the company at all. Tr. 345:13–20 (O'Rourke). And Agent Kash paid no mind to the specific terms whatsoever—he merely "glimpsed at" the terms and did not do "any … deep thinking on any particular term." Tr. 219:16–24 (Kash).

And, of course, the hearing record is clear that no one knows what terms the agents actually ended up using. Several of the agents testified that they maintained their own list, or added terms, but (other than Agent O'Rourke, who kept a tracker that proved how overbroad his list of terms was) kept no written record of what those terms were. Tr. 36:6–9, 56:10–22, 57:8–10 (Kroll); Tr. 417:22–25, 435:22–436:2, 437:7–12 (Rosenman); Tr. 361:16–362:7 (O'Rourke). Agent Kroll's declaration, submitted by the government in advance of the hearing, attached an appendix containing "[a] list of approximately 65 search terms that were used." Kroll Decl. ¶ 23. But he admitted on cross-examination that the list was incomplete, and he had no idea what the actual list of search terms was. Tr. 100:10–22 (Kroll).[5]

The search term list used by the government was unreasonably broad and the actual search terms each agent used remain a mystery. In fact, the case team never discussed whether anyone would use the list at all because—as Agent Kash put it—"[i]t remains up to the individual to conduct the search." Tr. 216:6–9 (Kash). For instance, Agent Kroll utilized an unknown number of search terms beyond those circulated via email. Tr. 56:10–22, 100:10–22 (Kroll). He conceded that he does not remember them all, did not write them down, and did not tell anybody about them. *Id.* It is therefore impossible to know what Agent Kroll actually reviewed, despite his acknowledgement that "[i]t is important to write reports generally speaking in my line of work." Tr. 66:18–19 (Kroll). Agent O'Rourke also ran additional search terms that he did not coordinate or share with other agents. Tr. 361:16–25, 362:1–7 (O'Rourke).

Taken together, the overbroad agreed-upon list, and the lack of memorialization of the terms actually used at each stage of the review and by each agent ensured that a tremendous number of non-responsive documents would be tagged as responsive.

**2. Bulk-Tagging Every Search Term Hit as Responsive**

The search terms' overbreadth was compounded by the bulk-tagging techniques the agents used to capture potentially responsive material—which, as conceded during their testimony, resulted in the identification of actually non-responsive emails, including copious junk. Agent O'Rourke and Agent Rosenman both described carrying out their responsiveness review by simply tagging every single document that hit on a search term as responsive.

> Q. . . . That process just included running these search terms one at a time and then tagging everything, bulk tagging everything that came back, correct?
>
> A. On March 19, that's what I did. That's correct.

[5] Agent Kroll claimed that his declaration was truthful because it did not purport to be a complete list of the terms used by the government. Tr. 57:3–4 (Kroll). We leave it to the Court to determine what the government purported to convey in the Kroll declaration.

> Q. That's the full sum of what you did on March 19, correct?
>
> A. Yes.
>
> Q. You ran each term. You bulk tagged everything that came back, right?
>
> A. Yes.

Tr. 363:16–25 (O'Rourke).

Using this process, between 12:04pm and 4:38pm on March 19, 2026, Agent O'Rourke tagged 93,857 of 111,232 documents—a whopping 84 percent overall—as responsive. 3501-034 at 1; 3501-034A ("Devices" tab); *see also* 3501-036 at 1; Tr. 402:11–23 (O'Rourke). Agent O'Rourke was not satisfied with that rate but nevertheless considered it a success in that he tagged as many documents responsive as he could in the few hours he was willing to spend. Tr. 374:16–18 (O'Rourke) (asked whether he was satisfied, answering "No, clearly not. But in that four-and-a-half hours, yes, I was."). On the other hand, he was satisfied that he surely tagged every document that could possibly be relevant to the case, while ensuring compliance with the warrants was an afterthought. Tr. 376:8–16 (O'Rourke). He never raised any issue with the search terms or suggested that they be refined. *Id.*

