**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 21, 2026

**BY ECF**
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Daniel Chu*, S1 25 Cr. 579 (PKC)**

Dear Judge Castel:

The Government respectfully writes in response to the defendant's post-hearing submission concerning his motion to suppress the fruits of duly authorized search warrants. (Dkt. 185 ("Def. Ltr.")). The three-day long evidentiary hearing established that the Government conducted a careful, reasonable search and responsiveness review of substantial volumes of electronic data. Nothing in the record supports the defendant's claim that the agents flagrantly disregarded the warrant, carried out a "general search" or "widespread seizure," or acted in bad faith. The defendant's letter mischaracterizes the hearing testimony, distorts the record to support his unfounded claims, and attempted to convert ordinary investigative judgment into constitutional error. The defendant's suppression motion should be denied.

A. The Government's Search Was Reasonable and Abided by the Terms of the Warrant

As an initial matter, the evidence at the hearing uniformly established that the Government conducted a reasonable search of a large volume of electronic evidence. Over three days of testimony, four federal agents testified about the careful process they followed in conducting their responsiveness review. Each agent testified that they received and reviewed copies of the warrants before beginning their respective reviews. (Tr. 31:24-32:1 (Kroll); 180: 6-10 (Kash); 332: 20-22 (O'Rourke); 412: 25-413: 3 (Rosenman)). After reviewing the warrants, each agent followed a reasonable process to sift through the large volume of material to which they had been assigned.

Agent Kroll, for example, testified that he reviewed every single document he marked responsive. (Tr. 17: 4-21). Agent Kash, for his part, did not mark anything responsive at all, but reviewed "substantially all" materials available. (Tr. 181: 8-10; Tr. 184: 2-4). Their methods fit the type of review they were doing: Agents Kash and Kroll primarily reviewed cellphones on Cellebrite and the limited Relativity review they did was, in some cases, duplicative of the Cellebrite review they performed. (Tr. 17: 4-21 (Kroll Testimony regarding Cellebrite); Tr. 42 (Kroll testimony regarding similarity between Relativity and Cellebrite materials); Tr. 179: 21 –

180:5, 181: 8-12 (Kash Testimony regarding Cellebrite review)). Stated differently, their quality control process was baked into how they reviewed their devices.

Agents Rosenman and O'Rourke, on the other hand, had tens of thousands of documents to review on Relativity, primarily from the 1B1 and 1B5 devices. Those data sets were searched, at the outset, with keywords. (Tr. 324: 14-19 (O'Rourke); Tr. 416: 22 – 417: 8). Agent Rosenman testified that he methodically worked in a quality control process as he was reviewing keyword hits on Relativity. (Tr. 417: 9-18). And Agent O'Rourke testified that he adopted Agent Rosenman's process after a discussion with him. (Tr. 332: 24 – 333:1). He spent nearly a week on that process and only stopped after it appeared to stop yielding results. (Tr. 343: 14-24). This process was reasonable and reflects agents using their judgment to conduct reasonable searches of the data sets they were assigned.

In response, the defendant argues that the search was "disorganized and reckless" because no one was "in charge." (Def. Ltr. at 3). But the Fourth Amendment doesn't require law enforcement to operate with a law firm-like hierarchy. The hearing testimony from the four agents shows coordination: the agents met to discuss progress, jointly determined which devices warranted full review, selected appropriate platforms, and consulted prosecutors when needed. As the defense drew out on cross, the case team met several times to discuss status of the responsiveness review. (Tr. 106-111). The case team collaborated in deciding to forego review of certain devices (Tr. 14: 13-15); which data sets to carefully review (Tr. 17: 9-16); and which platforms to use for others to facilitate cross-agency collaboration (Tr. 412: 6-20). Where appropriate, agents sought guidance from the prosecutors and prosecutors provided feedback as well. (Tr. 22: 4-10; 3501-50).

