UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANIEL CHU,<br><br>Defendant. | S1 25 Cr. 579 (PKC) |

**THE GOVERNMENT'S CONSOLIDATED *DAUBERT* RESPONSE AND MOTION TO EXCLUDE THE TESTIMONY OF THE DEFENDANT'S EXPERT WITNESSES**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Micah F. Fergenson
Shiva H. Logarajah
Justin V. Rodriguez
Assistant United States Attorneys
-Of Counsel

**Table of Contents**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

APPLICABLE LAW ........ 3

ARGUMENT ........ 7

I. The Government's Expert Testimony Is Admissible ........ 7

A. The Palmer Expert Disclosure ........ 7

B. Professor Palmer's Opinions Rely on Sufficient Facts and Data ........ 9

C. Professor Palmer Deployed a Reliable Methodology ........ 12

D. Professor Palmer Will Not Invade the Role of the Jury ........ 13

II. The Court Should Exclude Mr. Dubinsky's Testimony ........ 15

A. The Dubinsky Expert Disclosure ........ 15

B. Mr. Dubinsky's Proposed Testimony Is Inadmissible Because it Narrates Explanations of "The Evidence," Supplants the Jury, and Is Not Expert Analysis ........ 17

C. The Court Should Exclude Mr. Dubinsky's Testimony that Is Not Adequately Disclosed 20

III. The Court Should Exclude Mr. Eisbruck's Testimony ........ 22

A. The Eisbruck Expert Disclosure ........ 23

B. Mr. Eisbruck's Proposed Testimony Is Inadmissible Because It Is Unreliable, Lacks Any Methodology, and Impermissibly Opines On Chu's Mental State ........ 23

## TABLE OF AUTHORITIES

Cases

*Amorgianos v. National Railroad Passenger Corp.*,
303 F.3d 256, 266 (2d Cir. 2002) ........ 5

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18, 21 (2d Cir. 1996) ........ 5, 12

*City of Provid., R.I. v. Bats Glob. Mkts.*,
No. 14 Civ. 2811 (JMF), 2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) ........ 4, 25

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579, 593-94, 596-97 (1993) ........ 3, 4, 5, 12

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136, 139, 142, 146 (1997) ........ 5, 6

*In re Elysium Health-ChromaDex Litig.*,
No. 17 Civ. 7394 (LJL), 2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) ........ 18

*In re Rezulin Prods. Liability Litig.*,
309 F. Supp. 2d 531, 541, 546 (S.D.N.Y. 2004) ........ 4, 18, 24

*LinkCo, Inc. v. Fujitsu Ltd.*,
No. 00 Civ. 7242 (SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ........ 18

*Nimely v. City of New York*,
414 F.3d 396, 397, 399 ........ 3, 5

*Primavera Familienstifung v. Askin*,
130 F. Supp. 2d 450, 528-29 (S.D.N.Y. 2001) ........ 24

*Querub v. Hong Kong*,
649 F. App'x 55, 57 (2d Cir. 2016) ........ 3

*Shatkin v. McDonnell Douglas Corp.*,
727 F.2d 202, 208 (2d Cir. 1984) ........ 5

*Tyler v. Bethlehem Steel Corp.*,
958 F.2d 1176, 1188 (2d Cir. 1992) ........ 5

*United States v. Castillo*,
924 F.2d 1227, 1232 (2d Cir. 1991) ........ 4

*United States v. DiDomenico*,
985 F.2d 1159, 1164 (2d Cir. 1993)........................................................................ 20

*United States v. Gatto*,
986 F.3d 104, 117 (2d Cir. 2021)........................................................................... 3

*United States v. Kaufman*,
No. 19 Cr. 504 (LAK), 2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021)................................... 3, 6

*United States v. Lumpkin*,
192 F.3d 28, 290 (2d Cir. 1999).............................................................................. 4

*United States v. Mahaffy*,
No. 05 Cr. 613 (ILG), 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007)........................................ 6

*United States v. Marsh*,
568 F. App'x 15, 16-17 (2d Cir. 2014)...................................................................... 19

*United States v. Mejia*,
545 F.3d 179, 194 (2d Cir. 2008)......................................................................... 4, 18

*United States v. Mendlowitz*,
2019 WL 6977120 ................................................................................................. 24

*United States v. Mrabet*,
703 F. Supp. 3d 442, 444 (S.D.N.Y. 2023).................................................................. 6

*United States v. Newkirk*,
684 F. App'x 97 ................................................................................................... 23

*United States v. Rahman*,
189 F.3d 88, 138 (2d Cir. 1999)........................................................................... 20, 25

*United States v. Sanders*,
No. 12 Cr. 0574 (LAK), 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) ................................. 23

*United States v. Scop*,
846 F.2d 135, 138 (2d Cir. 1988)........................................................................... 14

*United States v. Shea*,
No. 20 Cr. 412-4 (AT), 2022 WL 1598189 (S.D.N.Y. May 20, 2022) .................................... 19

*United States v. Tin Yat Chin,*
371 F.3d 31, 40 (2d Cir. 2004)................................................................................ 3

*United States v. Valle*,
No. 12 Cr. 847 (PGG), 2013 WL 440687 (S.D.N.Y. Feb. 2, 2013) .......... 6

*United States v. Williams*,
506 F.3d 151, 160 (2d Cir. 2007) .......... 27

Rules

Fed. R. Evid. 704(b) .......... 3, 24
Fed. R. Evid. 702 .......... 2-5, 7, 12, 18, 24
Fed. R. Crim. P. 16(b)(1)(C) .......... 6, 20
Fed. R. Evid. 402 .......... 5
Fed. R. Evid. 403 .......... 5, 19, 25

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant Daniel Chu's motion *in limine* to exclude the Government's proposed expert testimony of Dr. Christopher Palmer (*see* ECF No. 179 ("Chu Mot.")), and in support of its motion to exclude the testimony of Chu's proposed experts, Bruce Dubinsky and Jay Eisbruck.

Professor Palmer will offer a straightforward, data-driven analysis of Tricolor's internal and external loan records. His methods are transparent, reliable, and replicable, and readily meets the requirements of Rule 702. Chu's arguments for exclusion are meritless. The defendant's lead contention—that Professor Palmer's analysis is unreliable because it draws on internal company files rather than the historical IDMS database—misunderstands both the data and the nature of the analysis. The files that were used by Professor Palmer are the contemporaneous internal loan records that Tricolor's finance department maintained while preparing the monthly reports provided to lenders whose accuracy lies at the heart of this case. These records are, therefore, the *best* source files for Professor Palmer's analysis. The defendant's next objection—that Professor Palmer's code was not produced with the initial disclosure—is moot: while the Government's initial disclosures were substantial, the Government has now produced to the defense the underlying code associated with Professor Palmer's computational analysis, fully resolving any disclosure concern and leaving no basis to dispute the transparency of Palmer's methodology. Finally, the defendant's complaints about isolated terminology cannot carry the heavy burden of exclusion. Professor Palmer will not use the phrase "fraudulent" at trial or opine as to anyone's intent or state of mind. His use of the word "manipulation" is different, however, as it accurately describes objective, loan-level mismatches. Indeed, Chu's own expert uses that exact phrase repeatedly in his disclosure.

