# EXHIBIT A

BOIES SCHILLER FLEXNER

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

October 29, 2026

**VIA ECF**

Honorable P. Kevin Castel
United States District Judge
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 11D
New York, New York 10007

**Re:** ***United States v. Chu*, Case No. 25 Cr. 579 (PKC)**

Dear Judge Castel:

We represent Daniel Chu and write in further support of Mr. Chu's pending motion to suppress, and in reply to the government's October 21 post-evidentiary hearing submission, ECF No. 186 ("Gov't Ltr."). The government has not met its burden to show that the search met constitutional muster. To the contrary, the evidence established that the search was not conducted in good faith and amounted to a general search in violation of the Fourth Amendment. As a result, the evidence must be suppressed in its entirety.

## I. The Government Has Not Met Its Burden

The government has not met its "burden of showing that [the government] didn't" act in "bad faith" or "engage[] in general rummaging or a general search akin to rummaging." Tr. 4:8–11; *see also* Tr. 6:25–7:12.[1] As set forth in Mr. Chu's October 15 letter, the responsiveness review employed patently unreasonable techniques given the particular types, volumes, and sources of materials being reviewed, and yielded objectively unreasonable results. In attempting to show the opposite, the government repeatedly mischaracterizes the record.

Take, for example, the government's assertion that "Agent Kroll . . . reviewed every single document he marked responsive." Gov't Ltr. at 1. That was decidedly not Agent Kroll's testimony. He was very careful to clarify that the only thing he "personally reviewed" was Cellebrite data (*i.e.*, chats), as well as "chats and documents" on Relativity. Tr. 17:18–25. For those chats, the claim that Agent Kroll reviewed "every single document he marked responsive" is overbroad. If credited, Agent Kroll's testimony simply means that for chat threads, he personally laid eyes on one or more individual messages that hit on search terms to confirm that those messages were responsive and, if so, he tagged the entire thread responsive. Agent Kroll certainly did not testify

[1] Capitalized terms have the same meaning as in Mr. Chu's letter of October 15, 2026, ECF No. 185.

that he "personally reviewed" the entirety of the chat threads that he marked responsive; he didn't even know how big many of those threads were. Tr. 121:2–4, 124:11–17 (Kroll).

The government's claims regarding the propriety of tagging entire text chains are also not supported by the evidence. It asserts that tagging entire chat threads was necessary to preserve "context, timeline, relationship" within threads that "go from one subject to another" between Mr. Chu and people with whom his "personal and professional relationships overlap." Gov't Ltr. at 3. This approach makes sense only by crediting the ridiculous hypothesis (under which the agents apparently operated, Tr. 485:12–488:10 (Rosenman)) that any individual to whom Mr. Chu speaks, including his wife and children, may be potential co-conspirators in the alleged crimes. As Mr. Chu pointed out in his initial post-hearing letter, the government admitted, for example, that seizing the entire massive chat between Mr. Chu and his wife was not necessary to illustrate the relationship between them, which was well known to the government before the time of its search. More to the point, this is not a valid basis on which to seize nonresponsive materials. The course of interactions between two people will always shed light on their "context, timeline, relationship," but the warrants did not authorize the seizure of that type of information. To be sure, the government may validly seize parts of a chat that are truly necessary to understand what makes the responsive part responsive. But that's a far cry from seizing tens of thousands of irrelevant and personal messages exchanged between two people over the course of many years.

The government also attempts to dismiss its own witnesses' damning admissions, claiming that basic questions regarding the agents' compliance with the warrants were "designed to 'mislead[] the witness.'" Gov't Ltr. at 2. For example, the government tries very hard to wiggle out from Agent Kroll's repeated testimony that the warrants themselves do not prescribe what may and may not be taken, but provide only "general parameters." *See* ECF No. 185 at 5 (quoting Tr. at 75–77); *see also* Gov't Ltr. at 2 (citing Tr. 74:16); Tr. 498:1 (prefacing a question for Agent Rosenman on re-direct with "You were asked misleading questions on cross."). There was nothing misleading about the questioning, and Agent Kroll double- and tripled-down on his assertion that the warrant provided only "parameters." In fact, in portions of the quoted testimony, Agent Kroll was actually responding to the Court's reiteration of defense counsel's question after overruling the government's objection to it. Specifically, the Court asked Agent Kroll, "You don't think you were forbidden from keeping and using material that did not fall in the categories authorized by the magistrate[?]" Tr. 74:22–25. Agent Kroll responded to the Court that "the warrant itself does not dictate such parameters by the letter." Tr. 75:1–4.