As described above, both the agents and the prosecutors were entirely satisfied by the process described by Agent Rosenman in his March 11 email, 3501-034 at 4–5, which called solely for running search terms. The agents started running those keywords on March 19, and by the end of that day the agents had declared their review of Mr. Chu's devices "complete." 3501-034 at 1 (O'Rourke: "I completed a responsiveness review of 1B1 and 1B5 using keywords."; Rosenman: "1B21 and 1B7 are complete. . . . The only device docs left are for Goodgame's phone."); *see also* 3501-034A (attached spreadsheet, showing for each device total number of documents and "Number of Responsive Documents," with an aggregate of 96,760 of 121,206 documents on Mr. Chu's devices being marked responsive, or 79.83%). Four days later, Agent Rosenman reported that he had "finished the docs on Relativity for Goodgame *so everything on Relativity to date has been reviewed for Responsiveness.*" 3501-037 at 1 (emphasis added).

To be clear, the review process used in March that led Agent Rosenman to declare that "everything . . . has been reviewed for Responsiveness" did not involve actually looking at any of the documents they tagged as responsive. Agent O'Rourke, who reviewed the lion's share of the materials, did not make any effort to do anything beyond running the search terms. Tr. 365:18–366:22 (O'Rourke) ("So essentially in those four-and-a-half hours, what you were doing was running the search terms and bulk tagging, right? A. Yes. . . . I may have clicked into some, but that wasn't really what I was engaged in."); Tr. 381:18–20 (O'Rourke) ("Q. You didn't open any documents during your key word search? A. If I did, I don't recall. If I did, it wouldn't have been many.").

And Agent Rosenman described his bulk-tagging process as looking at the "results matrix" in Relativity and its list of "metadata about the individual documents"—specifically the "'to,' 'from,' and if there was a subject of the email." Tr. 416:24–417:18 (Rosenman). Agent Rosenman's conduct is especially telling given his knowledge that "sometimes even Relativity

BSF

will give you stuff that doesn't hit on the key word, but just pops up. There are some things that could be the key word or could be just Relativity giving you something that shouldn't be there at all." Tr. 494:4–13 (Rosenman).

That is not to say that the agents, including Agent Rosenman, lacked the time or resources to individually review documents or even to sufficiently sample the document sets to alert themselves to the fact that additional review was required to complete a reasonable search. The agents had time to identify documents for their own investigative use as "hot" (*i.e.* highly relevant or inculpatory) documents. 3501-034 at 5; Tr. 437:18–23 (Rosenman) ("Q. Understood. So, you write in your top email: Here is a preliminary list of keywords to add to. We can use the keywords for responsive review purposes and then review the hits for hot docs if that works. Correct? A. Correct."); *see also* 431:15–432:20 (Rosenman).

And of course—as was entirely foreseeable—the vast majority of what the agents tagged as responsive only hit on the term "Tricolor," likely because of its presence in Mr. Chu's email address and signature block. *See* 3501-070; Tr. 377:21–378:1 (O'Rourke) ("Q. So you saw that that search term, just that one search term that was yielding more than 50 percent, right? A. Yes. Q. And you didn't think, hey, maybe we shouldn't use this search term? A. No, of course not."); Tr. 497:3–11 (Rosenman) ("A. Some emails got marked because they hit on the Tricolor key word. Q. And for no other reason? A. Possibly, yes.").

**3. Limited, Exclusion-Driven "Quality Control" Review**

While the agents had declared the review "complete" after running search terms, about a month later, it was finally suggested that they do some QC because of the number of "false positives." 3501-041 at 1. In fact, one of the AUSAs had realized that Agent O'Rourke's review had resulted in a vast over-seizure, and Agent Rosenman offered to assist him. *Id.* But because no one was in charge, even after the prosecutors identified a clear problem, each agent was left to do his own QC, which was just as botched as the original search.