The defendant also argues there was "confusion" among the reviewing agents about the "limits" imposed by the warrants. (Def. Ltr. at 5). Not so. As noted above, each agent testified they reviewed the warrant and understood the categories of items they could seize before beginning their search. In support of this strained argument, the defendant cites to exchanges with Special Agent Kroll on cross-examination in which he was asked about the "parameters" of the warrant. But those exchanges were part of a series of questions which the Government pointed out were designed to "mislead[] the witness," (Tr. 74:16), and—in any case—Special Agent Kroll appeared to be responding to a confusing defense question about "methods that resulted in a taking a whole lot of stuff," (Tr. 74: 7), when he accurately responded that no particular method for the search was "forbidden by the warrant," (Tr. 74:11), and "the warrant does not dictate such parameters [for search methods] by the letter," (Tr. 75:3-4).

The defendant's argument doesn't stop there. He also claims there was "confusion" in how the agents handled "privileged spousal communication." (Def. Ltr. at 5). But there was no confusion, let alone error in the Government's process. It is black letter law that the Government may use spousal communications to investigate matters, *see Trammel v. United States*, 445 U.S. 40, 53 n.12 (1980), and spousal privilege is a testimonial privilege that is not appropriately invoked at this stage, *United States v. An*, 733 F. Supp. 3d 77, 106 (E.D.N.Y. 2024) ("Finally, to the extent the Government reviewed documents protected by the marital communications privilege . . . the

Court may exclude such evidence on motions *in limine*; however, those determinations would be premature at this stage.").

Putting aside the legal infirmity of this point, the defendant cites extra record material to try to make it. The defendant claims that Agent Kroll somehow meaningfully testified about how communications that he was not a party to. (Def. Ltr. at 5). He did not. Those communications were exclusively between his prior counsel and personnel at the U.S. Attorney's Office. In the cited portions of the record, all defense did was read portions of an exhibit (DX64) that Agent Kroll was not a party to and was never admitted into evidence. The Court should reject the defendant's efforts to backdoor extraneous, irrelevant materials into the record.

Finally, the defendant's arguments on the device identified as 1B4 are similarly misplaced. The agents reviewed the device, found no responsive material, and seized nothing. (Tr. 34:22-24). Counsel never identified when discussing other devices for return and it was located among the defendant's own devices. (Tr. 270:1-3; 3501-03). Contrary to the defendant's insinuation that the Government committed an "egregious" error in reviewing this device, (Def. Ltr. at 7), the results of that review prove the Government abided by the warrant's terms: no responsive material was identified from that device. (Tr. 34: 22-24).

B. The Defense's Critiques of the Government's Process Are Unfounded

The defense next levies a bevy of specific criticisms against the Government for how the agents sifted through a large volume of material and designated materials responsive. None of these claims support the defendant's motion for blanket suppression.

First, the defendant challenges the Government's practice of tagging whole message threads responsive, calling the agent's explanations for doing so "pretext." (Def. Ltr. at 12). That is flat out wrong. The reviewing agents testified that tagging full message threads was not only consistent with prior practice, (*e.g.*, 414:2-10 (Rosenman)), but tagging anything less would mean losing out on "context, timeline, relationship." (Tr. 117: 14). Agent Kroll credibly testified that it would be "impractical to try and disaggregate" responsive and nonresponsive "line items" in a text message thread given how "[the defendant's] personal and professional relationships overlap." (Tr. 117: 11-19). Agent Rosenman underscored this when he testified about how "people don't normally speak in chat . . . in a linear fashion, you might go from one subject to another and then come back to a subject over time." (Tr. 414:13-21). And notably, Judge Kiyo Matsumoto, United States District Judge for the Eastern District of New York, made the same observation in *An* that tagging individual messages can be "impracticable" when "nonresponsive material [is] interspersed throughout the thread." 733 F. Supp. 3d at 105.