Whereas Professor Palmer performed the kind of verifiable analysis that falls in the heartland of proper expert testimony, the defendant seeks to call two witnesses to smuggle in improper and inadmissible testimony under the guise of court-qualified experts. The Court should not permit such testimony.

The defendant's first proposed expert, Mr. Dubinsky, would do little more than deliver the defense's narrative under the guise of expertise. He proposes to tell the jury "what the evidence shows" including who he believes participated in the fraud, and to opine on the supposed "complexity" of the charges. But none of this is proper expert testimony by any measure. Mr. Dubinsky has no personal knowledge of the facts; he offers no specialized insight beyond what any lay witness could provide; and his role would be to marshal and present the evidence in argumentative form rather than to apply any discernible methodology to it. Rule 702 does not authorize an expert to act as a second advocate, and the Court should not permit Mr. Dubinsky to assume that role. Worse, while the impropriety of certain testimony is obvious, Mr. Dubinsky's disclosure is bereft of his actual opinions let alone the reasons and bases for them. The Court should exclude his testimony in full, or at minimum dramatically narrow it and order prompt and robust supplemental disclosure.

The defendant's second proposed expert, Mr. Eisbruck, fares no better. He seeks to offer irrelevant and impermissible testimony to suggest that Chu operated Tricolor with good intentions. He seeks to compare Tricolor's operations to industry practice and custom; to testify about hypothetical scenarios involving theoretical warehouse debt facilities that are materially different from the ones that existed for Tricolor; and to blame Tricolor's collapse of the economic climate that followed the Covid-19 pandemic. And, like Mr. Dubinsky, he seeks to act as the hearsay narrator for emails that were sent to the defendant in order to suggest what the defendant's state of

mind was over the course of the fraud—precisely the kind of state-of-mind commentary Rule 704(b) forbids. All of this testimony is inadmissible and the Court should exclude it.

## APPLICABLE LAW

"An expert may be permitted to testify if he or she 'is qualified, reliable, and helpful.'" *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702). "The inquiry is 'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has "reliably applied" to the case. Fed. R. Evid. 702. Districts courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

A threshold issue is whether the witness "is qualified as an expert" to render the proposed opinion. *See Nimely*, 414 F.3d at 396. A witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004). Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13; *see also Querub v. Hong Kong*, 649 F. App'x 55, 57 (2d Cir. 2016) (excluding expert familiar only with foreign accounting standards, noting that because the expert "is not qualified to opine on [Public Company

Accounting Oversight Board] standards, she has no basis for comparing them with other standards”).

The first requirement—that the “expert’s scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue”—serves a dual purpose. First, “[i]n requiring that expert testimony be directed to ‘scientific, technical, or specialized’ knowledge,” the requirement “ensures that expert witnesses will not testify about lay matters” that are properly left for the jury, such as “facts or opinions stated by other potential witnesses” or “interpretations of conduct or views as to the motivation of parties.” *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Second, even testimony that is properly based on scientific, technical, or specified knowledge must “‘fit’ . . . the facts of the case.” *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not “usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.” *United States v. Lumpkin*, 192 F.3d 28, 290 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541. For example, if the proffered testimony pertains to “matters that the average juror is . . . capable of understanding on his own,” it is inadmissible. *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008); *see United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (district court should not admit testimony that is “directed solely to lay matters which a jury is capable of understanding and deciding without the expert’s help”).

Rule 702 also requires that the proffered expert testimony “is the product of reliable principles and methods” that are “reliably applied . . . to the facts of the case.” Fed. R. Evid. 702. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert’s reasoning or methodology is reliable: (1) whether the

theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citations omitted).

"Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith . . ., other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citations and internal quotation marks omitted) (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984), and *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation." *Nimely*, 414 F.3d at 397. The trial judge's exclusion of expert testimony will

be affirmed unless it constitutes an abuse of discretion. *See Gen. Elec. Co.*, 522 U.S. at 139, 142.

Finally, Federal Rule of Criminal Procedure 16(b)(1)(C) requires the defendant, for each expert witness, to provide "a complete statement of all opinions that the defendant will elicit from the witness," along with "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). While this "does not require a verbatim recitation of the testimony the expert will give at trial," it requires more than the "written summary" previously required under the Rules. Fed. R. Crim. P. 16 Adv. Comm. Notes, 2022 Amendment. Even before Rule 16(b)(1)(C) was amended in 2022, the advisory notes to the Rule recognized that the purpose of this requirement is "to provide the opponent with a fair opportunity to test the merits of the expert's testimony through focused cross-examination" and "to permit more complete pretrial preparation," Rule 16 Adv. Comm. Notes, 1993 Amendment, and courts have observed that "[m]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions." *Kaufman*, 2021 WL 4084523, at *19 (collecting cases); *see also United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) (same). Similarly, in the aftermath of Rule 16's amendment, "[s]ince an expert witness, by definition, offers opinions outside the everyday knowledge of judges and juries, detailed specificity is required as to bases for those opinions before a court can adequately assess their admissibility or a defendant can contest their weight and meaning before a judge or jury." *United States v. Mrabet*, 703 F. Supp. 3d 442, 444 (S.D.N.Y. 2023). "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial." *Kaufman*, 2021 WL 4084523, at *19; *see also United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (same).

## ARGUMENT

### I. The Government's Expert Testimony Is Admissible

There is no basis for excluding the testimony of Christopher Palmer, a highly qualified finance professor at the MIT Sloan School of Management. The defendant's motion is premised on a series of misunderstandings about his methodology and mischaracterizations of the data he analyzed. None of these arguments implicate Rule 702's requirements. Chu claims first that Professor Palmer's analysis is based on insufficient facts and data because he used reports generated from a particular database rather than querying the database directly. Next, he asserts that there is no reliable methodology, even though, in response to the defense's motion, the Government has now provided a supplemental production of the underlying code used in Professor Palmer's analysis.[1] Finally, he complains about certain word choices in the expert disclosure summarizing Professor Palmer's opinions. None of these arguments offers basis for excluding the testimony of Professor Palmer. The motion fails to identify an unreliable method, an unfounded analytical step, or any actual risk that Professor Palmer will offer the jury improper conclusions. Indeed, Chu's arguments and the disclosure of one of his own experts reflect instead broad agreement with the basic parameters of Professor Palmer's proposed expert testimony. The Court should reject each of Chu's arguments with respect to Professor Palmer.