Likewise, the government's attempt to make innocuous Agent Kash's remarkable statement about seizing a filing cabinet drawer (Gov't Ltr. at 3) requires rejecting the plain meaning of his words and relying upon reasoning from an inapposite case. In *United States v. Shi Yan Liu*, the agent spent 30 minutes reviewing individual asylum applications within a cabinet, saw that each one listed the same address, reasonably deduced that all the applications within the cabinet likely utilized the same fraudulent address, and therefore seized the entire cabinet. 239 F.3d 138, 141 (2d Cir. 2000). Agent Kash, on the other hand, would have seized the entire cabinet without such a review or any reasonable basis for believing the entire cabinet was within the scope of the warrant simply because he observed a single page within a single file in the drawer that he deemed responsive—solely for the purpose of "understand[ing] the context of where the document

BSF

fits into it." Tr. 238:1–238:7 (Kash). Agent Kash made clear that he would seize material outside the warrant without probable cause. *Shi Yan Liu* is therefore inapplicable.

The government's indifference to the sensitivity of the communications seized was further demonstrated by its treatment of privileged spousal communications. *See* Gov't Ltr. at 2–3. While the government pays no mind to these concerns because it asserts it was not legally obligated to segregate spousal communications, the evidence shows that even when agents presented concerns about how to handle those materials—perhaps because they were aware those communications could not be used as evidence at trial—the prosecutors in the case did not advise any particular treatment and, ultimately, even the agent who raised the concern admitted that he did absolutely nothing differently with respect to those communications' review. Tr. 22:1–10, 124:7–10 (Kroll). Just as the government suggests now in terms of remedy—do nothing now, wait until later when it marks exhibits from illegally seized materials—the adopted approach was to barrel ahead and plan to deal with the evidentiary issues months after the Fourth Amendment incursion.

The treatment of 1B4—the phone belonging to Mr. Chu's adult son—proves a similar point. The Kroll Declaration previously outlined how two of six devices the government reviewed for responsiveness, including 1B4, contained no responsive material. Kroll Decl. ¶ 29.a. That "[t]he agents reviewed the device, found no responsive material, and seized nothing," Gov't Ltr. at 3, was not in dispute. Nevertheless, the government elicited additional testimony regarding the contents of 1B4 at the hearing, emphasizing the "embarrassing" and "romantic" nature of content while simultaneously concealing that there was no affirmative evidence on the phone to associate it with Mr. Chu, whereas the agents knew it was associated with his son. Tr. 182:1–20 (Kash). This testimony was not only irrelevant, but incredibly misleading—as Agent Kash testified, he had told the team the device may have belonged to Mr. Chu's son. Tr. 264:5–22, 267:7–12 (Kash). Again, the government took no steps to confirm that information and when it came time for the hearing, plowed ahead with gross and incorrect insinuations about the device intended to simultaneously tarnish Mr. Chu and burnish themselves. There is simply no way to contextualize this portion of Agent Kash's review, or his testimony about it, as within the realm of good faith.

## II. The Government's Seizure Rate Is Irrelevant and, In Any Event, Closer to 56% Than .08%

Without evidence sufficient to meet its burden of rebutting the showing of an unconstitutional search, the government rests on its purported ".08%" seizure rate to show the search was reasonable. Gov't Ltr. at 6. That argument is again entirely misleading. The government acknowledges that the "two prongs" of the Court's analysis, Tr. 505:2–3, are whether "(1) agents 'effect a widespread seizure of items that were not within the scope of the warrant and (2) do not act in good faith.'" ECF No. 124 at 10 (quoting *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000)). The government's proffer of a seizure rate, though, is not a valid measure of either prong.

The Kroll Declaration calculated the seizure rate using a denominator of everything contained in the full images of the devices and iCloud accounts that Mr. Chu received in discovery, "according to [Mr.] Chu." Kroll Decl. ¶ 18. The evidence at the hearing and the government's submission double-down on that same flawed framework. Tr. 146:10–23 (Kroll); Tr. 430:20–24

(Rosenman); Gov't Ltr. at 6. However, it is patently improper for the government to base its calculation on the total amount of data Mr. Chu received, which includes large quantities of systems data and other files that were outside the scope of the government's review. Those types of data cannot be tagged and produced as responsive. In fact, no one could say how much of the data fell into this category.

Even as to the readable data, the government elected only to review certain materials. The government reviewed four of the ten devices without exporting any of their data to a review platform. Kroll Decl. ¶¶ 19–21. Three of the remaining devices included 1B4 (discussed above), 1B7, and 1B10. 1B7 contained just 27 chat messages, Tr. 269:8–22 (Kash); the emails took 30 minutes to review and resulted in zero responsive documents, Tr. 183:22–184:4 (Kash). From 1B10 and the dchu@tricolor.com iCloud account, the government produced only extraction reports. Schwartz Decl. ¶ 14.