To begin with, because there was no discussion of *what* the QC process should or could consist of, or mandate to conduct any QC, not everyone did. Tr. 207:6–10 (Kash) ("I tagged responsive documents and what I believe to be responsive documents, and I do not have any experience trying to actively not tag documents. I just don't have a – that's not how I see the review process."); Tr. 106:7–10 (Kroll) ("On March 19 when Agent Rosenman writes, Everything is done except for [Goodgame's], phone; you don't recall anyone ever saying QC or quality control, right? A. Not that I recall."). And the AUSAs did not themselves QC the documents the four reviewing agents tagged as responsive. Tr. 143:1–8.

To the extent there was any QC, the evidence shows that it was not actually intended to ensure compliance with the warrants. Instead, it was intended to be the most expedient way possible to weed out potential spam without ever having to make judgment calls, all in service of trying to get the total responsiveness rate down from 80% to a more defensible number.

Agent Rosenman described his approach as exactly that. He looked solely at document metadata, and looking especially at the "from" and "subject" field, he would exclude some senders of obvious spam emails, like bulk solicitations. Tr. 416:24–417:18 (Rosenman); *see also* Tr. 454:4–11 (referring to GX2 at 2). Even this approach didn't work, as Agent Rosenman did not

BSF

even come close to identifying all of the junk mail that he had tagged as responsive using the search terms. Tr. 484:10–23 (Rosenman).

Agent Rosenman expressly acknowledged that his QC process really only worked for repeated and consistent junk mail. Tr. 485:3–7 (Rosenman) ("Correct. If it was a one off out of a hundred on the screen, I may not have seen this one. As using your example earlier of the New York Times where there's often multiple ones that would often help pick out the ones that were obviously spam."). This process undoubtedly did not work for many other kinds of documents, such as emails in which Mr. Chu emails himself, or blank emails with to/from metadata but no content. Tr. 483:1–25 (Rosenman) ("Q. And then when you looked on that Relativity dashboard that we looked at before, GX2. You saw that the metadata said Daniel Chu, Daniel Chu. There was nothing spammy about it, right, so it didn't come out in any of your culling, right? A. No. Q. That's why it didn't get picked up in a QC? A. Well, the QC wasn't only looking for junk mail, but that was one of the primary goals of the QC. But as well -- here, it's an email moving between accounts, so I might have thought at the time that it was responsive. I don't recall specifically these emails or the set of emails to give you a definitive answer."); Tr. 495:2–10 (Rosenman) ("Q. And again when you were looking at the metadata in Relativity, this is not an obvious spam email because it's Daniel Chu to himself, so you would have never taken it out, correct? A. I should say I wouldn't necessarily have focused on it given that it's from one email account to another, doesn't appear to have a subject, so may not have been something I clicked on to see the body of, or may not have been."); *see also* DX31 (blank email containing search term "Origin"); DX33 (blank email containing search term "Tricolor" only in email address for Mauricio Delgado).

As for Agent O'Rourke, his initial bulk-tagging review process did not involve "any culling or elimination of data responsive to a particular search term that appeared to be utterly irrelevant[.]" Tr. 325:21–326:1 (O'Rourke). His zero-effort approach to the review process predictably resulted in tagging a massive amount of documents—that were clearly junk mail, even just based on the document metadata—as responsive. And despite their demonstrated knowledge that O'Rourke's review did not work because of the overbroad search terms, the case team never considered revising them, including by limiting the use of "Tricolor" as a search term.[6]

O'Rourke was only later forced to conduct a QC when the obvious deficiencies of his review were called out by a prosecutor. 3501-041 at 1 ("Makes sense to use search terms, but we also want to make sure that we are doing a QC of a term's hits so that we're checking they don't produce a bunch of false positives."); Tr. 380:2–5 (O'Rourke) ("Q. There were no further communications between you and the team until after the team raised concerns about you planning to do more review, right? A. That's right."). And at that point, the discussion focused on attempting to eliminate junk mail to get the amount down to a more facially reasonable amount. Tr. 380:18–21 (O'Rourke) ("Q. There was no specific discussion about what was or wasn't working, right? A. I did have a conversation with my colleague Jeremy Rosenman about how to eliminate some junk emails. Aside from that, no."); 3501-048 (Rosenman: "I am not sure how