The defendant purports to be "astonished" by Agent Kash analogizing a message thread to a "cabinet drawer" and proclaims "no agent could believe in good faith that he could seize an entire cabinet drawer of files because one page of one document was responsive to the warrant. (Def. Ltr. at 12). As an initial matter, Agent Kash did not say that "one page of one document" warranted taking a cabinet drawer. The defendant's efforts to twist Agent Kash's testimony aside, the concept of seizing a cabinet drawer shouldn't "astonish[]" the defendant: the Second Circuit has gone

further and expressly held that seizing "all files in . . . file cabinets" after a brief search of those cabinets for responsive materials "bear[s] none of the hallmarks of a general search. *United States v. Shi Yan Liu*, 239 F.3d 138, 141 (2d Cir. 2000).

Second, the defendant challenges the Government's use of search terms and QC process to reduce the over-seizure of non-responsive materials. But keyword breadth does not render a search unreasonable; it merely informs the structure of subsequent review. The agents' layered process, including manual checks, metadata review, and selective exclusion, was reasonable. The defendant's fixation on numerical responsiveness rates is misplaced. There is no evidence in the record that any agent was seeking "percentage-driven results," (Def. Ltr. at 19), as the defendant claims. Indeed, the defense elicited this—after clarification from the Court—from Agent Rosenman on cross-examination:

> Q: Isn't it true in this case you in fact manage your reviews to one-third, and then you stopped?
>
> The Court: Was your question - - I may not have heard it correctly - - that you managed your review to get down to that percentage. Is that what question you asked was?
>
> Q: In other words, you conducted your review to get the total number of responsive documents down to a third, and then you stopped your, quote, unquote QC?
>
> The Court: Thank you. I wasn't sure I heard what you said. Do you understand the question?
>
> The Witness: Yes, Your Honor.
>
> The Court: And your answer.
>
> A: No, cause there was a device that has no responsive documents.

(Tr. 489: 12-25).

For good measure, the defendant critiques the Government's technology review platform, (Def. Ltr. at 10 (criticizing the Government for paying for an "out-of-date version of Relativity")), but does not explain how that choice has any constitutional significance.[1]

---

[1] The defense took pains to call their own discovery vendor and proffered to the Court that the vendor representative knew "all of the relevant technology including the common features that the government does have . . . including the import into Relativity of files." (Tr. 287:21-22; 294:18-19). Turns out, the vendor representative has only used a version of Relativity—unclear whether it is the version available to the Government (likely not)—"at RelativityFest and perhaps at LegalWeek," (Tr. 313: 24-25), and has never "uploaded data into Relativity," (Tr. 314: 2-3). More

C. <u>There Was No Bad Faith</u>

Most fatal to the defense's motion is the total and complete lack of bad faith on the part of the agents who conducted the responsiveness review. As noted above, the agents worked diligently to conduct the search here using reasonable means. Nothing in the record lends credence to the defendant's claim that the agents acted in bad faith.

The defendant stretches to argue that the Government's "bad faith" is "apparent" when "put alongside its conduct of the litigation of this case." (Def. Ltr. at 21). Here, the defendant seems to argue that the Government rushed its responsiveness review in its effort to keep its preferred trial date. But there is no support in the record for such a claim. In fact, the defendant pressed this point several times during intense cross examinations of the agents, and at no point did any agent concede that the responsiveness review was rushed or corners were cut. In fact, the defense elicited just the opposite as the below colloquy with Agent Kroll demonstrates:

> Q: Now, you understood that it was important for the government to conduct its responsiveness review promptly, correct?
>
> A: Not necessarily. It was important for the government a full thorough reasonable search.
>
> Q: Well, forgot about legal requirements. It was important for your investigation to do that promptly, correct?
>
> A: No, I will not forget about legal requirements, and it is relevant.
>
> Q: I mean putting aside the legal requirement. It was important for your investigation to do it promptly, right?
>
> A: That is no way dictating how we conduct or search the timeliness in which to conduct a search.

(Tr. 75:12-24).