#### A. The Palmer Expert Disclosure

Professor Palmer is the Eastman Kodak Associate Professor of Management and an Associate Professor of Finance at the MIT Sloan School of Management. (Dkt. 180, Ex. 1 ("Palmer Disclosure") ¶ 1). He teaches courses and conducts research in asset-backed securitization—including in connection with the auto industry—as well as corporate finance, consumer finance, credit markets, banking, and applied econometrics. (*Id.* ¶ 2).

[1] The defense did not request Professor Palmer's code prior to filing their motion.

As disclosed in the Government's expert notice, Professor Palmer will testify about his analyses of double-pledged and manipulated loans that were pledged by Tricolor to its lenders and bondholders. (*Id.* ¶¶ 13-36). Professor Palmer reviewed Tricolor's internal loan data as well as the data Tricolor reported externally to its various lenders and bondholders, and performed a data analysis that identified double-pledged and manipulated loans over time. In aggregate, Professor Palmer found that over $1 billion of Tricolor's collateral was double-pledged, that over $1 billion of Tricolor's collateral was manipulated, and that (because some loans were both double-pledged and manipulated) over $1.8 billion of Tricolor's collateral was either double pledged or manipulated. (*Id.* ¶¶ 17, 26, 34).[2]

Professor Palmer deployed the following methodology for his double-pledging analysis: he identified double-pledged loans by comparing, for each month, the loan data in monthly servicer reports ("MSRs") that Tricolor provided to its lenders, as well as the loan data for Tricolor's periodic securitizations ("TASTs"). With respect to the securitizations, to be conservative, even though a given securitization occurred in a particular month, the securitized loans were not analyzed for double pledging until three months following the securitization date, as the TAST loan pool could have fluctuated during that period under the terms of the securitizations. (*Id.* ¶ 20 n.2). In order to match double-pledged loans across these data sources, Professor Palmer generally "relied on the Account Number, VIN Number, and Note Date data fields for matching, and adjusted the matching requirements to deal with missing data, errors or potential manipulation of the loan details." (*Id.* ¶ 15).

As for manipulated loans, Professor Palmer compared the loan data reported externally to Tricolor's lenders on MSRs with the loan data from Tricolor's internal files (referred to as "IDMS

[2] These figures use the "Narrow" manipulated collateral analysis performed by Professor Palmer.

Reports").[3] (*Id.* ¶ 12, 22). In order to match loans across the external and internal data sources, Professor Palmer generally "relied on the Account Number, VIN Number, Note Date, and Obligor Name data fields, and adjusted the matching requirements to deal with missing data fields and errors or potential manipulation of the loan details." (*Id.* ¶ 15). Professor Palmer then employed two standards to identify manipulation in matched loans, one "Broad" and one "Narrow." (*Id.* ¶¶ 24-25). The Broad analysis identified a loan as manipulated if any data field differed internally and externally. (*Id.* ¶ 24). The Narrow analysis flagged a loan as manipulated only in three specified circumstances "that are unnatural in the course of managing auto loan ABS program," such as if a loan was written off on Tricolor's internal data yet purportedly active on the external MSR data. (*Id.* ¶ 25). Palmer assumed that Tricolor's internal data was the source data subject to manipulation before being shared externally. (*Id.* ¶ 22).

Professor Palmer performed a computational analysis and the Government has produced the associated code to the defense.

**B. Professor Palmer's Opinions Rely on Sufficient Facts and Data**

Chu's first asserts that Professor Palmer relied on the "wrong" data from Tricolor's internal loan-level database—known as IDMS—when he used what his disclosure labeled "IDMS Reports" rather data from the IDMS database itself. (Chu Mot. 5-9). Chu claims that the analysis depends on an "assumption" that the IDMS Reports "accurately reflect the 'loan data from Tricolor's internal files,'" and suggests that only a direct pull from the IDMS database would suffice. (Chu Mot. 5 (quoting Palmer Disclosure ¶ 12)). That argument misunderstands both what these internal files are and what the expert's analysis is designed to measure.

[3] As explained below, the IDMS Reports came from Tricolor finance's internal shared drive for monthly servicer reporting, not directly from IDMS.

The IDMS Reports used in Professor Palmer's analysis quite literally *are* the "loan data from Tricolor's internal files." Specifically, these files were saved by Tricolor's finance department in the ordinary course of preparing the monthly servicer reports ("MSRs") sent to lenders. Chu concedes as much in his motion, acknowledging that these files come from Tricolor's internal shared drive. (Chu Mot. 6). What Chu leaves out—but what the metadata shows—is that these files come from Tricolor's internal shared folder named "Accounting," and have the following general file path that then leads to year-and-month-specific folders: "Accounting > Finance > Banking > Servicer Reports." The files themselves are generally named with two conventions: the earlier files are named "Data for Tricolor All Contracts Since 2010 [Month Year]" and beginning in 2021 the files are named "TH[4] Data Tape [Year-Month]." In other words, they are the very data Tricolor used when deciding what to represent externally. Chu harps on the fact that former Chief Financial Officer ("CFO") and cooperating witness Jerry Kollar often saved down these files (Chu Mot. 6-7), but that is to be expected: these files were taken from finance's shared drive for monthly servicer reports, and Kollar was the CFO tasked by Chu with implementing the fraud.

Chu's counter-argument, that Professor Palmer should instead have queried the underlying IDMS database, lacks both legal and practical foundation. Because Tricolor did not preserve historical monthly snapshots of its IDMS database (the only version that exists is the IDMS data as preserved by the bankruptcy trustee in September 2025), there is no database-as-it-existed in 2019, 2020, or any other relevant month for Professor Palmer to query. And even if some sort of data reconstruction were theoretically possible from the IDMS database, it would not answer the question Professor Palmer was asked to analyze: whether Tricolor's *internal* monthly accounting

[4] TH is short for Tricolor Holdings.

records that were actually used in preparing its MSRs differed from the data presented in *external* reports that Tricolor gave to lenders. Indeed, trial evidence will show that Tricolor employees, at the direction of the defendant, manipulated its IDMS database at various points during the fraud, undermining any suggestion that a present-day query of IDMS would yield the true historical internal record.[5] As the goal is to compare internal reporting to external reporting, the internal reporting files—not a later-preserved database structure—are the correct reference point. At most, Chu's objections concern nomenclature and are resolved by Professor Palmer referring to these files as "Internal" files, rather than "IDMS" files. Beyond that, Chu's arguments for exclusion plainly fail.