The remaining three devices (1B1, 1B5, 1B21) and one iCloud account (dchu@tricolorauto.com) included the majority of the materials reviewed by the agents. But even from those devices, the government did not seek to review everything. The government extracted emails, chats, and "media . . . such as images, videos, and audio files" from 1B21. Kroll Decl. ¶ 29.c. The government extracted only emails, chats, and documents from 1B1, 1B5, and the iCloud account. "[T]he other contents of these devices and accounts were excluded from review." Kroll Decl. ¶ 29.d. The government never attempted to calculate the total size of this data.

The evidence does show, however, that of the 119,605 emails from 1B1, 1B5, and 1B21 reviewed by the government, 3501-034 at 6, it ultimately tagged 67,105 of them—or 56.1%—as responsive. 3501-034A (1B21); 3501-070 (1B1, 1B5). The evidence contains no similar indication for how many of the chat files released to the reviewing agents were marked responsive (perhaps another indication of the government's disorganization or perhaps because the agents marked entire threads instead of the underlying message files).

Finally, as the government conceded, it did not even endeavor to review all of 1B1, 1B5, and both iCloud accounts because it concluded that they likely contained many of the same files as 1B21, the cellphone believed to have been primarily used. Kroll Decl. ¶ 29.d. For all of these reasons, the Court cannot rely on the government's purported seizure rate.

## III. The Government Continues to Backtrack from the Suppression Remedy Required

The government inexplicably continues to backtrack on its prior acknowledgment that suppression of all nonresponsive material is the minimum remedy required should the Court find that the search was improper. In opposition to Mr. Chu's motion, the government acknowledged that "Suppression of Specific Nonresponsive Materials . . . is Appropriate." ECF No. 124 at 20. And again at oral argument, the government eventually conceded that suppression of the evidence non-responsive to the warrants—including all non-responsive emails and texts—is the appropriate remedy. *See* Sept. 24, 2026 Hr'g Tr. at 18:20–19:21. Yet in response to Mr. Chu's letter, the government argues that suppression is not necessary. Gov't Ltr. at 6.

BSF

The government's cited authority, Gov't Ltr. at 6 n.3, proves the opposite. In *Nejad*, Judge Nathan ultimately found, on a challenge to the execution of an ESI warrant, "that the responsiveness review was reasonable but agree[d] with Sadr that the D.A.'s handling of the entire set of data after April 2017 was not only problematic but unconstitutional. It concludes that the remedy for this Fourth Amendment violation is, at a minimum, suppression of the 429 pages of the 417 documents that were seized *after* the conclusion of the responsiveness review." 436 F. Supp. 3d 707, 733 (S.D.N.Y. 2020) (emphasis in original). In other words, the court ordered the suppression of materials that were improperly seized.

Here, too, suppression of nonresponsive material is the minimum remedy the Court should grant. And there is no dispute that the government seized thousands upon thousands of irrelevant and nonresponsive documents.

Despite purporting to be a submission on the facts, the government's letter also spends substantial time dealing with irrelevant cases. In *United States v. Hampton*, the agents did not read the warrant before executing the search but indisputably seized only material described in the warrant. 2026 WL 1689485, at *2–3 (2d Cir. June 11, 2026). In *United States v. Garlick*, the materials at issue were less than 2,000 responsive documents that were not of the highly personal nature at issue here, and which the court concluded were "arguably encompassed" by the warrant terms. 2023 WL 2575664, at *11–13 (S.D.N.Y. Mar. 20, 2023). And in *United States v. Messalas*, the court expressly conditioned its holding on "the absence of additional evidence that the search was unreasonable," of which there is plenty here. 2020 WL 4003604, at *8 (E.D.N.Y. July 14, 2020).

* * *

In sum, the government's submission fails to demonstrate how it met its burden of proof, instead attempting to make a handful of points that are in fact belied by the record. Following the hearing before Your Honor, it is clear that the responsiveness review here had no process or supervision and was sure to capture (and to fail to weed out) large quantities of non-responsive materials. It is also clear, and in fact conceded, that the review *in fact* resulted in the large-scale designation of nonresponsive materials. Wholesale suppression is more than warranted and, at a minimum, the Court should order the immediate suppression of all non-responsive material. Anything less, including permitting the government to hold onto non-responsive materials in the leadup to trial and use them to continue to investigate and shape its trial presentation, would improperly continue to violate Mr. Chu's rights and prejudice him in this matter.

BSF

Thank you for your consideration.

Respectfully,

/s/ *Matthew L. Schwartz*

BOIES SCHILLER FLEXNER LLP

Matthew L. Schwartz
Craig A. Wenner
Jacqueline C. Kelly
55 Hudson Yards
New York, New York 10001
Telephone: (212) 303-3646
E-mail: mlschwartz@bsfllp.com
cwenner@bsfllp.com
jkelly@bsfllp.com

WEIL, GOTSHAL & MANGES LLP

Adam Fee
1999 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Telephone: (213) 667-5100
E-mail: Adam.Fee@weil.com

*Attorneys for Daniel Chu*