[6] Agent Kroll's declaration claimed (at paragraph 27) that "[t]he search term 'Tricolor' was run only after the other search terms had been used." To the extent that was intended to convey that the search term was used with some restraint—given how obviously overbroad it is in the context of this case—the evidence did not bear that out at all. To the contrary, it was clear that the term "Tricolor" was run across every data set.

Chris did his review. Looking at Relativity, Chris is at about 75% so probably can edit out some stuff.").

O'Rourke described his follow-up process as a combination of "eye-ball[ing]" the header information of emails and running additional search terms to exclude obvious junk by, again, batch coding. Tr. 326:3–18 (O'Rourke); *see also id.* at 334:1–24 (O'Rourke). Notably, the QC was not aimed at finding actually responsive documents or warrant compliance. *See* Tr. 383:17–384:5 (O'Rourke) ("Q. You weren't looking for actual responsive documents, right? A. During which time period are we talking about? Q. The QC process that you described on direct examination? A. Yes. . . . Q: It involved looking for nonresponsive documents, right? A. Yeah. Q. That had been mistakenly coded as responsive, right? A. Yes.").

Because his QC relied on email headers, it could not—and did not—catch blank or content-less documents. Simple tools, like sorting the documents by file size or text count, would have; Agent O'Rourke employed none. Tr. 386:24–387:4, 388:10–21 (O'Rourke). He admitted that he had never seen any of the examples shown to him on cross-examination, even though he had personally tagged them as responsive. Asked whether blank emails would have come up at all in his QC review, he answered "it wouldn't have." Tr. 389:6–11 (O'Rourke).

Agent O'Rourke likewise agreed that he "tagged numerous personal nonresponsive documents," even though "personal emails that have nothing to do with the categories of evidence defined in the warrant are not permitted to be seized." Tr. 396:8–15. Those documents included marketing emails from GrubHub, Mattress Firm, Jimmy John's and an email from Mr. Chu to himself containing nothing but a link to americanpregnancy.org—each of which Agent O'Rourke conceded was not responsive. Tr. 395–400 (O'Rourke); DX 68; DX 69; DX 70; Schwartz Decl. Ex. BB-18.

Agent O'Rourke ended his QC process when he "couldn't eyeball anymore nonresponsive or clearly nonresponsive documents." Tr. 343:21–24 (O'Rourke). As a result, although Agent O'Rourke re-tagged 30,000 documents as non-responsive, he left the responsive tag on over half of the documents he was tasked with reviewing. 3501-070; 3501-052; Tr. 402:11–23 (O'Rourke). He agreed that "there are many, many emails [he] reviewed that, even after [his] QC, were not responsive to the warrant." Tr. 400:9–12 (O'Rourke). In sum, a large volume of non-responsive documents was still erroneously identified and produced as responsive in violation of the Search Warrants as a direct, foreseeable result of the process adopted by the agents.

**4. Percentage-Driven Results**

A glaring reason why the review failed was that even the "quality control" process was aimed at achieving a result that appeared defensible without actually confirming it was in fact reasonable, by focusing on the number of documents tagged. Agent Rosenman made clear that the purpose of his review process was to achieve a certain "responsiveness" rate, in order to give the false impression that the agents had closely reviewed the documents and found a reasonable fraction to be responsive.