The defendant also jumbles the timeline in his attempt to ascribe bad faith to the Government. For instance, the defendant states that on March 19 the "case agents purported to conduct their entire responsiveness review of all the devices on Relativity." (Def. Ltr. at 23). But the Court heard directly from Special Agent O'Rourke. Special Agent O'Rourke testified that he had not completed his responsive review simply by running key words and he had never, in the course of his career, completed a responsive review by just running key words. (Tr. 329: 10-12).

---

to the point: he had no knowledge of what the capabilities of the Government's version of Relativity offers. (Tr. 314:21-25).

Finally, the defendant—despite having the ability to do so through their vendor —chose not to challenge the fact that the agents seized only .08% of all available data they were legally authorized to search. (Kroll Decl. ¶ 30).[2] That fact is fatal to their claim that this search was somehow a bad faith fishing expedition.

In sum, despite days of cross-examination at the hearing and over twenty pages of post-hearing briefing, the defendant has utterly failed to evince even a shred of bad faith on the part of the Government.

* * *

As a final note, the defendant is wrong about the Government's position on a remedy. Despite his assertion, the Government never conceded that "suppression of the evidence non-responsive to the warrants . . . is the appropriate remedy." (Def. Ltr. at 23). The Government conceded at oral argument and, again, repeats that it has no intention of introducing nonresponsive material at trial. (Oral Argument Tr. 19: 13-21 ("I think ultimately we are telling your Honor that we will not introduce nonresponsive documents. We are happy to engage with defense, as we noted in our papers, for an orderly process of the identification of nonresponsive materials in return. But in terms of actually ruling on the motion, I think the remedy they seek is blanket suppression. And I think the only thing the Court needs to do is say whether blanket suppression is warranted or not warranted.")).

All the Court must do is deny the defendant's motion as courts routinely do in similar circumstances. *United States v. Hampton*, No. 24-2805-CR, 2026 WL 1689485, at *3 (2d Cir. June 11, 2026) ("Under the circumstances here, the execution of the warrant was reasonable under the Fourth Amendment and the officers did not show a flagrant disregard for the warrant requirement. We conclude that the district court *properly denied the motion to suppress*." (emphasis added)); *United States v. Oztemel*, No. 3:23-CR-00026 (KAD), 2024 WL 3090251, at *11 (D. Conn. June 21, 2024) ("Therefore, Defendant's motion to suppress evidence seized pursuant to the two warrants, on the grounds that the Government's execution of the warrants was unreasonable, is denied."); *United States v. Garlick*, No. 22-CR-540 (VEC), 2023 WL 2575664, at *13 (S.D.N.Y. Mar. 20, 2023) ("For all of those reasons, Defendant's motion for to suppress is denied."); *United States v. Messalas*, No. 17-CR-339 (RRM), 2020 WL 4003604, at *8 (E.D.N.Y. July 14, 2020) ("Messalas is not entitled to suppression based on the scope of the search."); *United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324, 332 (S.D.N.Y. 2019) ("In conclusion, Pinto-Thomaz's motion to suppress all evidence obtained pursuant to the iCloud warrant is denied.").[3]

---

[2] The defense's vendor explicitly testified that while he could compare the full image to the responsive set, he was not asked to do so by the defense. (Tr. 318: 6-14).

[3] *United States v. Nejad*, 436 F. Supp. 3d 707 (S.D.N.Y. 2020), presented facts not at issue here. There, the Court suppressed "429 pages of the 2,978 the Government intend[ed] to rely on at trial because those were identified after the "conclusion of the responsiveness review." *Id.* at 738. Nonetheless, when it came to the defendant's motion for blanket suppression, the Court decided

In the event that the defendant wishes to challenge the introduction of any exhibit that purportedly contains non-responsive material, he may do so, as the Court has noted, at the exhibit deadline. (Oral Argument Tr. 24: 3-21).

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________
Micah F. Fergenson
Shiva H. Logarajah
Justin V. Rodriguez
Assistant United States Attorneys

cc: Counsel of Record (by ECF)

that there was no "basis for blanket suppression of any documents prior to the conclusion of the responsiveness review." *Id.* at 738 n.7.