Chu also challenges Professor Palmer's assumption that internal data was altered to produce the external reporting, rather than the other way around (whatever the latter might mean). (Chu Mot. 8-9). But that assumption is not only reasonable, it is the only one consistent with the record and with basic logic. The internal IDMS Reports consist of the *full* Tricolor data tape and contain loan data that was detrimental to Tricolor's finances (*e.g.*, showing certain loans as non-performing) and was not provided to Tricolor's lenders. By contrast, the external MSRs consist only of segments of the full internal data tape and contain data changes that benefited Tricolor's finances (*e.g.*, purportedly showing those loans as performing) and was provided to Tricolor's lenders. There is no coherent explanation for why Tricolor would start with lender-facing MSRs, create a combined internal file from them, and then alter the internal file in ways detrimental to the company's financial position. That is not how any servicer operates, and certainly not how a

[5] If anything, this manipulation of the IDMS system suggests that the true extent of Chu's fraud at Tricolor is even larger than what Professor Palmer's comparisons show.

borrower intent on preserving liquidity would behave. In any event, Chu's arguments certainly do not provide a basis for exclusion as opposed to cross examination.

Simply put, while Chu may engage in "vigorous cross-examination" and the "presentation of contrary evidence" on these topics, *Daubert*, 509 U.S. at 596, the questions of whether Professor Palmer is using the right files or has drawn the right inferences "go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21. Chu's arguments provide no basis for excluding highly probative and proper expert testimony analyzing the scope of loan data manipulation, as well as the recipients of manipulated loan data, over time.

### C. Professor Palmer Deployed a Reliable Methodology

Chu next asserts that Professor Palmer's findings are not the product of a reliable methodology because the computer code implementing his analysis was not provided in the initial expert disclosure. (Chu Mot. 9-13). While that objection is not a basis to exclude Professor Palmer's testimony under Rule 702, the complaint has been neutralized by the Government's production of the code used in Professor Palmer's computational analysis.

Professor Palmer's work involves computational matching of loan-level data across internal Tricolor files and files provided to external parties—precisely the type of large-scale data reconciliation that requires computer code to execute mechanically the matching described in Professor Palmer's disclosure. The code is not a methodology unto itself; it is the automated implementation of the methodology that Professor Palmer explained in detail in his disclosure, including the variables used for matching, the handling of missing entries, and the criteria for identifying double-pledged or manipulated loans. While not required by Rule 16, the Government has now provided, three months before trial, the code used in Professor Palmer's computational

analysis, which contains the granular information Chu seeks.[6] The defense thus has every detail that it claims it was missing.

Chu does not meaningfully contend that the analyses described in Professor Palmer's disclosure are somehow improper expert analyses. After all, his own proposed expert, Mr. Dubinsky, has apparently performed a similar historical analysis of double pledged loans, although it is described only in part or summarily, and the defense has withheld Mr. Dubinsky's code in its entirety. (*See* Ex. A ("Dubinsky Disclosure") ¶ 19). The defendant cannot credibly fault Professor Palmer for supposedly inadequate disclosures when his own expert's computational methods have never been disclosed at all. And because the Government has already provided the code at issue, the argument is not only incorrect, it is moot.

### D. Professor Palmer Will Not Invade the Role of the Jury

Finally, Chu argues that use of phrases such as "fraudulent," "manipulation," and "fabricated" invades the role of the jury and improperly goes to intent. (Chu Mot. 14-19). These are issues of word choice that are easily sanitized if needed and in no way call for the exclusion of Professor Palmer's testimony. To start, while Professor Palmer's disclosure used phrases like "fraudulent pledging" as shorthand to refer to the combined output of the double-pledging and collateral manipulation analyses, he will not use the term "fraudulent" at trial or opine as to anyone's intent or mental state. In addition, the Government agrees not to elicit testimony from Professor Palmer describing VINs that do not have the correct number of digits as "fabricated." The term "manipulation," however, should be permitted during Professor Palmer's testimony, particularly when discussing his "Narrow" collateral manipulation analysis, which identified loans

[6] The Government produced both the original and corrected versions of the code related to the corrected calculation in Professor Palmer's supplemental disclosure, so Chu has that detail as well. (*See* Chu Mot. 13-14).

as manipulated only in specific circumstances that are "that are unnatural in the course of managing auto loan ABS program," such as an internally written-off loan appearing as performing to lenders. (Palmer Disclosure ¶ 25).

Manipulation is the most succinct and accurate way to describe such data changes, given their type and scope, and using the term is not unfairly prejudicial to *Chu*. There can be no serious dispute that the loan data was manipulated at Tricolor. (*See* Chu Mot. 1 (referring to "Kollar—the person responsible for *the fraud* in the first place" (emphasis added))). Indeed, Chu seeks to call his own expert to testify about the "manipulation" and "falsification" of loan data given to Tricolor's lenders and others. (*E.g.*, Dubinsky Disclosure ¶¶ 20-25). And multiple cooperating witnesses who have pled guilty will tell the jury that Tricolor's loan data was manipulated. Rather, the issue at trial will be whether Chu had the requisite knowledge and intent to be criminally responsible for that manipulation and related criminal conduct. Unlike the improper proposed testimony of Chu's experts, *see infra* Section II(A), Professor Palmer's testimony will not touch on *who* was "involved" in the manipulation. (*E.g.*, Dubinsky Disclosure ¶ 23). That—plus the fact that there is no allegation of manipulating the securities markets or prices—distinguishes the circumstances here from those in the stock market manipulation case that Chu relies on. *See United States v. Scop*, 846 F.2d 135, 138 (2d Cir. 1988), *on reh'g*, 856 F.2d 5 (reversing convictions where expert repeatedly testified that the defendants were "active . . . and material participants" in a "manipulative and fraudulent scheme"). Nor is there anything intrinsically prejudicial to Chu about the term "manipulation." The jury will hear Chu use the word himself in recorded conversations as early as August 17, 2025, asking Kollar "are we clean on the [loans that are] 120 days [past due] or it's manipulated?" and remarking about another auto dealer that "I think there's a lot more manipulation there than we're talking about here." The term "manipulation" will be part of the trial either way, and Chu will not be prejudiced by Professor Palmer using the term to describe

loan data that has obvious indicia of manipulation. On the other hand, forbidding Professor Palmer from using the word "manipulation" when discussing such loan data risks simply confusing the jury.