Agent Rosenman expressly observed that a 35% responsiveness rate seemed reasonable, and tried to get the review of the various accounts and devices "proportionally consistent." *See* 3501-048; 3501-063. He then marked 440 of 1,310 documents from Mr. Chu's iCloud account as

responsive, or 33.6%. *See* 3501-025. From device 1B21, he marked 2,903 of 8,361 documents, or 34.7%, as responsive. *See* 3501-034A. For 1B1, he marked an even 6,500 of 18,927 documents as responsive, or 34.3%. *See* 3501-063; *see also* 3501-059 (noting that "about a third has been marked Responsive"). *See generally* Tr. 490:1–493:3 (Rosenman).[7]

Once that responsiveness rate was achieved, Agent Rosenman concluded his review, leaving many non-responsive documents in the review set. He tried to deny this, but with respect, his denials were not credible. Not only is there the uncanny coincidence of the responsiveness rates for four different devices falling within a percentage-point of one another coupled with his express observation that 35% was reasonable, but Agent Rosenman offered after-the-fact justifications to defend his responsiveness "calls" that defied believability. Of course, that's because he made no such calls; even Agent Rosenman admitted his process did not call for actually looking at the content of *any* of the emails he tagged responsive. Tr. 416:24–417:18, 495:11–16 (Rosenman). Nonetheless, for example, when presented with a series of blank emails between Mr. Chu and himself, Agent Rosenman argued that they might be responsive: "it depends on other information we may have; was there a phone call going on at the same time or something else. I wouldn't immediately say just on the face of it it's nonresponsive or responsive. But given that Mr. Chu was the subject, it could be why I marked it as responsive; but I don't know why specifically whether it was result of a key word or something else why it was marked." Tr. 482:14–25 (Rosenman). He even suggested that a birthday card could be responsive. Tr. 452:2–8 (Rosenman).

Agent Rosenman also assisted Agent O'Rourke with reaching an artificial responsiveness rate so as to align Agent O'Rourke's results with the "baseline" rate "that [Agent Rosenman] had done." Tr. 445:7–17 (Rosenman) ("Q. You understood just from looking at the hit counts that the work that Agent O'Rourke had done which had produced 75 percent and 85 percent responsive rates was probably not accurate; correct? A. No, not until AUSA Fergenson mentioned that there was an issue. The hit counts themselves didn't signal anything, but once I had a baseline of what I had done and, in addition, that AUSA Fergenson had seen additional stuff in the review that Agent O'Rourke had done that was not responsive or had some more junk that he had noticed, to me at that point the percentage became relevant."); *see also* 3501-048 (Agent Rosenman: "I think I get to roughly about 35% responsive which seemed reasonable. I am not sure how Chris did his review. Looking at Relativity, Chris is at about 75% so probably can edit out some stuff").

## III. The Agents' Testimony Proves They Undertook a "General Search" and the Only Appropriate Remedy is Full Suppression

It is undisputed that the search conducted by the government effected a widespread seizure of items that were not within the scope of the warrant. *See generally* Schwartz Decl. & Exs. N–

---

[7] Although several of the agents correctly observed that there is no ideal responsiveness rate and that it was even conceivable that a device could contain 100% responsive documents, Tr. 372:21–22 (O'Rourke); Tr. 446:24–447:1 (Rosenman)—think of a phone used by a drug dealer solely to transact business, for example—Agent Rosenman quite correctly acknowledged that he had never seen anything like that in data sets as large as the ones at issue here. Tr. 447:17–448:5 (Rosenman).

BSF

II. By their own accounts, the agents knowingly identified as responsive thousands and thousands of non-responsive and often highly personal chats and emails under the auspices of "context" and "relationship" or simple laziness. *See, e.g.*, Tr. 120:24–121:22 (Kroll); Tr. 391:10–14, 394:16–21 (O'Rourke); Tr. 493:24–494:3 (Rosenman). We respectfully submit that the evidence adduced at last week's hearing also demonstrates that the agents did not act in good faith.