Separately, Chu also contends that Professor Palmer's analysis is not itself a measure of actual monetary losses by the victims, risking confusion by the jury. (Chu Mot. 16-18). But Professor Palmer's analysis was not presented as such in his disclosure, nor will Professor Palmer's testimony be so presented by the Government at trial, and Chu can easily re-emphasize the distinction on cross examination should he choose to do so. Chu's claims of potential juror confusion are simply unfounded.

## II. The Court Should Exclude Mr. Dubinsky's Testimony

The Court should exclude the testimony of the defendant's proposed expert, Greg Dubinsky. The defendant seeks to call Mr. Dubinsky to testify regarding an array of general topics or "explanations" that should be excluded because they are either improper, inadequately disclosed, or both.

### A. The Dubinsky Expert Disclosure

The defense provided the Government with notice that it intends to call as an expert witness, Greg Dubinsky, a forensic accountant and frequent expert witness. According to the defense's notice, Mr. Dubinsky will testify regarding a wide array of topics described summarily as Mr. Dubinsky "explaining the evidence" regarding the topic. (Dubinsky Disclosure). The topics include:

- **Mechanics of Tricolor's Business and Financial Concepts.** Mr. Dubinsky will testify about the mechanics of Tricolor's business (Dubinsky Disclosure ¶¶ 7-12) and "financial concepts," including "why a company can be profitable on paper while nonetheless facing a liquidity or solvency crisis" and "certain macroeconomic conditions during the relevant period." (*Id.* ¶¶ 13-15). Elsewhere, Mr. Dubinsky asserts he will explain fair value accounting, "how it applies to the finance receivables and the

difference between what was reported on the balance sheet and the borrowing bases reported to lenders." (*Id.* ¶ 27).

- **Double Pledging Examples and Historical Quantification**. Mr. Dubinsky will testify regarding double pledging and loan data manipulation at Tricolor. (*Id.* ¶¶ 16-27). In particular, Mr. Dubinsky will testify about examples of Tricolor's double pledging across warehouses and securitizations (*Id.* ¶¶ 17-18); he also states, although he has not disclosed this analysis or its results, that he "will quantify" the double pledging and "explain how" it "changed over time, from the scheme's origins involving a single warehouse facility to its eventual extension across multiple warehouse facilities and Tricolor's securitizations" (*Id.* ¶ 19).[7]

- **Manipulation Examples**. Mr. Dubinsky will provide similar testimony regarding data manipulation, stating he has performed a "forensic reconstruction . . . of Tricolor's IDMS records," which is not disclosed, and compared it with reports sent to lenders. (*Id.* ¶ 20). Mr. Dubinsky will not quantify the manipulation over time, however; instead, he will show examples of specific manipulated loans. (*Id.* ¶ 21-22, 25).

- **Company 23.** Mr. Dubinsky will also testify regarding the creation of a fictitious portfolio company referred to as "Company 23." (*Id.* ¶ 23). Similar to other portions of his testimony, Mr. Dubinsky summarily states he will "explain, based on the evidence, which personnel were involved in creating Company 23." (*Id.*). Mr. Dubinsky also seeks to "describe generally for the jury . . . the magnitude of the impact that including the Company 23 loans on the Origin Borrowing Base had over time," without providing that analysis or its results. (*Id.*).

- **Auditors and Other Third Parties.** Mr. Dubinsky will "explain the evidence concerning Tricolor's dealings with" auditors and trustees or collateral managers, among (unnamed) others. (*Id.* ¶ 26). As an "example," Mr. Dubinsky will testify regarding manipulated data provided to Tricolor's for the 2023 and 2024 audits, and summarily states he will "explain, based on the evidence, . . . who manipulated the data that was provided to the auditors, and who provided the manipulated data to the auditors." (*Id.* ¶ 27). Mr. Dubinsky will also "explain the creation of a general ledger account titled 'Reserve for Unperforming Assets' . . . and how it impacted the finance receivables that were reported on the balance," without providing the explanation, his opinion regarding what the impact was, or his methodology. (*Id.* ¶ 27). Mr. Dubinsky also summarily asserts he will explain fair value accounting, "how it applies to the finance receivables and the difference between what was reported on the balance sheet and the borrowing bases reported to lenders." (*Id.* ¶ 27).

- **Who Committed the Fraud and the Complexity of the Indictment.** Mr. Dubinsky will testify regarding "the operational workflow" of the fraud and will "identify what that evidence shows regarding the roles played by particular individuals in creating and

[7] This quantification does not include double pledging on the inventory line of credit, for which Mr. Dubinsky only seeks to show specific examples. (Dubinsky Disclosure ¶¶ 19 n.11, 24).

transmitting" manipulated data. (*Id.* ¶ 28-31). Mr. Dubinsky seeks to explain to the jury "what the evidence shows, and does not show, regarding the comparative roles of the individuals involved," without naming the individuals, the roles, the evidence, or his methodology. (*Id.* ¶ 29). While stating that this "explanation" will be based on "analysis of metadata," Mr. Dubinsky does not provide this analysis or its conclusions. (*Id.* ¶ 29). Mr. Dubinsky likewise seeks to "explain what the evidence shows regarding who was responsible for communicating with," and transmitting data to, auditors and unnamed others, again without further detail. (*Id.* ¶ 30). Mr. Dubinsky will also testify "that an individual's title or general oversight responsibilities, standing alone, does not establish who performed a particular data operation." (*Id.* ¶ 31). Mr. Dubinsky will also purport to "explain to the jury the complexity of the scheme alleged in the Superseding Indictment." (*Id.* ¶ 31).

- **What Chu Was Told About the Davis Polk Investigation.** Mr. Dubinsky seeks to testify regarding the whistleblower allegation in 2021 and the resulting investigation by the law firm, Davis Polk, and others. (*Id.* ¶ 32). In particular, Mr. Dubinsky will "identify the documented findings communicated to" the defendant. (*Id.*).

- **Response to Professor Palmer's Testimony.** Lastly, Mr. Dubinsky will testify in response to Professor Palmer's purported testimony (*id.* ¶¶ 33-42), including by testifying that identifying a loan data "discrepancy is analytically distinct from determining who caused it" (*id.* ¶ 42), although, as noted above, the Government does not intend to have Professor Palmer testify as to causation.