We fully appreciate that is a difficult thing to ask the Court to find. But this is what bad faith in the execution of ESI warrants looks like: the knowing over-seizure of vast amounts of non-responsive material coupled with no meaningful process to ensure warrant compliance. Here, the agents had the warrants in hand, but the way they conducted their search made those warrants meaningless. They used extraordinarily broad search terms (as well as unknown ones that might be broader still) that ensured they seized large volumes of non-responsive materials including every document that had Mr. Chu's email address on it. And for chats, they seized entire years-long conversations without regard to even their own given rationales. The evidence shows that the agents ran a process that was intentionally overinclusive and then reviewed their work only to filter out *some* spam email—but nothing else. The process virtually never involved actually looking at the content of what they were seizing, even on a sample basis, to ensure compliance.

Again, it is not the defense's position that there is a single right way to execute a warrant for ESI, or that there must be a written search protocol, or that any particular tool or technique must be employed. The touchstone, as Agent Kash's warrant affidavit said, is reasonableness. But this process was not reasonable. No one could reasonably dispute, for example, that if the agents had told the reviewing magistrates the way they intended to execute these warrants, those judges would have declined to sign. The government took the reckless and bad faith approach it did here—and perhaps in other cases[8]—obviously believing that it would never have to reveal let alone defend its methodologies. Having been forced to, it now asks for forgiveness when it is obvious it never would have gotten permission in the first place. Blanket suppression is the appropriate remedy.

The government's bad faith is especially apparent when its conduct in the search is put alongside its conduct of the litigation of this case. Doing so makes crystal clear that the adequacy of the government's search—and with it, Mr. Chu's Fourth Amendment rights—was forced to give way to its desire to secure a short trial date:

[8] Although the record does not definitively answer this question, we are skeptical (including as a result of our own prior experience in other cases) that the government's review in this case even remotely resembles "business as usual." To the contrary, the evidence shows that the review in this case was influenced heavily by the government's desire to set and keep an early trial date, even though it had failed to conduct a timely review. 3501-034; 3501-063.

BSF

**October 7**
Devices seized
*(Kroll Decl. ¶ 6)*

**October 30**
iCloud received
*(Kroll Decl. ¶ 7)*

**December 15**
Indictment returned
*(ECF 2)*

**January 13**
Arraignment

**March 11**
Government receives 1B1, 1B5, 1B7, 1B21 emails.
Rosenman: "I am prepping for a trial next month and Kash and Kroll are mostly tied up over the next two weeks"
*(3501-034 at 4)*

**March 19**
**12:04 PM**
O'Rourke: "Im gonna start working on the device with 90K plus documents I'll start with keywords for now."
*(3501-034 at 1)*
**2:00 PM**
AUSAs: "[T]he government [responsiveness] review is ongoing. . . . We are ready for trial."
*(Hr'g Tr. at 5:19–20, 12:7)*
**4:38 PM**
O'Rourke: "I completed a responsiveness review of 1B1 and 1B5 using the keywords."
*(3501-034 at 1; 3501-034A)*
**6:04 PM**
Rosenman: "1B21 and 1B7 are complete. … The only device docs left are for Goodgame's phone."
*(3501-034 at 1; 3501-034A)*

**May 20**
Chu moves to adjourn
*(ECF 50)*

**June 3**
Government opposes adjournment: "The Government will endeavor to complete its responsiveness review of these five devices as reasonably quickly as possible."
*(ECF No. 56 at 4)*

**June 16**
Government receives 1B1, 1B5, 1B7, iCloud chats.
*(3501-052; 3501-063)*

**June 17**
AUSA: "Below are assignments for responsiveness reviews. I'll send a check in invite for next Friday [June 26]."
*(3501-063 at 1)*

**June 19**
Court schedules hearing for June 30 "regarding the production of materials from electronic devices and iCloud accounts of Tricolor that were utilized by Mr. Chu or were seized from Mr. Chu pursuant to warrant."
*(ECF No. 73)*