### B. Mr. Dubinsky's Proposed Testimony Is Inadmissible Because it Narrates Explanations of "The Evidence," Supplants the Jury, and Is Not Expert Analysis

The Court should exclude Mr. Dubinsky's testimony. His disclosure reads not as expert analysis but as a plan to deliver the defense's closing argument through a credentialed witness. The defense has identified a selection of topics for which Mr. Dubinsky will supposedly "explain the evidence," identify "who was involved" in creating manipulated data, describe the "operational workflow" of the fraud, and state "what the evidence shows, and does not show, regarding the comparative roles of the individuals involved." (Dubinsky Disclosure ¶¶ 23, 26-32). He further seeks to recite the findings of the Davis Polk investigation and identify what "was communicated to" the defendant. (*Id.* ¶ 32.) Yet Mr. Dubinsky has no personal knowledge of the facts of this case, and appears to be simply testifying to hearsay narratives that he has developed—but not adequately disclosed—based on reviewing unspecified documents, without using any methodology.

All of this is impermissible. Experts may not narrate evidence, summarize documents, or instruct the jury on how to interpret facts; the facts must come from lay witnesses, and their interpretation is a function that belongs to counsel and the jury. *See In re Elysium Health-ChromaDex Litig.*, No. 17 Civ. 7394 (LJL), 2022 WL 421135, at *29 (S.D.N.Y. Feb. 11, 2022) (excluding expert testimony consisting of narrative recitations of documents); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (Rule 702's requirements ensure "that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties."). Testifying about "what the evidence shows" is exactly the type of *ipse dixit* commentary courts consistently reject. *Mejia*, 545 F.3d at 194 (if the proffered expert testimony pertains to "matters that the average juror is . . . capable of understanding on his own," it is inadmissible). And testimony about "who participated" in a fraud is classic jury territory.

To the extent Mr. Dubsinky's testimony is merely meant to show how different documents in the case fit together, his purported expert testimony "does no more than counsel for [Chu] will do in argument." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002). While Mr. Dubinsky may be a fraud examiner, that certification does not grant him *cart blanche* as an expert witness in a fraud case to "explain the evidence" to the jury. It is well established that "a court cannot permit experts to offer credentials rather than analysis. If experts are permitted to testify on an issue of fact, they must provide some explanation for their conclusion." *Id.* at *4. As noted below, Mr. Dubinsky repeatedly fails to do so. Time and again, he fails to provide any actual opinions or any methodology with respect to his forthcoming narrative "explanations." That is both a problem of disclosure and a tell that his proposed testimony is actually not proper expert testimony at all. This Court should exclude it from trial.

For example, some of Mr. Dubinsky's hearsay narratives almost explicitly intrude on the jury's role by seeking to "explain" who participated in the alleged frauds—while, presumably, excluding the defendant from the list.[8] Mr. Dubinsky seeks to tell the jury "what the evidence shows, and does not show, regarding the comparative roles of the individuals involved" in "creating and transmitting" manipulated data—without disclosing the individuals, the evidence relied on, or his methodology.[9] (Dubinsky Disclosure ¶ 28-31). Similarly, Mr. Dubinsky intends to "explain, based on the evidence, . . . who manipulated the data that was provided to the auditors, and who provided the manipulated data to the auditors"—again without disclosing the individual(s), the evidence relied on, or his methodology. (*Id.* ¶ 27). Likewise, Mr. Dubinsky seeks to "explain, based on the evidence, which personnel were involved in creating Company 23"—a fictitious loan portfolio company—without identifying the personnel "involv[ed]," the evidence relied on, or his reasoning. (*Id.*). The question of "what the evidence shows" about who was "involved" in the criminal conduct is one for the jury, not Mr. Dubinsky. And to the extent Mr. Dubinsky is just going to read metadata or the "from" line in email headers, he is not offering expert testimony that is helpful to the jury.

---

[8] Relatedly, the Court should preclude Mr. Dubinsky from testifying about whether the Superseding Indictment or the schemes alleged in it are "complex." (Dubinsky Disclosure ¶ 31). Such testimony is not the product of any reliable, verifiable expert methodology and also runs afoul of Rule 403.

[9] Mr. Dubinsky states he will offer "analysis of metadata associated with [] files," but does not identify the specific files, provide this analysis or offer his purported conclusions. (Dubinsky Disclosure ¶ 29). In any event, this is not a proper subject for expert testimony. *See United States v. Marsh*, 568 F. App'x 15, 16–17 (2d Cir. 2014) (proper exercise of district court's discretion to permit law enforcement agent to testify as a lay witness about his extraction and review of data from a cellphone); *United States v. Shea*, No. 20 Cr. 412-4 (AT), 2022 WL 1598189, at *2 (S.D.N.Y. May 20, 2022) (permitting a government witness on metadata, who had been noticed as an expert, to testify as a lay witness).

These same reasons and others call for exclusion of Mr. Dubinsky's proposed narrative recitation of the 2021 whistleblower allegation and resulting investigation by the law firm, Davis Polk, and others. (*See* Dubinsky Disclosure ¶ 32). Again, Mr. Dubinsky has no personal knowledge of any of the relevant facts and would simply provide a hearsay narrative from selected records to the jury—much like counsel's argument, but under the guise of a court-qualified expert. That is not expert testimony. It is a vehicle for the defendant to recite hearsay and counsel's arguments to the jury. Notably in that regard, Mr. Dubinsky seeks to "identify the documented findings" from the Davis Polk investigation that were "communicated to" the defendant (though he does not identify the findings in his disclosure). (Dubinsky Disclosure ¶ 32). That proposed testimony is inadmissible. To the extent Mr. Dubinsky is just reading a document, he is not offering expert testimony; to the extent he is doing something more and seeking to suggest what Mr. Chu's state of mind was, his testimony is improper. *See United States v. Rahman*, 189 F.3d 88, 138 (2d Cir. 1999) (a defendant may not make an "effort to tell the jury the defendant's intentions through the mouth[] of" an expert witness); *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993) ("Expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function."). Finally, this testimony regarding the Davis Polk investigation should also be excluded for the reasons set out in the Government's motions *in limine*. (Dkt. 184 at 29-34).

**C. The Court Should Exclude Mr. Dubinsky's Testimony that Is Not Adequately Disclosed**

Mr. Dubinsky's disclosure repeatedly fails to actually disclose "a complete statement of all opinions" along with "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). Many examples are already noted above, as Mr. Dubinsky's narrative "explanations"—on top of being

inadmissible—are not actually disclosed in his notice, but there are several more topics of testimony that fall far short of the disclosure required by Rule 16.