**June 22**
**9:56 AM**
AUSA: "Folks. The court has scheduled a conference for June 30 (week from tomorrow) to address the state of the responsiveness reviews. Anything you can do to get as much as possible done this week would be great."
*(3501-063 at 1)*
**6:34 PM**
Rosenman: "For 1B1, I ran all of the key words along with some variations and phone numbers. I tagged positive hits after spot checking."
*(3501-063 at 1)*

**June 29**
AUSA: "The government has completed its responsiveness review"
*(ECF No. 85 at 1)*

BSF

The government charged this case before it was ready to do so and then repeatedly demanded that this Court set an early trial date and decline to move it, even as its discovery failures continued to mount. Mr. Chu was indicted in December, two months after the second of the two Search Warrants was executed. Despite non-privileged emails being released to the case team in early December (about a week before the indictment was returned), the responsiveness review did not begin until around February, and the government did not so much as look at any of the documents from the imaged devices or even settle on an (incomplete) search term list until March. But the most transparent indicator of what motivated the faulty responsiveness review was the government's announcement at the March 19, 2026 conference that it was "ready for trial." Schwartz Decl. Ex. E at 12:7. That statement was obviously wrong when it was made, but last week's hearing showed what was going on behind the scenes. The same day that the government declared itself "ready for trial" is the day that the case agents purported to conduct their entire responsiveness review of all of the devices on Relativity, using nothing but search terms. That review resulted in 80% of all documents being tagged responsive.

Then, with Mr. Chu's adjournment request pending—a request precipitated largely by the government's pace of discovery—and in advance of another conference in June 2026, the agents were pressed to get as much done as possible so that the government could try to maintain the earlier trial date, *even though everyone knew at that point that there were serious problems with the review. Compare* 3501-048 at 1; ECF No. 73; 3501-063 at 1. Put in this context, this review was not only lazy, sloppy, and erroneous, but it was intentionally rushed without regard to Mr. Chu's constitutional rights. The government should absolutely not be permitted to wield any evidence secured by such a deficient process against Mr. Chu at trial.

If the Court nevertheless declines to order blanket suppression, the government has conceded that suppression of the evidence non-responsive to the warrants—including all non-responsive emails and texts—is the appropriate remedy. *See* Sept. 24, 2026 Hr'g Tr. at 18:20–19:21; *see also United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (cited in ECF No. 124 at 20). And because of how the government deliberately chose to conduct its review and mark items responsive, that means that, on this record, *all* text threads that include non-responsive messages that were not necessary to understand or contextualize the responsive ones must be suppressed—including but not limited to Defense Exhibits 1, 2, 58, 59, 61, and 66. The government knew the majority of those messages were not permitted to be seized under the warrants and they seized them anyway because of undocumented and undisclosed (not to mention non-uniform) "practice." Permitting the government to have a second attempt at doing a constitutional review in order to isolate non-responsive materials from purportedly responsive ones would be highly prejudicial to Mr. Chu, not to mention cause significant delay if the Court takes the agents seriously that a more thorough review would require significantly more time (and if the Court doubts those dubious claims, it is even clearer that blanket suppression is warranted).

Finally, the government's suggestion that this be resolved when the government identifies exhibits is even more deficient. Especially given the vast scope of the seizure of non-responsive materials, the government is not entitled to retain non-responsive material and continue to use it for investigative or other purposes. Evidence seized in contravention of the Fourth Amendment must be suppressed immediately before Mr. Chu is even further prejudiced.

BSF

*        *        *

Thank you for your consideration.

Respectfully,

/s/ *Matthew L. Schwartz*

BOIES SCHILLER FLEXNER LLP

Matthew L. Schwartz
Craig A. Wenner
Jacqueline C. Kelly
55 Hudson Yards
New York, New York 10001
Telephone: (212) 303-3646
E-mail: mlschwartz@bsfllp.com
cwenner@bsfllp.com
jkelly@bsfllp.com

WEIL, GOTSHAL & MANGES LLP

Adam Fee
1999 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Telephone: (213) 667-5100
E-mail: Adam.Fee@weil.com

*Attorneys for Daniel Chu*