First, Mr. Dubinsky fails to disclose his double-pledging quantification analysis or its results. His disclosure states that at trial he "will quantify" the double pledging and "explain how" it "changed over time, from the scheme's origins involving a single warehouse facility to its eventual extension across multiple warehouse facilities and Tricolor's securitizations." (Dubinsky Disclosure ¶ 19). But of this seven-year quantification analysis, Mr. Dubinsky provides only a few sentences and a single high-level chart covering only two years. (*Id.* ¶ 19 & Figure 5). Nor did the defendant produce any code associated with Mr. Dubinsky's double pledging analysis, despite the defendant's moving to preclude the Government's expert witness, based on non-disclosure of his code. (Chu Mot. 11).

Second, Mr. Dubinsky notes he has performed a "forensic reconstruction . . . of Tricolor's IDMS records." (Dubinsky Disclosure ¶ 20). But that "forensic reconstruction" is neither described nor otherwise disclosed beyond this summary assertion.

Third, as part of his improper narrative explanations, Mr. Dubinsky notes quantitative analyses that are neither described nor disclosed. In addition to telling the jury who was "involved" in the Company 23 narrative, Mr. Dubinsky seeks to "describe generally for the jury . . . the magnitude of the impact that including the Company 23 loans on the Origin Borrowing Base had over time," without ever disclosing his analysis or its results (or even what he means by "magnitude of the impact"). In connection with his secondhand narrative about Tricolor's audits, Mr. Dubinsky seeks to "explain the creation of a general ledger account titled 'Reserve for Unperforming Assets' . . . and how it impacted the finance receivables that were reported on the balance," without disclosing the explanation, his opinion regarding what the impact was, or his methodology.

Fourth, Mr. Dubinsky will explain "why a company can be profitable on paper while nonetheless facing a liquidity or solvency crisis" but he does not include the explanation in his notice, or its reasons and bases.

Fifth, Mr. Dubinsky asserts he will explain fair value accounting, "how it applies to the finance receivables and the difference between what was reported on the balance sheet and the borrowing bases reported to lenders"—without disclosing his opinions as to "how it applies" or what "the difference" is, let alone his bases and reasoning for those opinions. (¶ 27).

This lack of detail, which pervades Mr. Dubinsky's disclosure, is not trivial. As noted above, even based on the scant disclosure provided, Mr. Dubinsky proposed testimony appears rife with improper testimony, and the lack of adequate disclosure may obscure what may be other plain improprieties and deprive the Government and the Court of exercising the gatekeeping function required under the law. The Court should thus exclude testimony on topics that were not adequately disclosed. Alternatively, and at minimum, the Court should order prompt and robust supplemental notice in order to exercise its gatekeeping function.

## III. The Court Should Exclude Mr. Eisbruck's Testimony

The Court should also exclude the testimony of the defendant's proposed expert, Jay Eisbruck. The defense seeks to use Mr. Eisbruck to suggest to the jury that Tricolor's business practices were "typical" of the standards and customs in the industry. These are but thinly disguised efforts to offer opinions as to Chu's intent. Other parts of Mr. Eisbruck's proposed testimony are designed to distract, blaming Tricolor's collapse on the financial conditions following the COVID-19 pandemic. Still other parts are little more than Mr. Eisbruck reading from documents in evidence. None of this is permissible, and the Court should exclude Mr. Eisbruck's testimony.

### A. The Eisbruck Expert Disclosure

The defendant provided the Government with notice that it intends to call Jay Eisbruck, a managing director at an expert witness consulting firm, to testify about the following topics:

- the standards and customs of the "buy here, pay here" auto industry (Ex. B ("Eisbruck Disclosure") ¶¶ 11-18);
- that Tricolor's "overall operations," including its revenue generation, financial sources, and movements of collateral, were consistent with standards and customs in the industry (*id.* ¶¶ 19-45);
- that Tricolor, by allowing receivables to be moved across facilities, was able to utilize available sources of financing in the most capital efficient manner (*id.* ¶¶ 51-54);
- a comparison of the economic conditions in the industry and those at Tricolor between 2020 and September 2025 (*id.* ¶¶ 55-68); and
- selected emails sent by Jerry Kollar, Tricolor's former CFO and a cooperating witness, as well as other Tricolor employees, to the defendant regarding cash flow (*id.* ¶¶ 69-76).

### B. Mr. Eisbruck's Proposed Testimony Is Inadmissible Because It Is Unreliable, Lacks Any Methodology, and Impermissibly Opines On Chu's Mental State

Like Mr. Dubinsky, the Court should exclude Mr. Eisbruck's testimony. His testimony is uniformly unreliable. He is not an expert on the "buy here, pay here" auto industry, let alone on Tricolor or Chu. He did not work at Tricolor and has no first-hand knowledge of how the business operated. Mr. Eisbruck may be familiar with how to read a balance sheet, but he has no basis to opine, for example, that Tricolor's "revenue categories" or "financing sources" were consistent with industry standards. And the testimony is irrelevant in any event. *See Newkirk*, 684 F. App'x at 97 (affirming district court's exclusion of expert testimony concerning industry practice as irrelevant to "attorney obligations not to convey information they actually know, or consciously avoid knowing, is false"); *United States v. Sanders*, No. 12 Cr. 0574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27, 2013) (precluding proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly

supplied by the defendant was not material to the insurance carriers" and unhelpful to the jury "given the abundant evidence thus far offered by percipient witnesses"); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 528-29 (S.D.N.Y. 2001) (whether aspects of Tricolor were "typical" of the broader industry has little, if any, probative value to the issues on trial and constitutes impermissible testimony about "the customs and standards of an industry, and . . . how a party's conduct measured up against such standards"); *Mendlowitz*, 2019 WL 6977120, at *5 (precluding expert testimony on the "general industry practices in the payment processing industry" as not relevant to whether the defendant violated the wire fraud statute). For this reason alone, his proposed testimony should be excluded.[10]

Separately, Mr. Eisbruck's proposed testimony impermissibly delves into Chu's motive, intent, and state of mind. Testimony that Tricolor operated just like the rest of the industry is a thinly veiled attempt to offer an opinion on Chu's intent. The same is true for Mr. Eisbruck's testimony that Tricolor, by allowing receivables to be moved across facilities, was able to utilize available sources of financing in the most capital efficient manner (Eisbruck Disclosure ¶¶ 51-54). That amounts to testimony that Chu was looking for capital efficient financing, not engaging in fraud, when he moved collateral among different facilities. But testimony about "whether the defendant did or did not have a mental state . . . constitutes an element of the crime charged" and is thus barred by not only Rule 702, but also Rule 704(b). *See, e.g.*, *Rezulin Prods.*, 309 F. Supp. 2d at 546 (expert cannot testify about "intent or motives underlying . . . certain business transactions"). A defendant may not "tell the jury [his] intentions through the mouth[] of" an expert

[10] The result is the same when Mr. Eisbruck proposes to testify, not that Tricolor was just like its competitors, but that Tricolor was better in ways that are irrelevant to the issues on trial. (Eisbruck Disclosure ¶ 22 (noting "Tricolor's "Community Development Financial Institution ('CDFI') Certification; Artificial Intelligence ('AI') underwriting; Higher quality vehicle inventory; Lower consumer Interest Rates; Credit Bureau reporting; Capital markets attention and participation").

witness. *Rahman*, 189 F.3d at 138. Accordingly, the foregoing proposed testimony should be excluded.

Nor should Mr. Eisbruck be permitted to testify regarding hypothetical collateral swaps among theoretical warehouse lines of credit (Eisbruck Disclosure ¶¶ 48-54). This testimony does not "fit" the facts of this case and would confuse, rather than help, the jury. *City of Provid.*, 2022 WL 902402, at *8. For example, Mr. Eisbruck seeks to opine, regarding a theoretical BHPH business with theoretical SPV warehouses, that

> if a car note held by a BHPH Dealership becomes 31 days delinquent and therefore ineligible to continue to serve as Collateral in SPV A, (because SPV A limits Collateral to 30 days delinquent), the BHPH could still use the car note in SPV B if that SPV allowed Collateral up to 60 days delinquent.

(Eisrbuck Disclosure ¶ 49). But this was not possible with Tricolor's SPVs. Accordingly, this testimony lacks fit, and is excludable under Rule 403. As Mr. Eisbruck's own chart makes clear, collateral that was 31 days past due could not be pledged as *new* collateral on *any* of its warehouses. (*Id.* ¶ 50 & Table 3). Specifically, Mr. Eisbruck's chart shows that loans 30 days past due were not eligible for Origin at all and that loans 30 days past due could not be pledged as new collateral to SPV 4 or SPV 6. (*Id.*). Thus, a Tricolor loan that was 31 days past due could *not* be moved from one warehouse to another in order to increase borrowing capacity, rendering Mr. Eisbruck's hypothetical inapposite—*i.e.*, lacking "fit" to the case—and rife with potential to mislead and confuse the jury or, at minimum, to waste time.

Mr. Eisbruck provides additional hypothetical scenarios of moving collateral among SPVs that do not fit the facts of this case, including: (1) "swap[ping] equivalently valued notes between SPVs," (2) relocating collateral from one SPV to another to avoid concentration limits, and (3) moving collateral from one SPV to an SPV with a higher advance rate or lower interest rate. (*Id.* ¶ 49). None of these hypotheticals fit this case, however, as Mr. Eisbruck's real-life examples at

Tricolor make clear. (*See* Eisbruck Disclosure ¶¶ 51-53). The only real-life example of moving collateral among *warehouses* that Mr. Eisbruck provides is one in which new collateral was *not* pledged to one warehouse and then moved to another warehouse; rather, according to the disclosure, the new collateral was "*going to be* included" on one warehouse, but due to concentration limits was instead pledged to another warehouse. (*Id.* ¶ 53 (emphasis added)). The only other example that Mr. Eisbruck provides also does not involve moving collateral pledged from one warehouse to another *warehouse*; rather, it describes what appears to be the typical securitization process in which loans from the warehouse facilities are securitized—*i.e.*, moved from a warehouse to a *securitization*. (*Id.* ¶¶ 51-52). That is how the securitizations work[11] and has nothing to do with moving collateral from one warehouse to *another warehouse*. In short, Mr. Eisbruck's testimony about hypothetical movements of collateral among imagined warehouses, which have no bearing on the actual facts or issues in this case, should be excluded.

Mr. Eisbruck's proposed testimony about the COVID-19 pandemic fares no better. Mr. Eisbruck seeks to testify about the "negative headwinds impacting the BHPH industry after Covid," and specifically how "the pandemic savings that could have represented a cushion to resist economic shocks" were already "depleted" during the period "that led to [the] Tricolor bankruptcy." (*Id.* ¶¶ 55-63). Here, Chu's intention is obvious: he seeks to distract the jury from his own conduct and suggest that had the broader economic climate been different, Tricolor would not have collapsed. This opinion lacks any reliable methodology and is entirely unhelpful to the jury. Mr. Eisbruck's disclosure does not describe any analysis he undertook to explain his opinions. Indeed, it is not clear that Mr. Eisburck's opinions derive from any analysis that could be replicated

[11] The improved advance rate on Mr. Eisbruck's exemplar securitization is also unremarkable and standard: Tricolor's securitizations delivered a higher advance rate than its warehouses.

or tested, or has been applied in accordance with any particular professional standard. *Cf. United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (describing indicia of reliability). To the contrary, it appears that Mr. Eisbruck has simply described the economic conditions at a particular point in time, and attempted to map those conditions onto the Tricolor business.

In addition to being unreliable, this proposed testimony envisioned by Mr. Eisbruck is also irrelevant. The extent to which the broader economic climate contributed to Tricolor's collapse is irrelevant to whether Chu engaged in the fraud scheme as alleged in the Indictment. Put differently, the economy could have been strong, and the "cushion to resist economic shocks" great, and the evidence at trial would still show that Chu engaged in the charged fraud scheme when he double-pledged collateral and falsified loan data. Thus, the Court should not permit Mr. Eisbruck to testify to the broader "macroeconomic conditions" that are irrelevant to the issues on trial.

Finally, the Court should exclude Mr. Eisbruck's testimony about Jerry Kollar's and other employee's "data reporting" to the defendant. (¶¶ 69-76). For the same reasons that Mr. Dubinsky should not be allowed to offer secondhand narratives explaining "the evidence," *see supra* Section I(A), Mr. Eisbruck should be precluded from simply summarizing documents that show cash flow reports sent to Chu. Indeed, Mr. Eisbruck has no discernible methodology for this portion of his testimony. While that is a failure to abide by Rule 16's disclosure requirements, it also underscores that Mr. Eisbruck is not offering actual expert testimony. Finally, this testimony presents acute dangers of Mr. Eisbruck, in effect, recounting the defendant's knowledge and state of mind over the course of the fraud. The Court should exclude the testimony.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendant's motion to exclude the expert testimony of Professor Palmer, and grant the Government's motion to exclude the

defense's proposed expert testimony of Messrs. Dubinsky and Eisbruck.

Dated: New York, New York
October 29, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney
Southern District of New York

By: ___________________________
Micah F. Fergenson
Shiva H. Logarajah
Justin V. Rodriguez
Assistant United States Attorneys
Southern District of New York